UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

RUSSELL RAMEAL HARRIS,

                          Plaintiff,

                                                    3:22-CV-0977
v.                                                  (BKS/ML)

BINGHAMTON POLICE DEPARTMENT and
BRYAN SOSTOWSKI, In Individual Capacity,

                          Defendants.

_____

APPEARANCES:                          OF COUNSEL:

RUSSELL RAMEAL HARRIS
*Pro se*
Bare Hill Correctional Facility
Caller Box 20
Malone, New York 12953


MIROSLAV LOVRIC, United States Magistrate Judge

## **REPORT and RECOMMENDATION**

        The Clerk has sent this *pro se* Amended Complaint (Dkt. No. 32) to the undersigned for

review.  For the reasons discussed below, I recommend that the Amended Complaint be

dismissed in its entirety without leave to amend.  (Dkt. No. 32.)

## I.        BACKGROUND

        As Plaintiff is proceeding *pro se*, the undersigned has liberally construed the Amended

Complaint, interpreting the strongest arguments possible based on the facts alleged therein.  *See*

*Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (citations omitted).

The Amended Complaint alleges that Plaintiff's civil rights were violated by defendants Binghamton Police Department ("Defendant BPD") and Bryan Sostowski (collectively "Defendants").  (*See generally* Dkt. No. 32.)

More specifically, Plaintiff alleges that on July 29, 2021, an "alleged victim" (Ryan Milazzo) contacted Defendant BPD regarding an incident involving Plaintiff.  (Dkt. No. 32 at 2.) Plaintiff alleges that Mr. Milazzo provided a supporting deposition regarding the incident around 12:45 a.m. on July 29, 2021.  (*Id.*; *id.* at 10-11.)  Plaintiff alleges that Defendant Sostowski created an investigative summary and report which directed other officers "not to file charges or issue a warrant" against Plaintiff.  (*Id.* at 2; *id.* at 15.)  Plaintiff alleges that around 2:15 a.m. on July 29, 2021, Defendant Sostowksi generated an email sent to members of Defendant BPD that attached a wanted poster containing a picture of Plaintiff and a caption stating that there was probable cause to arrest Plaintiff with a direction that "[i]f located please take into custody and contact the Detective Bureau."  (*Id.* at 2; *id.* at 13-14.)

Plaintiff alleges that on August 2, 2021, he was approached by an officer employed by Defendant BPD and was told that there was a warrant for his arrest.  (Dkt. No. 32 at 2.)  Plaintiff alleges that he "submitted to the arrest" and was transported to the jail where he was detained.  (*Id.*)

Plaintiff alleges that Investigator W. Balshuweit, generated a felony complaint that charged Plaintiff with Burglary in the First Degree in violation of N.Y. Pen. L. § 140.30(3), a class B felony.  (Dkt. No. 32 at 2; *id.* at 12.)  Plaintiff alleges that on August 3, 2021, Investigator Balshuweit filed the felony complaint and supporting deposition by Mr. Milazzo that was generated on July 29, 2021.  (*Id.*)  Plaintiff alleges that he was arraigned on August 3,

2021, then transported to the Broome County Correctional Facility where he remained detained. (*Id*.)

Plaintiff alleges that Mr. Milazzo failed to (1) present to law enforcement proof of purchase to establish that he was the legal owner of the item that Plaintiff allegedly took, (2) provide video or other witness proof that Plaintiff entered his residence, and (3) provide proof—other than his own affirmation—that Plaintiff used or threatened the use of a weapon.  (*Id*. at 3.) Plaintiff alleges that Mr. Milazzo denied medical help when offered.  (*Id*.)  Plaintiff alleges that Defendant Sostowski showed Mr. Milazzo a single photo of Plaintiff instead of a photo array and did not verify whether Mr. Milazzo and Plaintiff were in the jail at the same time and in the same pod.  (*Id*.)

The Amended Complaint appears to assert three claims (1) a claim against Defendants that Plaintiff's right to due process was violated pursuant to the Fourteenth Amendment and 42 U.S.C. § 1983; (2) a claim against Defendants of unreasonable seizure in violation of the Fourth Amendment and 42 U.S.C. § 1983; (3) a claim against Defendant Sostowski of "supervisor liability."  (*See generally* Dkt. No. 32.)  Plaintiff does not set forth any relief that he seeks.  (*Id*.)

Attached to the Amended Complaint are the following six documents: (1) one page from an examination of Defendant Sostowksi (Dkt. No. 32 at 9), (2) Mr. Milazzo's supporting deposition (*id*. at 10-11), (3) the felony complaint against Plaintiff (*id*. at 12), (4) Defendant Sostowksi's email dated July 29, 2021 (*id*. at 13), (5) the wanted person poster that Defendant Sostowski allegedly attached to his email on July 29, 2021 (*id.* at 14), and (6) Defendant Sostowski's investigative report (*id*. at 15).

Mr. Milazzo's supporting deposition states that on July 29, 2021, at approximately 12:45 a.m., Plaintiff entered Mr. Milazzo's residence uninvited, demanded Mr. Milazzo's phone,

punched Mr. Milazzo in the face, hit Mr. Milazzo multiple times, took Mr. Milazzo's phone, threatened to strike Mr. Milazzo with brass knuckles, and left Mr. Milazzo's residence.  (Dkt. No. 32 at 10-11.)  The supporting deposition alleges that Mr. Milazzo was familiar with Plaintiff because they were housed in the Broome County Jail H-pod together for approximately one month.  (*Id*.)

Defendant Sostowski's investigative report states that on July 29, 2021, Defendant Sostowski was dispatched to patrol, he printed out a picture of Plaintiff, showed it to Mr. Milazzo, who identified the individual in the picture as Plaintiff.  (*Id*. at 15.)  The investigative report further states that Defendant Sostowski directed another officer not to file charges or a warrant for Plaintiff yet, then Defendant Sostowksi created a "Wanted Flier" for Plaintiff and distributed it via e-mail to the other members of Defendant BPD.  (*Id*.)

## II.    RELEVANT LEGAL STANDARD GOVERNING INTIAL REVIEW OF A COMPLAINT

Having found that Plaintiff met the financial criteria for commencing this action *in forma pauperis*, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e).  Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis*, "the court shall dismiss the case at any time if the court determines that— . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B); *see also* 28 U.S.C. 1915A(a) ("The court

shall review . . . as soon as practicable . . . a complaint in a civil action in which a prisoner seeks

redress from a governmental entity or officer or employee of a governmental entity.").[1]

Additionally, when reviewing a complaint, a court may also look to the Federal Rules of

Civil Procedure.  Rule 8 of the Federal Rules of Civil Procedure provides that a pleading which

sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim

showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).  The purpose of Rule 8

"is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity

to file a responsive answer, prepare an adequate defense and determine whether the doctrine of

res judicata is applicable."  *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995)

(McAvoy, C.J.) (quoting *Brown v. Califano*, 75 F.R.D. 497, 498 (D.D.C. 1977)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007), *rev'd on other grounds*, 682 F. App'x 30.  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

While the court should construe the factual allegations in the light most favorable to the plaintiff,

"the tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."  *Ashcroft*, 556 U.S. at 678.  "Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

(citing *Twombly*, 550 U.S. at 555).  Rule 8 "demands more than an unadorned the-defendant-

unlawfully-harmed-me accusation."  *Id.*  Thus, a pleading that contains only allegations which

---

[1]      To determine whether an action is frivolous, a court must look to see whether the
complaint "lacks an arguable basis in either law or in fact."  *Neitzke v. Williams*, 490 U.S. 319,
325 (1989).

"are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

Finally, a few words are appropriate regarding what documents are considered when the court reviews a complaint pursuant to 28 U.S.C. § 1915. Generally, the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: "(1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records." *Cain v. Rambert*, 13-CV-5807, 2014 WL 2440596, at *2 (E.D.N.Y. May 30, 2014) (citing *L-7 Designs, Inc. v. Old Navy LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (public records)).

## III. ANALYSIS

Having reviewed Plaintiff's Amended Complaint, and construing the allegations liberally, I recommend that all causes of action be dismissed.[2]

---

[2] As an initial matter, the Court also notes that "[a]lthough a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located." *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by*, 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.). Thus, Defendant BPD is not a proper party, amenable to suit. However, for the reasons set forth

A.        **Substantive Due Process – Deliberate Indifference**

As set forth in the undersigned's Order and Report-Recommendation dated January 26, 2023, "not all wrongs perpetrated by a government actor violate due process." *Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002).  "[A] substantive due process claim 'must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Apatow v. Town of Stratford*, 21-CV-1692, 2023 WL 122038, at *5 (D. Conn. Jan. 6, 2023) (quoting *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005)). "Substantive due process is an outer limit on the legitimacy of governmental action . . . [and its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999).

I recommend that Plaintiff's substantive due process claim be dismissed because Plaintiff does not allege facts plausibly suggesting that the actions of Defendants were so arbitrary and conscience-shocking that they violated his substantive due process rights.  I find that after obtaining the supporting deposition from Ryan Milazzo (Dkt. No. 32 at 10-11), it cannot be said that the arrest of Plaintiff "was without any reasonable justification in the service of a legitimate governmental objective." *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999).

Moreover, the undersigned notes that Plaintiff appears to allege that his due process rights were violated because there was not probable cause for his arrest.  As set forth in the undersigned's Order and Report-Recommendation dated January 26, 2023, this assertion is properly analyzed under the Fourth Amendment, rather than substantive due process. *See Brown*

_____

below, even construing Plaintiff's claims against Defendant BPD as against the City of Binghamton, I recommend dismissal of the Amended Complaint.

*v. City of New York*, 16-CV-1919, 2018 WL 3821620, at *12 (S.D.N.Y. Aug. 10, 2018) (finding

that the plaintiffs' claim that Mr. Brown was "arrested and kept from his family as a result of

[Detective] Cardona's alleged fabrication of charges is properly analyzed under the Fourth

Amendment, rather than substantive due process."); *see also Tenenbaum*, 193 F.3d at 600

(quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 843 (1998)) ("Substantive due process

analysis is therefore inappropriate in this case . . . if [the] claim is 'covered by' the Fourth

Amendment.").[3]

To the extent that Plaintiff alleges that "the identification procedures used were unfairly

suggestive, [his] constitutional rights would not have been violated until he was convicted on the

basis of the suggestive identification." *Hasan v. Onondaga Cnty.*, 18-CV-0806, 2018 WL

4055296, at *5 n. 8 (N.D.N.Y. Aug. 2, 2018) (Baxter, M.J.) (citing *Wray v. City of New York*,

490 F.3d 189, 193 (2d Cir. 2007) (there is no constitutional right not to be subjected to an

unconstitutionally suggestive identification)), *report and recommendation adopted*, 2018 WL

4054105 (N.D.N.Y. Aug. 24, 2018) (Sharpe, J.).  Moreover, in order to state a claim, a plaintiff

"would have to show that the officers misled or pressured the prosecution or the trial judge.  It is

the admission of the testimony carrying a likelihood of misidentification which violates a

[criminal] defendant's right to due process." *Hasan*, 2018 WL 4055296, at *5 n.8 (citing *Wray*,

490 F.3d at 193).

As a result, I recommend that Plaintiff's due process claims be dismissed.  *See Hasan*,

2018 WL 4055296, at *5 n.8 ("[i]t is unclear what evidence was admitted at trial.  Thus, at this

time, there are multiple reasons to dismiss any claims against the officers who plaintiff alleges

---

[3]      The undersigned considered Plaintiff's Fourth Amendment claim below in Part III.B. of
this Report and Recommendation.

were involved in the alleged show up."); *see also Jiang v. Corpuz*, 19-CV-5664, 2022 WL 4539425, at *6 (E.D.N.Y. Sept. 28, 2022) (holding that the due process focus is principally on the fairness of the trial and not the conduct of police; thus, a suggestive pre-trial identification cannot, standing alone, violate a plaintiff's fair-trial right).

### B.    Unreasonable Seizure Claim

Liberally construed, Plaintiff asserts a false arrest claim against Defendants.  A Section 1983 claim for false [arrest] is anchored in the Fourth Amendment right 'to be free from unreasonable seizures.'" *Iverson v. Annucci*, 18-CV-0886, 2020 WL 1083152, at *6 (W.D.N.Y. Feb. 28, 2020) (citing *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007)).  For Section 1983 purposes, "false imprisonment is merely a species of false arrest."  *Bowman v. City of Middletown*, 91 F. Supp. 2d 644, 660 (S.D.N.Y. 2000) (citing *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995)).  "In analyzing false imprisonment claims under Section 1983, the Second Circuit has generally looked to the law of the state in which the arrest occurred."  *Aragon v. New York*, 14-CV-9797, 2017 WL 2703562, at *5 (S.D.N.Y. June 22, 2017) (citing *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)).

To state a false arrest or false imprisonment claim under New York law, a plaintiff must allege: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)).  An arrest is privileged if it is based on probable cause.  *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) ("The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest."); *accord Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)

("Probable cause is a complete defense to an action for false arrest."); *Heyliger v. Peters*, 771 F. App'x 96, 97 (2d Cir. 2019) (summary order) (Since "[a]n arrest is privileged if it is supported by probable cause," the existence of probable cause to arrest "is an absolute defense to a false arrest claim.").

Here, the Court has already held that the indictment established a presumption of probable cause to commence the proceeding. (Dkt. No. 24 at 4-5.)

Notwithstanding this holding, the Amended Complaint appears to allege that probable cause was lacking because (1) Mr. Milazzo did not provide a receipt for the phone Plaintiff allegedly stole, (2) there was no video or other witness statement supporting Mr. Milazzo's assertion that Plaintiff entered Mr. Milazzo's residence, (3) there was no additional evidence supporting Mr. Milazzo's assertion that Plaintiff threatened to use a weapon, (4) Mr. Milazzo denied offers to summon medical treatment, (5) Defendant Sostowski failed to verify that Plaintiff and Mr. Milazzo were housed in the jail together at the same time. (Dkt. No. 32 at 3-4.) However, "probable cause may be based solely on information received from an alleged victim or eyewitness, so long as there is no reason to doubt that person's veracity." *Brown v. City of New York*, 2018 WL 3821620, at *7 (citing *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 30 (E.D.N.Y. 2015) (dismissing false arrest claim upon finding of probable cause to arrest the plaintiff for endangering the welfare of a child based solely upon statements by the plaintiff's children describing the plaintiff throwing a child against the wall of a car, despite the plaintiff's claims of failure to investigate); *Slater v. Mackey*, 12-CV-4325, 2015 WL 6971793, at *12 (E.D.N.Y. Nov. 10, 2015) (dismissing false arrest claim upon finding of probable cause to arrest the plaintiff for assault on her child resulting in black eye and bruises to the child based upon a statement by the plaintiff's child, combined with corroborating evidence)). The Amended

Complaint fails to allege facts plausibly suggesting that Defendants should have or did have any reason to doubt the credibility of Mr. Milazzo. Thus, the Amended Complaint fails to allege facts plausibly suggesting that Plaintiff's arrest occurred without probable cause.

As a result, I recommend that Plaintiff's unreasonable seizure claim against Defendants be dismissed.

### C.    Supervisory Liability

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). "[D]irect participation as a basis of liability in this context requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (internal quotation marks omitted).

Courts in this circuit routinely hold that "the doctrine of respondeat superior cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control." *Kinch v. Artuz*, 97-CV-2419, 1997 WL 576038, at *2 (S.D.N.Y. Sept. 15, 1997) (citing *Colon v. Coughlin*, 58 F.3d 865, 874 (2d Cir. 1995); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)). Thus, supervisory officials may not be held liable for their subordinates' constitutional violations merely because they are in a position of authority. *See Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996); *see also Colon*, 58 F.3d at 874 (holding that the

11

fact that the defendant occupied a high-ranking position in the New York prison hierarchy,

without more, was insufficient to establish personal involvement).

In *Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020), the Second Circuit concluded that

"there is no special rule for supervisory liability," and held that a "plaintiff must plead and prove

'that each Government-official defendant, through the official's own individual actions, had

violated the Constitution.'"  *Tangreti*, 983 F.3d at 618.  The Second Circuit explained that, "'the

factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at

issue' because the elements of different constitutional violations vary.  The violation must be

established against the supervisory official directly."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S.

662, 676 (2009)).

There is no constitutional claim solely for "supervisory liability" and, as set forth above, I

recommend dismissal of Plaintiff's underlying constitutional claims for failure to state a claim

upon which relief may be granted.  As a result, I recommend dismissal of Plaintiff's claim for

"supervisory liability" against Defendant Sostowski.  *See Elek v. Inc. Vill. of Monroe*, 815 F.

Supp. 2d 801, 808 (S.D.N.Y. 2011) (citations omitted) ("[B]ecause Plaintiff has not established

any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability.").

## IV.    OPPORTUNITY TO AMEND

Generally, "[a] *pro se* complaint should not be dismissed without the court granting leave

to amend at least once when a liberal reading of the complaint gives any indication that a valid

claim might be stated."  *Nielson v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (citation and internal

quotation marks omitted); *see also* FED. R. CIV. P. 15(a)(2) ("The court should freely give leave

when justice so requires.").  Leave to amend is not required where "the problem with [the

plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

Out of deference to Plaintiff's *pro se* status, the undersigned previously recommended that he be permitted to amend his Complaint. (Dkt. No. 18 at 18-20.)  However, at this juncture, Plaintiff has already amended the complaint after the Court's analysis identifying the deficiencies in the Complaint.  (*See generally* docket sheet.)  "In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend."  *Sherman v. Yonkers Public Schs.*, 21-CV-7317, 2023 WL 137775, at *11 (S.D.N.Y. Jan. 9, 2023) (citing *Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first.  Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories of seriatim."); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom.*; *Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.")).  As a result, I recommend that the Amended Complaint be dismissed without leave to replead.  *See Official Comm. of Unsecured Creditors of*

*Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 168 (2d Cir. 2003) (quoting *Dluhos v. Floating & Abandoned Vessel, Known as "New York,"* 162 F.3d 63, 69 (2d Cir. 1998)) (finding that the "District Court did not abuse its discretion in denying [the plaintiff] leave to amend the complaint because there was a 'repeated failure to cure deficiencies by amendments previously allowed.'"); *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 236 (S.D.N.Y. 1997) ("Three bites at the apple is enough.").

**ACCORDINGLY**, it is respectfully

**RECOMMENDED** that the Amended Complaint (Dkt. No. 32) be **DISMISSED WITHOUT LEAVE TO AMEND**, for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. §§ 1915, 1915A; and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this Report and Recommendation on the parties, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  28 U.S.C. § 636(b)(1) (Supp. 2013); FED. R. CIV. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: September  15 , 2023
       Binghamton, New York

                                      Miroslav Lovric
                                      U.S. Magistrate Judge

---

[4]      If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  FED. R. CIV. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  FED. R. CIV. P. 6(a)(1)(C).

2014 WL 2440596
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Ileen CAIN, Plaintiff,

v.

Jerome RAMBERT, Kenya Pope, Brian
Mitchell, Karen Ruth, Unika Steele, Jane
Doe and Haaziq Paul Reid, Defendants.

No. 13–CV–5807 (MKB).
|
Signed May 30, 2014.

**Attorneys and Law Firms**

Ileen Cain, Brooklyn, NY, pro se.

***MEMORANDUM & ORDER***

MARGO K. BRODIE, District Judge.

**\*1** Plaintiff Ileen Cain, proceeding *pro se,* commenced this action on October 21, 2013, against her landlord, Jerome Rambert, and two neighbors, Kenya Pope and Brian Mitchell, alleging violations of the Fair Housing Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* ("FHA"), the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* (the "Rehabilitation Act"), the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, the "Equal Justice Under Telecommunications Act," the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8–101 *et seq.* ("NYCHRL"), as well as city and state law claims for retaliatory eviction, breach of warranty of habitability and breach of contract. By order dated November 26, 2013, the Court granted Plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915(a), and granted Plaintiff leave to file an amended complaint. On January 30, 2014, Plaintiff filed an Amended Complaint against her landlord Jerome Rambert, several tenants including Kenya Pope, Brian Mitchell, Karen Ruth, Unika Steele, and Jane Doe, and New York City Police Officer

Haaziq Paul Reid. (Docket Entry No. 7.) On February 6, 2014, Plaintiff requested the appointment of *pro bono* counsel. For the reasons discussed below, Plaintiff's Amended Complaint is dismissed for failure to state a claim upon which relief may be granted and her request for the appointment of counsel is denied.

**I. Background**

Plaintiff was diagnosed with post-traumatic stress disorder in 2007. (Am.Compl.1.) [1] In March 2012, Plaintiff moved into a Section 8 apartment on Stuyvesant Avenue in Brooklyn, New York. [2] Rambert, the landlord of the building in which Plaintiff lives, disclosed Plaintiff's disability to Ruth, a tenant. (*Id.*) Because Plaintiff did not respond to sexual advances and propositions from Ruth and another tenant, Steele, they organized "the spreading of lies regarding Plaintiff's sexuality and mental capacity, with the aiding and abetting of Defendant Pope [and] Defendant Mitchell," two other tenants in the building. (*Id.*) "Throughout the community ... and the internet Plaintiff is called 'bi coo coo bi too, kook kook ....' " (*Id.*) "The rant is continued by Defendants Ruth and Steele" through the use of an acoustic device that emits disturbing noises "that are harmful to Plaintiff['s] hearing ... and interrupt[ ] sleep," and through "telecommunication tools such as the [I]nternet." [3] (*Id.* at 1– 2.) Ruth and Steele yell "coo coo care care care coo kook her kook her" during the night and scream and bang on the walls. (*Id.* at 5.) Ruth and Steele have also gathered personal information about Plaintiff, attempted to make false police reports against Plaintiff and have called Emergency Medical Services ("EMS"), alleging that Plaintiff is an emotionally disturbed person. (*Id.* at 2.) Pope "is aiding and abetting" Steele and Ruth by calling out "koook it coo coo coo coo coo coo coo kook it he care he care kook it kook it," as Pope enters and leaves the building. (*Id.* at 2.) Mitchell has entered and left the building "yelling the same rant," and told Plaintiff that Plaintiff needs medication. (*Id.* at 3.) Reid, a New York City police officer, is "aiding and abetting" the allegations in the Amended Complaint and "put[ting] Plaintiff['s] life in danger ... by not informing Plaintiff he was soliciting sex from Defendants Pope and Steele." (*Id.* at 3.)

**\*2** Plaintiff also alleges that "[t]he foundation of the house is shoddy and this amplifies sound," that her apartment "is unfit for human privacy," and that as a result she is unable to speak on the telephone or have company. (*Id.* at 6, 9.) Plaintiff has filed numerous reports with the New York City Police Department and the Office of the New York

State Attorney General, which she attaches to the Amended Complaint. (*See* Police Reports, annexed to Am. Compl. as Ex. 3; Letter from Attorney General, annexed to Am. Compl. as Ex. 4.) Plaintiff has sent over 400 text messages to Rambert "describing the events taking place on [the] property as they unfold," as well as certified notarized mail which was returned to Plaintiff. (Am. Compl. at 4.) Since Plaintiff made the complaints to the police, Rambert has initiated "frivolous" holdover proceedings against her. (*Id.*) The holdover proceedings initiated by Rambert have been dismissed due to his failure to appear and improper service. (*Id.* at 5.) Plaintiff seeks monetary damages and unspecified injunctive relief, and seeks to have this Court "evict the tenants" who reside in the building. (*Id.* at 10–11.)

## II. Discussion

### a. Standard of Review

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although all allegations contained in a complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* In reviewing a *pro se* complaint, the Court must be mindful that the Plaintiff's pleadings should be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotation marks omitted); *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (noting that even after *Twombly,* the court "remain[s] obligated to construe a *pro se* complaint liberally"). If a liberal reading of a complaint "gives any indication that a valid claim might be stated," the Court must grant leave to amend the complaint. *See Shabazz v. Bezio,* 511 F. App'x 28, 31 (2d Cir.2013) (quoting *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991)). Nevertheless, the Court is required to dismiss *sua sponte* an *in forma pauperis* action, if it determines the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B); *Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007). A court's review of a

complaint is limited to the four corners of the complaint, but it may also review (1) documents attached to the complaint, (2) any documents incorporated in the complaint by reference, (3) documents deemed integral to the complaint, and (4) public records. *See* *L–7 Designs, Inc. v. Old Navy, LLC,* 647 F.3d 419, 422 (2d Cir.2011) (documents attached to the complaint, those incorporated by reference, and those integral to the complaint); *Global Network Commc'ns v. City of New York,* 458 F.3d 150, 156 (2d Cir.2006) (documents integral to the complaint); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (public records).

**\*3** A plaintiff seeking to bring a lawsuit in federal court must establish that the Court has subject matter jurisdiction over the action. *See, e.g., Monreal v. New York,* 518 F. App'x 11 (2d Cir.2013) (affirming dismissal of *pro se* complaint for failure to establish subject matter jurisdiction); *Zito v. N.Y.C. Office of Payroll Admin.,* 514 F. App'x 26 (2d Cir.2013) (same); *Chestnut v. Wells Fargo Bank, N.A.,* No. 11–CV–5369, 2012 WL 1657362, at \*3 (E.D.N.Y. May 7, 2012) ("Notwithstanding the liberal pleading standard afforded *pro se* litigants, federal courts are courts of limited jurisdiction and may not preside over cases if subject matter jurisdiction is lacking."). A court's lack of subject matter jurisdiction "is not waivable and may be raised at any time by a party or by the court *sua sponte.* If subject matter jurisdiction is lacking, the action must be dismissed." *Lyndonville Sav. Bank & Trust Co. v. Lussier,* 211 F.3d 697, 700–01 (2d Cir.2000). Federal subject matter jurisdiction is available only when a "federal question" is presented, or when plaintiffs and defendants have complete diversity of citizenship and the amount in controversy exceeds $75,000. 28 U.S.C. §§ 1331, 1332. In order to invoke federal question jurisdiction, a plaintiff's claims must arise "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

### b. Plaintiff's Amended Complaint

By Memorandum and Order dated November 26, 2013, Plaintiff was granted leave to amend the Complaint to "provide facts sufficient to allow each named Defendant to have a fair understanding of what the Plaintiff is complaining about and to know whether there is a legal basis for recovery" for housing discrimination under the FHA, the ADA, or Section 504. *Cain v. Rambert,* No. 13–CV–5807, 2013 WL 6194294, at \*4 (E.D.N.Y. Nov.26, 2013) (quoting *Knowles*

*v. Namdor Inc.,* No. 13–CV–3746, 2013 WL 5887039, at *2 (E.D.N.Y. Oct.31, 2013)). Plaintiff's Amended Complaint provides more detailed factual allegations regarding the names and activities of other tenants in the building. However, although the Court is sympathetic to Plaintiff's circumstances, even under the less stringent standards applicable to *pro se* complaints, Plaintiff's Amended Complaint fails to state a plausible housing discrimination claim pursuant to the FHA, the ADA, the Rehabilitation Act or the Equal Protection Clause.

### i. Subject matter jurisdiction

As an initial matter, Plaintiff seeks to have the Court evict other tenants in her building, but the Court has no authority to do so since federal courts, unlike state courts, have no jurisdiction over landlord-tenant matters. *Galland v. Margules,* No. 05–CV–5639, 2005 WL 1981568, at *1 (S.D.N.Y. Aug. 17, 2005) (noting that federal courts do not have federal question subject matter jurisdiction over state residential landlord-tenant matters), *aff'd,* 191 F. App'x 23 (2d Cir.2006); *see also McMillan v. Dep't. of Bldgs.,* No. 12–CV–318, 2012 WL 1450407, at *2 (E.D.N.Y. Apr. 26, 2012) (finding that federal courts lack subject matter jurisdiction over claims concerning eviction); *Rosen v. North Shore Towers Apartments, Inc.,* No. 11–CV–0752, 2011 WL 2550733, at *4 (E.D.N.Y. Jun. 27, 2011) (noting that courts in this Circuit "routinely dismiss for lack of subject matter jurisdiction" claims concerning eviction (collecting cases)).

### ii. FHA claims

**\*4** The FHA makes it unlawful to "discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of ... sex," or because of "a handicap of that buyer or renter." 42 U.S.C. § 3604(a), (f)(1). It also prohibits "discriminat[ion] against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of ... sex," or because of "a handicap of that person." § 3604(b), (f)(2); *see also Taylor v. Harbour Pointe Homeowners Ass'n,* 690 F.3d 44, 49 (2d Cir.2012), *cert. denied,* 568 U.S. ——, 133 S.Ct. 1280, 185 L.Ed.2d 186 (2013). In addition, the FHA prohibits retaliation against individuals who engage in "protected activity" under the statute. *See* 42 U.S.C. § 3617 ("It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or

on account of his having exercised or enjoyed ... any right granted or protected by" the statute.).

Plaintiff appears to allege in the Amended Complaint "sexual harassment, gender discrimination, perceived disability discrimination, [and] discrimination based on ... sexual orientation." (Am.Compl.6.) Plaintiff also alleges that Rambert retaliated against Plaintiff for filing numerous complaints with government agencies "regarding prostitution[,] sexual harassment[,] sexual coercion and cyber stalking." (*Id.* at 5.)

### 1. Discrimination claims

Plaintiff's Amended Complaint does not allege sufficient facts to plausibly state that any of the Defendants may be liable for violations of the FHA. Courts in this Circuit have construed § 3604(b) of the FHA to prohibit the creation of a "hostile environment" by individuals who have control or authority over the "terms, conditions, or privileges of sale or rental of a dwelling," similar to the prohibition imposed by Title VII against the creation of a hostile work environment.[4] *See Ponce v. 480 E. 21st St., LLC,* No. 12–CV–4828, 2013 WL 4543622, at *2 (E.D.N.Y. Aug. 28, 2013) ("The FHA prohibits discrimination 'against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of ... sex.' Sexual harassment constitutes such discrimination." (citing 42 U.S.C. § 3604(b) and *Rich v. Lubin,* No. 02–CV–6786, 2004 WL 1124662, at *4–5 (S.D.N.Y. May 20, 2004))); *Miles v. Gilray,* No. 12–CV–599S, 2012 WL 2572769, at *1 (W.D.N.Y. June 29, 2012) (finding that the FHA makes it unlawful to discriminate against any person "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin" (quoting 42 U.S.C. § 3604(b) and *Glover v. Jones,* 522 F.Supp.2d 496, 503 (W.D.N.Y.2007))); *Glover,* 522 F.Supp.2d at 503 ("Sexual harassment claims are cognizable under the FHA .... With regard to hostile environment discrimination, 'the legal standard for sexual harassment claims under the FHA has been analogized in the Second Circuit to the standard pertaining to hostile work environment claims under Title VII.' " (alteration omitted) (quoting *Rich,* 2004 WL 1124662, at *4)); *Rich,* 2004 WL 1124662, at *4 ("Sexual harassment constitutes

discrimination in the terms, conditions, or privileges of rental of a dwelling on the basis of sex."); *Anonymous v. Goddard Riverside Cmty. Ctr., Inc.,* No. 96–CV–9198, 1997 WL 475165, at \*4 (S.D.N.Y. July 18, 1997) ("The Second Circuit has repeatedly recognized that Title VII (employment discrimination) cases are relevant to Title VIII (housing discrimination) cases by virtue of the fact that the 'two statutes are part of a coordinated scheme of federal civil rights laws enacted to end discrimination.' " (quoting *Huntington Branch, NAACP v. Town of Huntington,* 844 F.2d 926, 934 (2d Cir.1988))); *People of State of N.Y. by Abrams v. Merlino,* 694 F.Supp. 1101, 1104 (S.D.N.Y.1988) (recognizing sexual harassment claim under the FHA and noting that "plaintiffs, to succeed, must demonstrate ... a relationship between the harassment and housing"); *see also United States v. Hurt,* 676 F.3d 649, 654 (8th Cir.2012) ("Sexual harassment is actionable under the FHA when it creates 'a hostile housing environment'...."); *Hall v. Meadowood Ltd. P'ship,* 7 F. App'x 687, 689 (9th Cir.2001) (recognizing a sexual harassment claim under the FHA (citing *Gamble v. City of Escondido,* 104 F.3d 300, 305 (9th Cir.1997))); *Krueger v. Cuomo,* 115 F.3d 487, 491 (7th Cir.1997) ("This court has recognized that sexual harassment in the housing context can violate the Fair Housing Act." (citing *DiCenso v. Cisneros,* 96 F.3d 1004, 1008 (7th Cir.1996))); *Honce v. Vigil,* 1 F.3d 1085, 1090 (10th Cir.1993) (recognizing a hostile housing environment claim for sexual harassment where a defendant's actions are "sufficiently severe or pervasive to alter the conditions of the housing arrangement and the offensive acts would not have happened but for claimant's gender" (alteration, citation and internal quotation marks omitted)); *but see Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n,* 388 F.3d 327, 328–30 (7th Cir.2004) (holding that the Fair Housing Act was only concerned with "access to housing," and not with discrimination that may take place subsequent to the sale or rental of a housing unit, and therefore declining to recognize claim for religious harassment brought by property owner against a homeowners association and its members).

**\*5** A plaintiff seeking to establish a hostile housing environment claim must establish that (1) "she was subjected to harassment that was sufficiently pervasive and severe so as to create a hostile [housing] environment," *Rich,* 2004 WL 1124662, at \*4, (2) the harassment was because of the plaintiff's membership in a protected class, *Rivera v.*

*Rochester Genesee Reg'l Transp. Auth.,* 743 F.3d 11, 20 (2d Cir.2014) (Title VII), and (3) "a basis exists for imputing the allegedly harassing conduct to the defendants," *Rich,* 2004 WL 1124662, at \*4. As with any claim asserted pursuant to the FHA, a plaintiff must also show a relationship between the discriminatory conduct and housing. *See Abrams,* 694 F.Supp. at 1104 ("[P]laintiffs, to succeed, must demonstrate ... a relationship between the harassment and housing."). The Amended Complaint does not state a claim of hostile housing environment against any of the Defendants based on either sexual harassment or disability-based harassment.

**A. Defendants Pope, Mitchell, Ruth, Steele and Reid**

Plaintiff's Amended Complaint fails to state a claim that the actions of Pope, Mitchell, Ruth, Steele, or Officer Reid comprise sexual harassment in violation of the Fair Housing Act. Pope, Mitchell, Ruth and Steele are Plaintiff's neighbors, tenants in the building, while Officer Reid is an acquaintance of Pope and Steele. Plaintiff does not allege that these Defendants have any control or authority over the "terms, conditions, or privileges of ... rental of [Plaintiff's] dwelling, or in the provision of services or facilities in connection therewith," as contemplated by the FHA. *See* 42 U.S.C. § 3604(b).

In the cases recognizing a cause of action for creation of a hostile housing environment under the FHA, the defendants were individuals or entities who own or manage housing and who were alleged to be the source of harassing or hostile actions, or to have an agent who was said source. *See Ponce,* 2013 WL 4543622, at \*2 (building superintendent); *Miles,* 2012 WL 2572769, at \*1 (owner of a mobile home park); *Glover,* 522 F.Supp.2d at 504 (property manager); *Williams v. Hernandez,* No. 02–CV–4473, 2004 WL 2793198, at \*1 (S.D.N.Y. Dec.6, 2004) (employee of New York City Housing Authority (N.Y.CHA) where tenant lived in NYCHA-owned and operated housing); *see also Hurt,* 676 F.3d at 651 (owner of trailer park). In contrast, here, Pope, Mitchell, Ruth, and Steele are Plaintiff's neighbors, who reside in the same building, but have no authority or control over the management of the building. Likewise, Reid is a police officer who does not live in the building or otherwise have a relationship to Plaintiff's housing. [5] Therefore, Plaintiff does not state a claim pursuant to § 3604(b) of the Fair Housing Act for sexual harassment against these Defendants.

Similarly, Plaintiff does not state a claim of disability harassment against Pope, Mitchell, Ruth and Steele, or Officer Reid under the FHA. Although the Second Circuit has not recognized a cause of action under the FHA for harassment based on disability, the Eighth Circuit Court of Appeals has done so. *See* 🚩 *Neudecker v. Boisclair Corp.,* 351 F.3d 361, 364–65 (8th Cir.2003) (recognizing disability harassment claim under the Fair Housing Act where Plaintiff "alleged ... that he suffers from [obsessive-compulsive disorder], that [defendant, a building management company] subjected him to unwelcome harassment based on his [disability], and that this unwelcome harassment was sufficiently severe to deprive him of his right to enjoy his home, as evidenced by his physical problems and ultimate decision to move out"). In *Neudecker,* the tenants in question were the children of the building managers, who "sent letters to Boisclair property manager ... containing false counter-accusations as reprisal" for the plaintiff Neudecker's complaints about harassment, and on one occasion one of these tenants "pinned Neudecker against a wall after Neudecker had made another complaint." 🚩 *Neudecker,* 351 F.3d at 363. The property manager "falsely accused Neudecker of 'stalking' another tenant and threatened to evict him, and ... threatened to evict Neudecker 'as reprisal' for his continued complaints about being harassed." *Id.* The plaintiff ultimately surrendered his apartment as a result of the harassment. *Id.* In contrast here, Plaintiff does not allege that Pope, Mitchell, Ruth and Steele, or Officer Reid have a familial or other relationship to the landlord or manager of the building, nor does she allege that her landlord contributed to the harassment. Because these Defendants are not alleged to have influenced the landlord or asserted control over the "terms, conditions, or privileges of ... [the] rental of [Plaintiff's] dwelling, or in the provision of services or facilities in connection therewith," as contemplated by the FHA, *see* 🚩 42 U.S.C. § 3604(b), the Amended Complaint does not state a claim of disability harassment against Pope, Mitchell, Ruth and Steele, or Officer Reid. [6]

### B. Defendant Rambert

**\*6** Plaintiff alleges that her landlord, Rambert, "created a hostile living environment by not responding to any of Plaintiff[']s request for intervention." (Am.Compl.8.) These allegations fail to state a claim of hostile housing environment against Rambert, based on either Plaintiff's gender or her disability. Plaintiff does not allege that Rambert harassed her. Plaintiff also does not allege that Pope, Mitchell, Ruth,

Steele or Reid are agents of Rambert. Therefore, because there is no basis for imputing the allegedly harassing conduct by the other tenants to Rambert, Plaintiff has not stated a claim of harassment on the basis of either gender or disability against Rambert. *See* 🚩 *Rich,* 2004 WL 1124662 (noting that a plaintiff alleging a hostile housing environment claim must establish "that a basis exists for imputing the allegedly harassing conduct to the defendants").

Plaintiff alleges that Rambert created a "hostile living environment" by failing to intervene to stop the alleged harassment from her neighbors. (Am.Compl.8.) The Eighth Circuit and some district courts have recognized that a landlord's willful failure to intervene in tenant-on-tenant harassment may be a violation of the FHA. *See* 🚩 *Neudecker,* 351 F.3d at 365 ("While Neudecker does not allege that Boisclair's agents themselves harassed him, he does allege that tenants—including children of Boisclair's management team—constantly harassed and threatened him based on his disability; that he repeatedly complained to Boisclair management about the harassment to no avail; and that he ultimately moved from his apartment out of concerns for his health stemming from the harassment."); 🚩 *Fahnbulleh v. GFZ Realty, LLC,* 795 F.Supp.2d 360, 364 (D.Md.2011) ("[C]onduct is imputable to a landlord, if the landlord knew or should have known of the harassment, and took no effectual action to correct the situation.' " (quoting 🚩 *Williams v. Poretsky Mgmt., Inc.,* 955 F.Supp. 490, 496 (D.Md.1996))); 🚩 *Reeves v. Carrollsburg Condo. Unit Owners Ass'n,* No. 96–CV–2495, 1997 WL 1877201, at \*7 (D.D.C. Dec. 18, 1997) (finding that a defendant condominium association could be held liable for creation of a hostile housing environment where the defendant "knew or should have known of the harassment, and took no effectual action to correct the situation"). Neither the Second Circuit nor district courts in this Circuit have opined on whether a landlord may be held liable under the FHA for failing to intervene in harassment between tenants based on protected status. However, the Court need not resolve whether the FHA permits such a claim because, as discussed above in footnotes 5 and 6, the Amended Complaint fails to state a plausible claim of harassment based on either gender or disability against the other tenants in Rambert's building, and therefore fails to state a claim against Rambert for discrimination pursuant to the FHA.

**2. Retaliation claim**

Plaintiff alleges that "[b]ecause Plaintiff made numerous complaints to various government agencies regarding ... sexual harassment sexual coercion and cyber stalking ... Rambert petitioned Plaintiff to court for holdover proceeding." (Am. Compl. 5; *see also id.* at 7, 9). [7] To establish a *prima facie* case of retaliation under the FHA, a plaintiff must show that she was (1) "engaged in protected activity by opposing conduct prohibited under the FHA; (2) that defendants were aware of that activity; (3) that defendants subsequently took adverse action against plaintiffs; and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action." *Lynn v. Vill. of Pomona,* 373 F.Supp.2d 418, 432 (S.D.N.Y.2005) (citing *Marks v. BLDG Mgmt. Co., Inc.,* No. 99–CV–5733, 2002 WL 764473, at \*9 (S.D.N.Y. Apr. 26, 2002), *aff'd,* 56 F. App'x 62, and *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 54 (2d Cir.2002)); *cf. Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.,* 716 F.3d 10, 14 (2d Cir.2013) (noting that in order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must establish "(1) she engaged in protected activity; (2) the [defendant] was aware of this activity; (3) the [plaintiff] suffered a materially adverse employment action; and (4) there was a causal connection between the alleged adverse action and the protected activity." (quoting *Lore v. City of Syracuse,* 670 F.3d 127, 157 (2d Cir.2012))). To be actionable, an adverse action "must have some materially adverse effect on the plaintiff." *Joseph's House & Shelter, Inc. v. City of Troy, N.Y.,* 641 F.Supp.2d 154, 159 (N.D.N.Y.2009) (quoting *Marks,* 2002 WL 764473, at \*11).

**\*7** Filing a police complaint about sexual harassment is "protected activity," at least where the plaintiff " 'had a good faith, reasonable belief' that she was opposing an unlawful practice." *See Ponce,* 2013 WL 4543622, at \*3, 3 n. 4 (quoting *Kelly,* 716 F.3d at 14). "The reasonableness of the plaintiff's belief is to be assessed in light of the totality of the circumstances." *Kelly,* 716 F.3d at 14–15 (discussing Title VII). Plaintiff need not establish that the underlying conduct that was the subject of the police complaint was an actual violation of the FHA, but courts in this Circuit "do require the allegation of factual circumstances that permit the inference that plaintiff was subjected to a hostile ...

environment because of her [protected status]." *Kelly,* 716 F.3d at 15 (discussing Title VII).

Here, the Amended Complaint does not make clear whether Rambert was aware of Plaintiff's police complaints or complaints to other government agencies. Although Plaintiff alleges "[a]fter making complaints to various government agencies Defendant Rambert retaliated against Plaintiff, brought frivolous hold over proceedings," (Am.Compl.4), this establishes only that Rambert initiated the holdover proceedings subsequent to Plaintiff's complaints to government agencies. The Amended Complaint provides insufficient factual assertions to permit the inference that Rambert was aware of the complaints when he initiated the holdover proceedings. While Plaintiff does allege that she sent over 400 text messages to Rambert "describing the events taking place on [the] property as they unfold," (*id.* at 4), Plaintiff has not alleged that she told Rambert of her complaints to the police or other government agencies. [8]

However, even assuming that Rambert was aware of Plaintiff's complaints when he initiated holdover proceedings, the Amended Complaint does not establish that Plaintiff had a reasonable belief that she was opposing a practice made unlawful by the FHA. Plaintiff's complaints to the police, appended to her Amended Complaint, include statements that she "is being harassed by downstairs neighbors [and that f]or a long time they have been trying to get [Plaintiff] in a prostitution business and calling her crazy," (Am. Compl. Ex. 3, Police Complaint # 2013–081–04729, dated August 2, 2013), that "while she is in her apartment she hears the downstairs and upstairs neighbors talking about her calling her a 'cuckoo,' " (Am. Compl. Ex. 3, Police Complaint # 2013–081–04006, dated July 2, 2013), that her neighbors "continue[ ] to annoy and alarm her by posting pictures and contacting her online and sending her emails," (Am. Compl. Ex. 3, Police Complaint # 2013–08–05085, dated August 17, 2013), and "she is being 'harassed' by her neighbors on the 1st floor, [who] was shouting her name and banging on window, calling her 'cuckoo,' " (Police Complaint # 2013–081–02699 dated May 9, 2013, appended to Am. Compl. at 41).

**\*8** As discussed *supra* in part II.b.ii.1.A, nothing in Plaintiff's complaints to the police indicate that she was opposing or complaining about harassment related to availability of her housing, or to the terms and conditions of her housing, other than the fact that the alleged harassers were her neighbors. *Cf. Kelly,* 716 F.3d at 15 (finding

that plaintiff did not have a good faith reasonable belief that the conduct she was complaining about was unlawful discrimination because "[a]lthough Kelly alleges that she repeatedly used the words 'discrimination' and 'harassment' when complaining to her employers, her argument that the [complained-of conduct] constituted gender discrimination because it resulted in an atmosphere demeaning to women is entirely unsupported by the allegations in her complaint"). Similarly, Plaintiff's pleadings are insufficient to plausibly show that she had a reasonable belief that she was being harassed because of her disability, or that her complaints to other government agencies were based on such a belief. Even in light of her complaints to the police that her neighbors were calling her "cuckoo," assessing the "reasonableness of the plaintiff's belief ... in light of the totality of the circumstances," Plaintiff's complaints to the police about her neighbors' name-calling are not sufficient to permit the inference that Plaintiff *reasonably* believed that she was being subjected to a hostile environment because of her disability, in violation of the FHA. *See Kelly,* 716 F.3d at 14–15; *Drumm v. Suny Geneseo Coll.,* 486 F. App'x 912, 914 (2d Cir.2012) (finding that "plaintiff's allegations that her supervisor 'berated' her and made other harsh comments ... amount only to general allegations of mistreatment, and do not support an inference that plaintiff had a reasonable good faith belief that she was subject to gender discrimination"). Therefore, the Amended Complaint fails to state a claim of retaliation under the FHA against Rambert.

### iii. Rehabilitation Act claim

Section 504 of the Rehabilitation Act provides in pertinent part that "[n]o otherwise qualified handicapped individual in the United States ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...." 29 U.S.C. § 794; *Bryant v. N.Y.S. Educ. Dept.,* 692 F.3d 202, 216 (2d Cir.2012). Although Plaintiff alleges that all the Defendants residing in the building "receive some form of Federal Government subsidy," (Am Compl. 8 ¶ 22), this allegation is insufficient to establish liability against Rambert pursuant to the Rehabilitation Act. *See Reyes v. Fairfield Properties,* 661 F.Supp.2d 249, 264 (E.D.N.Y.2009) (recognizing that "an entity or person who receives housing assistance payments under a housing assistance payments program or a voucher program is not a 'recipient' of federal financial assistance by virtue of receipt of such

payments" (quoting *Echeverria v. Krystie Manor, LP,* No. 07–CV–1369, 2009 WL 857629, at *7 (E.D.N.Y. Mar. 30, 2009))); 24 C.F.R. § 8.3 ("An entity or person receiving housing assistance payments from a recipient on behalf of eligible families under a housing assistance payments program or a voucher program is not a recipient or subrecipient merely by virtue of receipt of such payments.").

**\*9** This allegation is also insufficient to establish potential liability as to the other tenants in the building or Officer Reid, as the plain language of the Rehabilitation Act and the accompanying regulations make clear that the prohibitions in the Act apply to a "program or activity receiving Federal financial assistance," and not to individual families who are the direct recipients of housing rental assistance. *See* 29 U.S.C. § 794(a)–(b) ("No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. For the purposes of this section, the term 'program or activity' means all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government ... a college, university, or other postsecondary institution, or a public system of higher education ... a local educational agency ... [or] an entire corporation, partnership, or other private organization, or an entire sole proprietorship."); 24 C.F.R. §§ 8.3–8.4 (same). Accordingly, the Amended Complaint does not state a claim pursuant to Section 504 of the Rehabilitation Act against either Rambert, the other tenants in the building or Officer Reid.

### iv. ADA claim

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of *public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182 (emphasis added); *see also Kreisler v. Second Ave. Diner Corp.,* No. 10–CV–7592, 2012 WL 3961304, at *6 (S.D.N.Y. Sept.11, 2012).

Here, Plaintiff has not alleged sufficient facts to establish that the residential building is a place of public accommodation. *See Reyes,* 661 F.Supp.2d at 264 (finding that "receipt of Section 8 housing vouchers is an insufficient basis

upon which to deem the premises—a private, residential apartment complex—a place of public accommodation"); *accord Hardaway v. Equity Residential Mgmt., LLC,* No. 11–CV–A1924, 2012 WL 3903489, at *5 (D.Md. Sept.6, 2012) (same); *Mitchell v. Walters,* No. 10–CV–A1061, 2010 WL 3614210, at *4 (D.N.J. Sept.8, 2010) (same). As a result, the Amended Complaint does not state a claim under Title III of the ADA.

### v. Equal Protection claim

To state a claim under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, "a plaintiff must allege that a government actor intentionally discriminated against him on the basis of his [protected status]." *Brown v. City of Oneonta, New York,* 221 F.3d 329, 337 (2d Cir.2000). Plaintiff has not alleged that any of the Defendants are "government actors," as required to bring a claim pursuant to the Equal Protection Clause, and all Defendants appear to be private citizens. Therefore, the Amended Complaint does not state a claim for violation of the Equal Protection Clause of the United States Constitution.

 **\*10**  In sum, Plaintiff has not stated a claim under any federal law, and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims.[9] *See* 28 U.S.C. § 1367(c)(3). ("District courts may decline to exercise supplemental jurisdiction over a claim if the district court has dismissed all claims over which it has original jurisdiction."). Because Plaintiff's Amended Complaint does not contain sufficient facts that may fairly be read to state a claim for housing or disability-based discrimination or violation of

any of Plaintiff's constitutional rights, Plaintiff's Amended Complaint is dismissed. In view of Plaintiff's failure to state a valid claim, Plaintiff's request for the appointment of *pro bono* counsel is denied. *See Johnston v. Maha,* 606 F.3d 39, 41 (2d Cir.2010) (motions for appointment of pro bono counsel considered "by asking first whether the claimant has met a threshold showing of some likelihood of merit" (quoting *Cooper v. A. Sargenti Co.,* 877 F.2d 170, 174 (2d Cir.1989) and *Hodge v. Police Officers,* 802 F.2d 58, 59 (2d Cir.1986))).

### III. Conclusion

Plaintiff's Federal claims in the Amended Complaint are dismissed for failure to state a claim upon which relief may be granted. 28 U.S.C. § 1915(e)(2)(B). Plaintiff's request for the appointment of *pro bono* counsel is denied. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims and they are dismissed without prejudice. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). The Clerk of Court is directed to close this case.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 2440596

---

## Footnotes

1    The Court has paginated Plaintiff's Amended Complaint for ease of reference and assumes that the factual allegations are true for the purposes of this decision.

2    Section 8 of the Housing Act of 1937, as codified by 42 U.S.C. § 1437f, is a federal housing assistance program that provides, among other things, rental assistance to eligible low-income tenants who reside in units owned by participating landlords. *See* 42 U.S.C. § 1437f; *see also* Frederick K. Grittner, *Assisted housing—Section 8 Housing Assistance Program, in* 2 Fed. Admin. Prac. § 1506, (West, ed., 2013); Department of Housing and Urban Development, *Housing Choice Vouchers Fact Sheet,* http://portal.hud.gov/hudpor tal/HUD?src=/topics/housing_choice_ voucher_program_section_8 (last visited May 27, 2014); New

York City Housing Authority, *Housing Choice Voucher Program—Section 8,* http:// www.nyc.gov/html/nycha/ downloads/pdf/lh_housing_choice.pdf (last visited May 27, 2014).

3    Plaintiff's Amended Complaint reads in part:

> Throughout the community (communities), and the internet Plaintiff is called bi coo coo bi too, kook kook, mock it, coo her, kook and Plaintiff need medication and Plaintiff need to be evaluated. The rant is continued by Defendants Ruth and Steele in the confines of [the building] using an acoustic device (voice changer). Sounds made are clucking duck quack popping shattered glass piercing screeching shrill Defendants constantly tell Plaintiff it does not have to be this way kook kook get down, coo coo move leave moo moo (leave).

(Am.Compl.1–2.)

4    Although nearly all of the courts in this Circuit recognizing a cause of action for the creation of a hostile housing environment have done so with regard to allegations of sexual harassment, at least one court has recognized such a cause of action based on membership in another protected class, family status. *See Khalil v. Farash Corp.,* 260 F.Supp.2d 582, 583–589 (W.D.N.Y.2003) (denying defendant's motion for summary judgment on plaintiff's claim that, *inter alia,* the defendant, a management company that managed the plaintiff's housing complex, created a "hostile living environment for families with children" by promulgating and enforcing rules that disfavored families with children); *see also* 🚩 *Khalil v. Farash Corp.,* 277 F. App'x 81, 84 (2d Cir.2008) (assuming, without deciding, that a plaintiff may state a FHA claim of discrimination against families with children based on a hostile housing environment theory).

5    Even assuming that Plaintiff could properly state a claim against her neighbors and a police officer pursuant to the FHA, the Amended Complaint fails to state a claim of sexual harassment as to these Defendants. Plaintiff's broad assertion that "the above allegations are taking place because Plaintiff refuse to get down with prostitution [and] Plaintiff refused to get involved with them sexually," and her reference to having made a complaint to various government agencies about, *inter alia,* sexual harassment, (Am.Compl.6–7), are insufficient to state a plausible claim that Defendants created a hostile housing environment through sexual harassment. *See Ponce,* 2013 WL 4543622, at *2 (dismissing Plaintiff's sexual harassment claim under the FHA and finding that "Plaintiff's allegations about [a building superintendent's] unspecified 'unwanted sexual advances' and 'sexually explicit and humiliating comments about her anatomy' are 'naked assertion[s]' devoid of 'further factual enhancement' that do not suffice to establish a plausible claim." (quoting 🚩 *Iqbal,* 556 U.S. at 678)); 🚩 *Rich,* 2004 WL 1124662, at *4 ("Isolated or sporadic sexually inappropriate acts are not sufficiently pervasive and severe to constitute sexual harassment under the FHA.") The conclusory and nonspecific allegations in the Amended Complaint fail to state a claim for sexual harassment against Pope, Mitchell, Ruth, Steele and Reid. *See* 🚩 *Rich,* 2004 WL 1124662, at *4.

6    In addition, Plaintiff's allegation that Pope, Steele and Mitchell harassed her by "yelling the same rant" and telling her that she should be on medication, (Am.Compl.3), is not sufficiently pervasive or severe to create a hostile environment on the basis of Plaintiff's disability or perceived disability. *See* 🚩 *Rich,* 2004 WL 1124662, at *3. While Plaintiff alleges that Ruth and Steele are using an acoustic device that emits harmful noises "lasting throughout the day using different sound effects that are harmful to Plaintiff['s] hearing ... and interrupts sleep," she does not allege that these actions are because of Plaintiff's disability, nor does the Amended Complaint allege facts from which the Court can reasonably infer that Plaintiff's disability is a motivating-factor for Ruth and Steele's actions. Plaintiff's other allegations regarding the use of the Internet to spread defamatory comments about Plaintiff's "mental capacity" do not implicate Plaintiff's housing as

required under the Fair Housing Act. *Cf.* 📁 *United States v. Weisz,* 914 F.Supp. 1050, 1054 (S.D.N.Y.1996) ("[T]o bring a claim within § 3617 [of the FHA], a plaintiff must allege conduct on the part of a defendant which in some way or other implicates the concerns expressed by Congress in the FHA. If it were otherwise, the FHA would federalize any dispute involving residences and people who live in them.").

7    Plaintiff's Amended Complaint states: "After Plaintiff made several complaints to the 81st. Precinct, United States Attorney General, NYPD Internal Affairs and Brooklyn North Vice regarding the sexual harassment, gender discrimination [and] perceived disability discrimination ..., Defendant Landlord, Jerome Rambert, brought several frivolous housing cases against Plaintiff in Retaliation for making complaints to various government agencies." (Am.Compl.7.)

8    The Amended Complaint also states that "certified notarized mail" sent by Plaintiff to Rambert was refused by Rambert. (Am. Compl. 5 and Ex. 2.)

9    Plaintiff also brings claims pursuant to the "Equal Justice Under Telecommunications Act as amended," which she refers to as the "Law Cyber Stalking." (Am.Compl.4, 11.) The Court is unclear as to the statute Plaintiff is relying on. The Court is aware of a criminal statute which addresses stalking, making it a criminal offense to use "the mail, any interactive computer service or electronic communication service or electronic communication system of interstate commerce, or any other facility of interstate or foreign commerce, [with the intent to kill, injure, harass, intimidate] to engage in a course of conduct that places that person in reasonable fear of the death of or serious bodily injury to [that person, an immediate family member, or a spouse or intimate partner] or causes, attempts to cause, or would be reasonably expected to cause substantial emotional distress to a person." 📁 18 U.S.C. § 2261A. However, there is no private right of action to enforce this criminal statute, which, as a general matter, is prosecuted by the government and not by private individuals. *See Rock v. BAE Sys., Inc.,* —— F. App'x ——, ——, 2014 WL 715606, at *2 (11th Cir. Feb.26, 2014) (holding that there is no private right of action under 📁 § 2261A); *Weinstein v. City of New York,* No. 13–CV–06301, 2014 WL 1378129, at *4 (S.D.N.Y. Apr.8, 2014) ("Violations of the Criminal Code do not provide a basis for a civil cause of action, unless the particular provision in question includes an express or implied private right of action."); *Hopson v. Commonwealth Attorney's Office,* No. 12–CV–744, 2013 WL 1411234, at *3 (W.D.Ky. Apr. 8, 2013) ("It is clear that 📁 § 2261A does not provide for a private cause of action or civil remedies." (collecting cases)); *Jacobus v. Huerta,* No. 12–CV–02032, 2013 WL 673233, at *12 (S.D.W.Va. Feb. 22, 2013) (finding no private right of action under § 📁 18 U.S.C. § 2261A), *report and recommendation adopted,* No. 12–CV–02032, 2013 WL 1723631 (S.D.W.Va. Apr. 22, 2013); *Dorr v. Ford Motor Co.,* No. 10–CV–13822, 2011 WL 5857886, at *9 (E.D.Mich. Sept.27, 2011) (same), *report and recommendation adopted,* No. 10–CV–13822, 2011 WL 5838582 (E.D.Mich. Nov. 21, 2011). Therefore, to the extent Plaintiff seeks to bring a claim pursuant to 📁 18 U.S.C. 2261A, the claim is dismissed for failure to state a claim upon which relief may be granted.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 122038
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Michael APATOW, Plaintiff,

v.

TOWN OF STRATFORD, Robert McGrath,
Ronald Ing, and Laura Hoydick, Defendants.

CIVIL CASE NO. 3:21-CV-01692 (JCH)
|
Signed January 6, 2023

**Synopsis**

**Background:** Following firefighter's termination, arrest, and prosecution for altercation with colleague, firefighter brought action against defendants including town, fire chief, mayor, and human resources director, alleging discrimination based on disabilities of post-traumatic stress disorder (PTSD) and cardiac distress, induced by hostile work environment, and retaliation for complaining about environment, and asserting § 1983 claims against all defendants for violations of the Americans with Disabilities Act (ADA), the Rehabilitation Act, and his Fourteenth Amendment rights, as well as a claim under Connecticut law for intentional infliction of emotional distress (IIED), and asserting state-law claim against town for wrongful termination. Defendants moved to dismiss for failure to state a claim.

**Holdings:** The District Court, Janet C. Hall, J., held that:

[1] firefighter alleged insufficient facts to state claims against human resources director and mayor in their personal capacities either for violation of the Fourteenth Amendment or IIED;

[2] equal protection clause did not apply to claims of employment discrimination and retaliation;

[3] defendants' alleged indifference to harmful state of firefighter's workplace did not rise to the level of a substantive due process violation;

[4] firefighter failed to establish a prima facie case for disability-based discrimination in violation of the ADA;

[5] firefighter failed to state a claim for retaliation under the Rehabilitation Act;

[6] firefighter failed to state a claim for wrongful termination under Connecticut law; and

[7] firefighter failed to allege conduct sufficiently extreme and outrageous to support claim for IIED under Connecticut law.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (61)

**[1]    Federal Civil Procedure** 🔑 **Insufficiency in general**

The plausibility standard that must be met to survive a motion to dismiss for failure to state a claim is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Fed. R. Civ. P. 12(b)(6).

**[2]    Federal Civil Procedure** 🔑 **Matters deemed admitted; acceptance as true of allegations in complaint**

In reviewing a motion to dismiss for failure to state a claim, a court does not credit legal conclusions or threadbare recitals of the elements of a cause of action. Fed. R. Civ. P. 12(b)(6).

**[3]    Public Employment** 🔑 **Individual or Official Capacity**

Official-capacity suits are only one way of pleading an action against an entity of which an officer is an agent.

**[4]    Public Employment** 🔑 **Substitution of Government as Defendant**

As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

**[5]**    **Federal Civil Procedure** 🔑 Alternate, Hypothetical and Inconsistent Claims

Terminated firefighter's claims against fire chief, town human resources director, and town mayor in their official capacities were duplicative of claims brought against town, thus warranting dismissal of such claims, which alleged intentional infliction of emotional distress (IIED) and violations of equal protection and due process rights; suit against the individual defendants in their official capacities was unnecessary, and dismissal of such claims did not limit firefighter's recovery, as he did not seek injunctive relief. U.S. Const. Amend. 14.

**[6]**    **Civil Rights** 🔑 Employment practices

**Damages** 🔑 Other particular cases

Terminated firefighter alleged insufficient facts to state claims against town's human resources director and mayor in their personal capacities either for violation of his Fourteenth Amendment equal protection and due process rights under § 1983, or for intentional infliction of emotional distress (IIED), in firefighter's action alleging violations arising from his termination from town fire department, notwithstanding firefighter's vague assertions that director and mayor demanded arrest and investigation of firefighter, and that they "orchestrated and participated" in his unlawful termination; beyond firefighter's conclusory assertions, there were no supporting allegations outlining any involvement by either human resources director or mayor. U.S. Const. Amend. 14; 🚩42 U.S.C.A. § 1983.

**[7]**    **Civil Rights** 🔑 Substantive or procedural rights

By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere. 🚩42 U.S.C.A. § 1983.

**[8]**    **Constitutional Law** 🔑 Public employees and officials

**Municipal Corporations** 🔑 Grounds for removal

**Public Employment** 🔑 Exercise of Rights; Retaliation

Equal protection clause did not apply to terminated firefighter's claims of employment discrimination and retaliation based on his alleged disabilities of work-environment-induced post-traumatic stress disorder (PTSD) and cardiac distress, thus requiring dismissal of firefighter's § 1983 claim for violation of his equal protection rights in action against town and officials, notwithstanding firefighter's argument that § 1983 claims for disability discrimination and retaliation against individual defendants in their personal capacity were not subject to automatic dismissal. U.S. Const. Amend. 14; 🚩42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[9]**    **Constitutional Law** 🔑 Labor, Employment, and Public Officials

The equal protection clause does not apply to claims of disability-related discrimination or retaliation in employment. U.S. Const. Amend. 14.

1 Case that cites this headnote

**[10]**    **Civil Rights** 🔑 Handicap, Disability, or Illness

**Constitutional Law** 🔑 Class Legislation; Discrimination and Classification in General

Freedom from discrimination on the basis of disability is a right secured by statute, not by the Constitution.

**[11]    Civil Rights** 🔑 **Discrimination by Reason of Handicap, Disability, or Illness**

An employment-based disability discrimination claim is not actionable under § 1983. 🏳 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[12]    Constitutional Law** 🔑 **Similarly situated persons; like circumstances**

The Equal Protection Clause is essentially a direction that all persons similarly situated should be treated alike. U.S. Const. Amend. 14.

**[13]    Constitutional Law** 🔑 **"Class of one" claims**
**Constitutional Law** 🔑 **"Class of one" claims**

A plaintiff may bring a "class of one" equal protection claim where the plaintiff alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. U.S. Const. Amend. 14.

**[14]    Constitutional Law** 🔑 **Removal, recall, and discipline**
**Municipal Corporations** 🔑 **Grounds for removal**
**Public Employment** 🔑 **Disparate treatment**

Terminated firefighter's status as a public employee precluded his § 1983 claim for violation of the equal protection clause under a "class of one" theory, based on allegations of differential treatment of his complaints about his workplace, in action against town and officials; firefighter was employed by the town. U.S. Const. Amend. 14; 🏳 42 U.S.C.A. § 1983.

**[15]    Constitutional Law** 🔑 **"Class of one" claims**
**Constitutional Law** 🔑 **Enforcement, application, or administration in general**

"Selective enforcement" and "class of one" are different variations of Equal Protection claims that share many similarities while remaining distinct. U.S. Const. Amend. 14.

**[16]    Constitutional Law** 🔑 **Enforcement, application, or administration in general**

To prevail on a "selective enforcement" claim under the equal protection clause, a plaintiff must show both (1) that he was treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. U.S. Const. Amend. 14.

**[17]    Constitutional Law** 🔑 **Enforcement, application, or administration in general**

Selective enforcement claims under the equal protection clause require a reasonably close resemblance between a plaintiff's and a comparator's circumstances. U.S. Const. Amend. 14.

**[18]    Constitutional Law** 🔑 **Enforcement, application, or administration in general**

Under the standard for selective enforcement claims under the equal protection clause, a plaintiff must specify at least one instance in which he was treated differently from another similarly situated. U.S. Const. Amend. 14.

**[19]    Constitutional Law** 🔑 **Enforcement, application, or administration in general**

On a motion to dismiss a selective enforcement claim under the equal protection clause, a court need not decide whether two comparators are sufficiently similar, but only that the plaintiff has alleged sufficient facts to nudge the claims across the line from conceivable to plausible. U.S. Const. Amend. 14; Fed. R. Civ. P. 12(b)(6).

**[20]**    **Constitutional Law** 🔑 Removal, recall, and discipline

     **Municipal Corporations** 🔑 Grounds for removal

     **Public Employment** 🔑 Disparate treatment

Terminated firefighter's status as a public employee precluded his § 1983 claim for violation of the equal protection clause under a selective enforcement theory, in action against town and officials, even though he alleged that his termination was the first time a firefighter had been terminated for involvement in a physical altercation, and that at least three prior altercations among his colleagues had led to physical injury and property damage; firefighter was employed by the town. U.S. Const. Amend. 14; 🚩 42 U.S.C.A. § 1983.

**[21]**    **Constitutional Law** 🔑 Protections Provided and Deprivations Prohibited in General

Not all wrongs perpetrated by a government actor violate due process. U.S. Const. Amend. 14.

**[22]**    **Constitutional Law** 🔑 Egregiousness; "shock the conscience" test

To survive a motion to dismiss for failure to state a claim, a substantive due process claim must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience. U.S. Const. Amend. 14; Fed. R. Civ. P. 12(b)(6).

**[23]**    **Constitutional Law** 🔑 Egregiousness; "shock the conscience" test

Substantive due process is an outer limit on the legitimacy of governmental action, and thus substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority. U.S. Const. Amend. 14; Fed. R. Civ. P. 12(b)(6).

**[24]**    **Constitutional Law** 🔑 Particular issues and applications

     **Municipal Corporations** 🔑 Grounds for removal

     **Public Employment** 🔑 Exercise of Rights; Retaliation

Defendants' alleged indifference to the harmful state of firefighter's workplace did not rise to the level of a violation of substantive due process so as to support firefighter's § 1983 claim against town and officials, where firefighter alleged only that he was subjected to increased scrutiny after making complaints, that he received harsher discipline than others, that he suffered through insensitive comments about the race of his girlfriend's son, and that he was forced to work in an environment replete with heated arguments.

U.S. Const. Amend. 14; 🚩 42 U.S.C.A. § 1983.

**[25]**    **Constitutional Law** 🔑 Egregiousness; "shock the conscience" test

     **Constitutional Law** 🔑 Restraint, commitment, and detention

Deliberate indifference to a supervisee's wrongful behavior may shock the conscience, so as to support a claim for a violation of substantive due process, in instances in which the government owes a special duty of care to those in its charge, such as persons held in detention. U.S. Const. Amend. 14.

**[26]**    **Constitutional Law** 🔑 Particular issues and applications

     **Municipal Corporations** 🔑 Fire

     **Public Employment** 🔑 Rights, Interests, and Privileges in General

Allegations of terminated firefighter that defendants reported to police a physical altercation in which he was involved, and that a prosecution ensued, were insufficient to shock the conscience, and thus did not give rise to a § 1983 claim for violation of firefighter's substantive due process rights in his action against town and officials; complaint did not

provide any detail about the altercation, other than that he was forced to defend himself, and there was no allegation beyond conclusory statements that firefighter's arrest or prosecution arose from false complaints or malice. U.S. Const. Amend. 14; ⚑ 42 U.S.C.A. § 1983.

**[27]**   **Federal Courts** 🔑 Labor and Employment

State law, rather than the federal Constitution, generally governs the substance of the employment relationship.

**[28]**   **Civil Rights** 🔑 Practices prohibited or required in general; elements

A plaintiff challenging disability-based discrimination under the ADA must establish a prima facie case, which consists of a showing that: (1) his employer is subject to the ADA, (2) he was disabled within the meaning of the ADA, (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation, and (4) he suffered adverse employment action because of his disability. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[29]**   **Civil Rights** 🔑 Pleading

Terminated firefighter failed to allege that town fire department was a covered employer under the ADA, and thus did not establish a prima facie case for disability-based discrimination in his action against town and officials, alleging discrimination in his termination, arrest, and prosecution following his altercation with a colleague, based on disabilities of post-traumatic stress disorder (PTSD) and cardiac distress; complaint did not indicate the number of employees department had or whether they met the working requirements laid out in the ADA. Americans with Disabilities Act of 1990 § 101, ⚑ 42 U.S.C.A. § 12111(5)(A).

**[30]**   **Civil Rights** 🔑 Pleading

Terminated firefighter failed to allege that town fire department was a covered employer under the ADA, and thus did not state a claim for retaliation under the ADA in his action against town and officials, alleging that his complaints of a harmful work environment resulted in increased scrutiny by his supervisors; firefighter did not indicate the number of employees department had or whether they met the working requirements laid out in the ADA. Americans with Disabilities Act of 1990 § 101, ⚑ 42 U.S.C.A. § 12111(5)(A).

**[31]**   **Civil Rights** 🔑 Pleading

Terminated firefighter failed to allege that town fire department was a covered employer under the ADA, and thus failed to state a hostile work environment claim under the ADA in action against town and officials, notwithstanding his assertion that the hostile environment had induced post-traumatic stress disorder (PTSD) and cardiac distress. Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

**[32]**   **Civil Rights** 🔑 Pleading

Terminated firefighter failed to allege that town fire department received federal funding, and thus firefighter failed to state a claim for retaliation under the Rehabilitation Act, in his action against town and officials, notwithstanding his assertions that he had the disabilities of post-traumatic stress disorder (PTSD) and cardiac distress, that his complaints of a harmful work environment had resulted in increased scrutiny by supervisors, and that his termination was the first time that a firefighter had been terminated for involvement in a physical altercation, even though prior altercations had led to physical injury and property damage. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.

**[33]**   **Civil Rights** 🔑 Acts or Conduct Causing Deprivation

A prima facie case for retaliation under the Rehabilitation Act (RA) requires meeting the same elements as under the ADA, though tailored to fit the RA. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.

[34]    **Civil Rights** 🔑 Practices prohibited or required in general; elements

To establish a prima facie claim for retaliation under the Rehabilitation Act, a plaintiff must prove (1) that she is a person with a disability under the Act, (2) that she is otherwise qualified for the position sought, (3) that she is being excluded from the position solely by reason of her disability, and (4) that the position exists as part of a program or activity receiving Federal financial assistance. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.

[35]    **Labor and Employment** 🔑 Public policy considerations in general

Under Connecticut law, public policy imposes some limits on unbridled discretion to terminate the employment of someone hired at will.

[36]    **Labor and Employment** 🔑 Public policy considerations in general

A common law cause of action for wrongful termination may be maintained under Connecticut law when the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy.

[37]    **Labor and Employment** 🔑 Public policy considerations in general

Under Connecticut law, the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one.

[38]    **Labor and Employment** 🔑 Public policy considerations in general

**Labor and Employment** 🔑 Existence of other remedies; exclusivity

To prevail on a claim of wrongful termination under Connecticut law, a plaintiff must: (1) plead that the alleged conduct by the employer contravenes public policy and (2) demonstrate that the plaintiff is otherwise without remedy and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated.

[39]    **Labor and Employment** 🔑 Existence of other remedies; exclusivity

If a relevant state or federal law contains a private right of action which serves to protect the public policy allegedly violated, a wrongful discharge claim will fail under Connecticut law.

[40]    **Municipal Corporations** 🔑 Suspension and Removal of Firemen

**Public Employment** 🔑 Removal, separation, termination, and discharge in general

Absent any allegation that firefighter was terminated for refusing to work in a hostile work environment, firefighter's termination did not violate public policy embodied in Connecticut workplace safety statutes so as to state a claim for wrongful termination under Connecticut law, notwithstanding firefighter's allegations that he was terminated for complaining about the work environment and the psychological issues its hostility engendered. Conn. Gen. Stat. Ann. §§ 31-49, 31-370.

[41]    **Labor and Employment** 🔑 Existence of other remedies; exclusivity

Terminated firefighter failed to demonstrate that he was without remedy other than a claim for wrongful termination under Connecticut law, thus precluding such claim in his action against town and its officials; firefighter's allegations that he was terminated for complaining about

work environment and the psychological issues its hostility engendered were the basis of his claims under the ADA and the Rehabilitation Act, which remained available if he repleaded them, and he had other potential claims as well, such as for hostile work environment under Title VII and the Connecticut Fair Employment Practices Act. Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Conn. Gen. Stat. Ann. § 46a-60 et seq.

**[42]    Civil Rights**    Governmental Ordinance, Policy, Practice, or Custom

To properly bring a claim of municipal liability under Monell, a plaintiff must allege sufficient facts to plausibly show: (1) that he suffered a constitutional violation, and (2) that the violation resulted from an identified municipal policy, custom, or practice.

**[43]    Civil Rights**    Lack of Control, Training, or Supervision; Knowledge and Inaction

Monell recognizes liability when a municipality's failure to train its employees amounts to deliberate indifference to the rights of persons with whom the untrained employees come into contact.

**[44]    Civil Rights**    Governmental Ordinance, Policy, Practice, or Custom

A policy, custom, or practice need not be memorialized in a specific rule or regulation in order to give rise to municipal liability under § 1983. 42 U.S.C.A. § 1983.

**[45]    Civil Rights**    Governmental Ordinance, Policy, Practice, or Custom

A Monell claim may succeed when constitutional violations are so persistent and widespread, so permanent and well settled that they constitute a custom or usage with the force of law.

**[46]    Civil Rights**    Complaint in general

The mere assertion that a municipality has a custom or policy resulting in persistent and widespread constitutional violations is insufficient to support a Monell claim in the absence of allegations of fact tending to support, at least circumstantially, such an inference.

**[47]    Civil Rights**    Employment practices

Even if terminated firefighter had plausibly pleaded a violation of his constitutional rights, he failed to allege sufficient facts to show persistent violations that constituted a custom or usage, so as to give rise to a Monell claim against town for failure to train, in firefighter's action alleging a hostile work environment that induced post-traumatic stress disorder (PTSD); although complaint noted numerous "heated arguments" among firefighters over 21-year period, it alleged only four incidents leading to injury or property damage, giving a date for only one incident and failing to state the time elapsed between each, and allegations did not address the chronology and number of firefighter's complaints about racially offensive language and his physical and psychological distress.

**[48]    Civil Rights**    Lack of Control, Training, or Supervision; Knowledge and Inaction

A failure to train may constitute an official policy or custom, for purposes of municipal liability under § 1983, if the failure amounts to deliberate indifference to the rights of those with whom the public employee interacts. 42 U.S.C.A. § 1983.

**[49]    Civil Rights 🔑 Lack of Control, Training, or Supervision; Knowledge and Inaction**

A municipality's culpability for a deprivation of rights is at its most tenuous when a claim turns on a failure to train.

**[50]    Damages 🔑 Elements in general**

To prevail on a claim of intentional infliction of emotional distress (IIED) in Connecticut, a plaintiff must establish four elements: (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct, (2) that the conduct was extreme and outrageous, (3) that the defendant's conduct was the cause of the plaintiff's distress, and (4) that the emotional distress sustained by the plaintiff was severe.

**[51]    Damages 🔑 Nature of conduct**

Plaintiffs in Connecticut are held to a stringent standard when attempting to demonstrate that a defendant's conduct was extreme and outrageous, for purposes of a claim of intentional infliction of emotional distress (IIED).

**[52]    Damages 🔑 Nature of conduct**

To rise to the level of extreme and outrageous, as required to support a claim of intentional infliction of emotional distress (IIED) under Connecticut law, a defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

**[53]    Damages 🔑 Humiliation, insults, and indignities**

Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress (IIED) under Connecticut law.

**[54]    Damages 🔑 Nature of conduct**

To support a claim under Connecticut law for intentional infliction of emotional distress (IIED), conduct must be of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.

**[55]    Damages 🔑 Labor and Employment**

Under Connecticut law, the threshold for demonstrating extreme and outrageous conduct, as required for a claim of intentional infliction of emotional distress (IIED). is higher in the workplace than elsewhere; individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace.

**[56]    Damages 🔑 Labor and Employment**

Generally, personnel actions or workplace conduct that falls within the reasonably expected vicissitudes of employment, including insults, verbal taunts, threats, indignities, annoyances, petty oppressions, or conduct that displays bad manners or results in hurt feelings, even if unlawful, are usually not deemed extreme and outrageous conduct, as required for a claim of intentional infliction of emotional distress (IIED) under Connecticut law.

**[57]    Damages 🔑 Mental suffering and emotional distress**

For purposes of a claim for intentional infliction of emotional distress (IIED) under Connecticut law, whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine; only when reasonable minds could disagree does it become an issue for the jury.

**[58]    Damages 🔑 Handicap, disability, or illness**

Terminated firefighter failed to allege conduct sufficiently extreme and outrageous to support his claim for intentional infliction of emotional distress (IIED) against town and town officials under Connecticut law, despite his assertions of disability discrimination, and even though his termination involved arrest and prosecution following an altercation after he was allegedly cornered by a colleague intervening after firefighter's equipment had allegedly been hidden; firefighter readily admitted his participation in altercation, which was apparently the grounds for calling the police, firefighter's arrest, and his prosecution, about which complaint contained no details, and firefighter did not allege that defendants lied to police or made a false report to induce firefighter's arrest.

[59]    **Damages** 🔑 Nature of conduct

An example of an atypical situation in which a call to police might constitute extreme and outrageous conduct for purposes of a claim of intentional infliction of emotional distress (IIED) is when a false report is made concerning a particularly serious crime or for a vindictive purpose.

[60]    **Municipal Corporations** 🔑 Judgment

As a general rule, no punitive damages are allowed against a municipality unless expressly authorized by statute.

[61]    **Damages** 🔑 Particular cases in general

**Public Employment** 🔑 Trial, judgment, and relief

**Towns** 🔑 Appointment or election, qualification, tenure, and removal of officers or employees

Terminated firefighter could not recover punitive damages from town on claims brought under Connecticut law for wrongful termination in violation of public policy and intentional infliction of emotional distress (IIED), in firefighter's action against town and officials;

there was no statutory authorization for imposing punitive damages on town, as firefighter's state-law claims were rooted in the common law.

**Attorneys and Law Firms**

William Sylvester Palmieri, Law Offices of William S. Palmieri, LLC, New Haven, CT, for Plaintiff.

Raymond J. Rigat, Richard J. Buturla, Warren L. Holcomb, Berchem Moses PC, Milford, CT, for Defendants.

**RULING ON MOTION TO DISMISS**

Janet C. Hall, United States District Judge

**I. INTRODUCTION**

*1  Plaintiff Michael Apatow ("Apatow") brings this action under 🔖 section 1983 of title 42 of the United States Code ("🔖 Section 1983"); the Americans with Disabilities Act ("ADA"); the Rehabilitation Act ("RA"); as well as Connecticut state law against Town of Stratford ("Stratford"), Robert McGrath ("McGrath"), Ronald Ing ("Ing"), and Laura Hoydick ("Hoydick"). Apatow alleges violations of his rights arising from his formal complaints about, and termination from, the Stratford Fire Department ("SFD").

Before this court is the defendants' Motion to Dismiss ("Mot. to Dismiss") (Doc. No. 13), which the plaintiff opposes. Plaintiff's Opposition ("Pl.'s Opp'n") (Doc. No. 21). For the reasons set forth below, the Motion to Dismiss is granted.

**II. BACKGROUND**

A. Factual Background [1]

For thirteen years, Apatow served as a firefighter with the SFD. Compl. ¶ 11. His tenure was marked by hazardous rescues, unit citations, and other recognitions. Id. at ¶ 12. However, Apatow's time with the SFD was also marred by epithets from his fellow firefighters in reference to his girlfriend's Black son as well as a working environment that was generally "exceedingly hostile and intimidating." Id. at ¶¶ 16, 29. Heated arguments were a regular occurrence in the

firehouse, and these disagreements were known to escalate to violence. Id. ¶¶ 17, 24.

On one occasion, a colleague threw a wooden cutting board in a "frisbee-like" manner at the plaintiff. Id. at ¶ 25. Apatow attempted to file a written complaint about the incident, but it was refused by the Assistant Chief, who directed him instead to "go out back and fight, fight it out." Id. at ¶ 26. The firefighter who flung the cutting board at Apatow faced no disciplinary action, and supervisors at the SFD took "no steps" to ameliorate the hostility among the firefighters. Id. at ¶ 27. The state of the work environment induced Post Traumatic Stress Disorder ("PTSD") and cardiac distress for Apatow, id. at ¶ 30, but his complaints noting this toll on his body only resulted in increased scrutiny by his supervisors. Id. at ¶ 31.

The situation with Apatow's colleagues came to a head when a fellow firefighter "hid essential components of the plaintiff's fire safety gear." Id. at ¶ 33. While tensions were high, another firefighter intervened and cornered Apatow. Id. This intimidation "forc[ed] Apatow]" to defend himself. Id. Following the incident, Apatow was terminated on December 20, 2018. Id. at ¶¶ 32–33. Although there were at least three prior altercations among SFD firefighters that led to physical injury and property damage, id. at ¶¶ 37-38, this was the first time a firefighter was terminated for his involvement in such an incident, id. at ¶ 35. Beyond the disciplinary action, the defendants—including McGrath, the Chief of the SFD; Ing, the Human Resources Director for Stratford; and Hoydick, the Mayor of Stratford—reported the altercation to the police, leading to Apatow's arrest and prosecution. Id. at ¶ 39.

### B. Procedural Background

**\*2** Apatow filed his Complaint against the defendants on December 20, 2021. See Compl. He brings five Counts, alleging hostile work environment, disparate treatment, and retaliation, in violation of the ADA, 42 U.S.C. §§ 12111 et seq., as amended; the RA, 29 U.S.C. §§ 794 et seq.; and Fourteenth Amendment rights. Apatow asserts violation of his equal protection and due process rights in Count One against each of the defendants. In Count Two, which he brings against Stratford, he alleges that the Town's actions constitute wrongful termination in violation of public policy under Connecticut state law. Count Three, also brought against Stratford, alleges municipal liability for the constitutional

violations asserted in Count One. Count Four, like Count One, asserts violations of the ADA, 42 U.S.C. §§ 12111 et seq., as amended, and RA, 29 U.S.C. §§ 794. et seq., but Apatow alleges that Stratford is liable as opposed to the individual defendants. Count Five alleges intentional infliction of emotional distress against all the defendants under Connecticut state law.

In response, the defendants filed a Motion to Dismiss all counts on the grounds that Apatow failed to state a claim for relief that is facially plausible. See Mot. to Dismiss; Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defs.' Mem.") (Doc. No. 13-1). The plaintiff opposes this Motion. See Plaintiff's Opposition ("Pl.'s Opp.") (Doc. No. 21); Memorandum in Opposition to Defendants' Motion to Dismiss ("Pl.'s Mem.") (Doc. No. 21-1).

### III. LEGAL STANDARD

**[1]** **[2]** To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Reviewing a motion to dismiss under Rule 12(b)(6), the court liberally construes the claims, accepts the factual allegations in a complaint as true, and draws all reasonable inferences in the non-movant's favor. See La Liberte v. Reid, 966 F.3d 79, 85 (2d Cir. 2020). However, the court does not credit legal conclusions or "[t]hreadbare recitals of the elements of a cause of action." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal citations omitted).

### IV. DISCUSSION

#### A. Official Capacity Claims

Apatow raises claims in Counts One and Five against the Town of Stratford as well as McGrath, Ing, and Hoydick in their individual and official capacities. The defendants move to dismiss all claims against McGrath, Ing, and Hoydick in their individual capacities as duplicative of the claims brought against the Town of Stratford. Defs.' Mem. 1, 23. In his Memorandum in Opposition, Apatow fails to address defendants' argument on this issue.

 **[3]**    **[4]**   Official-capacity suits are only "one way of pleading an action against an entity of which an officer is an agent."

Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); see also Reynolds v. Giuliani, 506 F.3d 183, 191 (2d Cir. 2007) ("An official capacity suit against a public servant is treated as one against the governmental entity itself.").

"Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant." Phillips v. County of Orange, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) (collecting cases); see also Jones v. Sansom, 2022 WL 972445, at *9–10 (D. Conn. Mar. 31, 2022) (dismissing Equal Protection and Due Process claims against individuals in their official capacity as redundant to the claims against the city); Mr. Quinn v. Gould, 2020 WL 1234553, at *5 (D. Conn. Mar. 13, 2020) (dismissing claims against a police chief in his official capacity as "duplicative of the claims against the City"); Olschafskie v. Town of Enfield, 2015 WL 9239742, at *1 (D. Conn. Dec. 17, 2015) (determining that where a plaintiff brings "municipal liability claims against the Town under both federal and state law, the official capacity claims against the individual officers are redundant.").

 **\*3**    **[5]**   The only claims Apatow brings against the individual defendants in their official capacity are also brought against the Town of Stratford. As such, they are redundant, and it is unnecessary to sue McGrath, Ing, and Hoydick in their official capacities. Moreover, dismissing the official capacity claims does not limit Apatow's recovery because he does not seek injunctive relief. Compl. at 13.

Accordingly, the claims against McGrath, Ing, and Hoydick in their official capacity in Counts One and Five are dismissed.

### B. Individual Capacity Claims Against Ing and Hoydick

 **[6]**   Though Apatow asserts claims against Ing and Hoydick in their individual capacity in Counts One and Five, there is only one allegation in the Complaint that specifically addresses their conduct. Compl. ¶ 41. In particular, Apatow avers that "defendants McGrath, Ing and Hoydick demanded the arrest and investigatio [sic] of the plaintiff and orchestrated and participated in the unlawful termination of the plaintiff." Id. Beyond this conclusory statement, there are no supporting allegations outlining any involvement by Ing and Hoydick. Indeed, the other allegations refer simply to "the defendants" without further clarification. See, e.g., Compl. ¶¶ 18, 28–30, 39. These vague allegations fall short of meeting Iqbal's requirements. Even though the court must accept all factual allegations in the Complaint as true, there is insufficient factual allegations to plausibly suggest Ing and Hoydick violated Apatow's constitutional rights or intentionally inflicted emotional distress. Thus, the claims against Ing and Hoydick in their personal capacity in Count One and Count Five are dismissed without prejudice.

### C. Equal Protection Claim in Count One

The first ground upon which the defendants move to dismiss is that the Complaint failed to state a plausible claim of an Equal Protection Clause violation, as enforced through section 1983 of title 42 of the United States Code. See Defs.' Mem. at 8. In opposition, Apatow avers two potential grounds for an Equal Protection Clause violation: disability discrimination and retaliation, as well as differential treatment on the basis of his complaints about the workplace. See Compl. ¶ 3.

 **[7]**   Section 1983 affords a cause of action against any person who, acting under color of law, deprives another of any rights, privileges, or immunities secured by the Constitution and U.S. law. See 42 U.S.C. § 1983. "By its terms, of course, the statute creates no substantive rights; it merely provides remedies for deprivations of rights established

elsewhere." City of Oklahoma City v. Tuttle, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

1. The Equal Protection Clause Does Not Apply to Claims of Disability Discrimination and Retaliation

**[8]**  **[9]**  **[10]**  **[11]** Here, the Equal Protection Clause is invoked as the source of the right being deprived. Apatow's first basis for the violation—disability discrimination and retaliation—is barred because "the equal protection clause does not apply to claims of disability-related discrimination or retaliation in employment." Koenig v. City of New Haven, 2017 WL 631190, at *12 (D. Conn. Feb. 15, 2017); see also Chick v. County of Suffolk, 546 F. App'x 58, 60 (2d Cir. 2013) (summary order) (holding that plaintiff's equal protection clause "claim that he was discriminated against based on his alleged disability[ ] was not cognizable" because "disability is not a suspect classification under the Equal Protection Clause...."). "[F]reedom from discrimination on the basis of disability is a right secured by statute ... not by the Constitution." Fierro v. N.Y.C. Dep't of Educ., 994 F. Supp. 2d 581, 590 (S.D.N.Y. 2014). Accordingly, an employment-based disability discrimination claim "is not actionable" under section 1983. Id. As a result, a plaintiff's claim that his Equal Protection rights were violated because defendants discriminated against him based on his real or perceived disability must be dismissed. The rule barring section 1983 claims arising out of disability discrimination in this context also applies to "employment retaliation based on disability." Koenig, 2017 WL 631190, at *12.

**\*4** In his opposition to the Motion to Dismiss, Apatow counters by pointing to a footnote in the Fierro decision. Pl.'s Mem. 12–13. He argues that the footnote supports the proposition that only section 1983 disability discrimination and retaliation claims against defendants in their official capacity must be dismissed. Id.; Fierro, 994 F. Supp. 2d at 590 n. 9 (opining that section 1983 claims against defendants in their individual capacity "are not automatically dismissible" on the ground that the ADA alone confers the right to be vindicated "because individual liability is available under § 1983, but not under the ADA.").

As a result, Apatow concludes that the claims against the individual defendants should not be dismissed. Pl.'s Mem. 13.

However, this argument ignores that courts in this District and elsewhere in the Second Circuit have not adopted this reading and to, the contrary, have dismissed such claims against defendants in their individual capacity on this ground. See, e.g., McArthur v. City of Stamford, 2019 WL 1559431, at *1-2 (D. Conn. Apr. 10, 2019); Abbott v. New York State Div. of State Police, 2020 WL 5802236, at *3–4 (N.D.N.Y. Sept. 29, 2020); Bonds v. Cnty. of Westchester, 2020 WL 4347704, at *8, 12 (S.D.N.Y. July 28, 2020); A.K. v. Westhampton Beach Sch. Dist., 2019 WL 4736969, at *18–19 (E.D.N.Y. Sept. 27, 2019).

Because the Equal Protection Clause does not apply to claims of disability discrimination and retaliation in the employment context, the court dismisses this basis for a section 1983 Equal Protection violation in Count One with prejudice.

2. The Equal Protection Clause Does Not Apply to "Class of One" Claims of Differential Treatment Regarding Workplace Complaints in Public Employment Context

**[12]**  **[13]** Apatow's second basis for an equal protection violation—that is, differential treatment arising out of his complaints about the workplace—also fails. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). A plaintiff may bring a "class of one" equal protection claim "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Village of Willowbrook v. Olech, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000).

**[14]** That being said, the Supreme Court and the Second Circuit both have held that "class of one" claims do not apply to public employment. Engquist v. Or. Dep't of Agric., 553 U.S. 591, 607, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008) (holding that "the class-of-one theory of equal protection has no application in the public employment context"); Appel v. Spiridon, 531 F.3d 138, 141 (2d Cir. 2008) (recognizing that the "the Equal Protection Clause does not apply to a public

employee asserting a violation of the Clause under a 'class of one' theory", and overruling any Second Circuit precedent that conflicts with the 🚩 Engquist holding). Because Apatow is a firefighter employed by Stratford, he is a public employee who is barred from raising such claims. See Mancuso v. Village of Pelham, 2016 WL 5660273, at *13 (S.D.N.Y. Sept. 29, 2016) (determining that a plaintiff who was a "firefighter employed by the Village" was a public employee); O'Hanlon v. City of Danbury, 2009 WL 586278, at *2–3 (D. Conn. Mar. 9, 2009) (dismissing "class of one" claims raised by individuals who were denied employment with the town fire department). Accordingly, the Equal Protection claim cannot proceed under a "class of one" theory: it is dismissed with prejudice.

### 3. The Selective Enforcement Theory of an Equal Protection Violation Remains Viable in the Public Employment Context

**\*5** **[15]** **[16]** **[17]** **[18]** **[19]** Apatow attempts circumvent the "class of one" result by styling his claim as "a violation of Equal Protection pursuant to selective enforcement." Pl.'s Mem. 12. Selective enforcement and class of one are different variations of Equal Protection claims that share many similarities while remaining distinct. See 🚩 Hu v. City of New York, 927 F.3d 81, 91–96 (2d Cir. 2019) (discussing the two theories at length). To prevail on a selective enforcement claim, a plaintiff must show both "(1) that [he was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." Doninger v. Niehoff, 642 F.3d 334, 357 (2d Cir. 2011) (quoting 🚩 Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001)). Selective enforcement claims "require[ ] a 'reasonably close resemblance' between a plaintiff's and a comparator's circumstances." 🚩 Hu, 927 F.3d at 93. Under this standard, "a plaintiff must specify at least one instance in which he was treated differently from another similarly situated." 🚩 Id. at 101. Moreover, at the Motion to Dismiss stage, the court need not decide whether two comparators are sufficiently similar, 🚩 Brown v. Daikin Am. Inc., 756 F.3d 219, 230 (2d Cir. 2014) ("Ordinarily, whether two employees are similarly situated presents a question of fact, rather than

a legal question to be resolved on a motion to dismiss."), but only that the plaintiff has alleged sufficient facts to "nudge" the claims "across the line from conceivable to plausible", 🚩 Iqbal, 556 U.S. at 680, 129 S.Ct. 1937.

**[20]** Notably, the Second Circuit has not yet decided whether the 🚩 Engquist decision bars malice-based selective enforcement claims in the public employment context. 🚩 Hu, 927 F.3d at 100 n.5; see also Emmerling v. Town of Richmond, 434 F. App'x 10, 12 (2d Cir. 2011) ("This Circuit has not yet decided whether selective enforcement claims are still viable in the public employment context after 🚩 Engquist...."). To date, district courts in the Circuit have reached divergent conclusions. Compare, e.g., 🚩 Airday v. City of New York, 2020 WL 4015770, at *2–7 (S.D.N.Y. July 16, 2020) (concluding 🚩 Engquist did not bar a malice-based selective enforcement claim against a public employer), with Ramirez v. Town of Oxford, 2022 WL 3646203, at *8 (D. Conn. Aug. 24, 2022) ("[T]he holding and result in 🚩 Engquist compel the conclusion that malice-based equal protection claims may not proceed in the public employment context."). On this question, the court concurs with the Ramirez analysis, assessing that, even though the Supreme Court did not "tease out the distinction between class-of-one claims based on evidence of mere arbitrariness as opposed to outright malice," the principle of "stare decisis compels a lower court to follow the judgments of the Supreme Court and not just their reasoning." 2022 WL 3646203, at *9. Thus, this court concludes that 🚩 Engquist's prohibition on "class of one" claims in the public employment context extends to malice-based selective enforcement claims as well, and this claim is dismissed with prejudice.

### D. Due Process Claim in Count One

The defendants move to dismiss Apatow's claim that the government deprived him of his right to due process throughout his tenure with the SFD. See Defs.' Mem. 11–15. Apatow counters by arguing that he has plausibly pled a substantive due process violation as a result of the state of the workplace environment as well as his arrest and prosecution following termination. See Pl.'s Mem. 13–18.

[21]  [22]  [23] "[N]ot all wrongs perpetrated by a government actor violate due process." Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002). To survive a Rule 12(b)(6) motion, a substantive due process claim "must allege governmental conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Velez v. Levy, 401 F.3d 75, 93 (2d Cir. 2005) (internal quotation marks omitted). This "shocks the conscience" test is "necessarily imprecise", O'Connor v. Pierson, 426 F.3d 187, 203 (2d Cir. 2005), but because "[s]ubstantive due process is an outer limit on the legitimacy of governmental action[,] ... [s]ubstantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999).

*6  [24]  [25] Apatow's first basis for a potential substantive due process violation centers on the defendants' indifference to the harmful state of the workplace. However, Apatow does not state a facially plausible claim with respect to this assertion. Even assuming Apatow was subjected to increased scrutiny following his complaints, received harsher discipline than others, suffered through insensitive comments about the race of his girlfriend's son, and was forced to work in an environment replete with heated arguments, this falls short of violating substantive due process. See, e.g., Williams v. Perry, 960 F. Supp. 534, 539 (D. Conn. 1996) ("Derogatory remarks, reassignments, lack of assignments, higher standards of performance and conduct, and harsher discipline all fail to rise to the level of the delict necessary to set forth a substantive due process claim."); Bertram v. Metro. Transp. Auth., 2014 WL 748933, at *8 (S.D.N.Y. Feb. 26, 2014) (determining that "seemingly arbitrary and perhaps unfair" discipline and harassment do "not shock the conscience...."); Sweeney v. Enfield Bd. of Educ., 2016 WL 4435331, at *9 (D. Conn. Aug. 18, 2016) ("[A]n unfair investigation resulting in discipline does not violate substantive due process."). While "deliberate indifference" to a supervisee's wrongful behavior may "shock the conscience" in instances "where the government owes a special duty of care to those in its charge," such as a person held in detention, that is inapplicable to the case at hand. O'Connor, 426 F.3d at 203.

[26]  [27] Apatow also does not offer facts sufficient to "shock the conscience" with respect to the alleged substantive due process violation claim arising from the defendants' reporting his conduct to the police and subjecting him to prosecution. The Complaint does not provide detail on the incident that the defendants allege led to Apatow's firing—noting only that the plaintiff was forced to "defendant [sic] himself," Compl. ¶ 33—but allegations that the defendants' reported a physical altercation to the police and the ensuing prosecution are insufficient to shock the conscience. There is no allegation—beyond conclusory statements—that the arrest or prosecution arose from false complaints or malice. Even if such facts were pleaded, they would point towards the tort of malicious prosecution, see Bhatia v. Debek, 287 Conn. 397, 404–411, 948 A.2d 1009 (2008), or a section 1983 claim of malicious prosecution, rather than substantive due process. Notably, the Supreme Court has "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law...." Collins v. City of Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). In fact, the Court's reasoning "applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship." Id. Accordingly, both of Apatow's substantive due process claims fail and are dismissed without prejudice to replead.

### E. ADA and RA Claims in Counts One and Four

The defendants contend that Apatow did not sufficiently state a plausible claim for relief under the ADA and the RA. Defs.' Mem. 19. In opposition, Apatow asserts that he has adequately alleged disability discrimination as well as a hostile work environment under the ADA. Pl.'s Mem. 25–27. The court will address the ADA claim first, then the RA claim.

[28] A plaintiff challenging disability-based discrimination under the ADA must establish a prima facie case, which consists of a showing that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." Woolf v. Strada, 949 F.3d 89, 93 (2d Cir. 2020). In delineating which entities are subject to the ADA, the Act

defines covered employers as those "engaged in an industry affecting commerce who ha[ve] 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year...." 42 U.S.C. § 12111(5)(A).

[29]  [30]  Apatow's Complaint does not include allegations that the SFD is a covered employer under the ADA. There is no mention of how many employees SFD has or whether the firefighters meet the working requirements laid out in the ADA. While a prima facie case for retaliation under the ADA requires meeting different elements, see Zuro v. Town of Darien, 432 F. Supp. 3d 116, 126 (D. Conn. 2020), an employer must still meet the ADA's definition of a covered employer for such a claim to be viable.

*7  [31]  Apatow's hostile work environment allegation suffers from the same deficiency. While the Second Circuit has deemed such claims cognizable under the ADA, Fox v. Costco Wholesale Corp., 918 F.3d 65, 73 (2d Cir. 2019), that Court's rationale is that the claim is rooted in the text of Title I of the ADA, id. at 74 (holding that the ADA's language prohibiting a "covered employer" from discriminating on the basis of a disability was borrowed from Title VII, and that in doing so, Congress "intended for the ADA to be coextensive, at least in this respect, with Title VII.... [I]t follows that disabled Americans should be able to assert hostile work environment claims under the ADA ... and we here so recognize.") (internal quotations and citation omitted). Without any facts from which to infer that the SFD is a covered employer under the ADA, both of these claims fail and must be dismissed.

[32]  [33]  [34]  A prima facie case for retaliation under the RA requires meeting the same elements as the ADA, though tailored to fit the RA. Benson v. Westchester Med. Ctr., 2022 WL 2702544, at *10 (S.D.N.Y. July 12, 2022). A plaintiff must prove "(1) that she is a 'handicapped person' under the Act, (2) that she is 'otherwise qualified' for the position sought, (3) that she is being excluded from the position solely by reason of her handicap, and (4) that the position exists as part of a program or activity receiving Federal financial assistance." Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994) (internal citations omitted). Much like Apatow's failure to state any facts to support that SFD is a covered employer under the ADA, the Complaint also fails to assert any allegations that SFD receives federal funding such that it is subject to the Retaliation Act. Thus, the court

dismisses Apatow's claim under the RA in Count Four as well. However, the ADA and RA claims in Count Four are dismissed without prejudice to replead.

F. Wrongful Termination in Violation
of Public Policy in Count Two

The Town of Stratford argues that the wrongful termination claim must be dismissed because Apatow is not "otherwise without remedy" for the alleged unlawful termination. Defs.' Mem. 15–17. In opposing the Motion, Apatow highlights that the cause of action is not attacked in any other way, and that his claim meets the standards set out in applicable law. Pl.'s Opp. 18–20.

[35]  [36]  [37]  In Connecticut, "public policy imposes some limits on unbridled discretion to terminate the employment of someone hired at will." Sheets v. Teddy's Frosted Foods, Inc., 179 Conn. 471, 476, 427 A.2d 385 (1980). Thus, a common law cause of action for wrongful termination may be maintained where "the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Id. at 480, 427 A.2d 385. "[T]he public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one", Parsons v. United Techs. Corp., 243 Conn. 66, 79, 700 A.2d 655 (1997), and the Connecticut Supreme Court has cautioned that "courts should not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation", Sheets, 179 Conn. at 477, 427 A.2d 385.

[38]  [39]  To prevail on a claim of wrongful termination, a plaintiff must: "(1) plead that the alleged conduct by the employer contravenes public policy and (2) demonstrate that the plaintiff is 'otherwise without remedy' and that permitting the discharge to go unredressed would leave a valuable social policy to go unvindicated." Lopez v. Burris Logistics Co., 952 F. Supp. 2d 396, 405 (D. Conn. 2013) (quoting Burnham v. Karl and Gelb, P.C., 252 Conn. 153, 159–160 (2000)). On the other hand, if a "relevant state or federal law contains a private right of action which serves to protect the public policy allegedly violated, a wrongful discharge claim will fail." Nanos v. City of Stamford, 609 F. Supp. 2d 260, 268 (D. Conn. 2009).

**\*8**  **[40]**  **[41]**  Apatow argues that his wrongful termination claim is viable as a violation of public policy because his workplace was not reasonably safe, contravening sections 31-49 and 31-370 of the Connecticut General Statutes. Pl.'s Mem. 19. Apatow cites 🚩 Parsons to buttress this argument, Pl.'s Mem. 19, where the court recognized:

> Both §§ 31–49 and 31–370 reflect a broad legislative concern for the physical welfare and safety of Connecticut employees. Consequently, we are persuaded that the mandate of public policy that these statutes embody gives a Connecticut employee a cause of action for wrongful discharge against an employer transacting business in Connecticut if the employee is discharged for refusing to work under conditions that pose a substantial risk of death, disease or serious physical harm and that are not contemplated within the scope of the employee's duties.

🚩 243 Conn. at 80, 700 A.2d 655.[2] That being said, the key to the claim for wrongful termination in violation of the public policy embodied in sections 31-49 and 31-370 is that the employee "be discharged for refusing to work under [such] conditions." Id. In 🚩 Parsons, for example, the plaintiff was fired for refusing to report to non-military work at an airbase in Bahrain following State Department warnings against non-essential travel to the region as well as war breaking out in the Persian Gulf. 🚩 Id. at 84–86, 700 A.2d 655. However, in the case at bar, there is no allegation that Apatow was fired for refusing to report to work in light of the hostile work environment. Instead, Apatow alleges he was terminated for complaining about the work environment and the psychological issues the hostility engendered. That is the very basis of his claims under the ADA and the RA. Given that causes of action under the ADA and RA remain available should Apatow replead—in addition to other potential claims, e.g. hostile work environment, under Title VII of the Civil Rights Act of 1964 or the Connecticut Fair Employment

Practices Act—there are statutory remedies that can vindicate the significant public policy interests at issue in his case.

The wrongful termination claim in Count Two is therefore dismissed because Apatow has failed to allege that he is "otherwise without remedy."

## G. Monell Claim in Count Three

The defendants move to dismiss Count Three on the ground that it fails to state a claim against the Town of Stratford. Defs.' Mem. 17. Apatow alleges that Stratford incurred municipal liability for failing or refusing to: (1) distribute policies related to workplace violence, Compl. at ¶ 44, (2) train SFD employees about policies related to workplace violence, id. at ¶ 45, or (3) deter workplace violence, id. at ¶ 47.

**[42]**  **[43]**  To properly bring a claim of municipal liability, commonly known as a 🚩 Monell claim, a plaintiff must allege sufficient facts to plausibly show: (1) "that [he] suffered a constitutional violation," and; (2) "that the violation resulted from an identified municipal 'policy,' 'custom,' or 'practice.'" Parker v. City of Long Beach, 563 F. App'x 39, 41 (2d Cir. 2014) (citing 🚩 Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. at 690–91, 98 S.Ct. 2018).

"🚩 Monell also recognizes liability where a municipality's failure to train its employees ... amount[s] to deliberate indifference to the rights of persons with whom the untrained employees come into contact." Id. (quoting 🚩 Connick v. Thompson, 563 U.S. 51, 61, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)).

**\*9**  **[44]**  **[45]**  **[46]**  A policy, custom, or practice "need not be memorialized in a specific rule or regulation." 🚩 Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) (internal quotations and citation omitted). A 🚩 Monell claim may still succeed when the constitutional violations are so "persistent and widespread ... so permanent and well settled" that they "constitute a 'custom or usage' with the force of law." 🚩 Sorlucco v. N.Y.C. Police Dep't., 971 F.2d 864, 870–71 (2d Cir. 1992) (internal quotations and citations omitted). However, "the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an

inference." 🚩 Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (internal quotations and citations omitted).

**[47]  [48]  [49]** With the Equal Protection and substantive due process claims dismissed, Apatow has failed to plausibly plead any violation of his constitutional rights such that Stratford would be subject to municipal liability. [3] Because Apatow has failed to plead facts sufficient to assert a 🚩 Monell claim, the defendants' Motion to Dismiss is granted as to Count Three. The court dismisses this claim without prejudice to replead.

H. Intentional Infliction of Emotional Distress in Count Five

Defendants move to dismiss the intentional infliction of emotional distress claim in Count Five for failing to allege conduct that is extreme and outrageous. Defs.' Mem. 20. In opposing the motion, Apatow avers that he has alleged conduct that goes beyond the bounds of what is tolerated by a decent society. Pl.'s Mem. 27–28.

**[50]** To prevail on an intentional infliction of emotional distress claim in Connecticut, a plaintiff must establish four elements: "(1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe."
🚩 Watts v. Chittenden, 301 Conn. 575, 586, 22 A.3d 1214 (2011) (quoting 🚩 Appleton v. Bd. of Educ. of the Town of Stonington, 254 Conn. 205, 210, 757 A.2d 1059 (2000)).

**\*10  [51]  [52]  [53]  [54]** The court's Ruling as to Count Five turns on the second element. Regarding that element, "[p]laintiffs in Connecticut are held to a stringent standard when attempting to demonstrate that a defendant's conduct was 'extreme and outrageous.' " 🚩 Sangan v. Yale Univ., 2006 WL 2682240, at \*7 (D. Conn. Sept. 15, 2006). To rise to the level of extreme and outrageous, a defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." 🚩 Carrol v. Allstate Ins. Co., 262 Conn. 433, 443, 815 A.2d 119 (2003) (quoting 🚩 Appleton, 254 Conn.

at 210–11, 757 A.2d 1059). "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." 🚩 Appleton, 254 Conn. at 211, 757 A.2d 1059 (quoting 🚩 Mellaly v. Eastman Kodak Co., 42 Conn. Supp. 17, 19, 597 A.2d 846 (1991)). Rather, the conduct must be "of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind." 🚩 DeLaurentis v. City of New Haven, 220 Conn. 225, 267, 597 A.2d 807 (1991).

**[55]  [56]** "In the workplace, the threshold for demonstrating extreme and outrageous conduct is higher: '[i]t is clear that individuals in the workplace reasonably should expect to experience some level of emotional distress, even significant emotional distress, as a result of conduct in the workplace.' " 🚩 Brown v. Hearst Corp., 2015 WL 5010551, at \*7 (D. Conn. Aug. 24, 2015) (quoting 🚩 Perodeau v. Hartford, 259 Conn. 729, 757, 792 A.2d 752 (2002)). "Generally, personnel actions or workplace conduct that falls within the reasonably expected vicissitudes of employment, including insults, verbal taunts, threats, indignities, annoyances, petty oppressions or conduct that displays bad manners or results in hurt feelings, even if unlawful, are usually not deemed extreme and outrageous conduct." 🚩 Craig v. Yale Univ. Sch. of Med., 838 F. Supp. 2d 4, 10 (D. Conn. 2011) (citation and internal quotation marks omitted).

**[57]** "Whether a defendant's conduct is sufficient to satisfy the requirement that it be extreme and outrageous is initially a question for the court to determine. Only where reasonable minds disagree does it become an issue for the jury."
🚩 Appleton, 254 Conn. at 210, 757 A.2d 1059 (citation omitted).

**[58]** It is unclear from the Complaint and Apatow's Memorandum in Opposition precisely what conduct he alleges is extreme and outrageous. If Apatow intends to assert that it was the discrimination and retaliation he experienced at SFD, his claim fails. Courts in the District of Connecticut have repeatedly determined that "discrimination" and "retaliating against an employee for complaining about such discrimination[ ] do not meet the standard for finding that conduct was extreme and

outrageous." Koenig, 2017 WL 631190, at *13; Ucar v. Connecticut Dep't of Transp., 2016 WL 4275578, at *16 (D. Conn. Aug. 12, 2016); Lorenzi v. Conn. Judicial Branch, 620 F. Supp. 2d 348, 353 (D. Conn. 2009); see also White v. Martin, 23 F. Supp. 2d 203, 208 (D. Conn. 1998), aff'd sub nom. White v. Comm'n of Human Rights, Opportunities, 198 F.3d 235 (2d Cir. 1999).

[59] Additionally, if Apatow is alleging that the circumstances of his termination—including the call to police, his arrest, and his subsequent prosecution—were extreme and outrageous, his claim also fails. "Connecticut courts have held that a report to the police typically does not constitute the type of 'extreme and outrageous' conduct necessary to support a claim for intentional infliction of emotional distress." Wade v. Kay Jewelers, Inc., 2018 WL 4440532, at *9 (D. Conn. Sept. 17, 2018); see Crocco v. Advance Stores Co., Inc., 421 F. Supp. 2d 485, 504 (D. Conn. 2006) (collecting cases); Pantaleo v. Ravski, 1997 WL 94103, at *3 (Conn. Sup. Ct. Feb. 14, 1997) ("[C]ourts in Connecticut and elsewhere have concluded that calling the police to report suspected wrongdoing normally does not constitute 'extreme and outrageous' conduct sufficient to impose liability for intentional infliction of emotional distress."). An example of a nontypical situation where a call to police might constitute "extreme and outrageous" conduct is when a false report is made concerning a particularly serious crime or for a vindictive purpose. See Crocco, 421 F. Supp. 2d at 505; Jezierny v. Brown, 2005 WL 2496525, at *3 (Conn. Sup. Ct. Aug. 25, 2005). However, there are no allegations that the defendants lied to police or made a false report to induce Apatow's arrest. Indeed, Apatow readily admits that he participated in a physical altercation with a colleague, Compl. ¶ 33, which appears to be the grounds for the call to police, his arrest, and his prosecution.[4]

*11 In support of his intentional infliction of emotional distress allegation, Apatow asserts that a termination executed in a humiliating or inconsiderate manner may be enough to establish the claim. Pl.'s Mem. 28. Yet, the case for which that proposition is cited discusses only negligent infliction of emotional distress—a claim requiring only "unreasonable conduct ... in the termination process"—rather than intentional infliction of emotional distress. Belanger v. Commerce Clearing House, 25 F. Supp. 2d 83, 84–85 (D. Conn. 1998). Instead, the termination must rise to the level of extreme and outrageous conduct to make out a

claim for intentional infliction of emotional distress. See, e.g., Muniz v. Kravis, 59 Conn. App. 704, 709, 757 A.2d 1207 (2000) (concluding that plaintiff's firing was not extreme and outrageous where the defendants "sent an armed security guard to notify her and her husband of their termination" and gave "them only twenty-four hours to leave [their apartment on premises of employer] ... at a time when the plaintiff was on vacation and when her husband was recovering from a planned surgery").

The other argument advanced by Apatow asserts that conduct that would not ordinarily be considered extreme and outrageous can become so if a defendant acts knowing of a plaintiff's heightened state of vulnerability. Pl.'s Mem. 28. For this proposition, Apatow cites a case where, instead of freezing and storing ovarian tissue to aid a couple in their desire to procreate, a hospital unilaterally disposed of the genetic material. Witt v. Yale-New Haven Hosp., 51 Conn. Supp. 155, 179–183, 977 A.2d 779 (Conn. Sup. Ct. 2008). Thus, the Witt decision, too, does not buttress the assertion for which it is cited. There, the court was "hard-pressed to imagine conduct that is any more outrageous and utterly intolerable in a society in which a couple's desire to procreate, thereby leaving an indelible mark in our societal fabric, is so fundamental as to be inviolable." Id. at 181, 977 A.2d 779. However, no desire so fundamental as to be inviolable is implicated by Apatow's termination, nor does he allege conduct by defendants that similarly rises to the level of being "utterly intolerable in a civilized community." Id.

Apatow has therefore failed to state a claim for intentional infliction of emotional distress, and the claim in Count Five is dismissed.

I. Punitive Damages

Apatow's Complaint includes punitive damages in the prayer for relief. Compl. at 13. However, as the defendants point out, see Defs.' Mem. 24, punitive damages are not available against a municipality under the three statutes pursuant to which Apatow brings his federal claims. Apatow, on the other hand, does not respond to this argument in his Memorandum in Opposition.

[60] As a general rule, "no punitive damages are allowed [against a municipality] unless expressly authorized by

statute." Cook County v. United States ex rel. Chandler, 538 U.S. 119, 129, 123 S.Ct. 1239, 155 L.Ed.2d 247 (2003) (quoting Newport v. Fact Concerts, Inc., 453 U.S. 247, 260 n.2, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). With respect to section 1983 claims, the U.S. Supreme Court has held that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." Newport, 453 U.S. at 271, 101 S.Ct. 2748. Similarly, the Supreme Court has concluded that punitive damages may not be awarded in suits against municipalities under the Rehabilitation Act, Barnes v. Gorman, 536 U.S. 181, 189, 122 S.Ct. 2097, 153 L.Ed.2d 230 (2002), and this court has determined that punitive damages against a municipality are unavailable under the ADA. Palmieri v. City of Hartford, 947 F. Supp. 2d 187, 207 (D. Conn. 2013) (collecting cases).

[61] Punitive damages are also an issue with respect to the state law claims. See Defs.' Mem. 24. As the Appellate Court of Connecticut has acknowledged:

> In the overwhelming majority of jurisdictions which have considered [whether a municipality is liable for punitive damages], it is now firmly established that exemplary or punitive

damages are not recoverable unless expressly authorized by statute or through statutory construction....

*12 Hartford v. Int'l Ass'n of Firefighters, Local 760, 49 Conn. App. 805, 817, 717 A.2d 258 (1998), cert. denied, 247 Conn. 920, 722 A.2d 809 (1998) (quotation and citation omitted). Because both of Apatow's state claims are rooted in the common law, there is no statutory authorization for imposing punitive damages on a municipality.

As such, even if Apatow repleads where possible, he cannot recover punitive damages from the Town of Stratford with respect to claims in Counts One through Five.

### V. CONCLUSION

For the reasons stated above, the Motion to Dismiss (Doc. No. 13) is granted. If Apatow chooses to amend his Complaint, the court grants him leave to do so within 21 days consistent with this Ruling.

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2023 WL 122038

### Footnotes

1    The facts in this section are drawn from the well-pleaded allegations in the Complaint. See Complaint ("Compl.") (Doc. No. 1). Because, at the motion to dismiss stage, the court must accept all factual allegations in the Complaint as true, "we describe the facts as alleged in the complaint, drawing all reasonable inferences in the plaintiff's favor, and construing any ambiguities in the light most favorable to upholding the plaintiff's claim." Sung Cho v. N.Y.C., 910 F.3d 639, 642 n.1 (2d Cir. 2018) (internal quotation marks and citations omitted).

2    Apatow used an ellipsis to obscure a vital phrase in the block quote above. Pl.'s Mem. 20 ("[G]ives a Connecticut employee a cause of action for wrongful discharge against an employer transacting business in Connecticut ... [involving] conditions that pose a substantial risk of death...."). The court cautions counsel that omitting damning language will not make those words disappear.

3    If the plaintiff successfully repleads a violation of a constitutional right, this court notes that the Monell claim—as currently drafted—is still insufficient to satisfy Iqbal's pleading standard. Iqbal, 556 U.S. at 678, 129 S.Ct. 1937. While the Complaint notes that numerous "heated arguments" have occurred among

firefighters in the last twenty-one years, Compl. ¶ 22, only four incidents leading to injury or property damage are alleged, id. at ¶¶ 33, 36–38. Moreover, only one date is provided for an incident of workplace violence with the time that has elapsed between each altercation unknown. Id. at ¶ 37. The chronology and number of Apatow's complaints about the racially offensive language used, as well as the physical and psychological distress he was experiencing, are similarly unaddressed. As such, even if these incidents are plausibly pled as constitutional violations, they fall well short of being "so permanent and well settled" that they "constitute a 'custom or usage' with the force of law." ⚑Sorlucco, 971 F.2d at 870–71. A "failure to train" may constitute an "official policy or custom if the failure amounts to 'deliberate indifference' to the rights" of those with whom the public employee interacts. Waller v. City of Middletown, 89 F. Supp. 3d 279, 284 (D. Conn. 2015). While that test is slightly different, it is also worth noting for the sake of potential repleading that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." ⚑Connick, 563 U.S. at 61, 131 S.Ct. 1350 (2011).

4    The Complaint contains no details concerning Apatow's arrest and subsequent prosecution beyond stating their general occurrence. See Compl. ¶¶ 39, 41.

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by   Hallett v. Stuart Dean Co.,   S.D.N.Y.,   February 5, 2021

2018 WL 3821620
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

BROWN, Plaintiffs,
v.
CITY OF NEW YORK et al., Defendants.

16-CV-1919 (ALC)
|
Signed 08/10/2018

**Attorneys and Law Firms**

Vikrant Pawar, Vik Pawar, Attorney at Law, New York, NY, for Plaintiffs.

Evan Craig Brustein, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

ANDREW L. CARTER, JR., United States District Judge

**\*1** Plaintiffs Robert Brown ("Mr. Brown") and Marjorie Grodd-Brown ("Ms. Brown") (collectively, "Plaintiffs") bring this action under  42 U.S.C. § 1983[1] (" Section 1983") and the New York state and local law against Defendants the City of New York ("the City") and Detective Robert Cardona ("Cardona") (collectively, "Defendants"). Defendants have moved for summary judgment. In response, Plaintiffs have abandoned certain claims, but continue to pursue claims of false arrest, deprivation of due process rights, malicious prosecution, denial of the right to a fair trial, negligent training and screening, respondeat superior, First Amendment retaliation, and a violation of Mr. Brown's Fifth Amendment rights. For the reasons set forth in further detail below, summary judgment is warranted on each of these remaining claims. Defendants' motion is **GRANTED** in its entirety.

**BACKGROUND**

**I. Factual Background**

The following factual allegations are undisputed by the parties unless otherwise noted. [2] On February 28, 2015, Mr. Brown and E.B., his then-12 year-old daughter, got into an argument over how long E.B. had been in the bathroom. Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs' 56.1") ¶ 3 (ECF No. 61). During the argument, E.B. called her father a jerk. *Id.* ¶ 4. Mr. Brown then "pinched [E.B.] with a twisting motion." *Id.* ¶ 5.

On March 2, 2015, school officials at E.B.'s school noticed a mark on her arm. *Id.* ¶ 6. After observing the mark, a school official made a report to the New York State Office of Children and Family Services ("NYSOCFS") of suspected child abuse or maltreatment. *Id.* ¶ 7. The school official noted in the Suspected Child Abuse Report that E.B. had lacerations/bruises/welts, and had further informed the school official that, on February 28, 2015, E.B.'s father had pinched her with a twisting motion causing a bruise. *Id.* ¶¶ 8-9. The Suspected Child Abuse Report further detailed that E.B. told the school official that she frequently gets into verbal arguments with her father, that they can be physical at times, and that she had "done worse to her father" including punching and hitting him, "jump[ing] on his back[,]" and "go[ing] for his neck." *Id.* ¶ 10; *see* Declaration of Evan Brustein in Support of Motion for Summary Judgment ("Brustein Decl."), Ex. B (ECF No. 66); *see also* Order Granting Motion to Seal (ECF No. 58) (filing Suspected Child Abuse Report under seal).

**\*2** A child abuse case was then referred to the New York City Police Department ("NYPD") for investigation. Defs' 56.1 ¶ 11. The form used to refer the matter to the NYPD indicated that "the caretaker caused serious physical harm to child or has made a plausible threat of serious harm." *Id.* ¶ 12. The form, dated March 3, 2015, further described that E.B. attended a school specializing in serving children with "learning differences" and that there was a history of E.B. attacking her parents. Brustein Deck, Ex. C at DEF056. Also specified was that, during the altercation at issue, E.B. had "physically attacked" and "pinched" her father and, "[i]n an attempt to teach [E.B.] that what she does is not appropriate, [her] father pinched her in return, applying excess force and leaving a bruise." Defs' 56.1 ¶ 13; Brustein Decl., Ex. C at DEF056. However, the reporter indicated that Mr. Brown had no intention of injuring E.B., and that E.B. was "likely not at serious risk from her parents." *Id.*

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 47 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

On March 11, 2015, Mr. Brown received a phone call from an unidentified individual requesting to speak to his wife. Declaration of Vik Pawar, Esq., Ex. 2 ("R. Brown Depo.") at 21:8-10 (ECF No. 70-2). [3] After Mr. Brown indicated his wife was not there, the individual asked if he was Robert Brown, and Mr. Brown confirmed it was him. *Id.* at 21:11-13. The individual then said to Brown, "I need you to come down to the police station." *Id.* at 21:13-14. Brown then hung up the phone, not believing that the individual was a police officer. *Id.* at 21:14, 59:12-13, 60:7-11.

Approximately thirty minutes later, at 5:09 p.m., Cardona appeared at the Browns' residence, located at 55 West 14th Street, Apartment 7C, New York, New York, in a suit and tie, and "bang[ed]" on the door, and identified himself as an NYPD officer. *Id.* at 60:22-24, 61:7-13; Defs' 56.1 ¶ 16. [4] Mr. Brown looked out his peephole, saw Cardona, and asked "who is it." R. Brown Depo. at 61:14-24. After Cardona did not answer him, he called 9-1-1 because he was afraid to open the door. R. Brown Depo. at 61:25-62:3, 65:22-23; Defs' 56.1 ¶ 17. According to the 9-1-1 operator's event chronology, Brown reported that a male wearing a suit and tie was at the door of his apartment, and was identifying himself as an NYPD officer with Shield Number 7724. *Id.* ¶ 18. The 9-1-1 operator told Brown not to let the man inside if Brown did not know who he was. R. Brown Depo. at 62:4-7.

At approximately 5:17 p.m., Cardona called 9-1-1 to request a unit because the occupant was requesting verification that he was a police officer. Defs' 56.1 ¶ 19. At approximately 5:22 p.m., the 9-1-1 operator heard Cardona identifying himself to the occupant. *Id.* ¶ 20. Approximately ten minutes after Mr. Brown called 9-1-1, two uniformed police officers came out of the elevator on the Browns' floor. R. Brown Depo. at 62:16-24. Cardona took out what appeared to be identification from his coat pocket and showed it to the officers, to which the police officers seemed to smile, as if they knew him. *Id.* The officers turned around and went back downstairs. *Id.*

After the officers left, Mr. Brown felt less afraid, and was "confident enough ... that [Cardona] was with the police department ... to open the door and let him in ... since the officers knew who he was." *Id.* at 63:14-20, 64:17-21,65:22-66:1. When Brown opened the door, Cardona said, "I need for you to come down to the police station now." *Id.* at 65:5-7. Cardona came into the apartment and said, while near the front door, "I need for you [to] come down to the police station." *Id.* at 65:11-14; Defs' 56.1 ¶ 25. Brown refused, to which Cardona responded, "... I am going to arrest

you right here and put the cuffs [on] you and take you down right in front of your family." *Id.* ¶¶ 26-27; R. Brown Depo. at 68:16-21. Cardona was in the apartment for approximately ten minutes. Defs' 56.1 ¶ 23.

**\*3** Brown rode in the front seat of Cardona's car to the police station. *Id.* ¶ 28. It took approximately 10 to 15 minutes to get there. *Id.* ¶ 29. At no point prior to arriving at the police station was Brown in handcuffs. *Id.* ¶ 30. When Brown asked why they were going to the police station, Cardona told him, "I can't say anything to you until we get down to the police station." *Id.* ¶ 31.

At approximately 6:00 p.m. at the police station, Cardona provided Brown with a copy of *Miranda* Warnings. *Id.* ¶ 32. Brown initialed next to the word "yes" in response to questions relating to his understand of each of his *Miranda* rights, and also answered he was willing to answer questions. *Id.* ¶¶ 34-39. Brown also signed and printed his name on the *Miranda* warnings sheet. *Id.* ¶ 40. Brown could not recall whether Cardona said anything else to him when he received this paper, nor could he remember whether Cardona gave the document to him prior to the handwritten statement that he would ultimately give. R. Brown Depo. 88:25-89:5.

Cardona then "threw a piece of paper down in front of [Brown] and forced [him] to write a statement." R. Brown Depo. 78:2-4. Specifically, Cardona said to Brown, "[w]rite down the statement about what happened," and also read Mr. Brown "the charges of why [he] was being brought down to the police station." *Id.* ¶ 41. Cardona did not tell Brown what to write. *Id.* ¶ 42. However, Brown "felt threatened like there was a gun to [his] head" because of the way Cardona threw down the piece of paper and said "[p]ut down what happened." R. Brown Depo. 79:3-6, 80:11-17. Cardona made no other threats at that time. *Id.* at 80:18-20.

Mr. Brown then wrote, in his own words, an accurate account of what had happened. Defs' 56.1 ¶ 43. Specifically, Brown wrote that he asked his daughter E.B. to hurry up in the bathroom because he needed to use it and she called him a jerk. *Id.* ¶ 44. Brown also wrote that his daughter started making hissing sounds and scratching and pinching him. *Id.* ¶ 45. Then, he wrote, he told his daughter, "Ok you want to play the pinching game?" and pinched her arm a little while she pinched him back. *Id.* ¶ 46. One of his pinches was a little too hard, he continued, causing a black and blue mark the size of a quarter. *Id.* ¶ 47.

Cardona interviewed Ms. Brown and E.B. at the precinct, separately from Mr. Brown. Brustein Deck, Ex. H ("Grodd-Brown Depo.") at 40:17-24. [5] Cardona told them that Mr. Brown was "in big trouble" and asked them to answer his questions. *Id.* at 41:2-5. When Cardona asked E.B. about the incident, E.B. told him that her father had pinched her and caused a bruise, but made light of it, indicating that they were playing and that it was "no big deal." Defs' 56.1 ¶ 49; Grodd-Brown Depo. at 41:8-11, 42:7-13. Ms. Brown did not know if her daughter spoke to Cardona at the apartment on March 11, 2015. Defs' 56.1 ¶ 24.

At approximately 8 p.m., Cardona arrested Mr. Brown on charges of endangering the welfare of a child and assault in the third degree. *Id.* ¶ 50. Brown agrees that the narrative portion of the arrest report that he "did cause injury to a twelve year old child by pinching her on her upper right arm. Causing a quarter size bruise" was true. *Id.* ¶ 51. On March 12, 2015, the New York County District Attorney's Office charged Brown with intentional assault in the third degree, reckless assault in the third degree, endangering the welfare of a child, attempted assault in the third degree, and harassment in the second degree. *Id.* ¶ 52. The criminal complaint, signed by Cardona, charges as follows:

> **\*4** On or about March 2, 2015 at about 12:25 P.M., at the times and places described below in the County and State of New York, the defendant, with intent to cause physical injury to another person, caused such injury to another person; the defendant recklessly caused physical injury to another person; the defendant knowingly acted in a manner likely to be injurious to the physical, mental, and moral welfare of a child less than seventeen years old; the defendant, with intent to cause physical injury to another person, attempted to cause such injury to another person; the defendant, with intent to harass, annoy and alarm another, subjected that person to physical contact and attempted and threatened to do the same.

Brustein Decl., Ex. J (Criminal Complaint) (ECF No. 66-8).

The factual basis underlying those allegations is that E.B. informed Cardona that she "observed [Brown] pinch her right upper arm, causing bruising and substantial pain." *Id.* Brown has indicated that he does not believe that Cardona lied about the facts and circumstances underlying the arrest, but that Cardona "made up the charges." Defs' 56.1 ¶ 54.

On March 12, 2015, during Brown's arraignment, the Honorable Stephen Statsinger offered to give a shorter date to return to court, but Brown's attorney requested April 23, 2015. *Id.* ¶ 55. Brown was released on his own recognizance. Brustein Decl., Ex. K (arraignment transcript). The Court issued a temporary order of protection for Brown to stay away from his daughter, but gave the Family Court the ability to modify the conditions of the order, after Brown's attorney requested it. Defs' 56.1 ¶ 56. Plaintiff made no effort to modify the order of protection in Family Court. *Id.* ¶ 57. On April 23, 2015, the criminal charges were dismissed because the People could not prove the case beyond a reasonable doubt. *Id.* ¶ 58.

## II. Procedural History

Plaintiffs filed this action on March 15, 2016, on behalf of themselves and E.B. Defs' 56.1 ¶ 1. On August 7, 2017, Plaintiffs filed a Second Amended Complaint withdrawing E.B.'s claims. Defs' 56.1 ¶ 2. That complaint includes claims for: (1) false arrest—unlawful seizure; (2) deprivation of due process rights; (3) malicious prosecution; (4) denial of the right to fair trial; (5) violations of New York State and New York City Human and Civil Rights laws; (6) negligent screening, training, hiring, and retention; (7) negligence; (8) respondeat superior; (9) malicious abuse of process; (10) intentional and negligent infliction of emotional distress; (11) First Amendment retaliation; and (12) violation of Mr. Brown's Fifth Amendment rights. Second Amended Complaint (ECF No. 53). On September 26, 2017, Defendants moved for summary judgment. Motion for Summary Judgment (ECF No. 59).

Plaintiffs' opposition brief indicates that they only maintain the following causes of action, withdrawing all others: (1) false arrest on behalf of Mr. Brown; (2) deprivation of due process rights on behalf of Mr. and Ms. Brown; (3) malicious prosecution on behalf of Mr. Brown; (4) denial of the right to fair trial on behalf of Mr. Brown; (5) negligent screening, training, hiring, and retention on behalf of Mr. and Ms. Brown; (6) respondeat superior on behalf of Mr. and Ms.

Brown; (7) First Amendment retaliation on behalf of Mr. Brown; and (8) violation of Mr. Brown's Fifth Amendment rights on behalf of Mr. Brown. [6]

### III. The Parties' Rule 56.1 Statements
Each party claims that the other has not properly responded to its Rule 56.1 Statement for the purposes of this motion. These contentions are addressed in turn.

**\*5** Rule 56.1 of the Local Rules of this Court govern the procedures for summary judgment motions. This rule requires a moving party to submit "a separate, short and concise statement" setting forth material facts as to which "there is no genuine issue to be tried." Local Rule 56.1(a). An opposing party must respond to the moving party's 56.1 statement, articulating, if necessary, additional material facts as to which a triable issue remains. Local Rule 56.1(b). The material facts reflected in a moving party's 56.1 statement "will be deemed to be admitted unless controverted" by the opposing party's statement. Local Rule 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." [7] Local Rule 56.1(d).

First, Plaintiffs have failed to respond to paragraphs 1-6, 17-24, 27-30, 48-50, 52, and 55-59 of Defendants' 56.1 Statement. As such, where Defendants' unopposed factual averments are supported by citations to admissible evidence, the Court accepts them as true. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). However, the Court will exercise its discretion to overlook Plaintiffs' non-responses and comb the record as is necessary to adjudicate this motion. *Id.*

In addition, the Court deems paragraphs 7 through 13 admitted because Plaintiffs have not cited record evidence to dispute these facts. Plaintiff objects to paragraphs 7-10 as inadmissible hearsay. However, the document cited as supporting these facts, the NYSOCFS Report of Suspected Child Abuse or Maltreatment ("Suspected Child Abuse Report") is admissible as a business record through the testimony of an official at E.B.'s school "because the report appears to have been prepared at or near the time of the events, by ... a person with knowledge." *Gold v. Am. Med. Alert Corp.*, No. 14-CV-5485 (JFK), 2017 WL 663551, at \*4 (S.D.N.Y. Feb. 16, 2017) (citing Fed. R. Evid. 803(6) ).

Similarly, Plaintiffs' hearsay objection to paragraphs 11-13 is overruled, as the document cited in support of those facts, the New York County District Attorney's Office Child Abuse United Police Referral Form ("Police Referral"), is admissible as a business record. *Id.* Moreover, the statements reflected at paragraphs 11-13 are not being admitted for their truth, but to show that the statements were provided to the New York City Police Department and Detective Cardona. *Richards v. City of New York*, No. 97-CV-7990 (MBM), 2003 WL 21036365, at \*6 (S.D.N.Y. May 7, 2003) (reasoning that statements reflected in police report are not hearsay where used to demonstrate statements were made to officers so as to provide probable cause to arrest).

The Court further deems paragraphs 32-47, 51, 53, and 54 of Defendants' 56.1 Statement admitted, as Plaintiffs' response contains improper legal argument and, while broadly invoking deposition transcripts in response, does not cite specific pages and lines of those transcripts. *See, e.g., Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding a plaintiff's responses to a defendant's Rule 56.1 Statement where the plaintiff responded with conclusory assertions or legal arguments); *see also, e.g., Kastle v. Tompkins*, No. 13-CV-2256 (VB)(PED), 2017 WL 9534741, at \*2 (S.D.N.Y. Mar. 13, 2017) (declining to consider citations to transcripts without specific pages or line numbers) (citations omitted), *report and recommendation adopted in part, rejected in part on other grounds*, No. 13-CV-2256 (VB), 2017 WL 3206341 (S.D.N.Y. July 27, 2017). Nonetheless, the Court has considered admissible evidence in the record for which Plaintiff has provided citations.

**\*6** The Court declines to consider all but paragraphs 9-11 of Plaintiffs' Counter-Statement of Facts Pursuant to Rule 56.1, as it contains no record citations, except for a reference to the Second Amended Complaint and the "testimonies of the plaintiffs." As an initial matter, a complaint is inadmissible hearsay and cannot be properly cited for the truth of its contents in a 56.1 Statement. *E.g., Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 391 n.2 (S.D.N.Y. 2012), *aff'd sub nom. Edelhertz v. City of Middletown, N.Y.*, 714 F.3d 749 (2d Cir. 2013).

Plaintiffs nonetheless argue that because Defendants have failed to respond to their 56.1 Statement, the facts contained therein should be deemed admitted. Pls' 6/11/18 Letter at 1. The Court rejects Plaintiffs' invitation, as Defendants cannot be expected to respond to a 56.1 Statement devoid of record

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 50 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

citations. Accordingly, in deciding this motion, the Court has considered the affidavits and documents submitted by both parties but has not relied on the portions of Plaintiffs' Rule 56.1 Statement that are unsupported. *IBS Ketel, Ltd. v. Korea Telecom Am., Inc.*, No. 98-CV-4856 (DC), 2000 WL 821013, at *1 (S.D.N.Y. June 22, 2000).

## STANDARD OF REVIEW

A party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is considered "genuine" when a reasonable finder of fact could render a verdict in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted).

In deciding a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). If the court recognizes any genuine issue of material fact, summary judgment is improper, and the motion must be denied. *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

If the moving party discharges its burden of proof, the non-moving party must then set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party opposing a properly supported summary judgment motion "may not rest upon mere allegation[s] or denials of his pleading." *Anderson*, 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 247-50

(emphasis in original) (internal citations omitted). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See* *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.").

## DISCUSSION

### I. False Arrest

#### A. Probable Cause

*7 "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted). Probable cause is a complete defense to false arrest. *Id.* It "exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995). Probable cause does not require an actual showing of guilt. *Illinois v. Gates*, 462 U.S. 213, 243 n.13. Otherwise innocent behavior, under certain circumstances, can contribute to a finding that probable cause exists; thus, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Id.*

In addition, probable cause may be based solely on information received from an alleged victim or eyewitness, so long as there is no reason to doubt that person's veracity. *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 30 (E.D.N.Y. 2015) (quoting *Betts v. Shearman*, 751 F.3d 78, 81 (2d Cir. 2014) ) (dismissing false arrest claim upon finding of probable cause to arrest Plaintiff for endangering the welfare of a child based solely upon statements by Plaintiff's children describing Plaintiff throwing child against wall of car, despite Plaintiffs claims of failure to investigate); *Slater v. Mackey*, No. 12-CV-4325 (NGG)(RML), 2015 WL 6971793, at *12 (E.D.N.Y. Nov. 10, 2015) (dismissing false arrest claim upon finding of probable cause to arrest Plaintiff for assault on her

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 51 of 142

child resulting in black eye and bruises to child based upon statement by Plaintiff's child, combined with corroborating evidence).

Construing the evidence presented in the light most favorable to the non-moving party, as the Court must, there are no genuine issues of fact determinative of the question of whether there was probable cause to arrest Mr. Brown. Assuming for the sake of argument that an arrest occurred when Cardona first arrived at his apartment (as opposed to later at the precinct following Mr. Brown's confession),[8] it is undisputed that, at that time, Cardona was aware that a school official—a complaining witness—had filed a report of suspected child abuse with NYSOCFS, which was thereafter referred to the NYPD, noting that E.B. had lacerations/bruises/welts as a result of her father pinching her. This establishes probable cause to arrest Mr. Brown for assault in the third degree, among other things. *See, e.g., Peterson-Hagendorf v. City of New York*, 146 F. Supp. 3d 483, 485-87 & nn.2-6 (E.D.N.Y. 2015) (dismissing false arrest claim at summary judgment upon finding of probable cause to arrest teacher for assault and/or endangering the welfare of a child, as based upon principal having observed welt on student's neck, as well as interviews of child by several individuals which consistently described teacher's pinching of child's neck).

**\*8** That the Browns or E.B. may have later minimized the pinch as playful "does not preclude a finding that [Cardona] had probable cause" to arrest Mr. Brown, especially in the absence of any reason to doubt the credibility of the unequivocal accounts regarding the interaction and E.B.'s injury. *See, e.g.,* 🔖 *Thomas v. Culberg*, 741 F. Supp. 77, 80 (S.D.N.Y. 1990) (concluding that, while child's denial of father's abuse in the face of officer's own observations of child's scrapes and bruises and father's admission that holding son over trash can was a "joke" did not mitigate officer's probable cause, father's account that eyewitnesses were "crazy" and that "call was a prank" warranted denial of summary judgment on probable cause, but grant of summary judgment on arguable probable cause).

Thus, because Cardona had probable cause to arrest Mr. Brown, Plaintiffs' false arrest claim is dismissed.[9]

### B. *Payton* Claim

Plaintiffs appear to alternatively suggest that a warrant was necessary to arrest Mr. Brown in his home, given that exigent circumstances were lacking in light of the nine-day delay between the report and the arrest. *See* Plaintiffs' Memorandum of Law in Opposition to Summary Judgment ("Pls' Mem.") at 12 (citing 🔖 *Payton v. New York*, 445 U.S. 573, 602-03 (1980) ) (ECF No. 71); *see also* Sur-reply Letter dated June 11, 2018 ("Pls' 6/11/18 Letter") at 1 (ECF No. 75) (arguing that Cardona should have obtained an arrest warrant).

Assuming for the sake of argument that Mr. Brown was arrested in his home, as opposed to later on at the precinct, *supra* n.8, Plaintiffs are correct that a warrantless arrest that occurs inside an individual's home, absent exigent circumstances or consent, can form the basis of a false arrest claim under 🔖 42 U.S.C. § 1983 even if probable cause is present. *Durney v. City of New York*, No. 91-CV-3959 (JG), 1996 WL 1057148, at \*7 (E.D.N.Y. Oct. 25, 1996) (citations omitted). However, Plaintiffs, despite being represented by counsel, have neither pleaded this theory, nor, with but a single cite to *Payton* in their opposition papers, developed this claim "in any meaningful way." 🔖 *Morris v. Silvestre*, 604 Fed.Appx. 22, 26 (2d Cir. 2015) (affirming summary judgment dismissal of false arrest claim grounded in *Payton* because "single citation to *Payton* ... [was] wholly inadequate for a party with counsel to present a *Payton* claim.").

Even putting those deficiencies aside, and resolving ambiguities in Plaintiffs' favor, based on the limited record before the Court, any *Payton* claim advanced by Plaintiffs fails on its merits. Here, Cardona called and asked Mr. Brown to come down to the police precinct, but did not identify himself. Cardona then came to Plaintiffs' apartment door but did not identify himself, so Mr. Brown, afraid, called 9-1-1. Mr. Brown then observed through his peephole two uniformed officers come to his door, and Cardona presenting them with identification. Mr. Brown then opened his front door and Cardona entered.

Second Circuit law is unsettled as to whether a plaintiff's mere opening of a door in response to an officer's knock allows for a warrantless arrest in the home. *Parker-El v. Morales*, No. 13-CV-6996 (RWS), 2015 WL 5920031, at \*4 (S.D.N.Y. Oct. 9, 2015) (surveying cases). However, even assuming that Mr. Brown's decision to *open his door* was involuntary, Mr. Brown consented to Cardona's *entry* when he "felt confident enough [that Cardona was a police officer] to open the door and *let him in*[,]" after which Mr. Brown was arrested. *See* R. Brown Depo. at 64:17-22 (emphasis added); *see id.* at 63:19-20 ("I felt confident enough since the officers knew

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 52 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

who he was, that is why I opened the door."); *see also id.* at 65:22-66:1 (attesting that he was less afraid to open the door after the uniformed police officers left). Considering the totality of the circumstances, any coercive effect that Cardona's failing to identify himself and persistent attempts to speak with Mr. Brown might have had was substantially mitigated after the uniformed officers arrived and Mr. Brown felt confident enough to let Cardona into his apartment. *See United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, New York*, 775 F. Supp. 2d 545, 556-57 (E.D.N.Y. 2011) (to evaluate the voluntariness of consent, court must consider totality of the circumstances, including whether officers used force or intimidating tactics, or whether attempted entry was at late hour).

**\*9** Thus, even had Plaintiffs properly advanced a *Payton* claim, Mr. Brown's own testimony establishes consent, thus precluding such a claim.

## II. Malicious Prosecution

To prove a cause of action for malicious prosecution under Section 1983, a plaintiff must show that: (1) the defendant commenced a prosecution against the plaintiff, (2) there was no probable cause to believe the prosecution could succeed, (3) the defendant behaved with malice, (4) the prosecution ended in the plaintiff's favor, and (5) there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). Under state law, the fifth element described in *Rohman* is not required. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995).

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York...." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (internal citations and quotation marks omitted). "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Johnson v. Constantellis*, 221 Fed.Appx. 48, 50 (2d Cir. 2007) (internal citations and quotation marks omitted).

Here, as discussed above, *supra* Point B, there was probable cause to arrest Mr. Brown. Plaintiffs cite no intervening facts undermining Cardona's probable cause.

In addition, Plaintiffs cannot establish that Cardona initiated the prosecution with malice. "To initiate a prosecution, a defendant must do more than report the crime or give testimony." *Manganiello*, 612 F.3d at 163. Rather, an "active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act[,]" is necessary. *Id.* (quoting *Rohman*, 215 F.3d at 217) (internal quotation marks omitted). That the district attorney assigned to the case exercised independent judgment in initiating the prosecution is presumed, and typically rebutted only by evidence that the defendants "misled or pressured" that official. *Salim v. City of New York*, No. 15-CV-8521 (CM), 2017 WL 946345, at *2 (S.D.N.Y. Feb. 28, 2017) (quoting *Alcantara v. City of New York*, 646 F. Supp. 2d 449, 458-59 (S.D.N.Y. 2009) ) (internal quotation marks omitted).

The dearth of evidence that Cardona initiated this prosecution with malice is readily apparent from the record and the supporting briefs. Brown does not dispute that the substance of the complaint (*i.e.*, that he pinched his daughter, causing a quarter-sized bruise) is true. Moreover, Plaintiffs do not assert facts suggesting that Cardona played any more of a role in the short prosecution than signing the criminal complaint. Indeed, the only arguments that Plaintiff musters are that "[a] lack of probable cause generally creates an inference of malice[,]" along with a few highly conjectural hypotheticals. Pls' Mem. at 14-15 (quoting *Manganiello*, 612 F.3d at 162). [10] Because, as discussed at length above, Defendants have conclusively demonstrated probable cause, Plaintiffs' arguments are unavailing. They have failed to demonstrate a triable issue as to whether Cardona initiated the prosecution with malice.

**\*10** For these two independent reasons, Plaintiffs' malicious prosecution claim fails.

## III. Fair Trial

A claim that an official fabricated evidence in violation of a plaintiff's right to a fair trial requires that a plaintiff show that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 Fed.Appx. 149, 152 (2d Cir. 2012).

In response to Defendants' contention that Cardona fabricated no evidence whatsoever, Plaintiff takes no issue with

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 53 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

Cardona's description of the underlying facts, but rather with Cardona's characterization of the pinch in two statements in the criminal complaint: first, that the pinch resulted in "substantial pain" to E.B., and, second, that the pinch occurred on March 2, 2015, when it in fact occurred on February 28, 2015. Pl's Mem. at 17-18.

Defendants argue that statements in a criminal complaint are inadmissible hearsay and therefore unlikely to reach a jury, as is necessary to establish a denial of a right to fair trial claim. Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment at 6 (citing, *inter alia,* *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ) (ECF No. 72). However, courts in this Circuit, for the most part, have allowed such claims to proceed on the basis that the "likely to influence a jury's decision" element "refers to the materiality of the information, not its likelihood to be presented to a jury." *E.g.,* *Bryant v. Serebrenik*, No. 15-CV-3762 (ARR)(CLP), 2016 WL 6426372, at *6 (E.D.N.Y. Oct. 28, 2016) (distinguishing *Ricciuti* and surveying cases).

Therein, however, lies the most major defect of the fabrications that Plaintiff asserts: they are wholly immaterial. A court considering the materiality of a given piece of evidence should consider the admissibility of such evidence at trial, as well as "whether the false statements are entitled to absolute immunity, and whether these statements laid the groundwork for plaintiff's deprivation of liberty[.]" *Buie v. City of New York*, No. 12-CV-4390 (RJD)(CLP), 2015 WL 6620230, at *10 (E.D.N.Y. Oct. 30, 2015) (internal quotation marks and citations omitted).

First, the two-day discrepancy between the date of the actual incident and the date reflected in the criminal complaint is as immaterial a fabrication as they come. *See, e.g.,* *Bryant*, 2016 WL 6426372, at *6 (denying summary judgment to defendants on fair trial claim because factual discrepancies underlying probable cause determination were material to jury's assessment of probable cause to arrest for disorderly conduct). The Court cannot discern a reason for fabricating this information, nor do Plaintiffs suggest one (*see* Pls' 6/11/18 Letter at 2 (suggesting, in conclusory way, that date discrepancy was "pivotal") ); rather, it reasonably appears to have been a simple typographical error. *See Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 208 (E.D.N.Y. 2014) (rejecting malicious prosecution claim premised entirely upon defendants' listing wrong date on felony complaint in order to assert alibi defense). At bottom, the date discrepancy,

beyond being hearsay and likely subject to absolute immunity, has no conceivable bearing on Mr. Brown's deprivation of liberty.

**\*11** Secondly, that Cardona fabricated E.B.'s statement to the effect that she suffered "substantial pain" is similarly immaterial, and is, in any event, not a fabrication either. Addressing the latter issue first, Plaintiff presents no evidence suggesting the statement was false. Neither party has submitted testimony from E.B. Ms. Brown is apparently the only individual deposed in this case that observed Cardona's interview with E.B. However, the Court has culled the deposition testimony that has been submitted, and it establishes, at most, that E.B. downplayed the incident as playful to Cardona, but admitted that it happened. Ms. Brown testified that E.B. did not use the precise words "substantial pain" during the conversation she witnessed with Cardona, and that E.B. was not in pain as a result of her father's conduct. M. Grodd-Brown Depo. 55:23-24. However, this is not inconsistent with Cardona's statement that E.B. attested to having been in substantial pain *to him*. For example, Ms. Brown's testimony does not preclude the possibility that E.B. indicated such to Cardona in the apartment (*i.e.*, in a conversation that, as Ms. Brown acknowledged, she may have not witnessed). And Ms. Brown's testimony certainly does not establish that E.B. affirmatively *disclaimed* having been in substantial pain to Cardona, or did not describe any pain she might have felt using other words. [11] As such, Plaintiff has failed to raise an issue of material fact that this information was, in fact, false.

Even were that not the case, it is far from clear that this fabrication resulted in Mr. Brown's deprivation of liberty between his arrest and release on his own recognizance shortly thereafter. *See, e.g., Jovanovic*, 2010 WL 8500283, at *10 (quoting *Zahrey v. Coffey*, 221 F.3d 342, 349 (2d Cir. 2000) ) ("The constitutional right in question is 'the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity ... provided that the deprivation of liberty ... can be shown to be the result of [the officer's] fabrication of evidence.' "), *aff'd,* 486 Fed.Appx. 149 (2d Cir. 2012). The "substantial pain" allegation related only to the assault charges, and "was not material to any other charge." *Id.* As Plaintiffs offer no reason that, absent that allegation, Mr. Brown would not have been arrested on the other charges, arraigned, and then released on his own recognizance, Plaintiffs cannot demonstrate the materiality

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 54 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

of the alleged fabrication, and there is no genuine issue of material fact regarding this element.

For these reasons, Plaintiffs' fair trial claim is dismissed.

## IV. Fifth Amendment

Mr. Brown contends that Cardona violated his constitutional rights by pressuring him to write a statement describing the offense at issue. Mr. Brown has testified that, despite signing a *Miranda* sheet at the precinct, he felt threatened by Cardona's throwing a piece of paper on the table in the interview room and demanding that he "[w]rite down the statement about what happened[.]" However, as Mr. Brown conceded at deposition, Cardona did nothing else which Brown perceived as threatening, nor did Cardona dictate what Brown was to write in his statement.

Here, it is uncontested that Brown initialed and signed the *Miranda* sheet that Cardona gave to him. However, assuming for the sake of argument that Cardona did not read Plaintiff his *Miranda* rights out loud, "[i]t is well settled that the mere failure to read a suspect his *Miranda* warnings is not a constitutional violation in and of itself, and is therefore not the basis for a ⚑ Section 1983 claim." *Leogrande v. New York*, No. 08-CV-3088 (JFB)(ARL), 2013 WL 1283392, at *9 (E.D.N.Y. Mar. 29, 2013); ⚑ *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) ("*Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under ⚑ § 1983. The appropriate remedy for violations of Miranda rights is exclusion of the evidence at trial." (citation omitted) ); *see United States v. Suarez*, No. 06-CR-273 (RPP), 2006 WL 3543616, at *5 n.8 (S.D.N.Y. Dec. 7, 2006) (suggesting that advising defendant of rights both orally and in writing is "not constitutionally necessary" but good police practice).

 **\*12** As such, as Plaintiff's argument implies (Pls' Mem. at 18-19), Plaintiff must demonstrate coercion to make out a claim under ⚑ section 1983. "A plaintiff alleging coercion must allege more than that police told her she was a suspect, suggested that it would be to her benefit to cooperate, or promised leniency in exchange for cooperation." *Sedunova v. City of New York*, 652 Fed.Appx. 29, 31 (2d Cir. 2016) (citing ⚑ *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ). Rather, "[a] plaintiff must point to circumstances indicating that she *could not* make a knowing and voluntary decision."

*Id.* (emphasis added) (citing ⚑ *United States v. Taylor*, 745 F.3d 15, 24 (2d Cir. 2014) ).

The record is, however, devoid of such evidence. Cardona's throwing paper down on the table and demanding that Brown write a statement was, at most, aggressive, but not coercive in the constitutional sense. For example, in *Jocks*, the sole case that Plaintiff cites on this point, the Second Circuit rejected a claim that an officer "making provocative statements in front of a suspect who has insisted on having his lawyer present and asking if the statements are accurate" was sufficiently coercive, deeming it a mere "run-of-the-mill *Miranda* violation." ⚑ 316 F.3d at 138. Also illustrative are the facts in *Sedunova*, where the Court of Appeals affirmed the dismissal of a coerced confession claim despite two officers' trying to convince Plaintiff that it would be "good for her" to confess to murder and claim self-defense, and told Plaintiff that she would be free to leave if she confessed. 652 Fed.Appx. at 31. Here, none of these insufficiently coercive tactics, nor any more egregious methods, were present. Even considering Cardona's alleged threat to *arrest* Brown in front of his daughter together with the above-discussed evidence, Plaintiff falls far short of demonstrating "circumstances indicating that [he] could not make a knowing and voluntary decision." *Id.*

For these reasons, summary judgment is warranted on Plaintiffs' Fifth Amendment claim.

## V. Substantive Due Process

Plaintiffs claim that their substantive due process rights were violated because Mr. Brown was kept away from his family as a result of Cardona's having "fabricated, falsified and created false facts against Mr. Brown." Pls' Mem. at 16-17.

Families have a "substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state.' " *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999) (citation omitted). Substantive due-process rights "guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.' " *Id.* (quoting ⚑ *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ). Thus, "only" conduct that is "so shocking, arbitrary, and egregious" satisfies this standard. *Id.* (quoting ⚑ *Cty. of Sacramento*, 523 U.S. at 846).

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 55 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

In addition, "[w]here a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 599 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) ).

Here, as Defendants correctly argue, and Plaintiffs make no effort to refute, Plaintiffs' claim of having been arrested and kept from his family as a result of Cardona's alleged fabrication of charges is properly analyzed under the Fourth Amendment, rather than substantive due process. *Id.* at 600 (quoting *Cty. of Sacramento*, 523 U.S. at 843) ("Substantive due process analysis is therefore inappropriate in this case ... if [the] claim is 'covered by' the Fourth Amendment."). As discussed at length above, Plaintiffs' Fourth Amendment claim lacks merit.

**\*13** In any event, Plaintiffs cannot establish that the conduct at issue here was so arbitrary and conscience-shocking that it violated their substantive due process rights. At Mr. Brown's arraignment, at his counsel's request, Judge Statsinger granted him the ability to modify the temporary order of protection in family court should he have desired to do so. It is unclear whether Brown availed himself of that opportunity. Moreover, it is undisputed that Judge Statsinger offered Brown a shorter adjournment date, which his attorney declined. In light of the allegations in this case, it cannot be said that the protective order in this case "was without any reasonable justification in the service of a legitimate governmental objective." *Tenenbaum*, 193 F.3d at 600.

For these reasons, Plaintiffs' substantive due process claim lacks merit.

## VI. First Amendment Retaliation

Although Plaintiff has presented no argument with respect to this claim, it appears that Plaintiff is attempting to raise a claim for retaliatory arrest (as opposed to retaliatory prosecution). *See* Second Amended Complaint ¶¶ 72-78 (complaining of Cardona's retaliating against plaintiffs "by dragging plaintiffs to the precinct and against their will").

"To prevail on this claim, plaintiff must demonstrate that (1) she has an interest protected by the First Amendment; (2)

defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of her First Amendment right." *Holley v. Cty. of Orange, NY*, 625 F. Supp. 2d 131, 141 (S.D.N.Y. 2009) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ). It is well-settled law within this Circuit that probable cause defeats a retaliatory arrest claim. *See Van Dunk v. Brower*, No. 11-CV-4564 (ER), 2013 WL 5970172, at \*11 n.11 (S.D.N.Y. Nov. 7, 2013) (surveying Second Circuit case law providing that probable cause defeats retaliatory arrest claim). *But see Bartlett v. Nieves*, 712 Fed.Appx. 613, 616 (9th Cir. 2017) (holding that "a plaintiff can make a retaliatory arrest claim even if the arresting officers had probable cause"), *cert. granted*, No. 17-1174, 2018 WL 1023097 (U.S. June 28, 2018).

For the reasons discussed elsewhere in this opinion, Cardona had probable cause to arrest Plaintiff, thus foreclosing a retaliatory arrest claim. Plaintiffs do not contest the binding nature of the case law on this point (despite being given an opportunity to file a sur-reply addressing this argument raised for the first instance in Defendants' reply brief). [12] As such, Plaintiffs' First Amendment retaliation claim is dismissed.

## VII. State Law Claims

Having disposed of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claim grounded in state law. [13] *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (where, as here, all federal claims have been eliminated, concerns of "judicial economy, convenience, fairness and comity point towards declining to exercise jurisdiction over the remaining state-law claims").

## CONCLUSION

**\*14** For the aforementioned reasons, Defendants' Motion for Summary Judgment is **GRANTED**. Accordingly, the Clerk of Court is respectfully directed to terminate all pending motions and close this case.

## SO ORDERED.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 56 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3821620

## Footnotes

1    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or
     Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or
     other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured
     by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other
     proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission
     taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was
     violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable
     exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

2    As set forth in the section that follows, each party argues that the other has not properly responded to its
     Rule 56.1 Statement for the purposes of this motion. Those objections are addressed *infra*, Part III, unless
     the objection has been overruled or the evidentiary material deemed irrelevant for the purposes of deciding
     this motion.

3    Certain cited excerpts of Mr. Brown's deposition are appended to the Brustein Declaration at Exhibit E.

4    Brown claimed at his deposition that Cardona never identified himself as a police officer. R. Brown Depo.
     62:8-10; 64:5-11.

5    Certain excerpts of Ms. Brown's deposition are appended to the Pawar Declaration at Exhibit 3.

6    For the purpose of simplicity in the analysis that follows, when discussing a given claim, the Court refers to
     them as advanced by both Plaintiffs even if the claim is only advanced by one of them.

7    Fed. R. Civ. P. 56(c) provides examples of the types of evidence that may support a genuine dispute of
     material fact, that a party may object to certain evidence as inadmissible, that a court may, in its discretion,
     consider other materials in the record beyond those cited, and that affidavits and declarations in support
     "must be made on personal knowledge," provide admissible evidence, and demonstrate "competen[ce] to
     testify on the matters stated."

8    Either an arrest or detention "supported by less than probable cause may be actionable under 🚩 § 1983,
     provided the 'seizure' in question is 'unreasonable.' " Posr v. Doherty, 944 F.2d 91, 98 (citation omitted).
     However, where, as here, Plaintiffs have alleged both false arrest and unreasonable seizure (Second
     Amended Complaint at ¶¶ 35-38), the Court must determine when and whether the seizure—whether an
     investigatory detention or an actual arrest—occurred based on the totality of the circumstances, and whether
     that seizure was reasonable. *Id.* However, here, it is unnecessary for the Court to determine whether Brown
     was, in fact, seized at this apartment, because Cardona had probable cause to arrest Mr. Brown in either
     instance, and most certainly after Mr. Brown admitted to Cardona that he pinched his daughter, which
     corroborated the other accounts obtained by Cardona. *See, e.g., People v. Morales*, 939 N.Y.S.2d 824,
     828 (Kings Cty. Crim. Ct. 2012) (concluding that reasonable cause existed for purposes of sufficiency of
     accusatory instrument charging father with third-degree assault, endangering the welfare of a child, attempted
     third-degree assault, and third-degree menacing where child's mother observed bruises and welts to buttocks

and thighs after child returned home from weekend with father, officer observed marks on child, and father admitted to striking child).

9   Moreover, even if probable cause were lacking, Cardona most certainly had arguable probable cause to arrest Mr. Brown in light of the "potentially volatile" nature of familial disputes, and thus would be entitled to qualified immunity. 📁 *Weiner*, 90 F. Supp. 3d at 39 (alternatively finding qualified immunity on false arrest claim involving child's allegation that father threw him against side of car) (internal citations and quotation marks omitted).

10   Plaintiffs complain that they never had an opportunity to conduct discovery to substantiate this claim (*e.g.*, the deposition of Cardona). *See* Pl's Mem. at 5, 14. However, the Court allowed the "parties" to conduct limited discovery in this case from September 21, 2016, to March 3, 2017. Order (ECF No. 17). Despite serving written discovery, it appears that Plaintiffs chose not to take Cardona's deposition, despite Defendants offering to produce him. Letter dated August 28, 2017 (ECF No. 54). Plaintiffs did not move to compel Cardona's deposition. Thus, to the extent that Plaintiffs seek further discovery on this point, that request is denied. *See, e.g.*, *Harris v. Computer Assocs. Int'l, Inc.*, 204 F.R.D. 44, 45 (E.D.N.Y. 2001) (denying request for further discovery where party had ample opportunity to depose witnesses and move to compel prior to close of discovery and summary judgment motion and could only "speculate[ ] as to what evidence would be produced upon further discovery").

11   Indeed, it is more than plausible that E.B. conveyed the pain she experienced to Cardona in some other way, but that Cardona used the term "substantial pain" to parrot the terms of the relevant statutes. *See, e.g.*, 📁 N.Y. Penal Law § 120.00(1) (defining intentional third-degree assault as, "with the intent to cause physical injury to another person, he causes such injury to such person ..."); *id.* § 10.00(9) (defining "physical injury" as "impairment of physical condition or substantial pain"); 📁 *People v. Henderson*, 708 N.E.2d 165, 166 (N.Y. 1999) (accusatory instrument must reflect how victim suffered "substantial pain" or impairment to satisfy physical injury requirement for assault charge).

12   Even were the law in this Circuit that probable cause did not defeat such a claim, Plaintiff's claim would nonetheless fail as it is far from clear that Mr. Brown's arrest was motivated by First Amendment-protected activity.

13   Technically, Plaintiffs' negligent training and respondeat superior claims are the only state law claims that have not already been discussed or abandoned by Plaintiffs. However, as Plaintiffs acknowledge (Pls' Mem. at 11), their respondeat superior claim is contingent upon their prevailing on another state law claim. *See, e.g.*, 📁⚠️ *Shapiro v. Kronfeld*, No. 00-CV-6286 (RWS), 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004) (citing 📁 *Wende C. v. United Methodist Church*, 776 N.Y.S.2d 390, 395 (N.Y. App. Div. 4th Dep't 2004) ) (holding that there can be "no imposition of vicarious liability in the absence of underlying liability").

---

**End of Document**                                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4055296
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Haithem HASAN, Plaintiff,

v.

ONONDAGA COUNTY, et al., Defendants.

5:18-CV-806 (GLS/ATB)
|
Signed 08/02/2018

**Attorneys and Law Firms**

HAITHEM HASAN, pro se.

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** The Clerk has sent to the court an amended [1] civil rights complaint ("AC"), together with an application to proceed in forma pauperis ("IFP"), filed by pro se plaintiff, Haithem Hasan. (Dkt. Nos. 3, 4).

**I. IFP Application**
A review of plaintiff's IFP application shows that he declares he is unable to pay the filing fee. [2] (Dkt. No. 4). This court agrees, and finds that plaintiff is financially eligible for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i) -(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward *pro se* litigants, and must use extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint *sua sponte* even when plaintiff has paid the filing fee).

**\*2** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

**II. Complaint**
In this civil rights amended complaint, plaintiff has sued Onondaga County; William Fitzpatrick, the District Attorney of Onondaga County; Michael Manfredi, an Assistant District Attorney; seventeen Syracuse Police Officers/Detectives; a "P.I./ex-Detective, and Frank Fowler, the City of Syracuse Chief of Police. (Dkt. No. 3). Plaintiff's amended complaint is a statement of facts ("SOF") which describes encounters with police officers, detectives, and prosecutors, occurring on July 10, 2015, December 26, 2015, May 18, 2016, August 7, 2016, and February 2017. [3] (SOF ¶¶ 1-5) (Dkt. No. 3).

**1. July 15, 2015**
Plaintiff alleges that on July 15, 2015, apparently as the result of an incident in Armory Square in the city of Syracuse, he was charged with second degree assault, third degree criminal possession of a weapon, second degree harassment, and second degree menacing. (SOF ¶ 1 at 3). Plaintiff claims that defendant Police Officer ("PO") Szekecs arrived on the scene and arrested plaintiff. Shortly thereafter, several officers arrived "with witnesses" for a "show-up" identification. Plaintiff alleges that he was removed from the

police vehicle in which he had been seated by defendant Szekecs so that defendants PO Robert Jones, PO David Ciciriello, PO Jason Springer, and PO Ryan Blake could have their "witnesses" identify the plaintiff. Plaintiff alleges that the show-up witnesses all identified plaintiff as the perpetrator, but when defendant Detective Tara Kelil and PO J.M. Giarusso conducted photo arrays with "other" witnesses, those individuals were unable to identify the plaintiff. (*Id.*)

Plaintiff claims that defendant ADA Manfredi continued to prosecute plaintiff even though Keila Carrasquillo admitted to the assault for which plaintiff was being prosecuted. Plaintiff states that Ms. Carasquillo "through sworn statements, grand jury, and trial testimony" tried to take responsibility for the crimes. Plaintiff claims that, when ADA Manfredi heard about this, he threatened Ms. Carasquillo with perjury if she testified on plaintiff's behalf. Based on this threat, Ms. Carasquillo "pled the Fifth" on all matters, and plaintiff was convicted of the charges. Plaintiff also alleges that after his conviction, but prior to sentencing, Ms. Carasquillo again attempted to take the blame for the crimes, but defendant Manfredi told her that he was asking for a lengthy prison sentence for the plaintiff because the Syracuse Police Department had numerous interactions with plaintiff that did not result in convictions. Plaintiff was sentenced to 25 years incarceration.[4] (SOF ¶ 1 at p.4). Plaintiff states that the defendants' actions were "the direct cause of plaintiff's injuries." (*Id.*)

### 2. December 26, 2015

 **\*3** Plaintiff states that on December 26, 2015, he was charged with second degree criminal possession of a weapon, resisting arrest, and first degree reckless endangerment as the result of an incident at the Mobile Gas Station on South Geddes Street in Syracuse, New York. (SOF ¶ 5 at 4). Plaintiff states that defendants PO J.M. Giarusso and Ryan Blake "charged" plaintiff, even though plaintiff did not have a weapon. Plaintiff states that the officers told him that they had an eyewitness, but that individual never provided a "statement." Plaintiff claims that defendant Manfredi still proceeded to present the case to a grand jury. Although the grand jury returned a "no bill," defendant Manfredi stated that plaintiff should have been indicted because he was well-known to the Syracuse police. (*Id.*)

### 3. May 18, 2016

On May 18, 2016, plaintiff states that he was charged with criminal possession of a controlled substance in the fifth

and seventh degrees. (SOF ¶ 3 at 4). Plaintiff claims that defendants Detectives Scott Henderson and J. Ballagh of the Syracuse Police Department were investigating the residents of 303 Merriman Avenue in Syracuse, New York, and plaintiff was arrested when he walked by this location, while the defendants were getting out of their vehicles, "in the process of their raid," even though plaintiff was not "named in the investigation. (*Id.*) Plaintiff claims that "John Doe[s] 1-10 [and] Jane Doe[s] 1-10,[5] Detective Scott Henderson and Detective J. Ballagh" arrested plaintiff "as part of their investigation." (SOF ¶ 3 at 4-5).

Plaintiff claims that while arresting the plaintiff "the officers" proceeded to "beat" him, causing visible bruises on plaintiff's face "and other parts of his body." (SOF ¶ 3 at 5). Plaintiff states that, while he was being arraigned on May 19, 2016, he was charged with the additional crimes of resisting arrest and obstructing governmental administration. (*Id.*) Plaintiff states that after six months, the grand jury returned a "no-bill." (*Id.*)

### 4. August 7, 2016

On August 7, 2016, plaintiff was arrested at the Mobile gas station at 631 South Geddes Street in Syracuse, New York. (SOF ¶ 4 at 5). Plaintiff was charged with criminal possession of a weapon, second degree. Plaintiff states that defendants PO Chad King; PO Ryan Blake; PO Chad Picotte; PO Jacob Breen; PO Joseph Taylor; PO Sean Ryan; and PO John Tassani were "involved with the incident." (*Id.*) Plaintiff claims that he was on a "different street" when the "shots fired" incident occurred. PO King was the first to respond, and when he found "nothing of significance," he began to "roam around." He found plaintiff in a "driveway," where he and other individuals were sitting in a vehicle. Plaintiff states that he and two other individuals ran away as defendant King approached the car. Defendant King radioed for help, and defendants Picotta and Blake ultimately arrested the plaintiff. Plaintiff claims that, after he sat in the police vehicle for two hours, "they" came back and told plaintiff that he "beat [them]" when he was arrested at the same location the last time, but he would not get away "this time," because they had a gun in evidence. (*Id.*)

Plaintiff claims that one of the other two occupants of the car claimed ownership of the gun, but defendant Blake "coerced" him into stating that the gun belonged to plaintiff. Plaintiff claims that when he appeared before the grand jury on August 12, 2016, defendants ADA Manfredi and Private Investigator James Quatrone "guarantee[ed]" plaintiff that he

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 60 of 142

would be indicted, and he would be put in prison where he belonged. (*Id.*) Plaintiff was later indicted for second degree criminal possession of a weapon. Plaintiff states that he had a "suppression hearing" on June 19, 2017, at which defendant King testified. (SOF ¶ 4 at 6). The court denied suppression.[6] Plaintiff states that, since he was already incarcerated on the first degree assault charge, he offered to plead guilty to an unidentified charge. Defendant Manfredi turned down plaintiff's offer because he believed that plaintiff was "public enemy #1." (*Id.*) Plaintiff states that he was acquitted of the charges by a jury on November 15, 2017. (*Id.*)

### 5. February 2017

**\*4** Finally, plaintiff alleges that he filed a notice of appeal in the "July 2015 conviction" in February of 2017. (SOF ¶ 5 at 6). Plaintiff states that defendant District Attorney William Fitzpatrick was "put on notice through the direct appeal about the actions of the Syracuse Police Department," defendant Manfredi, and defendant Quatrone. (*Id.*) Plaintiff claims that, "through his office," defendant Fitzpatrick "vigorously" defended the appeal and the actions of defendants Manfredi and Quatrone. Plaintiff claims that "defendants [sic] actions was [sic] the direct cause of plaintiff's injuries." (*Id.*)

In a section, entitled "Injuries," plaintiff states that he lives "in constant fear to walk the streets," because he will be "constantly harassed and arrested by defendants." (SOF ¶ IV(e) at 6). Plaintiff claims that he has "lost his liberty interest," his job, and his ability to provide for his children, due to the defendants' unconstitutional actions. (*Id.* at 6-7). Plaintiff seeks substantial compensatory and punitive damages.

### III. Proscutorial Immunity

#### A. Legal Standards

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. 🏳 *Dory v. Ryan,* 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); 🏳 *Bernard v. County of Suffolk,* 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. 🏳 *Bernard v. County of Suffolk,* 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello,* 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. 🏳 *Scloss v. Bouse,* 876 F.2d 287, 292 (2d Cir. 1989).

#### B. Application

Plaintiff has named ADA Manfredi and DA William Fitzpatrick as defendants in this action. However, the only actions that plaintiff attributes to ADA Manfredi deal with his prosecution of plaintiff's criminal charges. Absolute immunity protect him from suit under the facts stated by plaintiff, regardless of whether ADA Manfredi called plaintiff "public enemy #1," and even if he refused to accept plaintiff's offer of a plea to some unidentified charge. This immunity applies whether plaintiff was convicted or acquitted of the charges. Thus, the case must be dismissed with prejudice as against defendant Manfredi.

The same is true for District Attorney Fitzpatrick. The only facts alleged against defendant Fitzpatrick are that he "vigorously," "through his office," defended plaintiff's appeal. The district attorney is protected by absolute immunity. In addition, plaintiff has failed to allege that defendant Fitzpatrick was personally involved in any constitutional violation. Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003). Simply alleging that defendant Fitzpatrick vigorously defended the appeal "through his office" is insufficient to allege personal involvement even if the prosecutor were not already protected by absolute immunity. Thus, the complaint may be dismissed with prejudice as against District Attorney Fitzpatrick.

### IV. Plaintiff's Claims

#### A. Legal Standards

**\*5** A civil lawsuit may not be used to collaterally attack a criminal conviction. 🏳 *Heck v. Humphrey,* 512 U.S. 477

Case 3:22-cv-00977-BKS-ML   Document 35   Filed 09/15/23   Page 61 of 142

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

(1994). In *Heck*, the Supreme Court held that a section 1983 action seeking damages is not cognizable if a decision in favor of the plaintiff would necessarily invalidate a criminal conviction unless the conviction or sentence had been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal, or called into question by a federal habeas court. *Id.* at 486-87.

**B. Application**

**1. July 2015 (SOF ¶ 1)**

Plaintiff states that he is still incarcerated on the July 2015 conviction for first degree assault.[7] He also states that he filed a notice of appeal in February of 2017. Plaintiff does not indicate that there has been any decision on the appeal, and if he is still incarcerated, either the appeal has not been decided, or the appeal was denied. Because plaintiff's conviction has not been overturned by a state appellate court nor called into question by a federal habeas action, plaintiff may not sue defendants at this time if the resolution of the claim in plaintiff's favor would necessarily invalidate that conviction.

Thus, in this case, plaintiff may not sue any defendants who were involved in the 2015 conviction if a decision in plaintiff's favor would render the 2015 conviction invalid. Plaintiff alleges that he was forced to stand in handcuffs next to defendant Szakacs, while defendants Jones, Ciciriello, Springer, and Black conducted a "show-up" identification of plaintiff, during which all of the eyewitnesses identified him, while defendants Giarusso and Kalil subsequently conducted unsuccessful photo arrays. Plaintiff seems to be arguing that the show-up identification violated his constitutional rights, evidenced by the fact that two other witnesses did not identify plaintiff in a photo array.

Plaintiff also claims that another individual, who initially confessed to the crime, asserted the Fifth Amendment, after being threatened with perjury by defendant Manfredi. (SOF ¶ 1 at 3). As stated above, ADA Manfredi would be entitled to absolute immunity. In addition, a decision in plaintiff's favor regarding improper identification or prosecutorial misconduct would clearly affect the validity of the conviction.[8] Thus, plaintiff's may not sue any of the defendants who he claims were involved in the alleged improprieties at this time, and may not sue defendant Manfredi, even if plaintiff's conviction is ever overturned.

**\*6** It is unclear why plaintiff has named detective Kalil and officer Giordano because the only facts stated against them are that they conducted a photo array, after which plaintiff was **not** identified. It is also unclear why plaintiff has named Officer Patricia Sargent. Plaintiff only asserts that defendant Sergeant detained a suspect who later confessed to the crime of which plaintiff was convicted. Plaintiff makes no other claims against this individual, nor does he state how she violated his rights in any way. Thus, the plaintiff's claim may also be dismissed as against defendants Kalil, Giordano, and Sargent.

**2. December 26, 2015 (SOF ¶ 2)**

Plaintiff alleges that the grand jury returned a "no bill" after the December 26, 2015 arrest. (SOF ¶ 2 at 4). Thus, *Heck* does not bar plaintiff's action. Plaintiff names three individuals in this section of his amended complaint. Plaintiff claims that defendant Officer Ryan Blake and defendant Giarusso arrested plaintiff for criminal possession of a weapon, resisting arrest, and reckless endangerment, even though plaintiff did not have a weapon, nor did the officers have any eyewitnesses "that the prosecutor could present." Plaintiff claims that ADA Manfredi prosecuted plaintiff notwithstanding the lack of evidence. (*Id.*)

As stated above, defendant Manfredi has absolute immunity. Although it is unclear what plaintiff may be attempting to allege against defendants Giarusso and Blake, pro se pleadings must be read to raise the strongest arguments that they suggest. *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). With respect to defendants Blake and Giarusso, plaintiff may be attempting to assert a claim for false arrest.[9] In order to prevail on a false arrest claim, plaintiff must plausibly allege that the defendant intended to confine him, plaintiff was conscious of the confinement, the plaintiff did not consent to the confinement, and the confinement was not "otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003) (internal quotation marks omitted). An arrest by a police officer is privileged if it is based on probable cause. *Id.* at 135. However, " ' [t]he defendant has the burden of raising and proving the affirmative defense of probable cause.' " *Curry v. City of Syracuse*, 316 F.3d 324, 335 (2d Cir. 2003) (citations omitted).

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 62 of 142

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

In this case, although plaintiff alleges that the defendants arrested him for weapons possession without a weapon, he also states that he was arrested for resisting arrest and reckless endangerment. Plaintiff does not describe the facts surrounding the particular arrest. It is well-established that a law enforcement official has probable cause to arrest if he has received information from some person, normally the putative victim or an eyewitness. *Felix v. New York State DOCCS*, No. 16-CV-7978, 2018 WL 3542859, at *7 (S.D.N.Y. July 23, 2018) (citing inter alia 🔖 *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) ).

**\*7** In the amended complaint, plaintiff states that the officers "claimed they had an eyewitness." (SOF ¶ 2 at 4). However, the "eyewitness" "never provided a statement to these officers." The failure to give a statement does not show that the eyewitness did not exist. However, if there was no witness, and there was no weapon, it is plausible that the officers did not have probable cause to arrest plaintiff. The facts surrounding this arrest are not clear, and as stated above, the plaintiff was also arrested for resisting arrest and reckless endangerment. The court will allow this claim to proceed at this time against officers Blake and Giarusso, but notes that this ruling is not meant to suggest that the claim would survive a supported motion for summary judgment.

### 3. May 18, 2016 (SOF ¶ 3)

Plaintiff appears to claim that he was improperly arrested on May 18, 2016 because he was not "named" as a suspect in a drug investigation, involving the residents of 309 Merriman Avenue. (SOF ¶ 3 at 4). Plaintiff states that he was arrested by defendants Henderson and Ballagh for just "walking by the residence" as the officers were getting out of their vehicles. [10] (*Id.*) Plaintiff states that while arresting him, the "officers beat plaintiff," causing multiple bruises on plaintiff's face and other parts of his body. (SOF ¶ 3 at 5). Plaintiff states that, at his May 19, 2016 arraignment, he was charged with the "additional crimes" of resisting arrest and obstructing governmental administration. (*Id.*) Plaintiff claims that, after six months, the grand jury returned a "no-bill."

*Heck* does not bar plaintiff's claim on the false arrest issue. In addition, plaintiff seems to be claiming that some officers used excessive force while they were arresting him. The Fourth Amendment prohibits the use of unreasonable force by a police officer in the course of an arrest. 🔖 *Tracy v.*

*Freshwater*, 623 F.3d. 90, 96 (2d Cir. 2010) (citing 🔖 *Graham v. Connor*, 490 U.S. 386, 395 (1989) ). A claim of excessive force during the arrest would not be barred by *Heck* even if plaintiff had been subsequently convicted of a crime, because a finding in favor of plaintiff on a claim of excessive force would not necessarily invalidate his conviction.

However, plaintiff does not specify which of the officers were involved in beating him as he was being arrested. In the previous sentence, he stated that defendants Henderson and Ballagh, along with John and Jane Does 1-10 arrested him. As stated above, plaintiff must allege personal involvement by specific defendants in his claims. As written, plaintiff's amended complaint does not state a claim of excessive force as against any particular officer or officers with respect to this incident. Thus, the court will recommend dismissing the excessive force claim without prejudice to amendment.

However, the court will not recommend dismissing the false arrest claim for the May 18, 2016 arrest at this stage of the proceedings. Plaintiff claims that defendants Henderson and Ballagh arrested him for "walking by" the residence that was being raided "as part of their investigation." (SOF ¶ 3 at 4-5). If defendants arrested plaintiff without probable cause, then plaintiff could have a claim for false arrest. The court is not making any determination of the merits of this claim, or whether such a claim could withstand a properly supported dispositive motion.

### 4. August 7, 2016 (SOF ¶ 4)

**\*8** Plaintiff alleges that on August 7, 2016, he was arrested for second degree criminal possession of a weapon, and that defendants King, Blake, Picotta, Breen, Taylor, Ryan, and Tassini were "all" involved in "the incident." (SOF ¶ 4 at 5). Plaintiff then states that defendant PO King responded to a "shots fired" call, but found nothing of "significance" at the relevant location, so he decided to "roam" around, when he found plaintiff and "other occupants in a vehicle" in a driveway. (*Id.*) Plaintiff states that whe defendant King got out of his vehicle and approached plaintiff and the other occupants of the car, plaintiff and two others ran away. (*Id.*) Plaintiff states that Officer King pursued and radioed a description of plaintiff's clothing to other officers. Plaintiff was ultimately apprehended and arrested by defendants Picotte and Blake. (*Id.*) A weapon was found, but plaintiff maintains that one of the other occupants told defendant Blake that it was his weapon, until defendant Blake "coerced" him

into stating that it was the plaintiff's weapon. Plaintiff was indicted, and subsequently moved to suppress the weapon, but the motion was denied. Plaintiff states that he was acquitted by a jury. Because plaintiff was acquitted of the charges, *Heck* does not bar an action for false arrest or malicious prosecution.

The only officers that plaintiff alleges were involved in his "arrest" were defendants King, Picotta, and Blake. Thus, none of the other officers that plaintiff names as "involved in the incident" may be held liable for false arrest. *See Minott v. Duffy, supra*, 2014 WL 1386583, at *11 (quoting *Travis v. Vill. of Dobbs Ferry*, 355 F. Supp. 2d 740, 747 (S.D.N.Y. 2005) ) (Each individual sued must have had personal involvement in the arrest in order to be liable under section 1983.) Plaintiff never states how defendants Breen, Taylor, Ryan, and Tassini were "involved" in the arrest, and therefore the action may be dismissed without prejudice as to these defendants.

The issue in a false arrest claim is whether the defendants had probable cause to arrest plaintiff. [11] If the complaint itself establishes that the defendants had probable cause, the complaint may be dismissed for failure to state a claim. *Overby v. Fabian*, No. 17-CV-3377, 2018 WL 3364392, at *9 (S.D.N.Y. July 10, 2018). Plaintiff concedes that defendant King reported to a "shots fired" call, even though he did not find anything "of significance" at the location of the alleged shots fired. The fact that defendant King decided to "roam" around the area is not unusual, given that often individuals who fire weapons do not stand around waiting for the police to arrive. When defendant King found plaintiff and other individuals in a car, plaintiff states that he and two other occupants ran from the officer. However, under New York law, "running from the police is not itself a crime." *Parker v. Bulik*, No. 11-CV-5412, 2017 WL 3396440, at *12 (E.D.N.Y. Aug. 5, 2017) (citing *People v. Howard*, 50 N.Y.2d 583, 586 (1980) ). [12] Plaintiff concedes that a weapon was ultimately found, and that one of the other occupants admitted that the weapon was his. However, the other occupant allegedly recanted his original statement when defendant King "coerced" him into saying that the gun belonged to the plaintiff. Given the factual issues raised by plaintiff, this claim of false arrest survives initial review. [13]

**\*9** Finally, plaintiff claims that when he appeared before the grand jury, defendant Quatrone (an ex-detective) and the prosecutor stated that "we guarantee that you will be indicted today ... and you will rot in prison where you belong." The

prosecutor is entitled to absolute immunity, and it is unclear what plaintiff is alleging against defendant Quatrone. Thus, the complaint may be dismissed as to the officers who plaintiff does not claim were "involved" in the arrest as well as defendant Quatrone, who was not involved in anything other than perhaps verbal abuse of plaintiff. It is well established that verbal abuse and profanity is not actionable conduct under 42 U.S.C. § 1983, because it does not violate any protected federal right. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam); *Crown v. Croce*, 967 F. Supp. 101, 104 (S.D.N.Y. 1997); *Beal v. City of New York*, No. 92 Civ. 0718, 1994 WL 163954, at *6 (S.D.N.Y. Apr. 22, 1994) ("mere verbal abuse, and even vile language, does not give rise to a cognizable claim under Section 1983"), *aff'd*, 89 F.3d 826 (2d Cir. 1995).

## V. Municipal Liability

### A. Legal Standards

In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979).

### B. Application

Plaintiff has named Onondaga County as a defendant in this action, but the municipal defendants are employees of the City of Syracuse, and when prosecuting a criminal matter, the district attorneys are acting in a quasi-judicial capacity, and they represent the State, not the County. [14] *Shanks v. Otsego County New York*, No. 6:17-CV-719, 2017 WL 4220463, at *7 (N.D.N.Y. July 24, 2017) (Rep't-Rec.), *adopted*, 2017 WL 4221070 (N.D.N.Y. Sept. 21, 2017) (citing *Baez v. Hennessy*, 853 F.2d 73, 77 (2d Cir. 1988) ). None of the defendants is employed by Onondaga County in the circumstances described in plaintiff's complaint. Plaintiff makes no separate claim against Onondaga County for municipal liability. Thus, the complaint may be dismissed with prejudice as against Onondaga County.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 64 of 142

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

## VII. <u>Chief of Police Frank Fowler</u>

### A. Legal Standards

As stated above, personal involvement is a prerequisite to the assessment of damages in a 🔖 section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d at 435. In 🔖 *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* See also 🚩⚠️ *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing 🚩 *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds,* 🔖 *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*10** Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. See 🚩⚠️ *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting 🔖 *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011) ). See also 🔖 *Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

In this case, plaintiff does not allege that defendant Fowler, the Chief of police was actually present during any of the police encounters that plaintiff described. Plaintiff never mentions defendant Fowler at all in the amended complaint. It appears that defendant Fowler was added to the caption solely because he is the Chief of Police in an attempt to establish liability based upon respondeat superior. Plaintiff may not bring such a claim. There is no indication that supervisory liability has been alleged in any of the ways described above in *Williams*. There is no allegation that defendant Fowler even knew about the plaintiffs arrests or had any involvement in the acts plaintiff described. Thus, the complaint may be dismissed in its entirety without prejudice as against defendant Fowler based on a lack of personal involvement.

## VIII. <u>Opportunity to Amend</u>

### A. Legal Standards

Generally, when the court dismisses a pro se complaint *sua sponte*, the court should afford the plaintiff the opportunity to amend at least once; however, leave to re-plead may be denied where any amendment would be futile. 🔖 *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993). In this case, the court finds that any attempt by the plaintiff to amend some of the claims in this complaint would be futile, but finds that he should be allowed to amend others as discussed herein.

### B. Application

The claims against both district attorneys may be dismissed **with prejudice** to the extent that plaintiff challenges any decisions or actions by the district attorneys related the prosecution of criminal charges against plaintiff or the prosecution of plaintiff's still-pending appeal. The complaint may be dismissed in its entirety as against Onondaga County because plaintiff makes no claims against Onondaga County, and the County is not the relevant municipality by which any of the defendants are employed. The claims against defendants Kalil, Giarusso, and Sergeant may also be dismissed with prejudice as stated above with respect to the July 2015 arrest.

Although any claims regarding the July 18, 2015 arrest should be dismissed without prejudice, as against defendants Jones, Ciciriallo, Springer, Blake, and Szakecs, plaintiff may not amend his complaint until the charges have been reversed

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 65 of 142

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

by an appellate tribunal or been called into question by a successful habeas corpus petition. Plaintiff's claims relative to the December 2015 may go forward as against defendants Giarusso and Blake without requiring amendment. The claims surrounding the August 7, 2016 incidents should be dismissed without prejudice as against defendants Breen, Taylor, Ryan, and Tassini, but may be allowed to go forward as against defendants King, Picotta, and Blake.

**\*11** Although the court is ordering that the complaint go forward as to the December 2015 arrest as against defendants Giarusso and Blake; the May 18, 2016 incident as against defendants Henderson and Ballagh; and the August 2016 arrest as against King, Picotta, and Blake, any service of process on these defendants should await the District Court's decision on this recommendation.[15] I will issue my recommendation below based on the individual incidents for ease of understanding.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE AS AGAINST DEFENDANTS FITZPATRICK, MANFREDI, KALIL, and SARGENT**, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED WITH PREJUDICE AS AGAINST DEFENDANT GIARUSSO - ONLY WITH RESPECT TO THE JULY 2015 INCIDENT**, and it is

**RECOMMENDED**, that the amended complaint be **DISMISSED WITHOUT PREJUDICE AS TO:**

**1.** Defendants Jones, Ciciriello, Springer, Blake, and Szakecs with respect to the July 2015 incident.

**3.** Defendants Breen, Taylor, Ryan, and Tassini with respect to the August 7, 2016, and it is

**ORDERED**, that the amended complaint go forward as against defendants **BLAKE and GIARUSSO (Dec. 26, 2015 incident); HENDERSON** and **BALLAGH (May 18, 2016 incident)**, and defendants **KING, PICOTTA, and BLAKE (Aug. 7, 2016 incident)**, but that service of process as against these defendants await the District Court's decision on this recommendation, and it is

**ORDERED**, that when the District Court issues a decision on this Recommendation, the case be returned to me for further proceedings, including any necessary orders regarding service of the complaint.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4055296

---

## Footnotes

1    The court notes that plaintiff's "Amended Complaint" is a copy of his original complaint attached to a form-civil rights complaint. The defendants, facts, and claims are identical in both complaints. (Dkt. Nos. 1, 3).

2    Plaintiff filed his original complaint on July 9, 2018. (Dkt. No. 1). Plaintiff's action was administratively closed due to his failure to comply with the filing fee requirement. (Dkt. No. 2). Plaintiff was given the opportunity to file the appropriate documents for IFP or pay the filing fee. (*Id.*) On July 11, 2018, plaintiff filed his amended complaint with a new motion for IFP status. (Dkt. Nos. 4, 4, 5). Although plaintiff's motion for IFP was still incomplete, plaintiff argued that the facility in which he is incarcerated refused to provide him

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 66 of 142

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

with the information necessary for him to properly complete his motion. (Dkt. No. 4). On July 11, 2018, the Honorable Gary L. Sharpe, Senior District Court Judge reopened the action, and on July 19, 2018, he issued a Text Order, excusing plaintiff from the certification requirement and determining that the motion for IFP was complete and ready for my review. (Dkt. No. 8).

3   Plaintiff has numbered the paragraphs of his SOF, and he has numbered the pages of his amended complaint at the bottom of the page. Thus, the court will cite to the SOF paragraph number as well as the page number on which the relevant fact appears.

4   Plaintiff is currently incarcerated.

5   The John and Jane Does are not named defendants in this action.

6   Plaintiff did not exactly state what evidence he moved to suppress. The court assumes that he may have moved to suppress the gun, and there is no indication if any other evidence or statements were obtained that may have been included in the motion to suppress.

7   In the SOF, plaintiff alleges that in November of 2017 (after the August 7, 2016 incident), he was already incarcerated on "an assault 1st" conviction. (SOF ¶ 4 at 6). However, at the beginning of the complaint, he states that, in July of 2015, he was arrested for, inter alia, **second degree** assault, and that he was convicted and sentenced to 25 years. (SOF ¶ 1 at 3-4). A check of the Department of Corrections and Community Supervision ("DOCCS") "inmate lookup" shows that plaintiff is currently incarcerated for a conviction of **first degree assault**, for which he was sentenced to 25 years incarceration. http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ1/WINQ000. He was received by DOCCS on February 23, 2017. (*Id.*) Plaintiff states that he was convicted of the 2015 charges, and there is no indication that they were reversed. Thus, it is possible that the amended complaint may contain a typographical error in the first paragraph of the SOF, and that the July 2015 arrest involved first degree assault, not second degree assault.

8   If the identification procedures were unfairly suggestive, plaintiff's constitutional rights would not have been violated until he was convicted on the basis of the suggestive identifications. *See* 🚩*Wray v. City of New York,* 490 F.3d 189, 193 (2d Cir. 2007) (there is no constitutional right not to be subjected to an unconstitutionally suggestive identification). *See also Delamota v. City of New York,* 683 F. App'x 65, 66-67 (2d Cir. 2017) (when an officer creates false information likely to influence a jury's decision and forwards that information to the prosecutor, he or she violates the plaintiff's right to a fair trial). In addition, in order to state a claim, plaintiff would have to show that the officers misled or pressured the prosecution or the trial judge. *Id.* It is the admission of the testimony carrying a likelihood of misidentification which violates a defendant's right to due process. *Wray, supra.* In the plaintiff's amended complaint, he cites no facts beyond the alleged show-up identification. In fact, he states that two photo arrays were unsuccessful in identifying the plaintiff. It is unclear what evidence was admitted at trial. Thus, at this time, there are multiple reasons to dismiss any claims against the officers who plaintiff alleges were involved in the alleged show up.

9   The court has also considered whether plaintiff may be attempting to allege claims of malicious prosecution. Malicious prosecution has four elements. 🚩*Bermudez v. City of New York,* 790 F.3d 368, 377 (2d Cir. 2015). The defendants must have commenced or continued a criminal proceeding against the plaintiff, the proceeding terminated in the plaintiff's favor, there was no probable cause for the criminal proceeding, and the proceeding was instituted with "actual malice." *Id.* (citations omitted). Police officers do not generally commence or continue criminal proceedings against an individual, but malicious prosecution claims may still be maintained if the officer is found to play an active role in the prosecution, such a giving advice and encouragement to the authorities to act. *Id.* (citations omitted). As it is written, most of plaintiff's allegations

are insufficient to state claims for malicious prosecution. However, if plaintiff amends his complaint, he may add any facts that he believes would assert a claim for malicious prosecution as against the officers.

10    Plaintiff also states that, in addition to defendants Handerson and Ballagh, "officers John Dos [sic] 1-10 [and] Jane Doe [sic] 1-10 "arrested plaintiff." (SOF ¶ 3 at 4). Plaintiff has not named any John or Jane Does in the caption of his amended complaint, and he would not be able to serve unnamed officers without obtaining their names. It also seems unlikely that it took twenty-two officers to arrest the plaintiff. Each individual sued must have had personal involvement in the arrest in order to be liable under section 1983. *Minott v. Duffy*, No. 11 Civ. 1217, 2014 WL 1386583, at *11 (S.D.N.Y. Apr. 8, 2014) (quoting *Travis v. Vill. of Dobbs Ferry*, 355 F. Supp. 2d 740, 747 (S.D.N.Y. 2005) ). Plaintiff has named the two individuals who he claims were the principle officers involved in his August 7, 2016 arrest. Thus, the court will not consider the John or Jane Does as defendants.

11    Probable cause is also a defense to malicious prosecution. *Wright v. Stephens*, No. 3:17-CV-1499, 2018 WL 3241352, at *3 (D. Conn. July 3, 2018) (citation omitted).

12    "Although flight alone is generally not sufficient to justify a stop or pursuit, petitioner's flight may be considered in conjunction with other attendant circumstances such as time and location, as well as the police officers' knowledge that a crime had been committed, to establish probable cause." *Morgan v. Superintendent*, 88 F. Supp. 2d 312, 318 n. 48 (S.D.N.Y. 2000) (citing, inter alia, *Sibron v. State of New York*, 392 U.S. 40, 66-67 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of mens rea, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.") ).

13    The court notes, however, that the fact that plaintiff was acquitted at trial does not indicate that probable cause to arrest him was lacking in the scenario that plaintiff described. *See McClenic v. Shmettan*, No. 15-CV-705, 2016 WL 3920219, at *4 (E.D.N.Y. July 15, 2016) (citing inter alia *Lehman v. Kornblau*, 134 F. Supp. 2d 281, 290 (E.D.N.Y. 2001) ("The existence of probable cause is a complete defense to a false arrest claim, even where the plaintiff was ultimately acquitted of the criminal charges.") ). This is true regardless of plaintiff's claim that the officer told plaintiff that he would not "beat" the charges "this time." (SOF ¶ 4 at 5). Thus, even though I am allowing the claim to proceed, the court makes no findings regarding the ultimate issue of probable cause.

14    It is only where claims center on the administration or management of the district attorney's office that a district attorney may be found to have acted as a "policy maker" for purposes of section 1983 liability. *Shanks, supra* (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 536 (2d Cir. 1993) ). In this case, plaintiff challenges only the district attorney's decisions regarding prosecution of plaintiff's criminal cases, and therefore, the district attorney is not an Onondaga County policy maker.

15    If plaintiff ultimately amends his complaint with respect to any of the claims dismissed without prejudice, he is advised that any amended complaint must be a complete pleading which shall repeat all the surviving claims including any amendments. Any amended complaint will **supercede** the original, must stand on its own, and must not incorporate any facts by reference to another pleading.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 68 of 142

2018 WL 4054105

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Haithem HASAN, Plaintiff,

v.

ONONDAGA COUNTY et al., Defendants.

5:18-cv-806 (GLS/ATB)

|

Signed 08/24/2018

**Attorneys and Law Firms**

Haithem Hasan, 17-B-0550, Auburn Correctional Facility, P.O. Box 618, Auburn, NY 13021, pro se.

## ORDER

Gary L. Sharpe, Senior District Judge

 **\*1** The above-captioned matter comes to this court following a Order and Report-Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on August 2, 2018. (Dkt. No. 9.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein. [1]

No objections having been filed, and the court having reviewed the Order and Report-Recommendation for clear error, it is hereby

**ORDERED** that the Order and Report-Recommendation (Dkt. No. 9) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the amended complaint (Dkt. No. 3) is **DISMISSED WITH PREJUDICE** as against defendants

William Fitzpatrick, Michael Manfredi, Tara Kalil, Patricia Sargent, James Quatrone, Frank Fowler, and Onondaga County; and it is further

**ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE** as against defendant J.M. Giarusso with respect to the July 2015 incident; and it is further

**ORDERED** that the amended complaint be **DISMISSED WITHOUT PREJUDICE** as against: (1) defendants Robert Jones III, David Ciciriello, Jason Springer, Ryan Blake, and Joseph Szekecs with respect to the July 2015 incident; and (2) defendants Jacob Breen, Joseph Taylor, Sean Ryan, and John Tassini with respect to the August 7, 2016 incident; and it is further

**ORDERED** that the following are the only remaining defendants/incidents: (1) Blake and Giarusso with respect to the December 26, 2015 incident; (2) defendants Scott Henderson and J. Ballagh with respect to the May 18, 2016 incident; and (3) Blake and defendants Chad Picotte and Chad King with respect to the August 7, 2016 incident; and it is further

**ORDERED** that the court construes plaintiff's August 15, 2018 "Amended Complaint" (Dkt. No. 10) as a motion for leave to file a second amended complaint, which will be addressed in due course by Judge Baxter; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4054105

---

## Footnotes

1    Plaintiff filed no objections; however, he submitted a document labeled "Amended Complaint," (Dkt. No. 10), which the court construes as a motion for leave to file a second amended complaint. That motion will be addressed by Judge Baxter in due course.

Hasan v. Onondaga County, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 69 of 142

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2022 WL 4539425

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

Kevin JIANG, Plaintiff,

v.

Briana CORPUZ, NYPD Detective Carolyn Celona,
NYPD Detective Robert Alartosky, Defendants.

19-CV-05664 (RPK)
|
Signed September 28, 2022

**Attorneys and Law Firms**

Fred Brian Lichtmacher, The Law Office of Fred Lichtmacher P.C., New York, NY, for Plaintiff.

Steven M. Warshawsky, Law Firm of Steven M. Warshawsky, Mount Kisco, NY, for Defendant Briana Corpuz.

Christopher G. Arko, LaDonna Sharde Sandford, Bilal Husain Haider, New York City Law Department, Special Federal Litigation Division, New York, NY, for Defendants NYPD Detective Carolyn Celona, NYPD Detective Robert Alartosky.

**MEMORANDUM AND ORDER**

RACHEL P. KOVNER, United States District Judge:

**\*1** Plaintiff Kevin Jiang brings this action against Briana Corpuz and New York City Police Department Detectives Carolyn Celona and Robert Alartosky. Plaintiff alleges Corpuz violated New York law by falsely imprisoning and maliciously prosecuting him. He alleges the NYPD Detectives violated 🏳 42 U.S.C. § 1983 by falsely arresting him, maliciously prosecuting him, and denying him a fair trial. All defendants have moved for summary judgment. For the reasons explained below, the detectives are entitled to summary judgment on the claims against them. I decline to exercise supplemental jurisdiction over plaintiff's remaining state-law claims against Corpuz.

**BACKGROUND**

The facts in this section are taken from the parties' exhibits and plaintiff's response to defendants' statements of facts filed in accordance with Local Rule 56.1. *See* Fed. R. Civ. P. 56(c)(1). Local Rule 56.1 "deems admitted each numbered paragraph in [a] statement of material facts" that is not specifically controverted in an opposing Local Rule 56.1 statement, *Freistat v. Gasperetti,* No. 17-CV-5870 (RPK) (LB), 2021 WL 4463218, at \*1 (E.D.N.Y. Sept. 29, 2021) (quotation marks omitted), but "the Court will not consider assertions for which no citations to record are provided ... that are merely legal arguments, ... or [that are] directly contradicted by or not patent from evidence in the record," *Sanders v. City of New York,* No. 16-CV-6526 (CBA) (SJB), 2021 WL 4395219, at \*3 n.8 (E.D.N.Y. June 15, 2021), *R. & R. adopted,* No. 16-CV-6526 (CBA) (SJB), 2021 WL 4350487 (E.D.N.Y. Sept. 24, 2021). This narrative also draws on unambiguous video footage when available. *See* 🏳 *Scott v. Harris,* 550 U.S. 372, 380–81 (2007); *Pratt v. Nat'l R.R. Passenger Corp.,* 709 F. App'x 33, 34 (2d Cir. 2017).

Plaintiff and Corpuz attended Saint John's University together in 2019. Pl.'s Resp. to Def. Corpuz's 56.1 Statement ("Corpuz Rule 56.1 Resp.") (Dkt. #98) ¶¶ 2–3, 14.\* Plaintiff is an Asian-American male, as is Corpuz's then-husband, Song Hun "Peter" Kim. *Id.* ¶¶ 1, 6, 8; Pl.'s Resp. to Defs.' Celona and Alartosky's 56.1 Statement ("NYPD Rule 56.1 Resp.") (Dkt. #93) ¶ 8.

On the evening of March 25, 2019, Kim drove Corpuz in Corpuz's car, a white Infiniti sedan, to the SJU campus. Corpuz Rule 56.1 Resp. ¶ 21; *see* Decl. of Attorney Fred Lichtmacher in Opp'n. to Mot. for Summ. J. ("Lichtmacher Decl.") Ex. 6 ("Criminal Compl.") (Dkt. #99-6) 2. After dropping Corpuz off for class just after 7 p.m., Kim continued to drive Corpuz's car on SJU's campus. Corpuz Rule 56.1 Resp. ¶¶ 21–22. He closely passed Robert DiStasio at a high speed. *Id.* ¶¶ 24–26; Decl. of Steven M. Warshawsk in Supp. of Def. Corpuz Mot. for Summ. J. ("Warshawsk Decl.") Ex. 13 (Dkt. #95-13) 00:00–00:07. He then turned around and again closely passed DiStasio at a high speed, causing DiStasio to jump out of the way. Corpuz Rule 56.1 Resp. ¶¶ 27, 31–32; Warshawsk Decl. Ex. 12 (Dkt. #95-12) 00:00–00:04. DiStasio had an "okay look" at the driver's face through the car's tinted window, but he could only identify the driver as an Asian male. Warshawsk Decl. Ex. 5 (Dkt. #95-5) 6, 20; NYPD Rule 56.1 Resp. ¶¶ 1–2.

**\*2** DiStasio reported the incident to campus security. Warshawsk Decl. Ex. 5 (Dkt. #95-5) 4. Campus security,

in turn, reported the incident to the NYPD. Corpuz Rule 56.1 Resp. ¶¶ 34–35; NYPD Rule 56.1 Resp. ¶¶ 1–3. After reviewing the security footage, campus security linked the car's license plate to Corpuz and passed this information along to the NYPD. Corpuz Rule 56.1 Resp. ¶¶ 34–35; NYPD Rule 56.1 Resp. ¶¶ 3–5.

NYPD Officer Christopher Conaghan called Corpuz shortly after 9 p.m. Corpuz Rule 56.1 Resp. ¶¶ 36–38; NYPD Rule 56.1 Resp. ¶ 5. The officer asked Corpuz "who dropped you off to class, who was driving your car then," and Corpuz responded "my friend Kevin ... Jiang." Warshawsk Decl. Ex. 14 (Dkt. #95-14) 01:30–01:55; Corpuz Rule 56.1 Resp. ¶ 43. Around 9:35 p.m. that evening, Officer Conaghan texted Corpuz "[w]ho was driving your car when you got dropped off at class tonight." Lichtmacher Decl. Ex. 1 (Dkt. #99-1) 2. Corpuz again responded "Kevin Jiang." *Ibid.* This was Corpuz's last interaction with the NYPD or campus security. Lichtmacher Decl. Ex. 9 ("Alartosky Depo.") (Dkt. #99-9) 60–61.

Officer Conaghan filed the initial police report. Decl. of Bilal Haider in Supp. of Defs. Celona's and Alartosky's Mot. for Summ. J. Ex. C ("NYPD Report") (Dkt. #87-3) 2; NYPD Rule 56.1 Resp. ¶ 4. The report stated that Corpuz had informed Officer Conaghan that plaintiff was driving her car at the time when the car was allegedly used to attempt to hit DiStasio. NYPD Report 2.

Detective Robert Alartosky then conducted further investigation. NYPD Rule 56.1 Resp. ¶ 9. He reviewed Officer Conaghan's report, as well as SJU's video footage. *Id.* ¶ 10. He interviewed DiStasio and obtained plaintiff's DMV photo. *Id.* ¶¶ 11–12. He also asked another detective to have DiStasio review a photo array to seek to identify the driver who had attempted to hit him. *Id.* ¶ 14. The photo array included plaintiff's DMV photo, with a "lighter" or "white" background, as well as five mugshots with "shadowy gray" backgrounds. Corpuz Rule 56.1 Resp. at ¶¶ 73–74. The mugshots showed Asian males appearing similar to plaintiff in age. *Ibid.*; NYPD Rule 56.1 Resp. ¶ 13. The detective administering the photo array instructed the victim to "[p]ay no attention to any markings that may appear on the photos or any other difference in the type or style of the photographs." NYPD Rule 56.1 Resp. ¶¶ 15–16.

DiStasio selected plaintiff's DMV photo as the driver. *Id.* ¶ 17. Later, in a deposition, DiStasio stated that the lighter photo background had led him to pick plaintiff's photo and

that, based on the background, he had believed that the "police officers were trying to [visually] sway [him] to pick out [plaintiff's picture]." Lichtmacher Decl. Ex. 8 ("DiStasio Depo.") (Dkt. #99-8) 19–20.

After DiStasio's photo-array identification of plaintiff, Detective Alartosky issued an I-Card stating that there was probable cause for plaintiff's arrest. NYPD Rule 56.1 Resp. ¶ 18.

Detective Carolyn Celona arrested plaintiff on April 4, 2019. *Id.* ¶ 19.[*] The next day, plaintiff was arraigned and the Queens County District Attorney charged him with reckless endangerment in the second degree under New York Penal Law § 120.20. Criminal Compl. 2; Alartosky Depo. 63–64; Corpuz Rule 56.1 Resp. ¶ 87; Lichtmacher Decl. Ex. 4 (Dkt. #99-4) 79–80; NYPD Rule 56.1 Resp. ¶¶ 19–20.

**\*3** On July 11, 2019, that charge was dismissed. Corpuz Rule 56.1 Resp. ¶¶ 97–98, 100–101; NYPD Rule 56.1 Resp. ¶ 21.

Plaintiff filed this lawsuit on in 2019. The operative second amended complaint alleges that Detectives Celona and Alartosky violated 🚩 Section 1983 through false arrest, malicious prosecution, and denial of a fair trial. Second Am. Compl. ("SAC") (Dkt. #68) 8–13. Plaintiff also brings claims for false imprisonment and malicious prosecution under New York law against Corpuz. *Ibid.*

Defendants have moved for summary judgment on all claims. Mot. for Summ. J. by Defs. Carolyn Celona and Robert Alartosky (Dkt. #85); Mot. for Summ. J. by Def. Briana Corpuz (Dkt. #89).

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." 🚩 *Frost v. N.Y.C. Police Dep't,* 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky,* 559 F.3d 133, 137 (2d Cir. 2009)). In assessing the record, the Court views "the evidence in the light most

favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Tracy v. Freshwater*, 623 F.3d 90, 95 (2d Cir. 2010).

## DISCUSSION

Detectives Celona and Alartosky are entitled to judgment as a matter of law on all claims and their motion for summary judgment is granted. Plaintiff's false-arrest and malicious-prosecution claims fail because the detectives are entitled to qualified immunity. And plaintiff abandoned his fair-trial claim. I decline to exercise supplemental jurisdiction over the remaining state-law claims against Corpuz and her motion for summary judgment is denied without prejudice.

### I. Detectives Celona and Alartosky Are Entitled to Summary Judgment.

Detectives Celona and Alartosky are entitled to qualified immunity and, in turn, summary judgment on plaintiff's false-arrest and malicious-prosecution claims. The detectives are also separately entitled to summary judgment on plaintiff's fair-trial claim.

### A. Plaintiff's False-Arrest and Malicious-Prosecution Claims Fail as a Matter of Law.

Detectives Celona and Alartosky are entitled to summary judgment on plaintiff's false-arrest and malicious-prosecution claims. As a general matter, probable cause at the time of arrest is a complete defense to a claim of false arrest, *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014), and to a claim of malicious prosecution so long as there is no "indication that the authorities became aware of exculpatory evidence between the time of the arrest and the subsequent prosecution that would undermine the probable cause which supported the arrest," *Rae v. Cnty. of Suffolk*, 693 F. Supp. 2d 217, 226 (E.D.N.Y. 2010) ("Plaintiff has ... failed to dissipate the probable cause that was present at the time of his arrest, and ... therefore ... there was also probable cause for" his prosecution); *Betts*, 751 F.3d at 82.

**\*4** Probable cause exists in the false-arrest context when an officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to

be arrested," *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)), and exists in the malicious-prosecution context under the "essentially ... same" inquiry "in light of the facts known or believed at the time the prosecution is initiated, rather than at the time of arrest," *Danielak v. City of New York*, No. 02-CV-2349 (KAM), 2005 WL 2347095, at \*10 (E.D.N.Y. Sept. 26, 2005) (quotation marks and citation omitted), *aff'd*, 209 F. App'x 55 (2d Cir. 2006). An officer may have probable cause even if it turns out that the officer "relied on mistaken information, so long as it was reasonable" for the officer to do so. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). Finally, under the collective knowledge doctrine, "an arrest ... is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating or involved with the investigation." *Smith v. City of New York*, 697 F. App'x 88, 89 (2d Cir. 2017) (quoting *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001)).

Qualified immunity, in turn, shields officers from liability for false arrest under *Section 1983* so long as "arguable probable cause" existed "to arrest the plaintiff." *Myers v. Patterson*, 819 F.3d 625, 632 (2d Cir. 2016) (quotation marks omitted) (quoting *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2014)). And qualified immunity provides the same shield against claims of malicious prosecution so long as no "intervening fact" caused the "arguable probable cause" justifying the arrest to "dissipate" before the criminal proceeding was commenced. *Gaston v. City of New York*, 851 F. Supp. 2d 780, 793 (S.D.N.Y. 2012) (quotation marks omitted) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). Arguable probable cause exists if either (i) "it was objectively reasonable for the officer to believe that probable cause existed," or (ii) "officers of reasonable competence could disagree on whether the probable cause test was met." *Myers*, 819 F.3d at 633 (quotation marks omitted) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)).

The NYPD detectives are entitled to summary judgment on plaintiff's false-arrest and malicious-prosecution claims because the detectives had at least arguable probable cause to believe that plaintiff had committed reckless endangerment in the second degree at the time of his arrest and at the time

of his prosecution. A person commits that crime "when he recklessly engages in conduct which creates a substantial risk of serious physical injury to another person." N.Y. Penal Law § 120.20.

The detectives had arguable probable cause to believe plaintiff had done so by attempting to hit Robert DiStasio with a vehicle. At the time of plaintiff's arrest, the evidence supporting that conclusion included: (i) DiStasio's report that an Infiniti car had "com[e] right at" him on a SJU campus road, then "came back around," "accelerat[ed]" by him, and "swept by [his] legs," DiStasio Depo. 11–13, 16; Alartosky Depo. 62; (ii) DiStasio's report that the driver was an Asian man, DiStasio Depo. 39; (iii) SJU video footage of a white Infiniti sedan letting Corpuz out of the passenger side and then driving off, Warshawsk Decl. Ex. 11 (Dkt. #95-11) 00:19–00:46; (iv) SJU video footage of a white Infiniti sedan passing DiStasio at a high rate of speed, Warshawsk Decl. Ex. 13 (Dkt. #95-13) 00:00–00:07; (v) SJU video footage of a white Infiniti sedan closing passing DiStasio at a high rate of speed a second time, causing DiStasio to jump out of the way, Warshawsk Decl. Ex. 12 (Dkt. #95-12) 00:00–00:04; (vi) evidence that the license plate on the white Infiniti sedan in the SJU videos was registered to Corpuz, Alartosky Depo. 26; (vii) Corpuz's representation to the officers that plaintiff was driving her car at the time of the alleged vehicular assault, *id.* at 19, 27; and (viii) plaintiff's DMV photo, which confirmed plaintiff was an Asian male, *id.* at 52–53.

**\*5** Those facts together were sufficient to lead "an officer in [the NYPD Detectives'] position [to] reasonably believe[ ] that" plaintiff had attempted to hit DiStasio with the Infiniti sedan. *Creese v. City of New York*, 815 F. App'x 586, 589 (2d Cir. 2020). At minimum, because "officers of reasonable competence could disagree on whether the probable cause test was met," *Serrano v. City of New York*, 793 F. App'x 29, 30–31 (2d Cir. 2019) (quotation marks omitted) (quoting *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017)), the officers had arguable probable cause to arrest plaintiff for "recklessly engag[ing] in conduct which creates a substantial risk of serious physical injury to another person," N.Y. Penal Law § 120.20, by attempting to hit DiStasio with the sedan. That same probable cause (and arguable probable cause) is fatal to plaintiff's malicious prosecution claim because plaintiff has offered no evidence of "intervening facts" arising between his April 4, 2019 arrest and his April 5, 2019 arraignment that "either cast doubt on [the] initial identification or made it apparent that the charges against [plaintiff] were 'groundless.' " *DaCosta v. Tranchina*, 783

F. App'x 54, 55–56 (2d Cir. 2019) (quoting *Lowth, 82 F.3d at 571*). The detectives are therefore entitled to qualified immunity on plaintiff's false-arrest and malicious-prosecution claims.

Plaintiff's arguments to the contrary are unpersuasive. Plaintiff assails the officers' reliance on Corpuz's account of who was driving her car, contending that it is unclear which officers Corpuz spoke with and that this uncertainty renders reliance on her statements improper. Mem. of Law in Opp'n to Defs.' Mots. for Summ. J. (Dkt. #97) ("Opp'n Mem.") 12. But the record is clear that Corpuz told Officer Conaghan it was plaintiff who had been driving her car and that Officer Conaghan put this information in the initial police report. NYPD Report 2; NYPD Rule 56.1 Resp. ¶ 5; Alartosky Depo. 59. In any event, precisely which of the investigating officers spoke to Corpuz is irrelevant to the probable cause analysis because, at minimum, Corpuz had provided her account to one of the "law enforcement officials initiating or involved with the investigation," *Smith, 697 F. App'x at 89*, before the arrest occurred.

Plaintiff next contends that Corpuz's statements could not contribute to probable cause because Detective Celona had reason to believe that Corpuz was an unreliable witness. Opp'n Mem. 13–14. Officers are generally entitled to rely on the accounts they receive from witnesses as supporting probable cause, but an exception applies when "the circumstances raise doubt as to the person's veracity." *Feehan v. Lengyel*, 278 F. App'x. 47, 49 (2d Cir. 2008) (quotation marks omitted) (quoting *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001)); *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995). Such circumstances arise, for example, if an arresting officer knew of a "bitter prior relationship" between the witness and the person alleged to have committed a crime, *Sankar v. City of New York*, 867 F. Supp. 2d 297, 306 (E.D.N.Y. 2012), or knew that the witness's "cognitive abilities" were so "severely impaired" as to render his "account ... unreliable," *Moroughan v. City of Suffolk*, 514 F. Supp. 3d 479, 499–500, 522 (E.D.N.Y. 2021) (off-duty officer's account failed to establish probable cause because he was so drunk that he insisted responding officers that he had shot himself when, in fact, he had not been shot at all).

Here, plaintiff's argument fails to undercut probable cause because plaintiff falls short in alleging circumstances raising

doubt about Corpuz's credibility. Plaintiff principally suggests that Detective Celona should have regarded Corpuz as unreliable because she knew Corpuz had changed a story about a crime in the past. Opp'n Mem. 13–14. But the circumstances fail to suggest that Detective Celona should have doubted Corpuz's honesty. Corpuz had evidently reported her dog stolen to SJU security, but she then told the officers that the matter was resolved after the return of the dog, which had been taken by Corpuz's boyfriend and friends. Corpuz Second Depo. 11–13; *see* Celona Depo. 15. The record does not suggest that Corpuz had knowingly made any false statement in reporting the dog as stolen initially—much less that Detective Celona had reason to believe she did. *Cf.* Celona Depo. 14, 48 (Detective Celona stating that she was not "aware of any situations where [Corpuz] lied to the police," was not "aware of any situations where [Corpuz] made a false report to the police," and did not ever "have occasion to believe that [Corpuz] was less than fully honest"). Accordingly, Celona's prior conversation with Corpuz in connection with the dog-theft report doesn't "suggest[ ] ... any ... material reason to doubt [Corpuz's] ... veracity." *Schnitter v. City of Rochester*, 556 F. App'x 5, 8 (2d Cir. 2014).

**\*6** Plaintiff also argues that probable cause could not rest on the photo array in which DiStasio identified plaintiff as the driver who had attempted to hit him, on the ground that the photo array was unduly suggestive. Opp'n Mem. 10–12. But, as explained above, Detectives Celona and Alartosky had probable cause to believe that plaintiff recklessly endangered DiStasio without that photo array. Setting the array aside, the evidence that plaintiff recklessly endangered DiStasio by attempting to hit him in a car included: (i) DiStasio's account of an Infiniti sedan attempting to hit him; (ii) video footage corroborating DiStasio's account and providing a license plate number for the offending car; (iii) the car's license plate being registered to Corpuz; (iv) Corpuz's identification of plaintiff, an Asian male, as the driver of her vehicle that day; (v) DiStasio's account that the driver was an Asian male; and (vi) plaintiff's DMV photo confirming plaintiff was an Asian male. As a result, even if the photo array is assigned no evidentiary value, the detectives had probable cause to believe plaintiff had committed second-degree reckless endangerment.

## B. Detectives Celona and Alartosky Are Entitled to Summary Judgment on the Fair-Trial Claim.

The detectives are entitled to summary judgment on plaintiff's fair-trial claim for two reasons.

First, plaintiff has abandoned his claim that Detectives Celona and Alartosky "created false information and caused that information to be provided to the District Attorney." SAC ¶¶ 87–90. "Where a partial response to a motion [for summary judgment] is made—*i.e.*, referencing some claims or defenses but not others ... in the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned." *Dynamic Concepts, Inc. v. Tri-State Surgical Supply & Equip. Ltd.*, 716 F. App'x 5, 14 (2d Cir. 2017) (italics in original) (quoting *Jackson v. Fed. Express*, 766 F.3d 189, 197–98 (2d Cir. 2014)).

Plaintiff did not address the detectives' dispositive argument that "[p]laintiff's fair trial claim ... fails because the photo array was not used at a trial." Mem. of Law in Supp. of Defs. Celona's and Alartosky's Mot. for Summ. J. (Dkt. #86) 17. Indeed, plaintiff did not even mention his fair-trial claim in his brief opposing summary judgment, even though he vigorously defended his false-arrest and malicious prosecution claims. *Kovaco v. Rockbestos-Suprenant* Cable Corp., 834 F.3d 128, 143 (2d Cir. 2016) ("[W]hen appropriate," a "court may ... infer from a party's partial opposition that relevant claims ... that are not defended have been abandoned" on summary judgment). Plaintiff has accordingly abandoned his fair trial claim. *Cui v. Fed. Bureau of Investigation*, 551 F. Supp. 3d 4, 16 (E.D.N.Y. 2021) ("Even [w]here abandonment by a counseled party is not explicit, a court may infer abandonment from the papers and circumstances viewed as a whole.") (quotation marks omitted and alteration in original) (quoting *Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) (collecting cases)).

Second, in any event, the fair-trial claim would fail as a matter of law. To prove this claim, plaintiff must show that "an (1) investigating official (2) fabricate[d] information (3) that [wa]s likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). Because "the due process focus is principally on the fairness of the trial, rather than on the conduct of the police," *Wray v. Johnson*, 202 F.3d 515, 524 (2d Cir. 2000), a suggestive pre-trial identification cannot, standing alone, violate plaintiff's fair-trial right, *ibid.*; *see, e.g.*, *Grace*

*v. City of New York*, No. 16-CV-4244 (RRM) (LB), 2018 WL 1368046, at \*3 (E.D.N.Y. Mar. 16, 2018) ("Because [plaintiff] does not allege that ... the photograph array ... [was] admitted in a proceeding against him, this claim must be dismissed.") (citation omitted). Here, because plaintiff alleges only that the detectives conducted a suggestive photo array as part of their investigation, plaintiff's fair-trial claim is insufficient as a matter of law.

**II. I Decline to Exercise Supplemental Jurisdiction Over Plaintiff's New York Law Claims.**

**\*7** Because I have dismissed all the federal claims in this action, I decline to retain jurisdiction over plaintiff's state-law claims of false imprisonment and malicious prosecution against Corpuz. Under 28 U.S.C. § 1367(c)(3), "a district court may decline to exercise supplemental jurisdiction if it has dismissed all claims over which it has original jurisdiction." Four factors bear on whether it is appropriate to exercise supplemental jurisdiction: "judicial economy, convenience, fairness, and comity." *Catzin v. Thank You & Good Luck Corp.*, 899 F.3d 77, 81 (2d Cir. 2018). As a general matter, where "a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." *Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010); *see Pension Benefit Guar. Corp. ex rel.*

*St Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 727 (2d Cir. 2013). Plaintiff did not address supplement jurisdiction in his briefing, let alone provide a persuasive reason to depart from the usual practice of declining to exercise supplemental jurisdiction once federal claims are dismissed. Accordingly, I decline to exercise supplemental jurisdiction over plaintiff's New York law claims and deny Corpuz's motion for summary judgment without prejudice.

**CONCLUSION**

Detectives Celona and Alartosky are granted summary judgment on plaintiff's claims of false arrest, malicious prosecution, and denial of a fair trial. I decline to exercise supplemental jurisdiction over plaintiff's state-law claims against Corpuz. The NYPD Detective's motion for summary judgment is granted and Corpuz's motion for summary judgment is denied without prejudice. The case is dismissed.

SO ORDERED.

**All Citations**

Slip Copy, 2022 WL 4539425

**Footnotes**

\*    All citations use the ECF pagination unless otherwise noted.

\*    Coincidentally, Detective Celona had interacted with Corpuz previously. Approximately two or three of these prior interactions were connected with domestic-violence allegations and one involved a reported dog theft. Lichtmacher Decl. Ex. 10 ("Celona Depo.") (Dkt. #99-10) 14–15; Lichtmacher Decl. Ex. 3 ("Corpuz First Depo.") (Dkt. #99-3) 16–17; Lichtmacher Decl. Ex. 2 ("Corpuz Second Depo.") (Dkt. #99-2) 11–13 (recounting discussion with Detective Celona about the dog-theft report). The dog-theft interaction occurred after Corpuz reported her dog as stolen to SJU security. Corpuz Second Depo. 11–13. In fact, Corpuz's then-boyfriend, Peter Kim, and friends had taken the dog. *Ibid.* After the dog was returned to Corpuz, she told SJU the matter was resolved and had the "perpetrators" tell SJU they were just watching her dog during the time it was missing. *Ibid.* SJU security then closed the report. *Ibid.* At the direction of SJU security officers, after reporting the dog incident as resolved, Corpuz also spoke with Detective Celona. *Ibid.* Neither Corpuz nor Detective Celona remember what was specifically said during that conversation. *Ibid.*; Celona Depo. 14–15.

2020 WL 1083152
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Michael IVERSON, Plaintiff,
v.
Anthony ANNUCCI, et al., Defendants.

18-CV-0886-LJV
|
Signed 02/28/2020

**Attorneys and Law Firms**

Michael Iverson, Buffalo, NY, pro se.

ORDER

LAWRENCE J. VILARDO, UNITED STATES DISTRICT
JUDGE

### INTRODUCTION

 **\*1**  The *pro se* plaintiff, Michael Iverson, was a prisoner
confined at the Orleans Correctional Facility ("Orleans")
when he filed this action. He asserts claims under 42
U.S.C. § 1983 and alleges that he was deprived of his Fourth
and Fourteenth Amendment rights when the defendants
arrested and detained him for violating certain conditions of
his parole. Docket Item 1. He also has moved to proceed
*in forma pauperis* (that is, as a person who should have
the prepayment of the ordinary filing fee waived because
he cannot afford it). Docket Item 2. And he has moved for
a preliminary injunction and a temporary restraining order.
Docket Item 3.

Because Iverson meets the statutory requirements of 28
U.S.C. § 1915(a) and has filed the required authorization,
Docket Items 2, this Court grants his motion to proceed *in
forma pauperis*. Therefore, under 28 U.S.C. §§ 1915(e)
(2)(B) and 1915A(a), this Court screens the complaint. For
the reasons that follow, Iverson's motion for a preliminary
injunction and a temporary restraining order is denied, two
of his claims may proceed, but the remaining claim will be
dismissed under sections 1915(e)(2)(B) and 1915A unless

he files an amended complaint correcting the deficiencies
noted below.

### DISCUSSION

Section 1915 "provide[s] an efficient means by which a
court can screen for and dismiss legally insufficient claims."
*Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing
*Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The
court shall dismiss a complaint in a civil action in which
a prisoner seeks redress from a governmental entity, or an
officer or employee of a governmental entity, if the court
determines that the action (1) fails to state a claim upon
which relief may be granted or (2) seeks monetary relief
against a defendant who is immune from such relief. *See* 28
U.S.C. § 1915A(b)(1)-(2). Generally, the court will afford a
*pro se* plaintiff an opportunity to amend or to be heard prior
to dismissal "unless the court can rule out any possibility,
however unlikely it might be, that an amended complaint
would succeed in stating a claim." *Abbas*, 480 F.3d at
639 (citation omitted). But leave to amend pleadings may be
denied when any amendment would be "futile." *See Cuoco
v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also id.*
("A *pro se* complaint is to be read liberally. Certainly the
court should not dismiss without granting leave to amend
at least once when a liberal reading of the complaint gives
any indication that a valid claim might be stated." (quoting
*Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir.
1999))).

### I. SCREENING THE COMPLAINT

In evaluating the complaint, the court accepts all factual
allegations as true and draws all inferences in the plaintiff's
favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003)
(per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir.
1999). "Specific facts are not necessary," and the plaintiff
"need only 'give the defendant fair notice of what the ...
claim is and the grounds upon which it rests.' " *Erickson
v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original)
(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544,
555 (2007)); *see also Boykin v. Keycorp*, 521 F.3d 202,
213 (2d Cir. 2008) ("[E]ven after *Twombly*, dismissal of a *pro
se* claim as insufficiently pleaded is appropriate only in the

most unsustainable of cases."). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis, 357 F.3d 197, 200 (2d Cir. 2004)*, even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure, see *Wynder v. McMahon, 360 F.3d 73, 76 (2d Cir. 2004)*.

**\*2** Here, a liberal reading of the complaint tells the following story. On March 15, 2013, a New York State Department of Corrections and Community Supervision ("DOCCS") parole officer issued a warrant for Iverson's arrest based on an alleged parole violation ("DOCCS warrant"). Docket Item 1 at 5, 38. DOCCS officials later learned that Iverson was in Guadalupe County, Texas. *Id.* at 5. On January 3, 2016, the "Guadalupe County Sheriff's Department swore out a complaint at DOCCS['s] behest solely upon DOCCS['s] accusation that [Iverson] was an alleged parole violator." *Id.* That same day, in Shertz, Texas, Iverson was "arrested and retaken into DOCCS custody by Texas authorities acting at DOCCS['s] behest." *Id.* at 5-6. On January 4, 2016, Iverson was arraigned at the Guadalupe County Jail and denied bail. *Id.* at 6.

On January 7, 2016, Iverson executed a waiver of extradition in the Guadalupe County District Court. *Id.* at 7. The waiver stated that Iverson

> knowingly and voluntarily, and without promise of reward or leniency, ... waive[d] the issuance and service of the governor's extradition warrant and other legal documents and procedures which otherwise would be required to secure [his] return to the demanding state, and that [he] knowingly and voluntarily consent[ed] to [his] return to that state.

*Id.* at 48. So Iverson apparently was ready to return to New York in connection with his alleged parole violation.

The following day, however, Iverson was "arrested by the U.S. Marshals [*sic*] Service [for violating] 18 U.S.C. § 2250(a)," failure to register as a sex offender. *Id.* at 7. Iverson subsequently was held in the Guadalupe County Jail for eight

months before being sentenced in the United States District Court for the Western District of Texas on August 18, 2016, [1] to 37 months of imprisonment and five years of supervised release. *Id.* at 9-10, 50. On August 22, 2016, Iverson was "taken into the United States Marshalls [*sic*] [c]ustody and turned over [to] the Bureau of Prisons [c]ustody." *Id.* at 10.

Iverson alleges that his eight-month detention at Guadalupe County Jail was based solely on the DOCCS warrant—not the pending federal charges. *Id.* at 10, 12-13. And he claims that this detention violated his due process rights because, under New York law, he should have been informed of the basis of his arrest, given a preliminary hearing within 15 days of his arrest, and given a revocation hearing within 90 days of his arrest. *Id.* at 7-9, 11-17. As a result, Iverson argues, the DOCCS warrant become "void" on April 2, 2016, at the latest, thereby "reinstating [his] original maximum [sentence] expiration date of January 15, 2015." *Id.* at 16. Iverson therefore argues that he was detained in the Guadalupe County Jail at DOCCS's behest "past his New York State [p]rison [s]entence's maximum expiration date" in violation of his constitutional rights. *Id.*

Iverson also claims that he erroneously and unconstitutionally was denied certain opportunities while incarcerated on the basis of the "void" DOCCS warrant. *See id.* at 17-22. Specifically, Iverson learned on February 14, 2018, that he was ineligible for release to a halfway house because on July 24, 2017, Jean Tabor, a DOCCS Parole Officer, and Patrick O'Connor, a Senior DOCCS Parole Officer, had lodged a detainer with the Marion Penitentiary, where Iverson was serving his federal failure-to-register sentence. *Id.* at 17-18, 58. Iverson filed various grievances and wrote to several DOCCS officials arguing that the detainer should be lifted because, for the reasons detailed above, it was "void." *Id.* at 18-22. On April 9, 2018, Iverson received a response letter from Dawn Anderson, Bureau Chief of the DOCCS Niagara Frontier Regional Area Office, stating:

> **\*3** As you are currently incarcerated for another conviction, with a projected release date of 9/9/18, we cannot proceed with the New York State Violation of Release Hearing process until you are available to our warrant only. Upon release from the Federal Penitentiary, you will

be returned to New York State for proceedings.

*Id.* at 59. On May 29, 2018, Iverson also received a response letter from Ana Enright, Acting Deputy Commissioner of DOCCS. Enright wrote that Anthony Annucci, Acting Commissioner of DOCCS, "ha[d] asked her to respond to [Iverson's] letter ... [raising] concerns regarding [the DOCCS warrant]." *Id.* Enright informed Iverson that "until [he was] available to [the DOCCS warrant, DOCCS] can't proceed with New York State violation proceedings." *Id.* at 68.

Iverson names Tabor, O'Connor, Anderson, Enright, and Annucci as defendants. He alleges that they violated his Fourteenth Amendment right to due process of law, falsely imprisoned him in violation of the Fourth Amendment, and maliciously prosecuted him in violation of the Fourteenth Amendment. He seeks compensatory and punitive damages. *Id.* at 32.

Iverson also has moved for a preliminary injunction and a temporary restraining order. Docket Item 3. He seeks to enjoin DOCCS from "carrying out an illegal and unlawful policy of detention by continuing to detain parolee[s] after a parole warrant has become void as a matter of clearly established law." *Id.* at 9.

## II. 🏷 SECTION 1983 CLAIMS

"To state a valid claim under 🏷 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997) (citing 🏷 *Eagleston v. Guido*, 41 F.3d 865, 875-76 (2d Cir. 1994)). " 🏷 Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." 🏷 *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing 🏷 *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

### A. Official Capacity Claims

Iverson includes a "*Monell* claim" in his complaint against "DOCCS Officials" for having "an unlawful policy or custom

of holding parole warrants in abeyance." Docket Item 1 at 22. He seeks monetary, declaratory, and injunctive relief. *Id.* at 31-32. Because 🏷 *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), applies only to municipalities, this Court liberally construes these allegations as suing the named DOCCS supervisory-official defendants in their official capacities.

"The Eleventh Amendment bars suits against states and their officials unless the state consents to suit, Congress abrogates the state's immunity, or the case falls within the *Ex parte Young* exception [for prospective injunctive relief]." *Nat'l Ass'n for Advancement of Colored People v. Merrill*, 939 F.3d 470, 475 (2d Cir. 2019); *see also* 🏷 *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir. 2000) ("[T]he Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." (quoting 🏷 *Green v. Mansour*, 474 U.S. 64, 68 (1985)) (citing 🏷 *Ex Parte Young*, 209 U.S. 123, 155-56 (1908))). "The line between prospective and retrospective relief is drawn because '[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law,' whereas 'compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment.' " 🏷 *Ward*, 207 F.3d at 119 (alteration in original) (quoting 🏷 *Green*, 474 U.S. at 64). For that same reason, " '[a] declaratory judgment is not available when the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief." 🏷 *Id.* at 120 (quoting 🏷 *Green*, 474 U.S. at 72).

**\*4** The Eleventh Amendment does not, however, bar suits for money damages against state officials in their individual capacities. But to establish liability against a supervisory official under 🏷 section 1983, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a "link[ ] in the ... chain of command." *See* 🏷 *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004); 🚩 *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995); *see also* 🏷 *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (explaining that the theory of respondeat superior is not available in a 🏷 section 1983 action). A plaintiff can state a

valid 🔖 section 1983 claim against a supervisory official by alleging that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) *the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom*, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Colon*, 58 F.3d at 873 (emphasis added) (citing 🔖 *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

"New York has not waived its immunity, nor has Congress abrogated it." *Li v. Lorenzo*, 712 F. App'x 21 (2d Cir. 2017) (summary order) (citing Trotman v. Palisades Interstate Park Comm'n, 557 F.2d 35, 38-40 (2d Cir. 1977); 🔖 *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)). Iverson's claims for money damages against the defendants in their official capacities therefore are dismissed with prejudice because any attempt to amend would be "futile." *See* 🔖 *Cuoco*, 222 F.3d at 112.

Similarly, Iverson's claim for declaratory relief—specifically, a "declaration that the acts and omissions described [in the complaint] violate[d] [Iverson's] rights"—is denied because "the result would be a partial end run around' the Eleventh Amendment's bar on retrospective awards of monetary relief," *Ward*, 207 F.3d 120 (quoting 🔖 *Green*, 474 U.S. at 72).

Iverson's claims against DOCCS employees in their official capacities for prospective injunctive relief, however, are not barred by the Eleventh Amendment. Nor are his claims

against the employees in their individual capacities. But as explained below, only two of those claims may proceed as pleaded, while the remaining claim must be amended before it may proceed.

**B. Fourteenth Amendment Due Process Claims**

Iverson alleges that the defendants violated his due process rights by not holding a preliminary parole violation hearing within 15 days of his arrest on the DOCCS warrant and a final revocation hearing within 90 days of his arrest on the DOCCS warrant. Docket Item 1 at 11-13. He further alleges that the DOCCS warrant thereby "bec[a]me void," Docket Item 1 at 27, such that his eight-month incarceration, allegedly under that warrant alone, was unconstitutional.

It is well settled that "the constitutional freedom of a parolee generated by statute is a liberty interest protected by the Due Process Clause of the Fourteenth Amendment which may not be terminated absent appropriate due process safeguards."

🔖 *Moody v. Daggett*, 429 U.S. 78, 85-86 (1976) (citing

🔖 *Morrissey v. Brewer*, 408 U.S. 471 (1972)). Among the due process rights afforded a parolee is "the right to a hearing at which the court determines two issues: whether the [parolee] violated a condition of [parole] as a matter of fact and, if so, whether this fact warrants revocation." *United States v. Jetter*, 577 F. App'x 5, 7 (2d Cir. 2014) (summary order) (alterations in original) (quoting 🔖 *United States v. Sanchez*, 225 F.3d 172, 175 (2d Cir. 2000)). Such a hearing must take place "within a reasonable time after [the person] is taken into custody." 🔖 *Morrissey*, 408 U.S. at 488.

**\*5** "[A] parolee detained in New York for allegedly violating parole is entitled to a preliminary hearing within 15 days of the execution of the parole warrant and to a final revocation hearing within 90 days of the preliminary hearing." *People ex rel. Harris v. Sullivan*, 74 N.Y.2d 305, 308 (1989) (citing

🔖 N.Y. Exec. Law §§ 259-i(3)(c)(i) and 259-i(3)(f)(i)). "A parolee convicted of committing a new crime while on parole and sentenced to a new definite term, however, need only receive a final revocation hearing." *Id.* (citing 🔖 N.Y. Executive Law § 259-i(3)(d)). "Failure to conduct a timely preliminary revocation hearing violates the parolee's right to due process unless the [New York State Division of Parole] is able to establish that it could not conduct a hearing because the parolee was beyond its convenience and practical control."

*People ex rel. Matthews v. New York State Div. of Parole*, 95 N.Y.2d 640, 643 (2001) (citations omitted).

To the extent Iverson claims that the defendants erred procedurally—either directly or through their unlawful "policy or custom," *Colon*, 58 F.3d at 873—by not holding a timely revocation violation to justify his detention from the time of his arrest under the DOCCS warrant until the time of his conviction under federal law,[2] the claim may proceed. Iverson has plausibly alleged that he remained *solely* in New York custody under the DOCCS warrant after both the 15-day preliminary hearing and the 90-day revocation hearing periods had lapsed. Even assuming that the constitutional limit on holding a revocation hearing is greater than New York State's 90 days, Iverson's allegation that he was held for eight months without a hearing plausibly states a claim that he did not receive a hearing "within a reasonable time after [he was] taken into custody." *See Morrissey*, 408 U.S. at 488.

To be sure, Iverson alleges that on January 8, 2016, he was "arrested by the U.S. Marshalls [*sic*] Service under 18 U.S.C. § 2250(a)"—a separate charge—and that he subsequently was convicted of, and sentenced to 37 months of imprisonment on, that separate charge. *Id.* at 7. But the mere prosecution of a federal crime does not automatically transfer an inmate into federal custody. *See In re Liberatore*, 574 F.2d 78, 89 (2d Cir. 1978) ("[T]he sovereignty which first arrests the individual acquires the right to prior and exclusive jurisdiction over him, and this plenary jurisdiction is not exhausted until there has been complete compliance with the terms of, and service of any sentence imposed by, the judgment of conviction entered against the individual by the courts of that first sovereignty." (citations omitted)). And Iverson alleges that he was being held in state—not federal —custody.

**\*6** At this early stage, the Court will permit Iverson's claim to proceed. DOCCS may, of course, furnish evidence disputing Iverson's allegation that he remained in New York custody—that is, that he was detained only under the DOCCS warrant—after his federal arrest, or that he did not knowingly and voluntarily waive his rights to a revocation hearing. *See, e.g., id.* ("[P]ursuant to a writ of *habeas corpus ad prosequendum* or ... a writ of *habeas corpus ad testificandum*[,] ... the first sovereignty can ... 'lend' its prisoner to the second sovereignty for trial on charges pending against him there or in order to have him testify in the courts

of the second sovereignty." (footnote omitted)); *People ex rel. Smith v. N.Y.S. Bd. of Parole*, 517 N.Y.S.2d 145, 147 (1987) (explaining that the ninety-day statutory period to hold a final parole revocation hearing may be extended when the petitioner "causes or consents to delay or precludes the prompt conduct of such proceedings" (citing N.Y. Exec. Law § 259-i(3)(f)(i))); *see also* 28 C.F.R. § 2.49(f) ("[I]f a parolee requests and receives any postponement or consents to a postponed revocation proceeding[,] ... the above-stated time limits may be extended."). But at this point, accepting, as it must, Iverson's allegations as true, the Court will allow his due process claims to proceed.

### C. Fourth Amendment False Imprisonment and Fourteenth Amendment Malicious Prosecution Claims

Iverson also alleges that the defendants are liable under section 1983 for false imprisonment and that defendants O'Connor and Tabor are liable for malicious prosecution. *See* Docket Item 1 at 27-31. He argues that "even though his initial confinement was valid on January 3, 2016," he was "unreasonably detained, under the guise of a valid parole warrant, which has become void," Docket Item 1 at 27, and that "DOCCS plans to unlawfully extradite and maliciously prosecute [him] under a parole warrant which is void," *id.* at 31.

A section 1983 claim for false imprisonment is anchored in the Fourth Amendment right "to be free from unreasonable seizures." *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007). "[Courts] look to ... state law principles to determine the validity of [a plaintiff's] federal civil rights claim based on false imprisonment." *Id.* at 204. "Under New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Weyant v. Okst*, 101 F.3d 845, 853 (2d Cir. 1996) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)). Iverson has alleged all of these elements, including that the confinement was not otherwise privileged because the DOCCS warrant was invalid. His claim for false imprisonment therefore may proceed.

"Section 1983 liability [also] may ... be anchored in a claim for malicious prosecution, as this tort 'typically

implicates constitutional rights secured by the [F]ourteenth [A]mendment, such as deprivation of liberty.' " *Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994) (quoting *Easton v. Sundram*, 947 F.2d 1011, 1017 (2d Cir. 1991)). "[Alt]hough section 1983 provides the federal claim, [courts] borrow the elements of the underlying malicious prosecution tort from state law." *Id.* Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its *termination favorably to plaintiff*, (3) lack of probable cause, and (4) malice." *Colon*, 60 N.Y.2d at 82 (emphasis added). Iverson has not adequately stated a claim for malicious prosecution because he has not alleged that the proceedings—here, the parole violation charge— terminated in his favor. Nevertheless, and in light of his *pro se* status, Iverson may amend his malicious prosecution claim to include factual allegations showing that his parole revocation has since been found invalid.

### D. Motion for Preliminary Injunction and Temporary Restraining Order

Finally, Iverson has asked this Court to grant a preliminary injunction and a temporary restraining order. Docket Item 3. He seeks to enjoin the defendants from

> **\*7** (1) holding parole warrant[s] in abeyance while a parolee is in custody under the basis of a parole warrant; (2) extending [a] parolee's maximum term[ ] of imprisonment under the basis of parole warrant[s] without affording the [p]arolee with a due process hearing; (3) ... unlawfully detaining parolee[s] under the basis of parole warrant[s] which have become void, due to New York State parole authorities['] failure to effectuate the required procedural safeguards; (4) ... scheduling and holding preliminary parole revocation hearing[s] more than (15) days from the date of the execution of a parole warrant, in clear violation of Executive Law § 259-i(3)(c)(iv); (5) [and] ...

extradit[ing Iverson] under the basis of [the DOCCS warrant].

*Id.* at 1.

"A party seeking a preliminary injunction must demonstrate '(1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief.' " *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995) (quoting *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991)).

At this early stage, Iverson has not demonstrated that he is likely to succeed on the merits of his claims. The Court therefore denies his motion for a preliminary injunction and a temporary restraining order.

### CONCLUSION

Because Iverson meets the statutory requirements of 28 U.S.C. § 1915(a) and has filed the required authorization, his request to proceed *in forma pauperis* is granted, But his claim for malicious prosecution will be dismissed under 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b) unless he files an amended complaint **within 45 days of the date of this order** that corrects the deficiencies noted above and otherwise complies with Rules 8 and 10 of the Federal Rules of Civil Procedure. Iverson's due process and false imprisonment claims, however, may proceed.

Iverson is advised that an amended complaint is intended to ***completely replace*** the prior complaint in the action and thus "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977); *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Therefore, any amended complaint must include all allegations against each of the defendants so that the amended complaint stands alone as the only complaint that the defendants must answer in this action.

**ORDER**

In light of the above,

IT IS HEREBY ORDERED that Iverson's request to proceed *in forma pauperis*, Docket Item 2, is GRANTED; and it is further

ORDERED that Iverson's motion for a preliminary injunction and a temporary restraining order, Docket Item 3, is DENIED; and it is further

ORDERED that Iverson may amend his claim for malicious prosecution **within 45 days of the date of this order**; and it is further

ORDERED that the Clerk of Court shall send to Iverson with this order a copy of the original complaint, a blank section 1983 complaint form, and the instructions for preparing an amended complaint; and it is further

ORDERED that if Iverson does not file an amended complaint **within 45 days of the date of this order**, the

Clerk of Court shall cause the United States Marshals Service to serve copies of the summons, complaint, and this order upon defendants Tabor, O'Connor, Anderson, Enright, and Annucci, without the plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in the plaintiff's favor; and it is further

ORDERED the Clerk of Court shall forward a copy of this order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>; and it is further

**\*8** ORDERED that, under 42 U.S.C. § 1997e(g), the defendants shall answer the complaint; and it is further

ORDERED that Iverson shall notify the Court in writing if his address changes. The Court may dismiss the action if Iverson fails to do so.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1083152

**Footnotes**

1     The date of Iverson's conviction under 18 U.S.C. § 2250(a) is not clear from the complaint.

2     To the extent Iverson claims that the defendants erred substantively in revoking his parole and ordering him reincarcerated, any such claim would be barred by *Heck v. Humphrey*, 512 U.S. 477 (1994). The Supreme Court has made clear that there is no cause of action under section 1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid." *Heck*, 512 US at 484. "A parolee challenging a parole revocation [under section 1983] must therefore demonstrate that his parole revocation has been 'reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.' " *Opperisano v. P.O. Jones*, 286 F. Supp. 3d 450, 455 (E.D.N.Y. 2018) (citing *Heck*, 512 U.S. at 486-87). In other words, Iverson may seek redress under section 1983 for the period of incarceration between his arrest under the DOCCS warrant and his (a) transfer to federal custody or (b) federal conviction triggering revocation of his state parole. He may not seek redress for the period of incarceration *following* his parole revocation.

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 83 of 142

Aragon v. New York, Not Reported in Fed. Supp. (2017)

2017 WL 2703562
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rodolfo ARAGON, Plaintiff,

v.

State of NEW YORK, City of New York,
Department of Correctional Services, Defendants.

14-CV-9797 (ER)
|
Signed 06/22/2017

**Attorneys and Law Firms**

Rodolfo Aragon, Fishkill, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department,
New York, NY, for Defendants.


### OPINION AND ORDER

Edgardo Ramos, U.S.D.J.

**\*1** Rodolfo Aragon ("Plaintiff"), acting *pro se* and *in
forma pauperis*, brings this action against the State of New
York ("New York"), the City of New York ("City"), and
the Department of Corrections and Correctional Supervision
("DOCCS", and collectively, "Defendants") pursuant to
42 U.S.C. § 1983 ("Section 1983"). Plaintiff alleges
that the conditions of his confinement at the Otis Bantum
Correctional Center ("Bantum") amount to cruel and unusual
punishment in violation of the Eighth Amendment. Plaintiff
further claims false imprisonment as a result of an unlawful
conviction in state court. The City brings the instant motion
to dismiss Plaintiff's Amended Complaint ("Am. Compl.")
and Second Amended Complaint ("Sec. Am. Compl.") pursuant
to Federal Rule of Civil Procedure 12(b)(6). For the reasons
set forth below, the City's motion to dismiss is hereby
GRANTED.


### I. FACTUAL BACKGROUND [1]
Liberally construed, Plaintiff alleges that he was subject to
unconstitutional conditions of confinement at Bantum on
Rikers Island starting on October 22, 2014. Compl., at 2.
Specifically, Plaintiff claims that he was "forced to live in
inhumane conditions" due to "insects, ants, roaches, lead
poisoning, asbestos, etc." and a "lack of vitamins and food,
[and] non-privacy." Am. Compl., at 1. As a result, Plaintiff
states he suffers from "external and internal f[u]ngus and
[rashes] to body," infections to his lungs and throat as well as
mental anguish. Am. Compl., at 1–2.

On October 22, 2014, Plaintiff requested to be moved from
Bantum due to these conditions, but was ignored by two
prison officials. Compl., Doc. 1-1, at 2. Plaintiff alleges to
have requested medical attention on October 22, 2014 due to
his exposure to the "inhumane conditions," and claims to have
submitted medical grievances on October 23, 2014. Compl.,
Doc. 1-2, at 1.

In addition, Plaintiff seeks damages based on a false
imprisonment claim resulting from an unlawful conviction
in state court. Sec. Am. Compl., at 2. Plaintiff claims that
he was falsely imprisoned based on "Defendant's guidelines,
practices, patterns and procedures," without any further
explanation. *Id.*


### II. PROCEDURAL BACKGROUND
Plaintiff filed the instant action on December 8, 2014 against
Jane Doe 1, Jane Doe 2, Bantum, and Rikers Island. Compl.
On March 20, 2015, the Court dismissed Plaintiff's claims
against Bantum because it is not an entity that can be sued.
Doc. 13. The Court instructed the Clerk of the Court to replace
Bantum with the City of New York pursuant to Federal Rule
of Civil Procedure 21. *Id.*

**\*2** On August 17, 2015, the Court granted the City's request
for an order to show cause on why this action should not be
dismissed for want of prosecution pursuant to Federal Rule
of Civil Procedure 41(b) based on Plaintiff's failure to keep
the Court apprised of his current residence. Doc. 22. After
Plaintiff failed to respond to this and two subsequent orders
to show cause dated September 4 and October 20, 2015,
respectively, Docs. 22–24, the action was dismissed by the
Court without prejudice on December 2, 2015. Doc. 25.

Having received a letter from Plaintiff on December 4,
2015 explaining that he had not responded because he had
been incarcerated, Doc. 27, the Court vacated the dismissal,
requested the Clerk of the Court to reopen the case, and
directed Plaintiff to file an Amended Complaint. Doc. 28. On
February 22, 2016, Plaintiff filed his Amended Complaint.
Doc. 34. On that same day, the Court terminated Plaintiff's
claims against Rikers Island, Jane Doe 1, and Jane Doe 2
pursuant to Rule 21.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 84 of 142

Aragon v. New York, Not Reported in Fed. Supp. (2017)

On March 10, 2016, the Court held an initial conference, during which Plaintiff was granted leave to file a second amended complaint to cure the factual deficiencies in his prior complaints. Doc. 37. The Court provided specific instructions to Plaintiff on the details to be included in the amended pleading. [2] After receiving several extensions of time, *see* Docs. 41–42, Plaintiff filed his Second Amended Complaint on November 15, 2016. On that same day, the Court terminated Plaintiff's claims against the Department of Correctional Services.

On December 1, 2016, the City filed a motion to dismiss Plaintiff's Amended Complaint and Second Amended Complaint pursuant to Rule 12(b)(6). Docs. 44–45. On January 20, 2017, Plaintiff filed an opposition to Defendant's motion. Opp. Mem. To date, the City has not replied to Plaintiff's opposition memorandum.

## III. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6), the Court is required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, the Court is not required to credit legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 681 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint must contain enough factual matter to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Iqbal*, 556 U.S. at 680 (quoting *Twombly*, 550 U.S. at 570).

### B. *Pro Se* Plaintiff

**\*3** The same standard applies to motions to dismiss for *pro se* plaintiffs. *See Zapolski v. Fed. Republic of Germany*, 425 Fed.Appx. 5, 6 (2d Cir. 2011). The Court remains obligated to construe a *pro se* complaint liberally, and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006). The obligation to be lenient while reading a *pro se* plaintiff's pleadings "applies with particular force when the plaintiff's civil rights are at issue." *Jackson v. N.Y.S. Dep't of Labor*, 709 F. Supp. 2d 218, 224 (S.D.N.Y. 2010) (citing *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004)). Nevertheless, "*pro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " *Triestman*, 470 F.3d at 477 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). To survive a motion to dismiss pursuant to Rule 12(b)(6), a *pro se* plaintiff's pleadings still must contain "more than an unadorned, the defendant-unlawfully-harmed me accusation." *Iqbal*, 566 U.S. at 678. A *pro se* complaint that "tenders naked assertion[s] devoid of further enhancement" will not suffice. *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### C. 42 U.S.C. § 1983

To state a claim under Section 1983, a plaintiff must allege that: (1) defendants were state actors or were acting under color of state law at the time of the alleged wrongful action; and (2) the action deprived plaintiff of a right secured by the Constitution or federal law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Section 1983 does not create any rights, but merely provides "a procedure for redress for the deprivation of rights [already] established." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). Accordingly, a civil rights action brought under Section 1983 will stand only insofar as the plaintiff can prove an actual violation of his rights under the Constitution or federal law. *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 119 (2d Cir. 1995) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

## IV. DISCUSSION

Aragon v. New York, Not Reported in Fed. Supp. (2017)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 85 of 142

Liberally construing his pleadings, Plaintiff brings a conditions-of-confinement claim under the Eighth Amendment and a false imprisonment claim against the Defendants. Compl.; Am. Compl.; Sec. Am. Compl. [3] Plaintiff also seeks to impose liability on the City pursuant to Section 1983. Sec. Am. Compl., at 2–3. Plaintiff raises a number of new claims in his opposition to Defendant's motion, including the violation of his constitutional rights under the First, Second, Fifth, Ninth, Fifteenth, Twenty-Fourth and Twenty-Sixth Amendments. Opp. Mem. However, even granting Plaintiff the liberal construction afforded to the submissions of a *pro se* plaintiff, he does not offer any plausible support for such claims. As such, the Court confines its analysis to the conditions-of-confinement claim under the Eighth Amendment, false imprisonment, and the municipal liability.

**A. Eighth Amendment Claim**

**\*4** Plaintiff alleges that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment due to the "inhumane conditions" of his confinement at Bantum. Am. Compl., at 1; Opp. Mem., at 17. Although the Constitution does not mandate comfortable prison settings, prisoners are entitled to "basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety." *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989)). Accordingly, prison officials are required to take "reasonable measure[s] to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 620 (2d Cir. 1996). To establish an Eighth Amendment claim based on conditions of confinement, a plaintiff must allege two elements: (1) objectively, that the deprivation the plaintiff suffered was "sufficiently serious" to deny "the minimal civilized measure of life's necessities," and (2) subjectively, that the defendant acted with a "sufficiently culpable state of mind" associated with the "deliberate indifference" to plaintiff's health or safety. *Trammel v. Keane*, 338 F.3d 155, 161 (2d Cir. 2003) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).

**i. Objective Element**

To establish the objective element of an Eighth Amendment violation, a plaintiff "must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citing *Helling*, 509 U.S. at 35–6). More specifically, a plaintiff must show that the conditions of confinement "pose an unreasonable risk of serious damage" to plaintiff's health or safety. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Generally, the "[n]ormal conditions of ... confinement do not constitute an Eighth Amendment violation," but "[s]uch confinement is not abnormal unless it is 'without penological justification, grossly disproportionate, or involving the unnecessary and wanton infliction of pain.' " *Branch v. Goord*, No. 05 Civ. 6495 (WHP), 2006 WL 2807168, at \*5 (S.D.N.Y. Sept. 28, 2006) (quoting *Smith v. Coughlin*, 784 F.2d 783, 787 (2d Cir. 1984)).

In support of its motion to dismiss, the City argues that Plaintiff has failed to provide sufficient details to determine whether the conditions he was subject to constitute a constitutional deprivation. Doc. 45, at 5. Despite the specific instructions provided by this Court to the Plaintiff on the necessity to include details in his amended pleadings, *see* Doc. 37, Plaintiff submits only scant factual matter to support his claim. Plaintiff solely alleges that he suffered from "inhumane conditions" as a result of "insects, ants, roaches, lead poisoning, [and] asbestos." Am. Compl., at 1. However, courts have recognized that contemporary standards of decency currently allow for some amount of exposure to vermin and asbestos in prison settings. *See Pack v. Artuz*, 348 F. Supp. 2d 63, 32 (S.D.N.Y. 2004) (plaintiff alleging a conditions-of-confinement claim under Section 1983 may be exposed to "low levels of asbestos exposure" "as reflected in the New York State Industrial Code and OSHA regulations"); *Solomon v. Nassau County*, 759 F. Supp. 2d 251, 258 (E.D.N.Y. 2011) ("conditions that are temporary or occasional have been found not to constitute a sufficiently serious deprivation to sustain a Section 1983 deliberate indifference claim"); *Wang v. Vahldieck*, No. 09 Civ. 3783 (ARR), 2012 WL 119591 at \*9 (E.D.N.Y. Jan 9, 2012) (temporary exposure to cockroaches in a dirty cell "does not rise to the sort of conduct held repugnant to the conscience of mankind") (internal quotations omitted). Without offering any details to substantiate the extent of the alleged exposure, Plaintiff's bare allegations do not sufficiently demonstrate that the conditions he was exposed to constitute a substantial risk

Aragon v. New York, Not Reported in Fed. Supp. (2017)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 86 of 142

of serious harm necessary to satisfy the objective element of an Eighth Amendment violation. 🚩 *Pack*, 348 F. Supp. 2d at 84; *see also* 🚩 *Farmer*, 511 U.S. at 837. Therefore, Plaintiff's Eighth Amendment claim must be dismissed.

**\*5**  Determining that a plaintiff failed to satisfy the objective component of an Eighth Amendment claim, courts may dismiss the claim without passing judgment on the subjective component. *See* ⚠️ *Martinez v. Schriro*, No. 14 Civ. 3965 (KMW), 2017 WL 87049, at \*5 (S.D.N.Y. Jan. 9, 2017) (dismissing plaintiff's Eighth Amendment claim solely based on plaintiff's failure to plead the objective element in his pleadings without analyzing the subjective element).

### B. False Imprisonment Claim

In analyzing false imprisonment claims under 🚩 Section 1983, the Second Circuit has generally looked to the law of the state in which the arrest occurred. 🚩 *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006) (citing 🚩 *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). Accordingly, to establish a claim for false imprisonment in New York, a plaintiff must allege: (1) that the defendant intentionally confined plaintiff; (2) that plaintiff was conscious of the confinement and did not consent to it, and (3) that the confinement was not otherwise privileged. *See* 🚩 *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (quoting 🚩 *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 314 (N.Y. 1975)).

The Court finds that Plaintiff has failed to satisfy any of the requisite elements to establish a cognizable claim for false imprisonment. Nowhere in his pleadings does Plaintiff substantiate his claim with any factual allegations; he simply states that he was falsely imprisoned. Sec. Am. Compl., at 2. Such a threadbare assertion does not state a plausible claim to relief. 🚩 *Iqbal*, 556 U.S. at 678 (quoting 🚩 *Twombly*, 550 U.S. at 557); *see also* 🚩 *Navarra v. Marlborough Gallery, Inc.*, 820 F. Supp. 2d 477, 485 (S.D.N.Y. 2011) (stating that allegations pled upon belief must be accompanied by facts upon which the belief relies).

Furthermore, Plaintiff's false imprisonment claim is barred by 🚩 *Heck v. Humphrey*, 512 U.S. 477 (1994). Doc. 45, at 6. In *Heck*, the Supreme Court held that a complaint must be dismissed if "judgment in favor of the plaintiff

would necessarily imply the invalidity of his conviction or sentence ... unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated." 🚩 512 U.S. at 477, 486–7. Thus, to recover damages for a false imprisonment claim under 🚩 Section 1983, a prisoner must demonstrate that his conviction "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 🚩 *Id.* at 486–7.

Here, Plaintiff alleges that he was falsely imprisoned and requests relief in the form of his "immediate release/liberty" as well as monetary damages amounting to \$9.8 million dollars. Am. Compl., at 1; Sec. Am. Compl., at 2–3. Pursuant to *Heck*, however, he must first demonstrate that said conviction was already invalidated. 🚩 512 U.S. at 487. This he fails to do. Therefore, Plaintiff is barred by *Heck* from seeking monetary relief under 🚩 Section 1983 based on his alleged false imprisonment.

### C. Monell Liability

Plaintiff's constitutional claims against the City are brought pursuant to 🚩 Section 1983. Sec. Am. Compl., at 3. Although a municipality cannot be held liable under 🚩 Section 1983 solely on a theory of *respondeat superior*, a 🚩 Section 1983 claim may be brought against a municipality if the alleged unconstitutional action was the result of an official policy, practice or custom. 🚩 *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–692 (1978). The Second Circuit has established a two prong test for 🚩 Section 1983 claims brought against a municipality. First, the plaintiff must prove " 'the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving [official].' " 🚩 *Johnson v. City of New York*, No. 06 Civ 09426 (GBD), 2011 WL 666161, at \*3 (S.D.N.Y. Feb. 15, 2011) (quoting 🚩 *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)). Second, the plaintiff must establish a causal connection between the policy or custom and the alleged deprivation of his constitutional rights. *Id.*

**\*6**  To satisfy the first prong of the municipal liability test, a plaintiff must allege the existence of at least one of the

following elements: (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation; (3) a practice so consistent and widespread that constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 276–7 (S.D.N.Y. 2010) (citations omitted).

The Court finds that Plaintiff has failed to meet any of the requisite elements to satisfy the first prong of a municipal liability claim. Plaintiff submits no allegations to indicate the existence of either a formally recognized policy or a consistent and widespread practice adopted by the City. Further, Plaintiff neither alleges that the Bantum prison officials have policymaking authority nor claims that the City failed to train and supervise its employees. Liberally construing the pleadings, Plaintiff seems to allege the existence of a practice adopted by the City solely based on Plaintiff's alleged experience. However, a "single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998) (quoting *Ricciuti v. New York City Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Without offering any factual support for his conclusory allegations, this Court cannot "infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557). Therefore, Plaintiff's claims against the City must be dismissed on this basis as well.

### D. Leave to Amend

In its motion to dismiss, the City requests that the Court deny Plaintiff any further leave to amend his pleading due to his repeated failure to cure the factual deficiencies. Doc. 45, at 8. Denying leave to amend is proper where the amendment would be futile or would result in undue prejudice to the opposing party. *Holmes v. Grubman*, 568 F.3d 329, 334–35 (2d Cir. 2009). An amendment is considered futile where the plaintiff is unable to demonstrate that he would be able to cure the defects in a manner that would survive a motion to dismiss. *Hayden v. Cnty. Of Nassau*, 180 F.3d 42, 53–54 (2d Cir. 1999).

Here, Plaintiff has been afforded two opportunities to amend his complaint pursuant to orders from this Court that contained specific instructions as to what he was required to plead for his claims to survive. Plaintiff failed to follow the directions contained in those orders. Given that Plaintiff's amended pleadings suffer from the same defects as his initial complaint, leave to file a third amended complaint would be futile. Therefore, the Amended and Second Amended Complaints will be dismissed with prejudice.

### V. CONCLUSION

For the reasons set forth above, the City's motion to dismiss Plaintiffs Amended Complaint and Second Amended Complaint is GRANTED. The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of the Court is respectfully directed to terminate the motion, Doc. 44, to mail a copy of this Opinion and Order to Plaintiff, and to close the case.

It is SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 2703562

---

### Footnotes

1    The following facts, accepted as true for purposes of the instant motion, are based on Plaintiff's allegations in his Complaint ("Compl.") (Doc. 1), Am. Compl. (Doc. 34), Sec. Am. Compl. (Doc. 43), and Plaintiff's Opposition Memorandum to Defendant's Motion to Dismiss ("Opp. Mem.") (Doc. 48). *See Koch v. Christie's Int'l PLC,*

699 F.3d 141, 145 (2d Cir. 2012); 🚩 *Walker v. Schult*, 717 F.3d 119, 122 n. 1 (2d. Cir. 2013) ("[a] district court deciding a motion to dismiss may consider factual allegations made by a *pro se* party in his papers opposing the motion.").

2    Specifically, the Court advised: "If you were placed in a cell that was subject to infestation, you should indicate precisely what facility you were in; to the extent that you can describe the cell or state which cell you were in, indicate where you were housed; indicate the dates that this happened; indicate who, if anyone, you complained to; indicate what their response was, if any. [...] If there are particular individuals who you say you complained to and who ignored your complaints, you need to indicate who they are because if you only sue the City, then you have a slightly tougher case to make because then you would have to establish that the conditions under which you were housed were part of a practice or policy or custom of the city to keep you and perhaps others in those unsafe conditions." Doc. 37, at 6:16–8:3.

3    Plaintiff has failed to plead the same claims or factual allegations in his amended pleadings as in his earlier complaints. The City acknowledges that Plaintiff appears to treat his amended pleadings as supplements to, not replacements of, his earlier complaints. Doc. 45, at 3. "[I]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training." 🚩 *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983). Accordingly, the Court liberally construes Plaintiff's pleadings by addressing the claims and factual allegations contained in all three of his complaints, regardless of their inconsistency.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by    Hallett v. Stuart Dean Co.,    S.D.N.Y.,    February 5, 2021

2018 WL 3821620

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

BROWN, Plaintiffs,

v.

CITY OF NEW YORK et al., Defendants.

16-CV-1919 (ALC)

|

Signed 08/10/2018

**Attorneys and Law Firms**

Vikrant Pawar, Vik Pawar, Attorney at Law, New York, NY, for Plaintiffs.

Evan Craig Brustein, New York City Law Department, New York, NY, for Defendants.

**OPINION AND ORDER**

ANDREW L. CARTER, JR., United States District Judge

**\*1** Plaintiffs Robert Brown ("Mr. Brown") and Marjorie Grodd-Brown ("Ms. Brown") (collectively, "Plaintiffs") bring this action under 42 U.S.C. § 1983[1] ("Section 1983") and the New York state and local law against Defendants the City of New York ("the City") and Detective Robert Cardona ("Cardona") (collectively, "Defendants"). Defendants have moved for summary judgment. In response, Plaintiffs have abandoned certain claims, but continue to pursue claims of false arrest, deprivation of due process rights, malicious prosecution, denial of the right to a fair trial, negligent training and screening, respondeat superior, First Amendment retaliation, and a violation of Mr. Brown's Fifth Amendment rights. For the reasons set forth in further detail below, summary judgment is warranted on each of these remaining claims. Defendants' motion is **GRANTED** in its entirety.

**BACKGROUND**

**I. Factual Background**

The following factual allegations are undisputed by the parties unless otherwise noted.[2] On February 28, 2015, Mr. Brown and E.B., his then-12 year-old daughter, got into an argument over how long E.B. had been in the bathroom. Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs' 56.1") ¶ 3 (ECF No. 61). During the argument, E.B. called her father a jerk. *Id.* ¶ 4. Mr. Brown then "pinched [E.B.] with a twisting motion." *Id.* ¶ 5.

On March 2, 2015, school officials at E.B.'s school noticed a mark on her arm. *Id.* ¶ 6. After observing the mark, a school official made a report to the New York State Office of Children and Family Services ("NYSOCFS") of suspected child abuse or maltreatment. *Id.* ¶ 7. The school official noted in the Suspected Child Abuse Report that E.B. had lacerations/bruises/welts, and had further informed the school official that, on February 28, 2015, E.B.'s father had pinched her with a twisting motion causing a bruise. *Id.* ¶¶ 8-9. The Suspected Child Abuse Report further detailed that E.B. told the school official that she frequently gets into verbal arguments with her father, that they can be physical at times, and that she had "done worse to her father" including punching and hitting him, "jump[ing] on his back[,]" and "go[ing] for his neck." *Id.* ¶ 10; *see* Declaration of Evan Brustein in Support of Motion for Summary Judgment ("Brustein Decl."), Ex. B (ECF No. 66); *see also* Order Granting Motion to Seal (ECF No. 58) (filing Suspected Child Abuse Report under seal).

**\*2** A child abuse case was then referred to the New York City Police Department ("NYPD") for investigation. Defs' 56.1 ¶ 11. The form used to refer the matter to the NYPD indicated that "the caretaker caused serious physical harm to child or has made a plausible threat of serious harm." *Id.* ¶ 12. The form, dated March 3, 2015, further described that E.B. attended a school specializing in serving children with "learning differences" and that there was a history of E.B. attacking her parents. Brustein Deck, Ex. C at DEF056. Also specified was that, during the altercation at issue, E.B. had "physically attacked" and "pinched" her father and, "[i]n an attempt to teach [E.B.] that what she does is not appropriate, [her] father pinched her in return, applying excess force and leaving a bruise." Defs' 56.1 ¶ 13; Brustein Decl., Ex. C at DEF056. However, the reporter indicated that Mr. Brown had no intention of injuring E.B., and that E.B. was "likely not at serious risk from her parents." *Id.*

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 90 of 142

On March 11, 2015, Mr. Brown received a phone call from an unidentified individual requesting to speak to his wife. Declaration of Vik Pawar, Esq., Ex. 2 ("R. Brown Depo.") at 21:8-10 (ECF No. 70-2). [3] After Mr. Brown indicated his wife was not there, the individual asked if he was Robert Brown, and Mr. Brown confirmed it was him. *Id.* at 21:11-13. The individual then said to Brown, "I need you to come down to the police station." *Id.* at 21:13-14. Brown then hung up the phone, not believing that the individual was a police officer. *Id.* at 21:14, 59:12-13, 60:7-11.

Approximately thirty minutes later, at 5:09 p.m., Cardona appeared at the Browns' residence, located at 55 West 14th Street, Apartment 7C, New York, New York, in a suit and tie, and "bang[ed]" on the door, and identified himself as an NYPD officer. *Id.* at 60:22-24, 61:7-13; Defs' 56.1 ¶ 16. [4] Mr. Brown looked out his peephole, saw Cardona, and asked "who is it." R. Brown Depo. at 61:14-24. After Cardona did not answer him, he called 9-1-1 because he was afraid to open the door. R. Brown Depo. at 61:25-62:3, 65:22-23; Defs' 56.1 ¶ 17. According to the 9-1-1 operator's event chronology, Brown reported that a male wearing a suit and tie was at the door of his apartment, and was identifying himself as an NYPD officer with Shield Number 7724. *Id.* ¶ 18. The 9-1-1 operator told Brown not to let the man inside if Brown did not know who he was. R. Brown Depo. at 62:4-7.

At approximately 5:17 p.m., Cardona called 9-1-1 to request a unit because the occupant was requesting verification that he was a police officer. Defs' 56.1 ¶ 19. At approximately 5:22 p.m., the 9-1-1 operator heard Cardona identifying himself to the occupant. *Id.* ¶ 20. Approximately ten minutes after Mr. Brown called 9-1-1, two uniformed police officers came out of the elevator on the Browns' floor. R. Brown Depo. at 62:16-24. Cardona took out what appeared to be identification from his coat pocket and showed it to the officers, to which the police officers seemed to smile, as if they knew him. *Id.* The officers turned around and went back downstairs. *Id.*

After the officers left, Mr. Brown felt less afraid, and was "confident enough ... that [Cardona] was with the police department ... to open the door and let him in ... since the officers knew who he was." *Id.* at 63:14-20, 64:17-21,65:22-66:1. When Brown opened the door, Cardona said, "I need for you to come down to the police station now." *Id.* at 65:5-7. Cardona came into the apartment and said, while near the front door, "I need for you [to] come down to the police station." *Id.* at 65:11-14; Defs' 56.1 ¶ 25. Brown refused, to which Cardona responded, "... I am going to arrest

you right here and put the cuffs [on] you and take you down right in front of your family." *Id.* ¶¶ 26-27; R. Brown Depo. at 68:16-21. Cardona was in the apartment for approximately ten minutes. Defs' 56.1 ¶ 23.

**\*3** Brown rode in the front seat of Cardona's car to the police station. *Id.* ¶ 28. It took approximately 10 to 15 minutes to get there. *Id.* ¶ 29. At no point prior to arriving at the police station was Brown in handcuffs. *Id.* ¶ 30. When Brown asked why they were going to the police station, Cardona told him, "I can't say anything to you until we get down to the police station." *Id.* ¶ 31.

At approximately 6:00 p.m. at the police station, Cardona provided Brown with a copy of *Miranda* Warnings. *Id.* ¶ 32. Brown initialed next to the word "yes" in response to questions relating to his understand of each of his *Miranda* rights, and also answered he was willing to answer questions. *Id.* ¶¶ 34-39. Brown also signed and printed his name on the *Miranda* warnings sheet. *Id.* ¶ 40. Brown could not recall whether Cardona said anything else to him when he received this paper, nor could he remember whether Cardona gave the document to him prior to the handwritten statement that he would ultimately give. R. Brown Depo. 88:25-89:5.

Cardona then "threw a piece of paper down in front of [Brown] and forced [him] to write a statement." R. Brown Depo. 78:2-4. Specifically, Cardona said to Brown, "[w]rite down the statement about what happened," and also read Mr. Brown "the charges of why [he] was being brought down to the police station." *Id.* ¶ 42. Cardona did not tell Brown what to write. *Id.* ¶ 42. However, Brown "felt threatened like there was a gun to [his] head" because of the way Cardona threw down the piece of paper and said "[p]ut down what happened." R. Brown Depo. 79:3-6, 80:11-17. Cardona made no other threats at that time. *Id.* at 80:18-20.

Mr. Brown then wrote, in his own words, an accurate account of what had happened. Defs' 56.1 ¶ 43. Specifically, Brown wrote that he asked his daughter E.B. to hurry up in the bathroom because he needed to use it and she called him a jerk. *Id.* ¶ 44. Brown also wrote that his daughter started making hissing sounds and scratching and pinching him. *Id.* ¶ 45. Then, he wrote, he told his daughter, "Ok you want to play the pinching game?" and pinched her arm a little while she pinched him back. *Id.* ¶ 46. One of his pinches was a little too hard, he continued, causing a black and blue mark the size of a quarter. *Id.* ¶ 47.

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 91 of 142

Cardona interviewed Ms. Brown and E.B. at the precinct, separately from Mr. Brown. Brustein Deck, Ex. H ("Grodd-Brown Depo.") at 40:17-24. [5] Cardona told them that Mr. Brown was "in big trouble" and asked them to answer his questions. *Id.* at 41:2-5. When Cardona asked E.B. about the incident, E.B. told him that her father had pinched her and caused a bruise, but made light of it, indicating that they were playing and that it was "no big deal." Defs' 56.1 ¶ 49; Grodd-Brown Depo. at 41:8-11, 42:7-13. Ms. Brown did not know if her daughter spoke to Cardona at the apartment on March 11, 2015. Defs' 56.1 ¶ 24.

At approximately 8 p.m., Cardona arrested Mr. Brown on charges of endangering the welfare of a child and assault in the third degree. *Id.* ¶ 50. Brown agrees that the narrative portion of the arrest report that he "did cause injury to a twelve year old child by pinching her on her upper right arm. Causing a quarter size bruise" was true. *Id.* ¶ 51. On March 12, 2015, the New York County District Attorney's Office charged Brown with intentional assault in the third degree, reckless assault in the third degree, endangering the welfare of a child, attempted assault in the third degree, and harassment in the second degree. *Id.* ¶ 52. The criminal complaint, signed by Cardona, charges as follows:

> **\*4**  On or about March 2, 2015 at about 12:25 P.M., at the times and places described below in the County and State of New York, the defendant, with intent to cause physical injury to another person, caused such injury to another person; the defendant recklessly caused physical injury to another person; the defendant knowingly acted in a manner likely to be injurious to the physical, mental, and moral welfare of a child less than seventeen years old; the defendant, with intent to cause physical injury to another person, attempted to cause such injury to another person; the defendant, with intent to harass, annoy and alarm another, subjected that person to physical contact and attempted and threatened to do the same.

Brustein Decl., Ex. J (Criminal Complaint) (ECF No. 66-8).

The factual basis underlying those allegations is that E.B. informed Cardona that she "observed [Brown] pinch her right upper arm, causing bruising and substantial pain." *Id.* Brown has indicated that he does not believe that Cardona lied about the facts and circumstances underlying the arrest, but that Cardona "made up the charges." Defs' 56.1 ¶ 54.

On March 12, 2015, during Brown's arraignment, the Honorable Stephen Statsinger offered to give a shorter date to return to court, but Brown's attorney requested April 23, 2015. *Id.* ¶ 55. Brown was released on his own recognizance. Brustein Decl., Ex. K (arraignment transcript). The Court issued a temporary order of protection for Brown to stay away from his daughter, but gave the Family Court the ability to modify the conditions of the order, after Brown's attorney requested it. Defs' 56.1 ¶ 56. Plaintiff made no effort to modify the order of protection in Family Court. *Id.* ¶ 57. On April 23, 2015, the criminal charges were dismissed because the People could not prove the case beyond a reasonable doubt. *Id.* ¶ 58.

## II. Procedural History

Plaintiffs filed this action on March 15, 2016, on behalf of themselves and E.B. Defs' 56.1 ¶ 1. On August 7, 2017, Plaintiffs filed a Second Amended Complaint withdrawing E.B.'s claims. Defs' 56.1 ¶ 2. That complaint includes claims for: (1) false arrest—unlawful seizure; (2) deprivation of due process rights; (3) malicious prosecution; (4) denial of the right to fair trial; (5) violations of New York State and New York City Human and Civil Rights laws; (6) negligent screening, training, hiring, and retention; (7) negligence; (8) respondeat superior; (9) malicious abuse of process; (10) intentional and negligent infliction of emotional distress; (11) First Amendment retaliation; and (12) violation of Mr. Brown's Fifth Amendment rights. Second Amended Complaint (ECF No. 53). On September 26, 2017, Defendants moved for summary judgment. Motion for Summary Judgment (ECF No. 59).

Plaintiffs' opposition brief indicates that they only maintain the following causes of action, withdrawing all others: (1) false arrest on behalf of Mr. Brown; (2) deprivation of due process rights on behalf of Mr. and Ms. Brown; (3) malicious prosecution on behalf of Mr. Brown; (4) denial of the right to fair trial on behalf of Mr. Brown; (5) negligent screening, training, hiring, and retention on behalf of Mr. and Ms. Brown; (6) respondeat superior on behalf of Mr. and Ms.

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 92 of 142

Brown; (7) First Amendment retaliation on behalf of Mr. Brown; and (8) violation of Mr. Brown's Fifth Amendment rights on behalf of Mr. Brown. [6]

### III. The Parties' Rule 56.1 Statements

Each party claims that the other has not properly responded to its Rule 56.1 Statement for the purposes of this motion. These contentions are addressed in turn.

**\*5** Rule 56.1 of the Local Rules of this Court govern the procedures for summary judgment motions. This rule requires a moving party to submit "a separate, short and concise statement" setting forth material facts as to which "there is no genuine issue to be tried." Local Rule 56.1(a). An opposing party must respond to the moving party's 56.1 statement, articulating, if necessary, additional material facts as to which a triable issue remains. Local Rule 56.1(b). The material facts reflected in a moving party's 56.1 statement "will be deemed to be admitted unless controverted" by the opposing party's statement. Local Rule 56.1(c). "Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)." [7] Local Rule 56.1(d).

First, Plaintiffs have failed to respond to paragraphs 1-6, 17-24, 27-30, 48-50, 52, and 55-59 of Defendants' 56.1 Statement. As such, where Defendants' unopposed factual averments are supported by citations to admissible evidence, the Court accepts them as true. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). However, the Court will exercise its discretion to overlook Plaintiffs' non-responses and comb the record as is necessary to adjudicate this motion. *Id.*

In addition, the Court deems paragraphs 7 through 13 admitted because Plaintiffs have not cited record evidence to dispute these facts. Plaintiff objects to paragraphs 7-10 as inadmissible hearsay. However, the document cited as supporting these facts, the NYSOCFS Report of Suspected Child Abuse or Maltreatment ("Suspected Child Abuse Report") is admissible as a business record through the testimony of an official at E.B.'s school "because the report appears to have been prepared at or near the time of the events, by ... a person with knowledge." *Gold v. Am. Med. Alert Corp.*, No. 14-CV-5485 (JFK), 2017 WL 663551, at \*4 (S.D.N.Y. Feb. 16, 2017) (citing Fed. R. Evid. 803(6) ).

Similarly, Plaintiffs' hearsay objection to paragraphs 11-13 is overruled, as the document cited in support of those facts, the New York County District Attorney's Office Child Abuse United Police Referral Form ("Police Referral"), is admissible as a business record. *Id.* Moreover, the statements reflected at paragraphs 11-13 are not being admitted for their truth, but to show that the statements were provided to the New York City Police Department and Detective Cardona.

*Richards v. City of New York*, No. 97-CV-7990 (MBM), 2003 WL 21036365, at \*6 (S.D.N.Y. May 7, 2003) (reasoning that statements reflected in police report are not hearsay where used to demonstrate statements were made to officers so as to provide probable cause to arrest).

The Court further deems paragraphs 32-47, 51, 53, and 54 of Defendants' 56.1 Statement admitted, as Plaintiffs' response contains improper legal argument and, while broadly invoking deposition transcripts in response, does not cite specific pages and lines of those transcripts. *See, e.g., Costello v. N.Y. State Nurses Ass'n*, 783 F. Supp. 2d 656, 661 n.5 (S.D.N.Y. 2011) (disregarding a plaintiff's responses to a defendant's Rule 56.1 Statement where the plaintiff responded with conclusory assertions or legal arguments); *see also, e.g.,*

*Kastle v. Tompkins*, No. 13-CV-2256 (VB)(PED), 2017 WL 9534741, at \*2 (S.D.N.Y. Mar. 13, 2017) (declining to consider citations to transcripts without specific pages or line numbers) (citations omitted), *report and recommendation adopted in part, rejected in part on other grounds*, No. 13-CV-2256 (VB), 2017 WL 3206341 (S.D.N.Y. July 27, 2017). Nonetheless, the Court has considered admissible evidence in the record for which Plaintiff has provided citations.

**\*6** The Court declines to consider all but paragraphs 9-11 of Plaintiffs' Counter-Statement of Facts Pursuant to Rule 56.1, as it contains no record citations, except for a reference to the Second Amended Complaint and the "testimonies of the plaintiffs." As an initial matter, a complaint is inadmissible hearsay and cannot be properly cited for the truth of its contents in a 56.1 Statement. *E.g., Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 391 n.2 (S.D.N.Y. 2012), *aff'd sub nom. Edelhertz v. City of Middletown, N.Y.*, 714 F.3d 749 (2d Cir. 2013).

Plaintiffs nonetheless argue that because Defendants have failed to respond to their 56.1 Statement, the facts contained therein should be deemed admitted. Pls' 6/11/18 Letter at 1. The Court rejects Plaintiffs' invitation, as Defendants cannot be expected to respond to a 56.1 Statement devoid of record

citations. Accordingly, in deciding this motion, the Court has considered the affidavits and documents submitted by both parties but has not relied on the portions of Plaintiffs' Rule 56.1 Statement that are unsupported. *IBS Ketel, Ltd. v. Korea Telecom Am., Inc.*, No. 98-CV-4856 (DC), 2000 WL 821013, at *1 (S.D.N.Y. June 22, 2000).

## STANDARD OF REVIEW

A party moving for summary judgment has the burden of establishing that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is considered "genuine" when a reasonable finder of fact could render a verdict in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted).

In deciding a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986). If the court recognizes any genuine issue of material fact, summary judgment is improper, and the motion must be denied. *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir. 1985).

If the moving party discharges its burden of proof, the non-moving party must then set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). The non-moving party opposing a properly supported summary judgment motion "may not rest upon mere allegation[s] or denials of his pleading." *Anderson*, 477 U.S. at 256. Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment, and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 247-50

(emphasis in original) (internal citations omitted). Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. *See* *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.").

## DISCUSSION

### I. False Arrest

#### A. Probable Cause

*7 "A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citation omitted). Probable cause is a complete defense to false arrest. *Id.* It "exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995). Probable cause does not require an actual showing of guilt. *Illinois v. Gates*, 462 U.S. 213, 243 n.13. Otherwise innocent behavior, under certain circumstances, can contribute to a finding that probable cause exists; thus, "the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Id.*

In addition, probable cause may be based solely on information received from an alleged victim or eyewitness, so long as there is no reason to doubt that person's veracity. *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 30 (E.D.N.Y. 2015) (quoting *Betts v. Shearman*, 751 F.3d 78, 81 (2d Cir. 2014) ) (dismissing false arrest claim upon finding of probable cause to arrest Plaintiff for endangering the welfare of a child based solely upon statements by Plaintiff's children describing Plaintiff throwing child against wall of car, despite Plaintiffs claims of failure to investigate); *Slater v. Mackey*, No. 12-CV-4325 (NGG)(RML), 2015 WL 6971793, at *12 (E.D.N.Y. Nov. 10, 2015) (dismissing false arrest claim upon finding of probable cause to arrest Plaintiff for assault on her

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 94 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

child resulting in black eye and bruises to child based upon statement by Plaintiff's child, combined with corroborating evidence).

Construing the evidence presented in the light most favorable to the non-moving party, as the Court must, there are no genuine issues of fact determinative of the question of whether there was probable cause to arrest Mr. Brown. Assuming for the sake of argument that an arrest occurred when Cardona first arrived at his apartment (as opposed to later at the precinct following Mr. Brown's confession),[8] it is undisputed that, at that time, Cardona was aware that a school official—a complaining witness—had filed a report of suspected child abuse with NYSOCFS, which was thereafter referred to the NYPD, noting that E.B. had lacerations/bruises/welts as a result of her father pinching her. This establishes probable cause to arrest Mr. Brown for assault in the third degree, among other things. *See, e.g., Peterson-Hagendorf v. City of New York*, 146 F. Supp. 3d 483, 485-87 & nn.2-6 (E.D.N.Y. 2015) (dismissing false arrest claim at summary judgment upon finding of probable cause to arrest teacher for assault and/or endangering the welfare of a child, as based upon principal having observed welt on student's neck, as well as interviews of child by several individuals which consistently described teacher's pinching of child's neck).

 **\*8** That the Browns or E.B. may have later minimized the pinch as playful "does not preclude a finding that [Cardona] had probable cause" to arrest Mr. Brown, especially in the absence of any reason to doubt the credibility of the unequivocal accounts regarding the interaction and E.B.'s injury. *See, e.g.,* 📙 *Thomas v. Culberg*, 741 F. Supp. 77, 80 (S.D.N.Y. 1990) (concluding that, while child's denial of father's abuse in the face of officer's own observations of child's scrapes and bruises and father's admission that holding son over trash can was a "joke" did not mitigate officer's probable cause, father's account that eyewitnesses were "crazy" and that "call was a prank" warranted denial of summary judgment on probable cause, but grant of summary judgment on arguable probable cause).

Thus, because Cardona had probable cause to arrest Mr. Brown, Plaintiffs' false arrest claim is dismissed.[9]

### B. *Payton* Claim
Plaintiffs appear to alternatively suggest that a warrant was necessary to arrest Mr. Brown in his home, given that exigent

circumstances were lacking in light of the nine-day delay between the report and the arrest. *See* Plaintiffs' Memorandum of Law in Opposition to Summary Judgment ("Pls' Mem.") at 12 (citing 📙 *Payton v. New York*, 445 U.S. 573, 602-03 (1980) ) (ECF No. 71); *see also* Sur-reply Letter dated June 11, 2018 ("Pls' 6/11/18 Letter") at 1 (ECF No. 75) (arguing that Cardona should have obtained an arrest warrant).

Assuming for the sake of argument that Mr. Brown was arrested in his home, as opposed to later on at the precinct, *supra* n.8, Plaintiffs are correct that a warrantless arrest that occurs inside an individual's home, absent exigent circumstances or consent, can form the basis of a false arrest claim under 📙 42 U.S.C. § 1983 even if probable cause is present. *Durney v. City of New York*, No. 91-CV-3959 (JG), 1996 WL 1057148, at *7 (E.D.N.Y. Oct. 25, 1996) (citations omitted). However, Plaintiffs, despite being represented by counsel, have neither pleaded this theory, nor, with but a single cite to *Payton* in their opposition papers, developed this claim "in any meaningful way." 📙 *Morris v. Silvestre*, 604 Fed.Appx. 22, 26 (2d Cir. 2015) (affirming summary judgment dismissal of false arrest claim grounded in *Payton* because "single citation to *Payton* ... [was] wholly inadequate for a party with counsel to present a *Payton* claim.").

Even putting those deficiencies aside, and resolving ambiguities in Plaintiffs' favor, based on the limited record before the Court, any *Payton* claim advanced by Plaintiffs fails on its merits. Here, Cardona called and asked Mr. Brown to come down to the police precinct, but did not identify himself. Cardona then came to Plaintiffs' apartment door but did not identify himself, so Mr. Brown, afraid, called 9-1-1. Mr. Brown then observed through his peephole two uniformed officers come to his door, and Cardona presenting them with identification. Mr. Brown then opened his front door and Cardona entered.

Second Circuit law is unsettled as to whether a plaintiff's mere opening of a door in response to an officer's knock allows for a warrantless arrest in the home. *Parker-El v. Morales*, No. 13-CV-6996 (RWS), 2015 WL 5920031, at *4 (S.D.N.Y. Oct. 9, 2015) (surveying cases). However, even assuming that Mr. Brown's decision to *open his door* was involuntary, Mr. Brown consented to Cardona's *entry* when he "felt confident enough [that Cardona was a police officer] to open the door and *let him in*[,]" after which Mr. Brown was arrested. *See* R. Brown Depo. at 64:17-22 (emphasis added); *see id.* at 63:19-20 ("I felt confident enough since the officers knew

who he was, that is why I opened the door."); *see also id.* at 65:22-66:1 (attesting that he was less afraid to open the door after the uniformed police officers left). Considering the totality of the circumstances, any coercive effect that Cardona's failing to identify himself and persistent attempts to speak with Mr. Brown might have had was substantially mitigated after the uniformed officers arrived and Mr. Brown felt confident enough to let Cardona into his apartment. *See United States v. Real Prop. & Premises Known as 90-23 201st St., Hollis, New York*, 775 F. Supp. 2d 545, 556-57 (E.D.N.Y. 2011) (to evaluate the voluntariness of consent, court must consider totality of the circumstances, including whether officers used force or intimidating tactics, or whether attempted entry was at late hour).

**\*9** Thus, even had Plaintiffs properly advanced a *Payton* claim, Mr. Brown's own testimony establishes consent, thus precluding such a claim.

## II. Malicious Prosecution

To prove a cause of action for malicious prosecution under Section 1983, a plaintiff must show that: (1) the defendant commenced a prosecution against the plaintiff, (2) there was no probable cause to believe the prosecution could succeed, (3) the defendant behaved with malice, (4) the prosecution ended in the plaintiff's favor, and (5) there was "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000). Under state law, the fifth element described in *Rohman* is not required. *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995).

"[T]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York...." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (internal citations and quotation marks omitted). "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Johnson v. Constantellis*, 221 Fed.Appx. 48, 50 (2d Cir. 2007) (internal citations and quotation marks omitted).

Here, as discussed above, *supra* Point B, there was probable cause to arrest Mr. Brown. Plaintiffs cite no intervening facts undermining Cardona's probable cause.

In addition, Plaintiffs cannot establish that Cardona initiated the prosecution with malice. "To initiate a prosecution, a defendant must do more than report the crime or give testimony." *Manganiello*, 612 F.3d at 163. Rather, an "active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act[,]" is necessary. *Id.* (quoting *Rohman*, 215 F.3d at 217) (internal quotation marks omitted). That the district attorney assigned to the case exercised independent judgment in initiating the prosecution is presumed, and typically rebutted only by evidence that the defendants "misled or pressured" that official. *Salim v. City of New York*, No. 15-CV-8521 (CM), 2017 WL 946345, at \*2 (S.D.N.Y. Feb. 28, 2017) (quoting *Alcantara v. City of New York*, 646 F. Supp. 2d 449, 458-59 (S.D.N.Y. 2009) ) (internal quotation marks omitted).

The dearth of evidence that Cardona initiated this prosecution with malice is readily apparent from the record and the supporting briefs. Brown does not dispute that the substance of the complaint (*i.e.*, that he pinched his daughter, causing a quarter-sized bruise) is true. Moreover, Plaintiffs do not assert facts suggesting that Cardona played any more of a role in the short prosecution than signing the criminal complaint. Indeed, the only arguments that Plaintiff musters are that "[a] lack of probable cause generally creates an inference of malice[,]" along with a few highly conjectural hypotheticals. Pls' Mem. at 14-15 (quoting *Manganiello*, 612 F.3d at 162). [10] Because, as discussed at length above, Defendants have conclusively demonstrated probable cause, Plaintiffs' arguments are unavailing. They have failed to demonstrate a triable issue as to whether Cardona initiated the prosecution with malice.

**\*10** For these two independent reasons, Plaintiffs' malicious prosecution claim fails.

## III. Fair Trial

A claim that an official fabricated evidence in violation of a plaintiff's right to a fair trial requires that a plaintiff show that "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors and (5) the plaintiff suffers a deprivation of liberty as a result." *Jovanovic v. City of New York*, 486 Fed.Appx. 149, 152 (2d Cir. 2012).

In response to Defendants' contention that Cardona fabricated no evidence whatsoever, Plaintiff takes no issue with

Cardona's description of the underlying facts, but rather with Cardona's characterization of the pinch in two statements in the criminal complaint: first, that the pinch resulted in "substantial pain" to E.B., and, second, that the pinch occurred on March 2, 2015, when it in fact occurred on February 28, 2015. Pl's Mem. at 17-18.

Defendants argue that statements in a criminal complaint are inadmissible hearsay and therefore unlikely to reach a jury, as is necessary to establish a denial of a right to fair trial claim. Defendants' Reply Memorandum of Law in Support of Motion for Summary Judgment at 6 (citing, *inter alia,* *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ) (ECF No. 72). However, courts in this Circuit, for the most part, have allowed such claims to proceed on the basis that the "likely to influence a jury's decision" element "refers to the materiality of the information, not its likelihood to be presented to a jury." *E.g.,* *Bryant v. Serebrenik*, No. 15-CV-3762 (ARR)(CLP), 2016 WL 6426372, at *6 (E.D.N.Y. Oct. 28, 2016) (distinguishing *Ricciuti* and surveying cases).

Therein, however, lies the most major defect of the fabrications that Plaintiff asserts: they are wholly immaterial. A court considering the materiality of a given piece of evidence should consider the admissibility of such evidence at trial, as well as "whether the false statements are entitled to absolute immunity, and whether these statements laid the groundwork for plaintiff's deprivation of liberty[.]" *Buie v. City of New York*, No. 12-CV-4390 (RJD)(CLP), 2015 WL 6620230, at *10 (E.D.N.Y. Oct. 30, 2015) (internal quotation marks and citations omitted).

First, the two-day discrepancy between the date of the actual incident and the date reflected in the criminal complaint is as immaterial of a fabrication as they come. *See, e.g.,* *Bryant*, 2016 WL 6426372, at *6 (denying summary judgment to defendants on fair trial claim because factual discrepancies underlying probable cause determination were material to jury's assessment of probable cause to arrest for disorderly conduct). The Court cannot discern a reason for fabricating this information, nor do Plaintiffs suggest one (*see* Pl's 6/11/18 Letter at 2 (suggesting, in conclusory way, that date discrepancy was "pivotal") ); rather, it reasonably appears to have been a simple typographical error. *See Crews v. Cty. of Nassau*, 996 F. Supp. 2d 186, 208 (E.D.N.Y. 2014) (rejecting malicious prosecution claim premised entirely upon defendants' listing wrong date on felony complaint in order to assert alibi defense). At bottom, the date discrepancy,

beyond being hearsay and likely subject to absolute immunity, has no conceivable bearing on Mr. Brown's deprivation of liberty.

**\*11** Secondly, that Cardona fabricated E.B.'s statement to the effect that she suffered "substantial pain" is similarly immaterial, and is, in any event, not a fabrication either. Addressing the latter issue first, Plaintiff presents no evidence suggesting the statement was false. Neither party has submitted testimony from E.B. Ms. Brown is apparently the only individual deposed in this case that observed Cardona's interview with E.B. However, the Court has culled the deposition testimony that has been submitted, and it establishes, at most, that E.B. downplayed the incident as playful to Cardona, but admitted that it happened. Ms. Brown testified that E.B. did not use the precise words "substantial pain" during the conversation she witnessed with Cardona, and that E.B. was not in pain as a result of her father's conduct. M. Grodd-Brown Depo. 55:23-24. However, this is not inconsistent with Cardona's statement that E.B. attested to having been in substantial pain *to him.* For example, Ms. Brown's testimony does not preclude the possibility that E.B. indicated such to Cardona in the apartment (*i.e.*, in a conversation that, as Ms. Brown acknowledged, she may have not witnessed). And Ms. Brown's testimony certainly does not establish that E.B. affirmatively *disclaimed* having been in substantial pain to Cardona, or did not describe any pain she might have felt using other words. [11] As such, Plaintiff has failed to raise an issue of material fact that this information was, in fact, false.

Even were that not the case, it is far from clear that this fabrication resulted in Mr. Brown's deprivation of liberty between his arrest and release on his own recognizance shortly thereafter. *See, e.g.,* *Jovanovic,* 2010 WL 8500283, at *10 (quoting *Zahrey v. Coffey,* 221 F.3d 342, 349 (2d Cir. 2000) ) ("The constitutional right in question is 'the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity ... provided that the deprivation of liberty ... can be shown to be the result of [the officer's] fabrication of evidence.' "), *aff'd,* 486 Fed.Appx. 149 (2d Cir. 2012). The "substantial pain" allegation related only to the assault charges, and "was not material to any other charge." *Id.* As Plaintiffs offer no reason that, absent that allegation, Mr. Brown would not have been arrested on the other charges, arraigned, and then released on his own recognizance, Plaintiffs cannot demonstrate the materiality

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 97 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

of the alleged fabrication, and there is no genuine issue of material fact regarding this element.

For these reasons, Plaintiffs' fair trial claim is dismissed.

## IV. Fifth Amendment

Mr. Brown contends that Cardona violated his constitutional rights by pressuring him to write a statement describing the offense at issue. Mr. Brown has testified that, despite signing a *Miranda* sheet at the precinct, he felt threatened by Cardona's throwing a piece of paper on the table in the interview room and demanding that he "[w]rite down the statement about what happened[.]" However, as Mr. Brown conceded at deposition, Cardona did nothing else which Brown perceived as threatening, nor did Cardona dictate what Brown was to write in his statement.

Here, it is uncontested that Brown initialed and signed the *Miranda* sheet that Cardona gave to him. However, assuming for the sake of argument that Cardona did not read Plaintiff his *Miranda* rights out loud, "[i]t is well settled that the mere failure to read a suspect his *Miranda* warnings is not a constitutional violation in and of itself, and is therefore not the basis for a Section 1983 claim." *Leogrande v. New York*, No. 08-CV-3088 (JFB)(ARL), 2013 WL 1283392, at *9 (E.D.N.Y. Mar. 29, 2013); *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003) ("*Miranda* violations, absent coercion, do not rise to the level of constitutional violations actionable under § 1983. The appropriate remedy for violations of Miranda rights is exclusion of the evidence at trial." (citation omitted) ); *see United States v. Suarez*, No. 06-CR-273 (RPP), 2006 WL 3543616, at *5 n.8 (S.D.N.Y. Dec. 7, 2006) (suggesting that advising defendant of rights both orally and in writing is "not constitutionally necessary" but good police practice).

**\*12** As such, as Plaintiff's argument implies (Pls' Mem. at 18-19), Plaintiff must demonstrate coercion to make out a claim under section 1983. "A plaintiff alleging coercion must allege more than that police told her she was a suspect, suggested that it would be to her benefit to cooperate, or promised leniency in exchange for cooperation." *Sedunova v. City of New York*, 652 Fed.Appx. 29, 31 (2d Cir. 2016) (citing *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995) ). Rather, "[a] plaintiff must point to circumstances indicating that she *could not* make a knowing and voluntary decision."

*Id.* (emphasis added) (citing *United States v. Taylor*, 745 F.3d 15, 24 (2d Cir. 2014) ).

The record is, however, devoid of such evidence. Cardona's throwing paper down on the table and demanding that Brown write a statement was, at most, aggressive, but not coercive in the constitutional sense. For example, in *Jocks*, the sole case that Plaintiff cites on this point, the Second Circuit rejected a claim that an officer "making provocative statements in front of a suspect who has insisted on having his lawyer present and asking if the statements were accurate" was sufficiently coercive, deeming it a mere "run-of-the-mill *Miranda* violation." 316 F.3d at 138. Also illustrative are the facts in *Sedunova*, where the Court of Appeals affirmed the dismissal of a coerced confession claim despite two officers' trying to convince Plaintiff that it would be "good for her" to confess to murder and claim self-defense, and told Plaintiff that she would be free to leave if she confessed. 652 Fed.Appx. at 31. Here, none of these insufficiently coercive tactics, nor any more egregious methods, were present. Even considering Cardona's alleged threat to *arrest* Brown in front of his daughter together with the above-discussed evidence, Plaintiff falls far short of demonstrating "circumstances indicating that [he] could not make a knowing and voluntary decision." *Id.*

For these reasons, summary judgment is warranted on Plaintiffs' Fifth Amendment claim.

## V. Substantive Due Process

Plaintiffs claim that their substantive due process rights were violated because Mr. Brown was kept away from his family as a result of Cardona's having "fabricated, falsified and created false facts against Mr. Brown." Pls' Mem. at 16-17.

Families have a "substantive right under the Due Process Clause 'to remain together without the coercive interference of the awesome power of the state.' " *Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999) (citation omitted). Substantive due-process rights "guard against the government's 'exercise of power without any reasonable justification in the service of a legitimate governmental objective.' " *Id.* (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ). Thus, "only" conduct that is "so shocking, arbitrary, and egregious" satisfies this standard. *Id.* (quoting *Cty. of Sacramento*, 523 U.S. at 846).

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 98 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

In addition, "[w]here a particular Amendment "provides an explicit textual source of constitutional protection" against a particular sort of government behavior, "that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Id.* at 599 (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion of Rehnquist, C.J.) ).

Here, as Defendants correctly argue, and Plaintiffs make no effort to refute, Plaintiffs' claim of having been arrested and kept from his family as a result of Cardona's alleged fabrication of charges is properly analyzed under the Fourth Amendment, rather than substantive due process. *Id.* at 600 (quoting *Cty. of Sacramento*, 523 U.S. at 843) ("Substantive due process analysis is therefore inappropriate in this case ... if [the] claim is 'covered by' the Fourth Amendment."). As discussed at length above, Plaintiffs' Fourth Amendment claim lacks merit.

 **\*13** In any event, Plaintiffs cannot establish that the conduct at issue here was so arbitrary and conscience-shocking that it violated their substantive due process rights. At Mr. Brown's arraignment, at his counsel's request, Judge Statsinger granted him the ability to modify the temporary order of protection in family court should he have desired to do so. It is unclear whether Brown availed himself of that opportunity. Moreover, it is undisputed that Judge Statsinger offered Brown a shorter adjournment date, which his attorney declined. In light of the allegations in this case, it cannot be said that the protective order in this case "was without any reasonable justification in the service of a legitimate governmental objective." *Tenenbaum*, 193 F.3d at 600.

For these reasons, Plaintiffs' substantive due process claim lacks merit.

## VI. First Amendment Retaliation

Although Plaintiff has presented no argument with respect to this claim, it appears that Plaintiff is attempting to raise a claim for retaliatory arrest (as opposed to retaliatory prosecution). *See* Second Amended Complaint ¶¶ 72-78 (complaining of Cardona's retaliating against plaintiffs "by dragging plaintiffs to the precinct and against their will").

"To prevail on this claim, plaintiff must demonstrate that (1) she has an interest protected by the First Amendment; (2)

defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of her First Amendment right." *Holley v. Cty. of Orange, NY*, 625 F. Supp. 2d 131, 141 (S.D.N.Y. 2009) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) ). It is well-settled law within this Circuit that probable cause defeats a retaliatory arrest claim. *See Van Dunk v. Brower*, No. 11-CV-4564 (ER), 2013 WL 5970172, at *11 n.11 (S.D.N.Y. Nov. 7, 2013) (surveying Second Circuit case law providing that probable cause defeats retaliatory arrest claim). *But see Bartlett v. Nieves*, 712 Fed.Appx. 613, 616 (9th Cir. 2017) (holding that "a plaintiff can make a retaliatory arrest claim even if the arresting officers had probable cause"), *cert. granted*, No. 17-1174, 2018 WL 1023097 (U.S. June 28, 2018).

For the reasons discussed elsewhere in this opinion, Cardona had probable cause to arrest Plaintiff, thus foreclosing a retaliatory arrest claim. Plaintiffs do not contest the binding nature of the case law on this point (despite being given an opportunity to file a sur-reply addressing this argument raised for the first instance in Defendants' reply brief). [12] As such, Plaintiffs' First Amendment retaliation claim is dismissed.

## VII. State Law Claims

Having disposed of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining claim grounded in state law. [13] *See Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) (where, as here, all federal claims have been eliminated, concerns of "judicial economy, convenience, fairness and comity point towards declining to exercise jurisdiction over the remaining state-law claims").

CONCLUSION

 **\*14** For the aforementioned reasons, Defendants' Motion for Summary Judgment is **GRANTED**. Accordingly, the Clerk of Court is respectfully directed to terminate all pending motions and close this case.

**SO ORDERED.**

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 99 of 142

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3821620

## Footnotes

1    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

2    As set forth in the section that follows, each party argues that the other has not properly responded to its Rule 56.1 Statement for the purposes of this motion. Those objections are addressed *infra*, Part III, unless the objection has been overruled or the evidentiary material deemed irrelevant for the purposes of deciding this motion.

3    Certain cited excerpts of Mr. Brown's deposition are appended to the Brustein Declaration at Exhibit E.

4    Brown claimed at his deposition that Cardona never identified himself as a police officer. R. Brown Depo. 62:8-10; 64:5-11.

5    Certain excerpts of Ms. Brown's deposition are appended to the Pawar Declaration at Exhibit 3.

6    For the purpose of simplicity in the analysis that follows, when discussing a given claim, the Court refers to them as advanced by both Plaintiffs even if the claim is only advanced by one of them.

7    Fed. R. Civ. P. 56(c) provides examples of the types of evidence that may support a genuine dispute of material fact, that a party may object to certain evidence as inadmissible, that a court may, in its discretion, consider other materials in the record beyond those cited, and that affidavits and declarations in support "must be made on personal knowledge," provide admissible evidence, and demonstrate "competen[ce] to testify on the matters stated."

8    Either an arrest or detention "supported by less than probable cause may be actionable under 🚩 § 1983, provided the 'seizure' in question is 'unreasonable.' " 🚩 Posr v. Doherty, 944 F.2d 91, 98 (citation omitted). However, where, as here, Plaintiffs have alleged both false arrest and unreasonable seizure (Second Amended Complaint at ¶¶ 35-38), the Court must determine when and whether the seizure—whether an investigatory detention or an actual arrest—occurred based on the totality of the circumstances, and whether that seizure was reasonable. *Id.* However, here, it is unnecessary for the Court to determine whether Brown was, in fact, seized at this apartment, because Cardona had probable cause to arrest Mr. Brown in either instance, and most certainly after Mr. Brown admitted to Cardona that he pinched his daughter, which corroborated the other accounts obtained by Cardona. *See, e.g., People v. Morales*, 939 N.Y.S.2d 824, 828 (Kings Cty. Crim. Ct. 2012) (concluding that reasonable cause existed for purposes of sufficiency of accusatory instrument charging father with third-degree assault, endangering the welfare of a child, attempted third-degree assault, and third-degree menacing where child's mother observed bruises and welts to buttocks

Brown v. City of New York, Not Reported in Fed. Supp. (2018)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 100 of 142

and thighs after child returned home from weekend with father, officer observed marks on child, and father admitted to striking child).

9   Moreover, even if probable cause were lacking, Cardona most certainly had arguable probable cause to arrest Mr. Brown in light of the "potentially volatile" nature of familial disputes, and thus would be entitled to qualified immunity. *Weiner*, 90 F. Supp. 3d at 39 (alternatively finding qualified immunity on false arrest claim involving child's allegation that father threw him against side of car) (internal citations and quotation marks omitted).

10   Plaintiffs complain that they never had an opportunity to conduct discovery to substantiate this claim (*e.g.*, the deposition of Cardona). *See* Pl's Mem. at 5, 14. However, the Court allowed the "parties" to conduct limited discovery in this case from September 21, 2016, to March 3, 2017. Order (ECF No. 17). Despite serving written discovery, it appears that Plaintiffs chose not to take Cardona's deposition, despite Defendants offering to produce him. Letter dated August 28, 2017 (ECF No. 54). Plaintiffs did not move to compel Cardona's deposition. Thus, to the extent that Plaintiffs seek further discovery on this point, that request is denied. *See, e.g., Harris v. Computer Assocs. Int'l, Inc.*, 204 F.R.D. 44, 45 (E.D.N.Y. 2001) (denying request for further discovery where party had ample opportunity to depose witnesses and move to compel prior to close of discovery and summary judgment motion and could only "speculate[ ] as to what evidence would be produced upon further discovery").

11   Indeed, it is more than plausible that E.B. conveyed the pain she experienced to Cardona in some other way, but that Cardona used the term "substantial pain" to parrot the terms of the relevant statutes. *See, e.g.*, N.Y. Penal Law § 120.00(1) (defining intentional third-degree assault as, "with the intent to cause physical injury to another person, he causes such injury to such person ..."); *id.* § 10.00(9) (defining "physical injury" as "impairment of physical condition or substantial pain"); *People v. Henderson*, 708 N.E.2d 165, 166 (N.Y. 1999) (accusatory instrument must reflect how victim suffered "substantial pain" or impairment to satisfy physical injury requirement for assault charge).

12   Even were the law in this Circuit that probable cause did not defeat such a claim, Plaintiff's claim would nonetheless fail as it is far from clear that Mr. Brown's arrest was motivated by First Amendment-protected activity.

13   Technically, Plaintiffs' negligent training and respondeat superior claims are the only state law claims that have not already been discussed or abandoned by Plaintiffs. However, as Plaintiffs acknowledge (Pls' Mem. at 11), their respondeat superior claim is contingent upon their prevailing on another state law claim. *See, e.g., Shapiro v. Kronfeld*, No. 00-CV-6286 (RWS), 2004 WL 2698889, at *24 (S.D.N.Y. Nov. 24, 2004) (citing *Wende C. v. United Methodist Church*, 776 N.Y.S.2d 390, 395 (N.Y. App. Div. 4th Dep't 2004) ) (holding that there can be "no imposition of vicarious liability in the absence of underlying liability").

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 6971793
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Natasha SLATER, Plaintiff,

v.

P.O. Karen MACKEY # 2267, TAX ID 4000 63RD
Precinct Nypd; P.O. Daniel Young, Tax ID 4000 63rd
Precinct, Nypd; The City of New York; New York City
Police Department, 63rd Precinct; Child Protective
Specialist: Charmaine McDonald, ACS # 6666517,
UNIT # : 181–3 New York City Administration for
Child Services Dcp/Brooklyn Field Office, Defendants.

No. 12–CV–04325 (NGG)(RML).
|
Signed Nov. 9, 2015.
|
Filed Nov. 10, 2015.

**Attorneys and Law Firms**

Natasha Slater, Brooklyn, NY, pro se.

Neil Anthony Giovanatti, Brian Jeremy Farrar, David Alan Rosinus, Jr., New York City Law Department, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

 **\*1** On October 18, 2013, pro se Plaintiff Natasha Slater ("Slater" or "Plaintiff") filed an Amended Complaint asserting numerous causes of action against Police Officers Karen Mackey and Daniel Young (together, "Police Defendants"), the New York City Police Department ("NYPD"), the 63rd Precinct, Charmaine McDonald ("McDonald"), the New York City Administration for Child Services ("ACS"), and the City of New York (the "City") (collectively, "Defendants"). (Am.Compl.(Dkt.16).) Slater's claims center on her arrest for allegedly assaulting her daughter (referred to by the court as "A.F.") in 2012, her subsequent indictment on charges of robbery and assault, and the Neglect Petitions eventually brought against her by ACS, which resulted in her three children being removed. On October 3, 2014, Defendants filed their fully briefed motion

to dismiss. (Not. of Mot. to Dismiss (Dkt.32).) For the reasons stated below, the court construes the motion to dismiss as a motion for summary judgment and GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

**I. CONVERSION INTO MOTION FOR SUMMARY JUDGMENT**

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed.R.Civ.P. 12(d). "The essential inquiry" in deciding whether it is proper to treat a motion to dismiss as a motion for summary judgment "is whether the nonmovant 'should reasonably have recognized the possibility that the motion might be converted into one for summary judgment or was taken by surprise and deprived of a reasonable opportunity to meet facts outside the pleadings.' " *Krijn v. Pogue Simone Real Estate Co.,* 896 F.2d 687, 689 (2d Cir.1990) (quoting *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Averst Labs.,* 850 F.2d 904, 911 (2d Cir.1988)); *see also Lawrence v. City of Rochester,* No. 09–CV–6078 (FPG), 2015 WL 510048, at \*4 (W.D.N.Y. Feb.6, 2015). When both parties request that evidence outside the pleadings be considered, the risk of surprise or a party being deprived of a reasonable opportunity to meet the facts is low and conversion to summary judgment is proper. *See Gurary v. Winehouse,* 190 F.3d 37, 43 (2d Cir.1999) ("[I]t was plaintiff who submitted the affidavit relied upon by the district court and who thus invited [the district court] to rely not only on the complaint, but upon the more elaborate explication of plaintiff's grievance contained in his affidavit. He certainly cannot be heard to claim that he was surprised when the district court accepted his invitation."); *see also Facciolo v. City of New York,* No. 09–CV–1332 (DGT)(JMA), 2010 WL 3155251, at \*3 (E.D.N.Y. Aug. 6, 2010) ("In this case, by including an affidavit with their opposition papers and by explicitly recognizing the possibility of conversion in those papers, plaintiffs should have been aware of the likelihood of conversion."); *Roberts v. Phillips,* No. 06–CV–2866 (LAP) (THK), 2009 WL 3241525, at \*1 n. 2 (S.D.N.Y. Sept. 30, 2009).

 **\*2** Here, Plaintiff appended over 100 pages of materials to her Amended Complaint. Although Defendants suggested

that the court could still treat their motion as a motion to dismiss, they alternatively, "request[ed] that the Court convert the motion to a motion for summary judgment and decide the case based on the documents annexed to the Amended Complaint." (Mem. in Supp. of Defs.' Mot. to Dismiss the Am. Compl. ("Defs.' Mem.") (Dkt.33) at 5 n. 4.) Defendants also annexed their own exhibit to the memorandum. (*Id.* at ECF pp. 36–39.) Moreover, Defendants notified Plaintiff that their motion to dismiss could be converted by the court into a motion for summary judgment and accordingly, she should respond with evidence. (*See* Not. to Pro Se Litigant Who Opposes a Rule 12 Mot. Supported By Matters Outside the Pleadings (Dkt.34).) Plaintiff responded by annexing additional evidence to her opposition brief (Exs. (Mem in Supp. of Pl.'s Am. Compl. ("Pl.'s Mem.") (Dkt.31), Exs. 1–2 (Dkts.31–1, 2)), and requesting that the court review "all paperwork" in making its decision (Pl.'s Mem. at 2). Accordingly, the court deems it proper to convert Defendants' motion to dismiss into a motion for summary judgment.

## II. BACKGROUND

### A. Factual Allegations

The facts are drawn from the Amended Complaint and the exhibits thereto, the Notice of Amended Complaint, and the exhibits to both Plaintiff's and Defendants' briefs submitted in connection with Defendants' motions. Except as otherwise noted, the following facts are undisputed. Where facts are in dispute, the court credits Slater's version of the particular fact, if supported by record evidence.[1] The court has not included in this section facts introduced by the parties that are not material to Slater's claims.

### 1. *The Arrest of Plaintiff*

On June 1, 2012, the Statewide Central Register ("SCR") received a call concerning "safety concerns of Lacerations Bruises Welts Inadequate Guardianship [sic]." (Investigation Progress Notes (Am.Compl., Ex. F.(Dkt.16–1)) at ECF p. 29; *see also id.* at ECF p. 39.) The caller stated that on May 24, 2012, Slater became upset with her daughter, A.F.[2] and "slapped her in the face, punched her and threw her on the floor" in the presence of Slater's other two children. (*Id.* at ECF p. 29.) The caller alleged that A.F. suffered bruising to her left eye and one of her arms. (*Id.*) The caller further indicated that A.F.'s injuries had not been observed until June 1 because A.F. had been kept out of school from May 24 until June 1 and Slater had taken A.F.'s phone. (*Id.* at ECF p. 31.) The caller alleged that Slater had a history with child

protective services in Florida, where she previously lived. (*Id.*)

In response to the tip, ACS went to Slater's home to investigate the allegations. (*Id.*) ACS arrived at Slater's home on June 1 at 4:05 p.m. (*Id.*) At some point the NYPD was summoned. (*Id.*) Both ACS and the Police Defendants interviewed A.F. (Am. Compl. at ECF p. 4: *see also* Not. of Am. Compl. (Dkt.15) at ¶ 1.) Following the interview, the Police Defendants asked Slater to accompany them to the precinct in order to continue the investigation. (Am. Compl. at ECF p. 4.) Slater responded by asking what the investigation concerned and whether she was being arrested; the Police Defendants did not respond. (*Id.*) Slater then tried to re-enter the home and make a phone call. (*Id.*) In response, Detective Young "blocked Plaintiff's pathway" back into the home and "scream[ed] in Plaintiff's face acting as if he was going to hit her if she tried to take another step." (*Id.*) Slater ultimately went to the precinct. (*Id.*)

**\*3** At the precinct, A.F. and G.T.-two of Slater's children-were interviewed. (Investigation Progress Notes at ECF p. 32; *see also* Not. of Am. Compl. ¶ 1.) Both interviews occurred at 4:30 p.m. (Investigation Progress Notes at ECF pp. 32–33.) A.F. told both ACS and the NYPD that on May 24, 2012:

> "[S]he was in the car with her mother and her mother slapped her across the left side of her face and injured her left eye. She said mother continued to hit her when they got in the house. Child said she tried to hide under a desk in her room but her mother hit her with a belt and her fist. A.F. said she hit her head on the floor but her mother continued to hit her. She said she heard her little sisters crying and one of them tried to help her but the mother pushed the sister out of the way and continued to hit her."

(*Id.* at ECF p. 32.) A.F. further stated that "her mother also had a [child protective services] case in Florida and she believed her mother may have mental health issues because she heard the CPS worker in Florida ask her mother if she took her medication." (*Id.*) Finally, she stated that "when CPS came to the home ... her mother started telling [G.T.] to lie and say

she was injured by a cousin." (*Id.*) The Police Defendants observed that A.F. had a "bruise and red line under her left eye, bruises on her rights arm and a bruise on her left thigh, close to her knee." (*Id.* at ECF p. 33.) G.T. indicated that "nothing really" happened at home on May 24, 2012. (*Id.*) She could not explain the bruising on A.F.'s arm and leg. (*Id.*) ACS's interview records state that "it was obvious that [G.T] was lying and she seemed nervous." (*Id.* at ECF p. 34.)

At the same time that A.F. and G.T. were being interviewed, Slater was also interviewed at the precinct. (*Id.* at ECF p. 35.) Slater was told that she was being interviewed "regarding injuries to [A.F.]." (*Id.*) She responded that she "don't [sic] hit my children at all." (*Id.*) She was then informed by Detective Mackey that she was being arrested for second degree assault. (*Id.*)

At 5:35 p.m. on June 1, 2012, Slater was arrested at the precinct. (Am Compl. at ECF p. 4 ("When Plaintiff arrived to the precint [sic] and after the Defendants spoke with Plaintiff's children and the Plaintiff, Plaintiff was arrested and taken to jail."); Webcrims Case Details–Summary (Am. Compl., Ex. B (Dkt.16–1)) at ECF p. 15 (indicating the time of the arrest).) Slater was charged with various crimes including robbery and numerous charges offenses to the assault of A.F. (the "A.F. Assault Charges"). (Am. Compl. at ECF p. 4, 6, 7; Webcrims Case Details–Charges (Am. Compl., Ex. B (Dkt.16–1)) at ECF p. 14.) All of the charges were eventually dropped. (Am. Compl. at ECF p. 15.)

### 2. *The Investigation Continues*
After the arrest, ACS and the NYPD continued to investigate. At 6:15 p.m., ACS spoke to T.F.-Slater's third child-at Slater's home. T.F. stated that "sometimes her mother would 'slap me on my arm or leg with the hand and she used a belt couple [sic] times.' " (Investigation Progress Notes at ECF p. 33.) T.F. told ACS that her mother had beaten A.F. with a belt "a week or two ago." (*Id* .) T.F. described the alleged assault of A.F. as follows:

> **\*4** [I]t happened in [A.F.]'s room, which is in the attic. [T.F.] said their mother thought [A.F.] was skipping school. She said their cousin, wrote some nasty stuff about boys on facebook and blamed it on A.F [T.F.] said the argument with their mother

and [A.F.] started in the car and continued when they got in the house. She said her mother hit [A.F.] with a belt. CPS asked how many time [sic] [A.F.] got hit with the belt and [T.F.] said she didn't see her get hit but she saw her mother take off [ ] a black leather belt and go upstairs to [A.F.]'s room. Child said she heard [A.F.] say ouch.

(*Id.* (internal quotation marks omitted.) T.F. further stated that following the assault, A.F. had a black eye. (*Id.*)

The NYPD also continued to investigate. For unknown reasons, Slater was placed in a lineup. At 6:15 p.m. on June 1, 2012, Slater was positively identified to Detective Mackey by Melissa Acevado. (*See* Not. Pursuant to CPL 710.30(1)(b) (Am. Compl., Ex. C (Dkt .16–1)) at ECF p. 19.) The basis for the lineup or the use of the lineup's results are unclear from the record.

During the following days, ACS continued to investigate the assault of A.F. (Investigation Progress Notes at ECF p. 37–47; Not. of Am. Compl. 2–8.) On June 6, 2012, ACS met with G.T. at school; G.T. recanted her June 1, 2012, statement. (Investigation Progress Notes at ECF p. 41.) Instead, G.T. stated that Slater hit A.F. with a belt on May 24, 2012. (*Id.*) ACS also received records from the child protective services agencies in Florida and Texas; the records indicated that Slater had a history with each agency. (*Id* . at ECF p. 44 (case history in Fort Myers, Florida); *id.* at ECF p. 47 (twelve cases in Florida); id at 47 (cases in Harris County, Texas).)

### 3. *Petitions of Child Neglect are Brought Against Slater*
On June 12, 2012, ACS called Slater multiple times, without reaching her. (Am. Compl. at ECF pp. 12–13.) When Slater returned the calls, ACS did not answer. (Id at ECF p. 13.) On June 13, 2012, ACS brought three substantively identical Petitions of Neglect against Slater, one for each child. (*Id.; see also* Neglect Pets. (Am. Compl., Ex. I (Dkt.16–1)) at ECF pp. 59–80.) Each Neglect Petition alleged that Slater's children should be removed from the home. (Neglect Pets. at ECF pp. 59–80.) Each Neglect Petition alleged that: (1) Slater threatened the child's safety because she engaged in excessive corporal punishment, specifically, the May 24, 2012, assault of A.F., and (2) Slater suffers from a mental

illness, which impairs her ability to care for her children. (*Id.*) Slater claims that "Defendants had no reason to file Petitions against Plaintiff other than the fact that they were mad at Plaintiff." (Am. Compl. at ECF p. 13.) To date, the removal proceedings are ongoing.

**B. Procedural History**

On August 28, 2012, Slater filed her Complaint. (*See* Compl. (Dkt.1).) On October 18, 2013, Slater filed the Amended Complaint. (*See* Am. Compl.; *see also* Not. of Am. Compl.) Broadly construed, the Amended Complaint alleges the following claims against the Police Defendants, the NYPD, the 63rd Precinct, and the City: (1) false arrest (Am. Compl. at ECF pp. 3–7); (2) excessive force (*id.*); (3) false imprisonment (*id.* at ECF pp. 7–9); and (4) malicious prosecution concerning the criminal charges (*id.* at ECF pp. 9–10); the following claims against McDonald and ACS: (1) malicious prosecution concerning the Neglect Petitions (*id.* at ECF pp. 10–13); (2) false allegations of drug abuse (*id.* at ECF p. 14); (3) false allegations of having bipolar and schizophrenia (*id.* at ECF pp. 14–15); and (4) fraud upon the court (*id.* at ECF pp. 15–16); the following claims against all Defendants: (1) intentional infliction of emotional distress (*id.* at ECF p. 16); (2) defamation (*id.* at ECF pp. 16–17); and (3) malicious abuse of process (*id.* at ECF pp. 17–18); and the following claims against ACS alone: (1) exposure of a minor to environmental toxins (*id.* at ECF pp. 18–19); and (2) subjecting a minor to a website that promotes nudity (*id.* at ECF p. 19).

**\*5** On October 3, 2014, Defendants filed a motion to dismiss all of the claims alleged in the Amended Complaint. (Not. of Mot. to Dismiss.)

**III. LEGAL STANDARDS**

**A. Summary Judgment**

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(c)*. A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. No genuine dispute of material fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*. In evaluating a motion for summary judgment, the court "is required to construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." *Trammell v. Keane, 338 F.3d 155, 161 (2d Cir.20031; see also Anderson, 477 U.S. at 255* ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

The moving party bears the initial burden to show an absence of genuine factual dispute. *See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)*. Summary judgment will be granted if the opposing party then "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. To defeat summary judgment, the opposing party must do more than demonstrate "some metaphysical doubt as to the material facts," *Matsushita, 475 U.S. at 586*, and may not rely on "conclusory allegations." *Twin Labs., Inc. v. Weider Health & Fitness, 900 F.2d 566, 568 (2d Cir.1990)*. Where the party opposing summary judgment is proceeding pro se, the court must construe its filings liberally. *See Ferran v. Town of Nassau, 471 F.3d 363, 369 (2d Cir.2006)*.

**B. 42 U.S.C. § 1983**

Slater purports to bring all of her claims under *42 U.S.C. § 1983.*[3] "*Section 1983* provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States." *Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993)*. A claim under *§ 1983* therefore has two "essential elements." *See Bailey v. City of New York, 79 F.Supp.3d 424, 440 (E.D.N.Y.2015)* (describing the proper inquiry for evaluating claims under *§ 1983*). First, "[t]he conduct at issue 'must have been committed by a person acting under color of state law.' " *Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir.2010)* (quoting *Pitchell v. Callan, 13 F.3d 545, 547 (2d Cir.1994)*). Second, "[t]he conduct at issue ... 'must have deprived a person of rights, privileges, or immunities secured by the

Constitution or laws of the United States.' " *Id.* (quoting *Pitched,* 13 F.3d at 547).

**\*6** Accordingly, " Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999); *see also Hansel v. Brazel,* 85 F. App'x 237, 238 (2d Cir.2004) (summary order). That is, in order to succeed on a claim under § 1983, a plaintiff must not only show that her rights were violated, but also that the rights which were violated were rights protected by the Constitution or federal law.

### C. Municipal Liability under § 1983

"Local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, a "municipality cannot be held liable solely because it employs a tortfeasor." *Id.*

Consequently, a municipality may be held liable under 42 U.S.C. § 1983 only if the constitutional violation at issue results from the municipality's official policy. *See id.* at 694. Such a policy may be (1) an express policy, (2) "a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law,' " *City of St. Louis v. Praprotnik,* 485 U.S. 112, 127, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 167–68, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)), or (3) a decision by a person with "final policymaking authority," *see Praprotnik.* 485 U.S. at 123; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Importantly, the official policy must cause the plaintiff's injury. *Wray v. City of New York,* 490 F.2d 189, 195 (2d Cir.2007).

### D. Qualified Immunity

Qualified immunity shields government officials from civil damages liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

Individual government actors performing discretionary tasks are entitled to qualified immunity if: "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Wilkinson ex rel. Wilkinson v. Russell,* 182 F.3d 89, 103 (2d Cir.1999) (quoting *Tiemev v. Davidson,* 133 F.3d 189, 196 (2d Cir.1998H.

"[T]he entitlement is an immunity from suit rather than a mere defense to liability." *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curium) (quoting *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). Accordingly, questions of qualified immunity should be resolved "at the earliest possible stage in litigation," *id.,* and qualified immunity is often properly resolved on a motion for summary judgment, *see, e.g., Pines v. Bailey,* 563 F. App'x 814, 818 (2d Cir.2014) (summary order).

### E. False Arrest and False Imprisonment

**\*7** "In New York, the tort of false arrest is synonymous with that of false imprisonment." *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir.1991). False arrest and false imprisonment claims stem from the Fourth Amendment right to be free from unreasonable searches and seizures, which includes the right to be free from arrest absent probable cause. [4] *See Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006). Accordingly, the existence of probable cause is an absolute defense to a false arrest claim. *Id.* at 152; *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). It is a defendant's burden to establish the existence of probable cause. *See Dickerson v. Napolitano,* 604 F.3d 732, 751 (2d Cir.2010) ("When an arrest is not made pursuant to a judicial warrant, the defendant

in a false arrest case bears the burden of proving probable cause as an affirmative defense." (quoting *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 315 (N.Y.1975))); *Jenkins v. City of New York,* 478 F.3d 76, 88 (2d Cir.2007) (explaining that under New York law, an arrest made without a warrant is presumed unlawful unless the officer can prove the existence of probable cause).

Probable cause exists when, based on the totality of the circumstances, the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant,* 101 F.3d at 852; *see also Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Escalera v. Lunn,* 361 F.3d 737, 743 (2d Cir.2004). Determining whether probable cause exists requires an objective assessment of the facts known to the officer at the time of arrest. [5] *See Devenpeck v. Alford,* 543 U.S. 146, 152–53, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004); *Finigan v. Marshall,* 574 F.3d 57, 61–62 (2d Cir.2009). Accordingly, "[s]ubjective intentions" of the arresting officer "play no role in ordinary, probable cause Fourth Amendment analysis." *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see also United States v. $577,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 85 (2d Cir.2002) ("[T]he determination of probable cause is an objective one, to be made without regard to the individual officer's subjective motives....").

When an officer receives his information from a putative victim or eyewitness, probable cause is established "unless the circumstances raise doubt as to the person's veracity." *Fabrikant v. French,* 691 F.3d 193, 216 (2d Cir.2012) (quoting *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006)). "The most common situation in which doubts arise is when there exists a prior relationship between the victim and the accused that gives rise to a motive for a false accusation." *DiStefano v. Sedita,* No. 11–CV–1125(MKB), 2014 WL 349251, at *4 (E.D.N.Y. Jan.31, 2014) (quoting *Mistretta v. Prokesch,* 5 F.Supp.2d 128, 133 (E.D.N.Y.1998)); *see also Hart v. City of New York,* No. 11–CV–4678 (RA), 2013 WL 6139648, at *5 (S.D.N.Y. Oct.28, 2013) ("[W]here a bitter prior relationship exists that is known to the arresting officer before the arrest is made, a complaint from the complaining victim alone may not be enough to constitute probable cause; the officer may need to investigate further." (internal quotation marks and citation omitted)). When there is reason to doubt the truthfulness of a complaint, the officer is required to investigate further and acquire additional information that corroborates the putative victim's statement. *See DiStefano,* 2014 WL 349251, at *5; *Hart,* 2013 WL 6139648, at *5; *Williams v. City of New York,* No. 02–CV–3693 (CBM), 2003 WL 22434151, at *5 (S.D.N.Y. Oct.23, 2003).

**\*8** Finally, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Jaeglv v. Couch,* 439 F.3d 149, 153 (2d Cir.2006).

**F. Excessive Force**

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment's reasonableness standard. *See Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Under this standard, the determinative question is whether the officers' actions were " 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Reasonableness is judged "from the perspective of a reasonable officer on the scene," and " '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* at 396 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)). The court considers the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

**G. Malicious Prosecution**

To succeed on a claim of malicious prosecution under New York or federal law, a plaintiff must show that: (1) the defendant initiated a prosecution against the plaintiff; (2) the defendant lacked probable cause to believe the proceeding could succeed; (3) the defendant acted with malice; and (4) the prosecution terminated in the plaintiff's favor. *See* *Rohman v. N.Y. C. Transit Auth.,* 215 F.3d 208, 215 (2d Cir.2000). A federal malicious prosecution claim also requires that the plaintiff demonstrate a sufficient post-arraignment liberty restraint to implicate his Fourth Amendment rights. *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 117 (2d Cir.1995). Unlike with false arrest, malicious prosecution claims are analyzed with respect to the specific crime charged. *See, e.g., Janetka v. Dabe,* 892 F.2d 187, 190–91 (2d Cir.1989); *Bennett v. N.Y. Police Dep't,* No. 12–CV–1345 (KBF), 2013 WL 840611, at *4 (S.D.N.Y. Mar.1, 2013).

"Once probable cause to arrest has been established, claims of malicious prosecution survive only if, between the arrest and the initiation of the prosecution, 'the groundless nature of the charges [is] made apparent by the discovery of some intervening fact." ' *Smith v. Tobon.* 529 F. App'x 36, 38 (2d Cir.2013) (summary order) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir.1996)). "In addition, where the alleged malicious prosecution was a civil action, [the plaintiff] must also demonstrate a 'special injury,' i.e., 'some interference with [the] plaintiff's person or property ... beyond the ordinary burden of defending a lawsuit." *McCaul v. Ardsley Union Free Sch. Dist.,* 514 F. App'x 1, 6 (2d Cir.2013) (summary order) (alteration in original) (quoting *Engel v. CBS, Inc.,* 145 F.3d 499, 502 (2d Cir.1998)).

### H. False Allegations

**\*9** False allegations by government officials, particularly in relation to court proceedings, are actionable in a number of ways, including as due process claims, defamation "stigma plus" claims, and state law claims. It is not completely clear which theories Slater is pursuing and which Defendants are defending against. Nonetheless, the court-mindful of its role in assessing pro se complaints-attempts to articulate and address each plausible theory.

First, it is "clearly established that it violates due process under the Fourteenth Amendment for a government official to give false testimony in a state court proceeding." *Velez v. Reynolds,* 325 F.Supp.2d 293, 316 (S.D.N.Y.2004).

Second, a claim for government defamation may be actionable under § 1983, but only if a plaintiff alleges "stigma plus." "To prevail on a stigma plus claim, a plaintiff must show (1) the utterance of a statement sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false, and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir.2008) (internal quotation marks and citation omitted).

Additionally, state tort law protects plaintiffs from false statements. In New York, to prove libel, a plaintiff must show "(1) a written defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability." *Chau v. Lewis,* 771 F.3d 118, 126–27 (2d Cir.2014). Similarly, the elements of slander are "(i) a defamatory statement of fact, (ii) that is false, (iii) published to a third party, (iv) of and concerning the plaintiff, (v) made with the applicable level of fault on the part of the speaker, (vi) either causing special harm or constituting slander per se, and (vii) not protected by privilege." *Sleepy's LLC v. Select Comfort Wholesale Corp.,* No. 07–CV–4018 (JS)(ARL), 2015 WL 5599145, at *11 (E.D.N.Y. Sept. 22, 2015) (internal quotation marks and citation omitted).

### I. Intentional Infliction of Emotional Distress

Slater attempts to bring her intentional infliction of emotional distress claim under § 1983. As explained above, § 1983 only allows a plaintiff to challenge the deprivation of a federal right. *See supra* Part III.B. Courts have been careful to ensure that § 1983 does not become a vehicle to federalize all torts committed by state actors. *See Paul v. Davis,* 424 U.S. 693, 700–01, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (rejecting a reading of § 1983 that "would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States").

A claim for intentional infliction of emotional distress does not implicate a federal right, rather it is a state law tort claim. In New York "[t]he state law tort of intentional infliction of emotional distress has four elements: (1) extreme and outrageous conduct, (2) intent to cause severe emotional

distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir.1996). "Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman,* 164 F.3d 820, 827 (2d Cir.1999) (internal quotation marks and citations omitted).

### J. Malicious Abuse of Process

**\*10** Under either New York or federal law, "a malicious abuse of process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir.1994). "[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Saving v. City of New York,* 331 F.3d 63, 77 (2d Cir.2003). "In other words, the proper use of legal process based on an improper or malicious motive such as a desire for retaliation is insufficient to satisfy the 'collateral objective' requirement." *Pinter v. City of New York,* 976 F.Supp.2d 539, 568 (S.D.N.Y.2013). "A malicious abuse of process claim thus requires an ulterior purpose such as the infliction of economic harm, extortion, blackmail, or retribution." *Hovos v. City of New York,* 999 F.Supp.2d 375, 391 (E.D.N.Y.2013).

"[T]he gist of abuse of process is the improper use of process after it is regularly issued." *Cook,* 41 F.3d at 80. Accordingly, to succeed on an abuse of process claim, a plaintiff must not only show a collateral objective, but must show that that objective was pursued after legal process was issued. *Richardson v. N.Y.C. Health & Hosps. Corp.,* No. 05–CV–6278 (RJS), 2009 WL 804096, at * 16–17 (S.D.N.Y. Mar.25, 2009).

"Finally, while the law is not entirely settled on this point, the weight of authority holds that the presence of probable cause negates a claim for abuse of criminal process." *Pinter,* 976 F.Supp.2d at 568–69 (collecting cases).

### K. Exposure of a Minor to Toxins and Websites

"[C]hildren in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm." *Green ex rel. T.C. v. Mattingly,* No. 07–CV–1790 (ENV)(CLP), 2010 WL 3824119, at *13 (E.D.N.Y. Sept. 23, 2010) (quoting *Tvlena M. v. Heartshare Children's Servs.,* 390 F.Supp.2d 296, 302 (S.D.N.Y.2005)). "When an official is charged with default in exercise of the above affirmative responsibility, there are two fundamental requisites for [§] 1983 liability to be imposed. The first is that the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest. The second is that the officials in charge of the agency being sued must have displayed a mental state of deliberate indifference in order to meaningfully be termed culpable." *Doe v. N.Y.C. Dep't of Soc. Servs.,* 649 F.2d 134, 141 (2d Cir.1981:

*see also Phillips ex rel. Green v. City of New York,* 453 F.Supp.2d 690, 721 (S.D.N.Y.2006). "Deliberate indifference' encompasses an official 'know[ing] of and disregard[ing] an excessive risk' to a child's 'health or safety.' " *Green,* 2010 WL 3824119, at *13 (quoting *Phillips,* 452 F.Supp.2d at 722–23).

## IV. DISCUSSION

### A. Municipal Liability

**\*11** Slater attempts to show that her rights were violated because of a governmental policy. She claims that "[t]he Defendants have testified under oath in open court that they committed actions due to their governmental policy." (Am. Compl. at ECF p. 3.) She then directs the court to the transcript of a June 25, 2012, family court hearing. (*Id.; see also* June 25, 2012, Tr. (Am. Compl., Ex. A (Dkt.16–1)) at ECF p. 2.) As Defendants correctly note, all the transcript shows is that McDonald did not seek to remove Slater's children earlier because of a governmental policy that required a safety conference prior to instituting removal proceedings:

> Q: And you didn't come to the Family Court at that time on June 3, to file any papers regarding the status of those two children, right?
>
> A: No, because the procedure is that we have a Child Safety Conference and then the results of the Child Safety

Conference then would determine whether we'd go to court or not.

(June 25, 2012, Tr. at 73:15–21.) Slater does not explain how the policy of having a child safety conference prior to instituting a Neglect Petition caused any of her (or her children's) purported constitutional injuries. Indeed, it defies logic to believe that the City's policy of delaying a removal petition until a child safety conference can be held in any way contributed to Slater's purported injuries. To the contrary, the procedure that Slater complains of is intended to protect parents by delaying removal petitions. Absent proof of a causal connection between a City policy and Slater's alleged injuries, Slater's municipal liability claim fails.

In her opposition brief, Slater attempts to revive her claim of municipal liability by alleging that the City failed properly to train the Police Defendants. (Pl.'s Mem. at 11, 19.) This claim is wholly lacking in support. Slater does not identify any deficiency in training or any facts that would link a purported training failure to her purported deprivation of rights. Absent such allegations, and some proof thereof, Slater's claim fails.

*See* *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 129 (2d Cir.2004) (Sotomayor, J.) (dismissing a claim of municipal liability where the plaintiffs "neglected to offer any evidence ... as to the purported inadequacies in the Town's training program and the causal relationship between those inadequacies and the alleged constitutional violations").[6] Accordingly, Defendants' motion for summary judgment is GRANTED with regard to Slater's municipal liability claim.

### B. False Arrest and False Imprisonment

Slater alleges that she was falsely arrested and imprisoned on a charge of robbery. (Am. Compl. at ECF p. 5.) Defendants respond that "Detective Mackey had probable cause to arrest Plaintiff for assaulting A.F." (Defs.' Mem. at 11), and that because Detective Mackey had probable cause to arrest, the fact that Slater may have been wrongly charged with a robbery is irrelevant (*id.* at 10).

**\*12** The court concludes that the Police Defendants had probable cause to arrest Slater as a matter of law. Prior to the arrest, the Police Defendants interviewed A.F. and observed her injuries. A.F. stated that Slater had assaulted her, resulting in a black eye and bruising on her arms and legs. This allegation corresponded with the injuries that the Police Defendants observed. A statement by the victim along with corroborating evidence was more than

enough to give the Police Defendants probable cause to arrest Slater "unless the circumstances raise doubt as to the [victim's] veracity." *Fabrikant v. French,* 691 F.3d 193, 216 (2d Cir.2012) (quoting *Panetta v. Crowley,* 460 F.3d 388, 395 (2d Cir.2006)). Slater does not allege that the Police Defendants were or should have been on notice of facts that should have required them to further investigate A.F.'s allegations. Accordingly, the Police Defendants had probable cause to arrest Slater for assaulting A.F. *See, e.g.,* *Martinez v. Simonetti,* 202 F.3d 625, 634 (2d Cir.2000) ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); *Curley v. Village of Suffern,* 268 F.3d 65, 70 (2d Cir.2001) ("When information is received from a putative victim or an eyewitness, probable cause exists."); *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 119 (2d Cir.1995) ("An arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity."); *Pearson v. Lorancaitis,* No. 09–CV 1641(VLB), 2012 WL 162355, at *7 (D.Conn. Jan.19, 2012) ("Typically, a 'police officer may rely upon the statements of victims or witnesses to determine the existence of probable cause for the arrest, regardless of the ultimate accurateness or truthfulness of the statements.' " (quoting *Bourguignon v. Guinta,* 247 F.Supp.2d 189, 193 (D.Conn.2003))).

Slater nonetheless claims that she was arrested not for the A.F. Assault Charges, but for a robbery, and further that there was no probable cause to support a robbery charge. (Am. Compl. at ECF p. 5.) This argument misses the mark.

First, Slater's contention that she was arrested solely on a robbery charge is belied by the record. Slater has adduced no evidence that raises a genuine issue of material fact that she was not arrested on the A.F. Assault Charges. Instead, the documents that Slater has annexed to the Amended Complaint only show that she was indicted for both robbery and the A.F. Assault Charges. (Webcrims Case Details–Charges at ECF p. 14.) Indeed, the incident date listed to justify Slater's arrest is May 24, 2012, the date of the alleged assault of A.F. (*Id.*) Slater herself appears to acknowledge that she was arrested in connection with the investigation into the assault of A.F. (Not. of Am. Compl. ¶ 1 ("Plaintiff was arrested on June 1st, 2012 as a result of the visit [describing

ACS and NYPD investigation into the assault of A.F.]"). Additionally, the relative timing of the arrest and the lineup (which Slater alleges underlies the robbery charge) do not support Slater's contention that she was arrested for robbery. Slater was arrested at 5:35 p.m. on June 1, 2014.[7] (Webcrims Case Details–Summary at ECF p. 15.) It was not until 6:15 p.m. that Slater was identified in a lineup. (Not. Pursuant to CPL 710.30(l) (b) at ECF p. 19; Am. Compl. at ECF p. 7 ("The identified eyewitness allegedly pointed out Plaintiff at the 63rd Precint [sic], where the Plaintiff was being held in a holding cell at the time.").) Slater alleges that the lineup procedure formed the basis of the robbery charge. (Am. Compl. at ECF p. 5.) However, the lineup occurred after Slater's arrest, indicating that robbery was not the arrest charge.

*13 More fundamental, even if Slater was arrested on the robbery charge, her claim would nonetheless fail. "[T]he 'subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause.' " *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir.2006) (quoting *Devenpeck v. Alford,* 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004)). Accordingly, "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and ... it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest." *Id.* Slater has failed to show that there is a genuine issue of material fact regarding whether the Defendants had probable cause to arrest for the assault of A.F. Accordingly, the Police Defendants had probable cause to arrest Slater and there is no genuine issue of material fact regarding Slater's false arrest and false imprisonment claims. Defendants' motion for summary judgment is GRANTED with regard to Slater's false arrest and false imprisonment claims.

### C. Excessive Force

Slater alleges that "[i]t is clear how the Officers exerted force against the Plaintiff." (Am. Compl. at ECF p. 4.) It is not. Indeed, Slater neither alleges nor adduces evidence that any Defendant actually used force against her. Rather, the Amended Complaint only alleges that Detective Young "was screaming in Plaintiff's face acting as if he was going to hit her" and that he "blocked Plaintiff by putting his arm across the doorway" to her home. (Am. Compl. at ECF p. 4.) Defendants argue that the claim fails because "Plaintiff

does not allege that either Detective Mackey or Detective Young ever made physical contact with her. The claim would fail." (Defs.' Mem. at 7–8 n. 7.) Defendants are correct.

"A threat of force does not constitute excessive force." *Dunkelberger v. Dunkelberger,* No. 14–CV–3877 (KMK), 2015 WL 5730605, at *15 (S.D.N.Y. Sept.30, 2015) (collecting cases); *Murphy v. Pizarro,* No. 94–CV–0471 (JFK), 1995 WL 56599 0, at *3 (S.D.N.Y. Sept. 22, 1995) ("[M]ere threatening language and gestures of a custodial officer do not, even if true, amount to constitutional violations." (citation omitted)). Accordingly, Slater cannot prevail on a claim of excessive force.

Moreover, even if a threat of force could conceivably underlie an excessive force claim, "[b]ecause of the considerable uncertainty revealed in the case law cited above, this Court cannot find that [Defendants'] alleged threats ... constitute the violation of a clearly established constitutional right." *Snoussi v. Bivona,* No. 05–CV–3133 (RJD)(LB), 2008 WL 3992157, at *6 (E.D.N.Y. Aug. 22, 2008); *see also Pelt v. City of New York,* No. 11–CV–5633 (KAM) (CLP), 2013 WL 4647500, at *14 (E.D.N.Y. Aug. 28, 2013) (citing *Snoussi* and finding that even if a threat of force claim were cognizable, defendants would be entitled to qualified immunity on such a claim). Accordingly, even if an excessive force claim could be premised on threats of force alone, Slater's claim would still fail because the Police Defendants would be entitled to qualified immunity on such a claim. Accordingly Defendants' motion for summary judgment is GRANTED with regard to Slater's excessive force claim.

### D. Malicious Prosecution: Slater's Criminal Charges
*14 As explained above, the Police Defendants had probable cause to arrest Slater for the A.F. Assault Charges. *See supra* Part IV.B. Slater has not adduced evidence to suggest that between her arrest and the prosecution of the assault, the prosecution discovered new evidence that would have made the groundless nature of the charges apparent. Indeed, following the arrest, the prosecution discovered additional evidence that supported the A.F. Assault Charges. For example, hours after the arrest, the police interviewed T.F., who largely confirmed A.F.'s account of the assault. Moreover, although G.T. initially told the NYPD and ACS that A.F. had not been assaulted, she later recanted and substantially corroborated A.F.'s account of the assault. Accordingly, Slater cannot raise a genuine issue of material fact with regard to her claim that the A.F. Assault Charges

were maliciously prosecuted. *See Smith v. Tobon,* 529 F. App'x 36, 38 (2d Cir.2013) (summary order).

Slater appears to raise an additional claim, namely that she was maliciously prosecuted for robbery without probable cause. She argues that "[t]he Police Officers were not under the impression that the Plaintiff committed a robbery, but arrested her, fingerprinted her, had her identified, and processed the paperwork in accusation that the Plaintiff committed robbery." (Pl.'s Mem. at 10.) That is-interpreting her claims as charitably as possible-Slater alleges that even if the Police Defendants may have had probable cause to arrest and charge her with the A.F. Assault Charges, they had no basis to subject her to a lineup and later charged with robbery.

This claim fails as a matter of pleading because the Amended Complaint "does not assert in even a cursory manner that the lineups were carried out without probable cause, a necessary allegation without which claims for false arrest or malicious prosecution must fail." *Scratching v. Schlosser,* No. 12–CV–8129 (PAE)(JLC), 2014 WL 1797687, at *6 (S.D.N.Y. May 6, 2014) (report and recommendation), *adopted,* 2014 WL 2624754 (S.D.N.Y. June 4, 2014). Instead, Slater states that the robbery charge was unsupported because (1) she was charged with committing a robbery at her parents' residence, and (2) she does not know the name of the identifying witness. (Am. Compl. at ECF p. 5.) Slater does not allege when, or even if, Defendants ever learned of these purported flaws in the robbery charge. Nonetheless, Slater may be able to state a claim for malicious prosecution for robbery if she can allege either that the police lacked probable cause to conduct a lineup in the first place, or that Defendants learned of highly exculpatory evidence and proceeded nonetheless. Accordingly, Slater's malicious prosecution claim related to the robbery is DISMISSED WITHOUT PREJUDICE for failure to state a claim. [8]

### E. Malicious Prosecution: Neglect Petitions

Slater alleges that McDonald and ACS maliciously brought neglect petitions against her in retaliation for her not answering their phone calls. (Am. Compl. at ECF pp. 11–13.) As an initial matter, Slater cannot succeed on her malicious prosecution claim concerning the Neglect Petitions because the actions have not been terminated in her favor. At present, Slater appears to be appealing an adverse ruling by the Family Court. (Family Court Appeal (Pl.'s Memo, Ex. 1 (Dkt.31–1)).) "Accordingly, plaintiff has failed to allege that the Family Court proceeding was terminated in her favor, and thus

plaintiff has failed to state a claim for malicious prosecution." *Green v. Mattingly,* 585 F.3d 97, 104 (2d Cir.2009).

**\*15** In any event, McDonald had probable cause to initiate Neglect Petitions against Slater. A finding of probable cause will negate a claim of malicious prosecution premised on a Neglect Petition. *Yuan v. Rivera,* 48 F.Supp.2d 335, 349 (S.D.N.Y.1999). The Neglect Petitions charged Slater with neglect under section 1012 of the New York Family Court Act. (Neglect Petitions at ECF p. 60.) The court finds that McDonald had probable cause to believe that the children were being neglected at the time that the Neglect Petitions were filed and prosecuted.

Section 1012 defines "[n]eglected child" to include "a child less than eighteen years of age ... whose physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as a result of the failure of his parent or other person legally responsible for his care to exercise a minimum degree of care ... in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or a substantial risk thereof, including the infliction of excessive corporal punishment...." N.Y. Fam. Ct. Act § 1012(f) (i)(B). At the time that McDonald filed the Neglect Petitions, she had probable cause to believe that Slater had engaged in excessive corporal punishment. Namely, by June 13, all three of Slater's children had reported that Slater assaulted A.F. and ACS had learned of Slater's extensive history of child protective services cases in Florida and Texas. Based on these facts, a reasonable jury would be compelled to find that McDonald had probable cause to initiate the Neglect Petitions. *See, e.g., Mercedes ex rel. Brown v. Blue,* No. 00–CV–9225 (RMB), 2004 WL 2202578, at *10 (S.D.N.Y. Sept.30, 2004); *Dietz v. Damas,* 932 F.Supp. 431, 458 (E.D.N.Y.1996). Accordingly, Defendants' motion for summary judgment is GRANTED with regard to Slater's malicious prosecution claim against McDonald .%

### F. False Allegations of Drug Abuse and Bipolar Disorder, Defamation, and Fraud on the Court

Slater's claims of false allegations of bipolar disorder, defamation, and fraud on the court all essentially assert the same theory-namely, that McDonald made false statements in the Neglect Petitions and in Family Court concerning Slater's mental health, A.F .'s injuries, and Slater's drug abuse,. (*See*

Am. Compl. at ECF pp. 14, 16.) [9] The court reads these claims as presenting a due process violation (either free standing or as a stigma plus claim)-namely, that because of ACS's false statements, Slater's children were removed.

The majority of Plaintiff's claim cannot succeed because McDonald is entitled to qualified immunity for all reasonable statements made during the family court proceedings. [10] "It is well settled that case workers are entitled to 'unusual deference' in connection with child abuse and neglect investigations." *Shapiro v. Kronfeld,* No. 00–CV–6286 (RWS), 2004 WL 2698889, at *15 (S.D.N.Y. Nov.24, 2004) (quoting *Wilkinson ex rel. Wilkinson v. Russell,* 182 F.3d 89, 104–05 (2d Cir.1999)). Indeed, "[t]he Second Circuit has held that 'sins of commission and omission in what [caseworkers] told and failed to tell [a] Family Court Judge' are insufficient to overcome the 'necessary freedom of action that qualified immunity accords caseworker defendants' dealing with evolving and dangerous domestic abuse situations.' *Walker v. City of New York,* 63 F.Supp.3d 301, 312 (E.D.N.Y.2014) (quoting *Cornejo v. Bell,* 592 F.3d 121, 128 (2d Cir.2010)). Nonetheless, "[i]t is axiomatic that a caseworker seeking the protection of qualified immunity cannot have utilized perjury and intentional fabrications during her investigation and in presenting a case to the Family Court." *Id.* "The question for the Court, then, is whether [the caseworker's] alleged misrepresentations were sufficiently material and serious to render the removal process constitutionally defective ." *Green ex rel. T.C. v. Mattingly,* No. 07–CV–1790 (ENV)(CLP), 2010 WL 3824119, at *9 (E.D.N.Y. Sept. 23, 2010).

### 1. *Mental Illness*

**\*16** Slater alleges that despite receiving the Florida mental health examination which indicated that Slater did not suffer from a mental illness (*see* Fla. Mental Health Examination (Am. Compl., Ex. N (Dkt.16–1)) at ECF p. 102), McDonald stated in the Neglect Petition that the Florida mental health examination indicated the opposite (Am. Compl. at ECF p. 13). If Slater's allegation is confined to this style of claim, it survives Defendants' motion. Indeed, at this stage, there is a genuine issue of material fact regarding precisely what documents McDonald received and precisely what formed the basis of the Neglect Petitions. The Neglect Petitions indicate that according to "records from the Florida Department of Children and Families the respondent mother has been diagnosed with bi-polar disorder and prescribed

Zoloft and Trazodone and was supposed to be engaged in therapy. According to Florida records the respondent mother was hospitalized at Brookdale Hospital Psychiatric Center." (Neglect Pets. at ECF p. 71.) This statement is not an accurate summary of the mental health evaluation from Florida included in the current record before the court. (*See* Fla. Mental Health Evaluation). Perjury by government workers in state court is actionable under § 1983 and is not entitled to qualified immunity. *Walker,* 63 F.Supp.3d at 312; *Velez v. Reynolds,* 325 F.Supp.2d 293, 316 (S.D.N.Y.2004). Accordingly, at this stage, Slater's claim-as confined to a misrepresentation claim about her mental health-must survive.

### 2. *Photos of A.F.'s Bruising*

Slater further claims that ACS and McDonald violated her due process rights by submitting into evidence false photographs of A.F.'s bruises. (Am. Compl. at ECF p. 15 ("Plaintiff realized that the pictures that ACS had in evidence were pictures of old bruises that child A.F. had allegedly received in the year of 2011.").) Further, Slater alleges that she "informed the Court that she has pictures that she wants to submit into evidence." (*Id.*)

Slater's claim fails as a matter of pleading. Slater has neither alleged, nor produced evidence indicating, that ACS or McDonald knew or had reason to know that the photographs that they submitted to the family court were false. [11] Absent such allegations, Slater cannot show that it was unreasonable for McDonald to rely on the purportedly false photographs; and accordingly, Slater cannot state a claim. *See Tenenbaum v. Williams,* 193 F.3d 581, 596 (2d Cir.1999). Consequently, Slater's fraud on the court claim related to photographs of A.F.'s bruises is DISMISSED WITHOUT PREJUDICE.

### 3. *Substance Abuse*

Slater also alleges that ACS and McDonald referred her to substance abuse treatment without basis. (Am. Compl. at ECF p. 14.) Notably, Slater does not allege that the referral was made public, was mandatory, or resulted in any consequences if she failed to attend. (*Id.; see also* Referral to Outpatient Treatment (Am. Compl., Ex. M (Dkt.16–1)) at ECF pp. 98–99.) Absent such allegations, Slater fails to state a claim. First, Slater cannot state a claim of defamation without alleging publicity. *See supra* Part III.H. Second, without alleging that

consequences flowed from the referral, Slater cannot plead a stigma plus claim. (*Id.*) Finally, without alleging that she was forced to attend treatment, Slater cannot show a restriction on her liberty. *Cf. Mills v. Rogers,* 457 U.S. 291, 298–99, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982) (explaining that there is a liberty interest in avoiding mandatory administration of anti-psychotics). Because Slater's substance abuse claim fails as a matter of pleading, it is DISMISSED WITHOUT PREJUDICE.

### G. Intentional Infliction of Emotional Distress

**\*17** Slater alleges that Defendants intentionally inflicted emotional distress on her because "ACS knew that it was wrong to remove Plaintiff's children when there was no reasons documented to do so." (Am. Compl. at ECF p. 16.) Namely, Slater claims "Plaintiff has suffered emotional distress from having her children taken away from her without just cause and from not having lived with them for the last sixteen months." (*Id.*)

In order to prove intentional infliction of emotional dresses, "[t]he conduct which allegedly caused the emotional distress must be intentionally directed at the plaintiff without reasonable justification; a showing of gross negligence is insufficient." *Callahan v. City of New York,* 90 F.Supp.3d 60, 76 (E.D.N.Y.2015) (quoting *Shapiro v. Kronfeld,* No. 00–CV–6286 (RWS), 2004 WL 2698889, at \*25.(S.D.N.Y. Nov.24, 2004)). Slater's claim fails: "Plaintiff alleges that the Defendants committed the tort of intentional infliction of emotional distress merely by doing their jobs to report and investigate allegations of suspected child neglect, file neglect petitions ..., and pursue the allegations of child neglect ... until a disposition was reached. These actions are insufficient to support Plaintiff's allegation of intentional infliction of emotional distress by the Defendants." *Id.* (internal citations and quotation marks omitted). Consequently, Defendants' motion for summary judgment is GRANTED with regard to Slater's intentional infliction of emotional distress claim.

### H. Malicious Abuse of Process

Slater alleges that "Defendants was [sic] angry at Plaintiff and thereby instituted actions intentionally." (Am Compl. at ECF p. 18 .) She further claims that "[a]s a collateral objective an [sic] outside the legitimate ends of process, the Defendants wanted to exhibit to Plaintiff that she was in authority and that because of her position, she is allowed to break the law without being penalized. The objective was to

have Plaintiff s children in her possession." (*Id.*) Defendants raise three arguments opposing the abuse of process claim. First, Defendants argue that probable cause for arrest and prosecution exists here and negates abuse of process. (Defs.' Mem. at 18.) Next, Defendants argue that a "malicious abuse of process claim fails because Plaintiff does not allege that Detective Mackey, Detective Young, or CPS McDonald had a collateral objective in initiating the criminal and Family Court proceedings against her." (*Id.*) Third, Defendants argue that "Plaintiff fails to allege that Detective Mackey, Detective Young, or CPS McDonald pursued any objective after the initiation of criminal and Family Court proceedings" as is required to state a claim. (*Id.* at 19.) Defendants are correct on all three and accordingly, their motion for summary judgment is GRANTED on the abuse of process claim. [12]

First, as explained above, Defendants had probable cause both to arrest and charge Slater with the A.F. Assault Charges and to initiate family court proceedings. *See supra* Parts IV.B. & IV.E. Accordingly, to the extent the abuse of process claim is premised on the A.F. Assault Charges or the family court proceedings, the claim fails as a matter of law.

**\*18** However, liberally construed, Slater alleges malicious abuse of process with regard to the robbery charge as well. Even so construed, the claim fails. Plaintiff alleges that she was arrested and charged with robbery because the Defendants wished to exhibit their authority over her.

(Am. Compl. at ECF p. 18.) Such a claim speaks only to the Defendants' motive, not to a collateral purpose. The Second Circuit's decisions in *Savino v. City of New York,* 331 F.3d 63 (2d Cir.2003), is instructive. There, the plaintiff alleged that his investigation and arrest "was solely motivated to seek vindication for the [city's] great political embarrassment and humiliation for allowing plaintiff to be the highest paid [city] employee through his overtime earning which was widely reported in the news media for several years and to punish plaintiff for his lawfully and properly earned overtime compensation." *Id.* at 77–78. The Second Circuit held that the plaintiff could not state a claim because such an allegation did not allege an improper collateral objective. *Id.* Likewise, here, Slater alleges that she was arrested and charged with robbery so that Defendants could exhibit their power over her. However, she does not allege-much less produce any evidence showing-that the Defendants had an ulterior purpose, other than securing conviction, in pursuing

the charge. Consequently, Slater's abuse of process claim premised on the robbery charge fails.

Moreover, even if Slater could show that Defendants illegitimately *sought* process against her on the robbery charge, she has neither alleged nor adduced evidence that the Defendants pursued a collateral objective *after the issuance* of process. Absent such evidence, the abuse of process claim fails. Accordingly, Defendants' motion for summary judgment is GRANTED with regard to Slater's abuse of process claim.

### I. Exposure of a Minor to Toxins and a Website Promoting Nudity

Slater alleges that "[w]hile Plaintiff's children has been in the care of ACS, Plaintiffs [sic] Minor Child was subjected to Liquor at parties." (Am. Compl. at ECF p. 19.) Slater also alleges "[w]hile Plaintiff's children has been in the care of ACS, Plaintiff's minor child was subjected to a website that promotes nudity." (*Id.*)

Slater's claim fails as a matter of pleading. Slater has not alleged any policy or custom that caused her children's purported exposure to liquor at parties or websites that promote nudity. Accordingly, Slater cannot state a claim of municipal liability. In addition, Slater has not alleged that any individual had any involvement with her children's purported exposure to liquor at parties or websites that promote nudity. Accordingly, no claim has been stated against any plausible defendant at this time. Consequently, Slater's claim is DISMISSED WITHOUT PREJUDICE.

### V. CONCLUSION

For the reasons stated above, the court rules as follows:

• Defendants' motion for summary judgment is GRANTED for all claims against the City, the 63rd Precinct, ACS, and the NYPD.

*19 • Defendants' motion for summary judgment is GRANTED on the false arrest, false imprisonment, excessive force, malicious prosecution claims related to the Neglect Petitions, intentional infliction of emotional distress, and malicious abuse of process.

• Defendants' motion for summary judgment is GRANTED on the malicious prosecution claim against the Police Defendants to the extent the claim concerns the assault of A.F.

• Defendants' motion for summary judgment is DENIED on Plaintiff's false allegations of mental illness claim to the extent it is premised on a misrepresentation claim.

• Plaintiff's malicious prosecution claim against the Police Defendants concerning the robbery charge, fraud on the court claim, false allegation of drug abuse claim, exposure of a minor to toxins claim, and exposure of a minor to a website that promotes nudity claim are DISMISSED WITHOUT PREJUDICE.

Should Slater wish to address the pleading defects in her malicious prosecution of robbery claim, fraud on the court claim, false allegation of drug abuse claim, exposure of a minor to toxins claim, or exposure of a minor to a website that promotes nudity claim, she is instructed to file a Second Amended Complaint by December 15, 2015.[13] The parties are directed to contact the chambers of Magistrate Judge Robert M. Levy in order to determine the schedule for any remaining discovery and any further motion practice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 6971793

---

**Footnotes**

1    Because Slater is proceeding pro se, the court has performed an independent review of the entire record submitted by the parties to determine whether there are disputed issues of material fact. *See McClendon v. County of Nassau,* No. 1 l–CV–0190 (SJF)(ETB), 2012 WL 4849144, at *2 (E.D.N.Y. Oct. 11, 2012); *Williams v. City of New York,* No. 06–CV–6601 (NGG), 2009 WL 3254465, at *1 n. 1 (E.D.N.Y. Oct.9, 2009). Likewise,

the court will consider Slater's filings to be sworn statements so long as they are otherwise admissible. *See Washington v. William Morris Endeavor Entm't. LLC,* No. 10–CV–9647 (PKC), 2014 WL 4401291, at *1 n. 1 (S.D.N.Y. Sept.5, 2014); *Geldzahler v. N.Y. Med. Coll.,* 746 F.Supp.2d 618, 620 n.I (S.D.N.Y.2010).

2    To protect their identities, the court refers to Slater's minor children by their initials.

3    As explained below, many of Slater's claims are not actionable under § 1983. Where Slater's claim could nonetheless be actionable under state law and the court's exercise of supplemental jurisdiction, the court examines the viability of the claim as such.

4    A false arrest claim under § 1983 is substantially similar to a claim for false arrest under New York law. *See Wevant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996). Under New York law, to prove the elements of false arrest, a plaintiff must show: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994).

5    Pursuant to the collective knowledge doctrine, facts known to one member of a law enforcement team cooperating in an investigation are presumed to be shared by the others when determining the existence of probable cause to arrest. *See Savino v. City of New York,* 331 F.3d 63, 74 (2d Cir.2003).

6    Slater attempts to sue not only the City, but also the NYPD, ACS, and the 63rd Precinct. Each is a non-suable entity. *See Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007) (N.Y.PD is a non-suable entity); *Worrell v. City of New York,* No. 12–CV–6151 (MKB), 2014 WL 1224257, at *3 (E.D.N.Y. Mar.24, 2014) ("ACS is not a suable entity."); *Simmons v. 52nd Precinct,* No. 12–CV–4395 (JGK), 2012 WL 2304261, at *1 (S.D.N.Y. June 18, 2012) (Plaintiffs claims against the 52nd Precinct of the New York City Police Department must be dismissed because an agency of the City of New York is not an entity that can be sued."). Accordingly, Defendants are granted summary judgment on all the claims against the NYPD, ACS, and the 63rd Precinct.

7    The court recognizes that '[t]here is no bright line rule differentiating an arrest from a detention supportable by less than probable cause.' *Vanderwoude v. City of New York,* No. 12–CV–9046 (KPF), 2014 WL 2592457, at *10 (S.D.N.Y. June 10, 2014) (quoting *Posr v. Doherty,* 944 F.2d 91, 98 (2d Cir.1991)). And that accordingly, the time that the State formally makes an arrest may not correspond to the actual time that an arrest legally occurred. Here however, the evidence indicates that Slater was actually arrested at 5:35 p.m. First, Slater herself alleges that she was arrested at the precinct. (Am. Compl. at ECF p. 4 ("When Plaintiff arrived to the precint [sic] and after the Defendants spoke with Plaintiff's children and the Plaintiff, Plaintiff was arrested and taken to jail.").) Second, Slater notes that while still at her home she was threatened with arrest, as opposed to actually arrested. (14) Finally, Slater acknowledges that she was arrested following the interviews of herself and her children (*id.*), and those interviews occurred at the precinct (Investigation Progress Notes at ECF p. 32).

8    Slater appears also to assert a malicious prosecution claim against the prosecutors and the judge in her criminal case. (Am. Compl. at ECF p. 9.) Those individuals were not was named or served in this action. Additionally, both the prosecutors and the judge would likely be protected by absolute immunity. *Buckley v. Fitzsimmons,* 509 U.S. 259, 273, 277, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993).

9    "To the extent that plaintiff's] claims encompass representations actually made by ACS's lawyer at the Family Court hearing, those representations cannot serve as the basis for § 1983 liability because the lawyer is

entitled to absolute immunity. ACS caseworkers, on the other hand, are protected only by qualified immunity." *Green ex rel. T.C. v. Mattingly,* No. 07–CV–1790 (ENV)(CLP), 2010 WL 3824119, at *14 (E.D.N.Y. Sept. 23, 2010).

10    The court notes that it is permitted to reach qualified immunity before deciding the merits of Slater's allegations. *See* ⚑*Pearson v. Callahan,* 555 U.S. 223, 227, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

11    For the purposes of this motion, the court assumes that the photos were indeed inaccurate.

12    It appears that Slater also attempts to allege a claim against the Judge in the Family Court case. That claim fails. First, Slater has not named or served the family court judge. More important, the judge would be protected by absolute immunity. ⚑*Bliven v. Hunt,* 579 F.3d 204, 209 (2d Cir.2009).

13    Plaintiff is advised that a Second Amended Complaint will completely replace both the original Complaint and the Amended Complaint. Therefore, any new amendment must include all the claims Slater intends to pursue against all Defendants. However, Slater is cautioned that she is not permitted to re-plead her claims against the 63rd Precinct, ACS, and the NYPD, or to re-plead her claims of false arrest, false imprisonment, excessive force, malicious prosecution claims against related to the Neglect petitions, intentional infliction of emotional distress, and malicious abuse of process.

---

**End of Document**                                   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 117 of 142

Kinch v. Artuz, Not Reported in F.Supp. (1997)

1997 WL 576038
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Danilo KINCH, Plaintiff,

v.

Superintendent C. ARTUZ; Deputy Superintendent
D. Bliden; Rabbi M. Chill, Defendants.

No. 97 CIV. 2419 (LAP).
|
Sept. 15, 1997.

*MEMORANDUM AND ORDER*

PRESKA, District J.

**\*1** Plaintiff, a prisoner currently an inmate in the custody of the Green Haven Correctional Facility ("Green Haven"), brings this *pro se* action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Rabbi M. Chill ("Rabbi Chill") denied plaintiff access to Jewish Sabbath Services provided at Green Haven as well as the right to participate in the kosher food program at Green Haven. Defendant Superintendent C. Artuz ("Artuz") and defendant Deputy Superintendent D. Bliden ("Bliden") have moved to dismiss plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil procedure. For the reasons that follow, defendants' motion to dismiss is granted.

*BACKGROUND*

Kinch is currently an inmate at Green Haven. (Complaint ("Compl.") at 2). Artuz and Bliden are employed by the New York State Department of Correctional Services ("DOCS") as Superintendent and Deputy Superintendent for Programs at Green Haven, respectively. (Compl. at 3).

Plaintiff alleges that Rabbi Chill discriminated against plaintiff in violation of DOCS' Directive 4202. (*Id.*). Directive 4202 provides as follows:

> Resident Chaplains are responsible for pastoral care for the entire inmate population and for staff. They also

provide spiritual guidance, religious activities and volunteers, ongoing pastoral counseling, and religious education for particular faith groups. Chaplains report directly to the Deputy Superintendent for Program Services, but as situations warrant, may consult directly with the superintendent.

Plaintiff claims that he attempted to attend Sabbath Services but was denied the right to attend because he is a Black Hebrew Israelite. (*Id.*). Plaintiff further alleges that on September 6, 1996, Rabbi Chill informed plaintiff that Hebrew Israelites could not participate in the kosher food program at Green Haven. (*Id.* at 3-a). Two days later plaintiff made a written request for an interview with Rabbi Chill. (*Id.*). Rabbi Chill responded to plaintiff's request with a request for documentation verifying plaintiff's affiliation with the Jewish faith. Plaintiff subsequently provided Rabbi Chill with a letter from a rabbi outside of DOCS by the name of Simeon Ben Israel verifying that plaintiff was in fact a Jew/Hebrew. (*Id.*). Plaintiff claims that although Rabbi Chill acknowledged receipt of this verification, Rabbi Chill continued to deny plaintiff access to the kosher food program. (*Id.*). Nowhere in the body of the complaint does plaintiff allege that either Artuz or Bliden played any role whatsoever in the denial of religious services.

*DISCUSSION*

I. Standard Applicable to A Motion to Dismiss
When deciding a motion to dismiss under Rule 12(b)(6), a court must accept as true all well-pleaded factual allegations of the complaint and must draw all inferences in favor of the pleader. *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1174 (2d Cir. 1993); *see City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488, 493 (1986); *Miree v. DeKalb County,* 433 U.S. 25, 27 n.2 (1977) (both referring to "well-pleaded allegations"). "'[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991), *cert. denied sub nom. Cortec Indus.,*

*Inc. v. Westinghouse Credit Corp.,* 503 U.S. 960 (1992)). Dismissal is proper only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957), *quoted by Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974); *accord Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir. 1994). "The latter principle is to be applied with particular strictness when the plaintiff complains of a civil rights violation." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir. 1991).

**\*2** Furthermore, because Mr. Kinch filed this action *pro se,* I must judge his pleadings by a more lenient standard than that accorded to "formal pleadings drafted by lawyers." *Haines v. Kerner,* 404 U.S. 519, 520, *reh'g denied,* 405 U.S. 948 (1972); *accord Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir. 1994) ("[W]e read [the *pro se* party's] supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest."); *Hanlin v. Mitchelson,* 794 F.2d 834, 838-39 (2d Cir. 1986) (citing *Haines* to support the principle that *pro se* pleadings are given a liberal construction); *see Graham v. Lewinski,* 848 F.2d 342, 344 (2d Cir. 1988) (referring to the "special solicitude" afforded *pro se* litigants when confronted with motions for summary judgment).

Nevertheless, proceeding *pro se* does not altogether relieve Mr. Kinch from the usual pleading requirements. *See Lee v. Coughlin,* 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (holding that a "*pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment") (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir. 1991)), *reh'g granted on other grounds,* 914 F. Supp. 1004 (S.D.N.Y. 1996); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080 (PKL), 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("The work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*'s] failure to allege either specific facts or particular laws that have been violated renders his attempt to oppose defendants' motion ineffectual."); *Stinson v. Sheriff's Dep't,* 499 F. Supp. 259, 262 (S.D.N.Y. 1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended"). Applying these standards to plaintiff's complaint, I find that plaintiff has not stated a claim upon which relief may be granted.

II. Section 1983 Claim Requirement of Personal Involvement

Kinch has sued under 42 U.S.C. § 1983. According to this provision,

> [e]very person who, under any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Under section 1983, "[p]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978) (citations omitted)). Furthermore, the doctrine of *respondeat superior* cannot be applied to section 1983 actions to satisfy the prerequisite of personal involvement. Therefore, a prison official may not be found liable for a constitutional violation merely because of the acts of those under his control. *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319 (2d Cir. 1986); *Williams v. Vincent,* 508 F.2d 541, 546 (2d Cir. 1974). Although both Artuz's and Bliden's names appear in the caption of the complaint, the complaint contains no allegations with respect to Artuz or Bliden. Nowhere in the complaint does plaintiff suggest that either of these two defendants was personally involved in the alleged deprivation of plaintiff's rights. Nor does the complaint suggest that defendants were grossly negligent in managing their subordinates who caused the alleged constitutional

Kinch v. Artuz, Not Reported in F.Supp. (1997)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 119 of 142

violation or that they created a policy or custom permitting the alleged violation to occur.

**\*3**  Plaintiff does assert in his memorandum that he wrote Bliden on October 14, 1996 and again on November 18, 1996 "to have him correct the on going discriminatory practices of Rabbi Chill." (Plaintiff's Memorandum in Support of Opposition to Motion to Dismiss at 1, 4). Plaintiff also asserts in his memorandum that he "made no direct claim as to Artuz and Bliden's involvement because their function, responsibilities, authorities, and duties are covered under the Department of Correctional Services directives. Even if these allegations had been contained in plaintiff's complaint and thus could properly be considered as part of plaintiff's pleadings, such allegations would be insufficient to withstand a motion to dismiss.

With respect to plaintiff's first argument, even if a letter complaining of discrimination were sufficient to plead a claim under § 1983, plaintiff has not even alleged that any such letter was sent to Artuz. Thus, regardless of the significance of plaintiff's letter, plaintiff has not alleged any involvement whatsoever on behalf of Artuz. Furthermore, even if the letter had been sent or forwarded to Artuz, sending a letter to a supervisory official does not amount to the level of personal involvement necessary to state a claim under § 1983, because

> ... it is well established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegation made therein is insufficient to hold that official liable for the alleged violations.

*Greenwald v. Coughlin,* 1995 WL 232736, \*4 (S.D.N.Y. 1995); *see also Zamakshari v. Dvoskin,* 899 F. Supp. 1097,

1110 (S.D.N.Y. 1997) (citing *Candelaria v. Coughlin,* 787 F. Supp. 368, 373 (S.D.N.Y. 1992), *aff'd,* 979 F.2d 845 (2d Cir. 1992); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989)).

Plaintiff's second argument is directly contrary to the holdings of *Monell* and its progeny. *Monell v. N.Y.C. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S. Ct. 2018 (1978); *accord City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S. Ct. 915 (1988); *see also Hendricks v. Coughlin,* 114 F.3d 390, 394 (2d Cir. 1997); *Champion v. Artuz,* 76 F.3d 483, 486-87 (2d Cir. 1996); *Colon v. Coughlin,* 58 F.3d 865, 874 (2d Cir. 1995); *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir. 1995). Plaintiff argues that Artuz and Bliden are liable by virtue of their supervisory position with respect to Rabbi Chill. In *Monell,* however, the Supreme Court stated unequivocally that a plaintiff may not rely on the doctrine of *respondeat superior* to impose liability on a supervisory official in a § 1983 action. *Monell,* 436 U.S. at 691, 98 S. Ct. at 2036. Accordingly, plaintiff's motion with respect to defendants Artuz and Bliden must be dismissed.

### CONCLUSION

For the reasons set forth above, the motion of defendants Artuz and Bliden to dismiss plaintiff's claims against them is granted.

SO ORDERED:

Dated: New York, New York
 **\*4**  September 10, 1997

**All Citations**

Not Reported in F.Supp., 1997 WL 576038

---

2023 WL 137775
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Gwendolyn SHERMAN, Plaintiff,

v.

YONKERS PUBLIC SCHOOLS, Yonkers Public
Schools Board of Education, Edwin M. Quezada,
Superintendent, Cesar E. Chaves Elementary School, f/
k/a Cedar Place School, Magdaline M. Delany, Principal,
John Doe, #1-50, and Mary Roe, #1-50, Defendants.

No. 21-CV-7317 (CS)
|
Signed January 9, 2023

**Attorneys and Law Firms**

Adrian J. Johnson, Johnson & Associates, PC, Iselin, New
Jersey, Counsel for Plaintiff.

Joanna M. Topping, Abrams Fensterman, LLP, White Plains,
New York, Counsel for Defendants.

**OPINION & ORDER**

Seibel, United States District Judge

*1 Before the Court is the motion to dismiss of Defendants
Yonkers Public Schools and Yonkers Public Schools Board
of Education (together, "YPS"), Dr. Edwin M. Quezada, and
Magdaline M. Delany (collectively, "Defendants"). (ECF No.
25.)[1] For the following reasons, the motion is GRANTED.

**I. BACKGROUND**
I accept as true the facts, but not the conclusions, set forth in
Plaintiff's AC.

**A. Factual Background**
Plaintiff Gwendolyn Sherman is Black woman employed by
YPS as a special education teacher at the Cesar E. Chavez
School ("Chavez"). (AC ¶¶ 14-15.) Defendant Magdaline M.
Delany is the principal at Chavez. (Id. ¶¶ 16-17.) Plaintiff
alleges that Defendants created a hostile work environment;
discriminated against her on the basis of her race, (AC ¶¶ 36,
78, 79), color, (id. ¶ 79), religion, (id.), gender, (id. ¶ 78), and

veteran status, (id.); and retaliated against her for speaking out
about student placement, (id. ¶ 46), student misconduct, (id.
¶32), and child abuse (id. ¶¶ 64-67).

Plaintiff alleges that from 2009 to 2019, Defendants
"collectively and individually" publicly belittled and
humiliated her and reprimanded her without basis. (Id. ¶¶
18-20.) She alleges she faced "verbal, mental and emotional
abuse" daily during this period. (Id. ¶ 71.) She does not
provide examples or any specifics regarding these alleged
belittlings, reprimands or abuses.

Plaintiff states that Defendants have reassigned Plaintiff's
classroom aides to allegedly "increase the difficulty"
for Plaintiff. (Id. ¶ 87.) As early as 2012, Defendant
Delany allegedly started punishing Plaintiff for protesting
the reassignment by transferring back to Plaintiff's class
"difficult" students who had earlier been transferred to
non-white co-workers by the Special Education Placement
Department. (Id. ¶¶ 24, 46.) These transfers from non-white
teachers are also alleged to constitute "favoritism towards
Caucasian teachers." (Id. ¶ 83.)

She alleges that starting in 2013, Defendant Delany
purposefully tampered with her evaluations, "in an attempt to
cause fear," (id. ¶ 21), and "force her to resign or retire," (id.
¶¶ 31, 55). She provides no facts regarding what was changed
in her evaluations or what effect this alleged conduct had.
She alleges that Defendants defamed her by portraying her
negatively to others outside of the school, preventing her
from transferring, being promoted, or being hired in other
districts. (Id. ¶¶ 97-99.) No specifics are provided regarding
any allegedly false statements made by Defendants, to whom
they were made, when they were made, how they were
communicated, or what connection they had to positions
for which Plaintiff applied. Plaintiff further alleges that
from 2014 through 2019, Delany allegedly "blackballed"
Plaintiff from applying for or obtaining higher-level positions
for which Plaintiff believes she was qualified, (id. ¶ 73),
and Plaintiff had to train staff members newly appointed
to those positions, (id. ¶ 74). No information is provided
about these positions, what Delany said or did, how Delany
communicated with the decision makers, or how Plaintiff's
qualifications compared to those of other applicants.

*2 Pursuant to New York state law, Plaintiff was required
to report suspected child abuse. (Id. ¶¶ 61-63); see 📙 N.Y.
Soc. Serv. Law § 413(1)(a) (teachers, among others, "are
required to report ... when they have reasonable cause to

suspect that a child coming before them in their professional or official capacity is an abused or maltreated child."). During the 2016-2017 school year, Plaintiff reported to her building principal (presumably Delany) that she believed another teacher at the school was abusing a student, and was told that she should not report it, as the school would conduct an internal investigation. (AC ¶¶ 64-66.) She alleges that she was then "targeted" for opposing orders to not report such incidents, (*id.* ¶ 33; *see id.* ¶ 32), in that "harassing activities," (*id.* ¶ 67), directed against her intensified, (*id.* ¶¶ 67, 71). She does not describe what she said or did to protest the alleged orders. The only specific she provides about the retaliation is that "Defendants, collectively and individually, kept [her] from leaving her classroom at any time for any reason," (*id.* ¶ 68), but she also alleges that "Defendant Delany instructed [her] not to leave her classroom outside of her lunch or planning period," (*id.* ¶ 69). Plaintiff believes that the retaliatory harassment was intended to hamper her ability to teach and advocate on behalf of her special education and African-American students. (*Id.* ¶ 34.) Plaintiff also believes that because she expressed concerns about "the sexual misconduct of emotionally disturbed students, both disabled and non-disabled," Defendants retaliated against her by writing negative and false evaluations, verbally abusing and threatening her, humiliating her in front of her peers, and more. (*Id.* ¶ 32.) She does not say when or how she expressed these concerns, nor are there any facts regarding the evaluations or the other abuse.

Plaintiff also alleges she was assaulted by Defendant Delany. In November 2017, after meeting with Plaintiff in her office, Delany allegedly "had an angry attitude and rushed [Plaintiff] out of the door." (*Id.* ¶¶ 89-90.) Plaintiff turned around to ask Delany a question but she "slammed her door in [Plaintiff]'s face." (*Id.* ¶ 91.) Although the door did not touch her, Plaintiff believed she was in "imminent danger of being hit by the door." (*Id.* ¶ 92.)

Beginning in 2018 and through 2019, according to Plaintiff, Delany "embarrassed, humiliated and belittled Plaintiff in the presence of other staff members." (*Id.* ¶ 45.) At unstated times, "Defendants, collectively and individually," would allegedly reprimand Plaintiff "openly and publicly throughout the building," (*id.* ¶ 26), and publicly humiliate her during staff meetings, (*id.* ¶ 29), but again no facts about the alleged conduct are provided. Plaintiff alleges that she is "treated ... differently" in the presence of non-white team members, (*id.* ¶ 23), but does not say from whom she is treated differently, how she is treated, or how that treatment is different if white

staff members are present. Defendants allegedly stated that they had received complaints about Plaintiff from other staff members, but would not identify who lodged these complaints and did not put any complaints in her employee file. (*Id.* ¶¶ 26-27.)

Plaintiff is allegedly the only special education teacher who is denied access to information related to students' assessments and performance. (*Id.* ¶¶ 28, 52; *see id.* ¶ 85.) Plaintiff was "forced ... to come out of her classroom to address behavioral needs of students in other classrooms," which was not required of other teachers. (*Id.* ¶ 84.)

Allegedly at the instruction of Defendant Delany, (*id.* ¶ 54), support staff, "collectively and individually," would not schedule meetings for Plaintiff with the District superintendent or other administrators, (*id.* ¶ 30). Further, she claims she was denied funding for class trips, even though her white counterparts regularly received funding approval. (*Id.* ¶¶ 80-81.) She also believes she was intentionally excluded from administrative emails that were sent to other staff members. (*Id.* ¶ 82.)

Plaintiff alleges that as a result of Defendants' actions, she has suffered from many panic attacks, (*id.* ¶ 56), and in September 2019 applied to retire "to escape this nightmare," (*id.* ¶ 57), but due to the alleged stress her co-workers were facing, she withdrew her application and returned to work in November 2019, (*id.* ¶ 58). She also claims that she would have earned more had she gotten one of the positions she believes she was denied as a result of Defendants' "slanderous statements." (*Id.* ¶ 99; *see id.* ¶ 100.) These false statements have also resulted in her taking a medical leave of absence. (*Id.* ¶ 101.)

### B. Procedural History

Plaintiff filed her IC in this Court on August 31, 2021, bringing federal and state employment discrimination claims against Defendants YPS, Quezada, Cesar E. Chaves Elementary School, Delany, John Does #1-50, and Mary Roes #1-50. (ECF No. 1.) The case was initially assigned to Judge Paul A. Crotty. No summons was issued, yet Plaintiff purported to have served Defendants. (*See* ECF Nos. 6, 8.) On December 7, 2021, Defendants requested an extension of time to respond to the IC, which Judge Crotty granted. (ECF Nos. 4-5.) Defendants then requested a conference in advance of their anticipated motion to dismiss. (ECF No. 6.) On January 26, 2022, the matter was reassigned to the undersigned in White Plains. The Court then set a date for a pre-motion conference and ordered Plaintiff to respond to Defendants'

Sherman v. Yonkers Public Schools, Slip Copy (2023)

earlier letter. (ECF No. 7.) Plaintiff responded, (ECF No. 8), and on February 23, 2022, the Court held a pre-motion conference, granted Plaintiff leave to amend her complaint, and set a briefing schedule for this motion, (Minute Entry dated Feb. 23, 2022). [2] Plaintiff filed her AC on April 8, 2022, summonses were issued, and the instant motion followed. (AC; ECF Nos. 13-22; ECF Nos. 25-28.)

## II. LEGAL STANDARDS

### A. Federal Rule of Civil Procedure 12(b)(6)

**\*3** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). [3] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.' " *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). [4]

## III. DISCUSSION

Plaintiff brings seven claims: (1) race-based discrimination and retaliation under 42 U.S.C. § 1981, (AC at 8-9); (2) conspiracy under 42 U.S.C. § 1985(3), (*id.* at 9-10); (3) hostile work environment, untethered to any provision of law, (*id.* at 10-13); (4) retaliation, untethered to any provision of federal law, (*id.* at 13-15); (5) discrimination under Title VI of the Civil Rights Act of 1964, (*id.* at 15-17); [5] (6) assault, (*id.* at 17-18); and (7) defamation, (*id.* at 18-19). All of these claims are dismissed.

### A. Federal Claims

#### 1. Statute of Limitations

**\*4** Defendants argue that the statute of limitations limits Plaintiff's discrimination and retaliation claims under § 1981 and Title VI. (Ds' Mem. at 14.)

"[E]mployment discrimination claims arising under ... § 1981 are subject to the four-year federal 'catch-all' statute of limitations...." *Bedden-Hurley v. N.Y.C. Bd. of Educ.*, 385 F. Supp. 2d 274, 278 (S.D.N.Y. 2005); *see James v. Countrywide Fin. Corp.*, 849 F. Supp. 2d 296, 317-18 (E.D.N.Y. 2012). A three-year statute of limitations governs Title VI claims. *Singh v. Wells*, 445 F. App'x 373, 376 (2d Cir. 2011) (summary order). Recovery for discrete acts of discrimination that occur outside the applicable limitations period are barred, but a hostile work environment claim is timely, even if some of the conduct at issue occurred before the limitations period, so long as an act contributing to that environment occurred within that period. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 (2002).

Plaintiff filed her IC in this Court on August 31, 2021. Accordingly, any discrete acts of discrimination or retaliation under § 1981 that are alleged to have occurred prior to August 31, 2017, and any such acts under Title VI that are alleged to have occurred prior to August 31, 2018, are time barred.

#### 2. Claims as to YPS

Defendants argue that Plaintiff's § 1981 and Title VI claims against YPS fail because Plaintiff does not allege that

any civil rights violations occurred because of a municipal policy or custom. (Ds' Mem. at 3-4.) Plaintiff did not address this argument in her opposition, and thus has abandoned those claims as to YPS. *Horsting v. St. John's Riverside Hosp.*, No. 17-CV-3230, 2018 WL 1918617, at *6 (S.D.N.Y. Apr. 18, 2018) ("At the motion to dismiss stage, where review is limited to the pleadings, a plaintiff abandons a claim by failing to address the defendant's arguments in support of dismissing that claim."); *Johnson v. City of N.Y.*, No. 15-CV-8195, 2017 WL 2312924, at *17 (S.D.N.Y. May 26, 2017) ("By failing to address Defendants' arguments in support of dismissing this claim, it is deemed withdrawn or dismissed as abandoned.");

*Brandon v. City of N.Y.*, 705 F. Supp. 2d 261, 268 (S.D.N.Y. 2010) (claims abandoned where Plaintiff "did not raise any arguments opposing Defendants' motion") (collecting cases); *Bonilla v. Smithfield Assocs. LLC*, No. 09-CV-1549, 2009 WL 4457304, at *4 (S.D.N.Y. Dec. 4, 2009) (claims deemed abandoned and dismissed as a matter of law where defendants raised three arguments for dismissal of those claims and plaintiff responded to only one).

But while Defendants are correct that when a municipality (or an individual in his official capacity, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991)), is sued for discrimination under § 1981, the plaintiff must show that the challenged acts were performed pursuant to a municipal custom or policy, *see, e.g., Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989), it has not provided authority for the proposition that the same is true under Title VI. Thus, despite Plaintiff's failure to oppose, I will dismiss only the § 1981 claims against Defendant YPS for failure to allege a policy or custom. As will be seen, the Title VI claim fails for different reasons.

### 3. Personal Involvement

**\*5** Defendants argue that Plaintiff has failed to plead facts showing the personal involvement of Defendant Quezada. (Ds' Mem. at 5-6.) As for claims under 42 U.S.C. § 1983, a showing of personal involvement by the defendant is required for liability under § 1981. *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004); *Baker v. Connecticut*, No. 03-CV-1994, 2006 WL 581205, at *10 (D. Conn. Mar. 8, 2006); *see Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2d Cir. 2000) ("[P]ersonal

liability under section 1981 must be predicated on the actor's personal involvement."). While *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995), laid out a special test for supervisory liability, outlining five ways a plaintiff could show personal involvement of a supervisor, the Second Circuit has clarified that under the Supreme Court's ruling in *Iqbal*, the *Colon* test is invalid and "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676). "Simply put, there's no special rule of liability for supervisors." *Id.* While " '[t]he factors necessary to establish a [§ 1981] violation will vary with the constitutional provision at issue' because the elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676), "[t]he violation must be established against the supervisory official directly," *id.*

Plaintiff has not pleaded enough facts to render it plausible that Defendant Quezada – the Superintendent of YPS, (AC ¶ 8) – was personally involved in the alleged violations. While Plaintiff alleges that "Defendants, collectively and individually" retaliated against Plaintiff, created a hostile work environment, belittled and humiliated her, and reprimanded her for no reason, (*id.* ¶¶ 18-20, 35-38), those allegations are insufficient because they "lump[ ] all the defendants together in each claim and provide[ ] no factual basis to distinguish their conduct." *Tracey v. City of Geneva*, No. 17-CV-6567, 2018 WL 1509355, at *3 (W.D.N.Y. Mar. 26, 2018); *see Ruiz v. Westchester County*, No. 18-CV-7007, 2020 WL 4340788, at *4 (S.D.N.Y. July 28, 2020) (collecting cases); *see also Gonzalez v. Yepes*, No. 19-CV-267, 2019 WL 2603533, at *7 (D. Conn. June 25, 2019) ("As a corollary of the personal involvement requirement, complaints that rely on 'group pleading' and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim.") (collecting cases); *5465 Route 212, LLC v. N.Y. State Dep't of Transp.*, No. 19-CV-1510, 2020 WL 6888052, at *9 (N.D.N.Y. Nov. 24, 2020) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under § 1983, a plaintiff cannot rely on a group pleading against all defendants without making specific individual factual allegations"). Plaintiff provides no specifics as to anything Quezada did or did not do, or how he was involved in the alleged mistreatment of Plaintiff.

It is apparent that Quezada is being sued merely based on his supervisory position, which even before *Tangreti* would not have sufficed to show personal involvement. *See, e.g.,* 🚩 *Banks v. Annucci*, 48 F. Supp. 3d 394, 416 (N.D.N.Y. 2004) ("Where a defendant is a supervisory official, a mere linkage to the unlawful conduct through the chain of command (*i.e.*, under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct."). Further, Plaintiff in her opposition does not address how Quezada may have been personally involved, so her 🚩 § 1981 claims against him have been abandoned.

The 🚩 § 1981 claims against Quezada are dismissed.

### 4. Discrimination Claims

#### a. 🚩 Section 1981 Claim

As established above, Plaintiff's 🚩 § 1981 claim remains only as to Defendant Delany. To state a claim under that statute, a plaintiff "must allege facts supporting the following elements: (1) plaintiff [is a] member[ ] of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities." 🚩 *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000).

**\*6** In her AC, Plaintiff summarily states, "Defendants' conduct ..., motivated in substantial respect by race-based animus, violated Plaintiff's rights as guaranteed [under] 🚩 42 U.S.C. § 1981." (AC ¶ 36.) But despite this allegation, the vast majority of the facts she provides are wholly unconnected to race. Plaintiff states that she was singled out – for example, she alleges she is the only special education teacher who was denied information on students' assessments and performance, (*id.* ¶¶ 28, 86); she was excluded from administrative emails that had been sent to other staff members, (*id.* ¶ 83); and, unlike other teachers, she had to leave her classroom to address other students' behavioral issues, (*id.* ¶ 84) – but nowhere does she provide facts suggesting that she was subjected to such treatment because of her race, as opposed to say, Delany not liking her. She does not describe any racially discriminatory remarks by Delany or any mistreatment of other Black teachers. Indeed,

that Plaintiff attributes her mistreatment variously to her race, color, gender, veteran status, and religion, (*id.* ¶¶ 78-79), illustrates that Plaintiff lacks facts supporting the notion that her treatment was attributable to any particular protected characteristic.

The only allegations Plaintiff connects to race are that Defendants never approved her requests to fund class trips, even though her white colleagues regularly received approval, (*id.* ¶ 81), and that Delany reassigning difficult students back to Plaintiff was favoritism toward Caucasian teachers, (*id.* ¶ 83). Elsewhere Plaintiff alleges that the difficult students came back to her from non-white teachers, (*id.* ¶ 24), so it is hard to see how that conduct could reflect favoritism toward white teachers. And Plaintiff provides no facts about her trip requests or those of other teachers that would show the requests to be sufficiently similar to give rise to an inference of discrimination. *See Wegmann v. Young Adult Inst., Inc., Trustees of Supplemental Pension Plan for Certain Mgmt. Emps. of Young Adult Inst.,* No. 20-1147, 2021 WL 3573753, at \*4 (2d Cir. Aug. 13, 2021) (where plaintiff seeks to make out *prima facie* case by reference to disparate treatment of other employees, situation of those employees must be sufficiently similar to support minimal inference that difference in treatment may be attributable to discrimination).

But even if she had, and even assuming that she meant to say that the difficult students came back to her from white teachers, Plaintiff's claim fails as to the third element of her *prima facie* case, because the treatment she describes does not amount to an adverse employment action. For purposes of a discrimination claim, "[a]n adverse employment action is a materially adverse change in the terms and conditions of employment," 🚩 *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008), "one which is more disruptive than a mere inconvenience or an alteration of job responsibilities," 🚩 *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." 🚩 *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004).

As a general matter, "assignments that are part of an employee's normal responsibilities are not adverse employment actions where, as here, the rate of pay and

benefits remains the same." *Rodriguez v. Coca Cola Refreshments USA, Inc.*, No. 12-CV-234, 2013 WL 5230037, at *3 (E.D.N.Y. Sept. 16, 2013) (collecting cases); *see Potash v. Fla. Union Free Sch. Dist.*, 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013) ("Changes in assignments or responsibilities that do not radically change the nature of work are not typically adverse employment actions.") But "[a] change in duties or job reassignment may be an adverse employment action, if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Edwards v. Huntington Union Free Sch. Dist.*, 957 F. Supp. 2d 203, 211 (E.D.N.Y. 2013). "A plaintiff can make such a showing by demonstrating that the new assignment was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Id.* But unfair work assignments or undesirable duties, absent negative ramifications for employment status, do not rise to the required level. *Grant v. N.Y. State Off. for People with Developmental Disabilities*, No. 12-CV-4729, 2013 WL 3973168, at *7 (E.D.N.Y. July 30, 2013). Nor does being berated or embarrassed by a supervisor. *Voss v. McDonough*, No. 17-CV-9015, 2021 WL 4199941, at *10, *17 (S.D.N.Y. Sept. 15, 2021); *see Stewart v. City of N.Y.*, No. 18-CV-7140, 2022 WL 4485048, at *5 (E.D.N.Y. Sept. 27, 2022) (reprimands, admonishments, and other actions causing embarrassment and anxiety are not adverse actions where they result in no tangible employment consequences).

**\*7** Disapproval of trip requests and assignment of "difficult" students do not involve a guaranteed employment benefit or a term or condition of employment, such that the denial amounted to a material adverse action. *See Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (unfair criticism, unfavorable schedules, or undesirable work assignments do not rise to level of adverse employment actions because they do not have material impact on terms and conditions of employment). Nor does Plaintiff allege that teaching "difficult" students was outside her job responsibilities, *see Rodriguez*, 2013 WL 5230037, at *3 ("[I]t is well established that assignments that are part of an employee's normal responsibilities are not "adverse employment actions" where, as here, the rate of pay and benefits remains the same."), or "so significant as to constitute a setback to the plaintiff's career," *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000). At most, what Plaintiff describes can be characterized as "mere inconvenience," which is not enough to constitute an adverse employment action. *Brown*, 673 F.3d at 150. [6]

Therefore, Plaintiff's § 1981 discrimination claim is dismissed.

### b. Title VI Claim

Section 601 of Title VI of the Civil Rights Act of 1964 provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. For the same reasons described above, Plaintiff has not made out a plausible discrimination claim. She has provided only conclusions, not facts, to support the notion that her race resulted in any discrimination. But her Title VI claim must also be dismissed for independent reasons.

To begin, Title VI does not provide for individual liability, *see Bayon v. State Univ. of N.Y. at Buffalo*, No. 98-CV-578, 2001 WL 135817, at *2 (W.D.N.Y. Feb. 15, 2001), so any Title VI claim against Defendants Quezada and Delany in their individual capacities would have to be dismissed. Further, "covered entities can only be sued for employment discrimination [under Title VI] 'where a primary objective of the Federal financial assistance ... is to provide employment.' " *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1531 (10th Cir. 1995) (quoting 42 U.S.C. § 2000d-3). Thus, "for a claimant to recover under Title VI against an employer for discriminatory employment practices, a threshold requirement is that the employer be the recipient of federal funds aimed primarily at providing employment." *Ass'n Against Discrimination in Emp., Inc. ("AADE") v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981); *see Sulehria v. New York*, No. 13-CV-6990, 2014 WL 4716084, at *5 (S.D.N.Y. Sept. 19, 2014) ("To state a claim under Title VI, a plaintiff must plausibly allege ... that the federal funds have been made available primarily for providing employment."). "This section essentially requires a logical nexus between the use of federal funds and the practice toward which the action is directed." *Johnson v. County of Nassau*, 411 F. Supp. 2d 171, 175 (E.D.N.Y. 2006).

Plaintiff has not alleged, even in conclusory fashion (which in any event would not suffice), that the federal funds received by YPS were primarily intended to provide employment. *See*

*Gilmore v. Univ. of Rochester*, 410 F. Supp. 2d 127, 132 (W.D.N.Y. 2006) (Title VI claim dismissed where complaint alleged only that defendant received federal funds, not that the funds were primarily intended to provide employment. The AC alleges that "[a]ll Defendants in this matter, in some form or another, receive financial benefits that can be traced back to Federal spending," (AC ¶ 76), but that is not enough to show that any federal funds were primarily intended to provide employment. *Verdi v. City of N.Y.*, 306 F. Supp. 3d 532, 546 (S.D.N.Y. 2018) (Title VI claim dismissed because the "allegations regarding federal funding are bare and conclusory and do not describe the federal funding the DOE received, let alone link that funding to the students whose discrimination was the subject of Plaintiff's complaints"). Plaintiff thus has not plausibly alleged any "logical nexus between the use of federal funds and the practice toward which agency action is directed." *AADE*, 647 F.2d at 276; *see Dobroff v. Hempstead Union Free Sch. Dist.*, No. 21-CV-1567, 2022 WL 4641128, at *5 (E.D.N.Y. Sept. 30, 2022).[7]

**\*8** Plaintiff's Title VI claim is therefore dismissed.

### 5. Conspiracy Claim Under Section 42 U.S.C. § 1985(3)

To state a claim under § 1985(3), a plaintiff must show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Dolan v. Connolly*, 794 F.3d 290, 296 (2d Cir. 2015); *see* 42 U.S.C. § 1985(c). "[T]o maintain an action under Section 1985, a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003). Here, Plaintiff has provided no more than a conclusory allegation of conspiracy, stating, "Under the premises Defendants' conduct violated Plaintiff's rights .... [W]e have such conspiracies by Defendants to violate Plaintiff's constitutional rights." (AC ¶¶ 40, 42.) On this basis alone, Plaintiff's conspiracy must be dismissed for

failure to state a claim. *See Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper). That Plaintiff's conclusory allegations are aimed at Defendants "collectively" does not, as Plaintiff argues in her opposition, render it plausible that Defendants acted as a collective and "with one objective in mind." (*See* P's Opp. at 8.)

Defendants also argue that Plaintiff's conspiracy claim fails because she does not show that racial animus motivated Defendants' claimed conspiracy. (Ds' Mem. at 10-11.) To plead a § 1985(3) claim, "[t]he conspiracy must also be 'motivated by some racial or perhaps otherwise class-based, invidious discriminatory animus.' " *Dolan*, 794 F.3d at 296 (quoting *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 791 (2d Cir. 2007)). The AC does not explicitly allege any race-based motivation for her conspiracy claim, and – as discussed above – barely mentions facts related to race. Even in her opposition, Plaintiff simply states that she has adequately shown that Defendants acted in concert toward her, (P's Opp. at 8), with no effort to describe any such actions or connect them to race.

Moreover, even if a sufficient connection to race were pleaded, the AC (as discussed) provides facts only against Delany, and she cannot conspire with herself. *See Jianjun Li v. Vill. of Saddle Rock*, No. 22-CV-2289, 2021 WL 1193618, at *10 (E.D.N.Y. Mar. 30, 2021); *Heinfling v. Colapinto*, 946 F. Supp. 260, 266-67 (S.D.N.Y. 1996). Finally, even if Plaintiff had pleaded facts as to Quezada, her claim would be barred by the intracorporate conspiracy doctrine. Under this doctrine, "officers, agents and employees of a single corporate entity are legally incapable of conspiring together." *Quinn v. Nassau Cnty. Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999) (applying doctrine in § 1985(3) context).[8]

**\*9** For all these reasons, the § 1985(3) conspiracy claim is dismissed.

### 6. Retaliation

Plaintiff brings a "workplace retaliation" claim, alleging Defendants retaliated against her after she reported a

potential instance of child abuse in 2016-2017. (AC ¶¶ 64-66.) She claims that after she reported the incident, Defendants harassed her by keeping her from leaving her classroom; verbally, mentally, and emotionally abused her; and obstructed her ability to apply for and get a higher-level administrative position. (*Id.* ¶¶ 67-74.)

As an initial matter, Plaintiff's retaliation claim is pleaded without specifying the statute under which it is brought. Defendants analyze it as a claim under § 1983 for retaliation for opposition to a discriminatory employment practice, and note that such a claim is analyzed under the same standards as a retaliation claim under Title VII. (Ds' Mem. at 12-14); *see Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). In her opposition, Plaintiff seems to concur, citing Title VII standards. (P's Opp. at 5). Accordingly, Plaintiff's retaliation claim can only be brought against Defendant Delany, for the reasons stated above. "[F]or a retaliation claim under § 1983 to survive a ... motion to dismiss, the plaintiff must plausibly allege that: (1) defendants acted under the color of state law, (2) defendants took adverse employment action against h[er], (3) because [s]he complained of or otherwise opposed discrimination." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 91 (2d Cir. 2015). "That is, [Plaintiff] must plead (1) engagement in opposition to an unlawful employment practice; (2) an adverse employment action; and (3) factual matter rendering plausible an inference of causation between her protected activity and the adverse employment action." *Ray v. N.Y. State Ins. Fund*, 2018 WL 3475467, at *9 (S.D.N.Y. July 18, 2018). "[T]o establish participation in a protected activity, a plaintiff is required to show not an actual violation of the act, but only that he was acting under a good faith, reasonable belief that such a violation existed." *Grant v. Hazelett Strip-Casting Corp.*, 880 F.2d 1564, 1569 (2d Cir. 1989). "Moreover, the employer must be able to reasonably understand that the complaint was directed at conduct prohibited by Title VII." *Bamba v. Fenton*, 758 F. App'x 8, 12-13 (2d Cir. 2018) (summary order).

Plaintiff's claim fails. First, Plaintiff alleges she reported a suspected incident of child abuse in 2016-2017, which is outside of three-year statute of limitations period. *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015) ("Section 1983 actions in New York are subject to a three-year statute of limitations."). Thus any alleged retaliatory activity that occurred prior to August 31, 2018 is time-barred. Even

assuming that at least some of the retaliatory activity occurred after this date [9] – and if it did, it is hard to see how it could be connected to the protected activity, *see Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (To establish causation based on temporal proximity, period between protected activity and adverse action must be "very close.") – Plaintiff's claim fails because she does not plead a sufficient protected activity. Protected activity is complaining about or otherwise opposing discrimination. *Vega*, 801 F.3d at 91; *see Littlejohn v. City of N.Y.*, 795 F.3d 297, 316-17 (2d Cir. 2015). Here, Plaintiff does not allege that she complained about unlawful discrimination; rather, she reported a potential incident of child abuse. [10] Plaintiff does not even allege, let alone plausibly show, that she had a good faith reasonable belief that she was opposing an employment practice that is outlawed by federal law, or that there was any way her employer could have understood her report as such.

**\*10** Therefore, Plaintiff's retaliation claim must also be dismissed.

### 7. Hostile Work Environment

Plaintiff also alleges a hostile work environment claim, and as with her retaliation claim, does not state under which statutory scheme she intends this claim to fall, but I will assume she meant to invoke a race-based or gender-based § 1981 or § 1983 claim.

"To establish a hostile work environment under Title VII, § 1981, or § 1983, a plaintiff must show that the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Littlejohn*, 795 F.3d at 320-21. Courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 321. Plaintiff must come forward with "evidence not only that [she] subjectively perceived the environment to be hostile or abusive," but also that an objectively reasonable employee would perceive it to be so. *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir.

2003); *see* *Dawson v. County of Westchester*, 351 F. Supp. 2d 176, 186 (S.D.N.Y. 2004). Furthermore, "[a] plaintiff must also demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).

Plaintiff alleges that from 2009 to 2019, Defendants, "collectively and individually," created a hostile work environment by publicly belittling and humiliating her, (AC ¶¶ 18-19; *see id.* ¶ 45), but because no details about this alleged abuse are provided, it is impossible to conclude that an objectively reasonable employee would plausibly view it as severe or pervasive. She also specifies that: (1) from 2012 to 2019, Delany reassigned difficult students back to Plaintiff's classroom as punishment for Plaintiff speaking out, at an unspecified time, about removal of aides, (*id.* ¶¶ 46-47) [11] ; (2) from 2010 through 2019, Delany reprimanded Plaintiff without cause, (*id.* ¶ 48); (3) from 2013 to 2019, Delany tampered with Plaintiff's evaluations in an unspecified way, (*id.* ¶¶ 49, 55); (4) from 2009 through 2019, Delany ordered Plaintiff to take on students "outside her teaching grade group," train staff members for positions she did not hold, and work with staff members against whom Plaintiff had filed complaints, (*id.* ¶ 50); (5) at an unspecified time, Delany did not provide Plaintiff with information about students' assessments and performances, (*id.* ¶ 52); (6) throughout Plaintiff's entire tenure, Delany divulged unspecified sensitive information about Plaintiff, (*id.* ¶ 53); and (7) at an unspecified time, Delany directed support staff to not schedule Plaintiff for meetings with administrators, (*id.* ¶ 54).

 **\*11** Without more detail, it is dubious whether these alleged events, over a ten-year period, are plausibly objectively severe or pervasive enough to constitute a hostile work environment. But regardless, Plaintiff plainly fails to show how any of these allegations, singularly or in the aggregate, occurred because of her membership in a protected class. Even in her opposition, Plaintiff addresses only whether the environment was sufficiently hostile, and makes no effort to suggest, let alone point to facts that support, that the hostility arose because she is Black and/or female. Allegations of unfair treatment directed at a member of a protected class do not establish a claim absent a basis to conclude that unfair treatment arose because of the victim's membership in that class. *See* *Grillo v. N.Y.C. Transit Auth.*, 291 F.3d 231, 235 (2d Cir. 2002) ("Even if [plaintiff's] highly dubious claim that he was unfairly singled out for punishment by the instructors

is credited, [plaintiff] has done little more than cite to his alleged mistreatment and ask the court to conclude that it must have been related to his race."); *Varghese v. Mount Sinai Med. Ctr.*, No. 12-CV-8812, 2015 WL 1499618, at \*42 (S.D.N.Y. Mar. 27, 2015) ("fallacy" for plaintiff to say: "I belong to a protected class; something bad happened to me at work; therefore, it must have occurred because I belong to a protected class"); *Rissman v. Chertoff*, No. 08-CV-7352, 2008 WL 5191394, at \*4 (S.D.N.Y. Dec. 12, 2008) ("In essence, plaintiff alleges that because he was yelled at [by his supervisors], this must have been because [of his protected status]. Such conclusory and speculative statements are insufficient.").

> Unfortunately, the term "hostile work environment" has been interpreted by some in the general public to refer to workplaces with abusive bosses, bullying, cutthroat competition, nastiness, or unfairness. While those workplaces may be hostile in the colloquial sense, they do not violate the law unless they are that way because of an employee's protected characteristic.

*Estevez v. Berkeley Coll.*, No. 18-CV-10350, 2021 WL 3115452, at \*19 n.21 (S.D.N.Y. July 19, 2021), *aff'd*, No. 21-1988, 2022 WL 16843460 (2d Cir. Nov. 10, 2022).

Accordingly, Plaintiff's hostile work environment claim is also dismissed.

### B. State Law Claims

Defendants argue that Plaintiff's state law claims for assault and defamation must be dismissed because Plaintiff did not file a notice of claim, as required by N.Y. Educ. Law. § 3813, and they are time-barred, given that state law claims brought against a school district or its employees are subject to a one-year statute of limitation. (Ds' Mem. at 15-17.) Plaintiff did not address her state law claims in her opposition, and as a result, those claims are deemed abandoned and dismissed.

### C. Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." 🚩Kim v. Kimm, 884 F.3d 98, 105 (2d Cir. 2018). "Leave to amend, though liberally granted, may properly be denied" for " 'repeated failure to cure deficiencies by amendments previously allowed' " or " 'futility of amendment,' " among other reasons. 🚩Ruotolo v. City of N.Y., 514 F.3d 184, 191 (2d Cir. 2008) (quoting 🚩Foman v. Davis, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended, after having the benefit of a pre-motion letter from Defendants outlining the proposed grounds for dismissal, (ECF No. 8), and the discussion at the February 23, 2022 pre-motion conference, (see Minute Entry dated Feb. 23, 2022). In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided notice of them, is alone sufficient ground to deny leave to amend. See 🚩Nat'l Credit Union Admin. Bd. v. U.S. Bank Nat'l Ass'n, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was aware of the deficiencies in his complaint when he first amended, he clearly has no right to a second amendment even if the proposed second amended complaint in fact cures the defects of the first. Simply put, a busy district court need not allow itself to be imposed upon by the presentation of theories seriatim."); 🚩In re Eaton Vance Mut. Funds Fee Litig., 380 F. Supp.2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), aff'd sub nom. 🚩Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007) (per curiam) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.").

**\*12** Moreover, Plaintiff has not asked to amend or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion. See 🚩TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); Gallop v. Cheney, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); Horoshko v. Citibank, N.A., 373 F.3d 248, 249-50 (2d Cir. 2004) (per curiam) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (ECF No. 25), and close the case.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 137775

---

### Footnotes

1    Defendants state, and Plaintiff does not dispute, that Cesar E. Chavez School – erroneously named as "Cesar E. Chaves Elementary School" in the initial Complaint, (ECF No. 1 ("IC")), and Amended Complaint, (ECF No. 11 ("AC")) – is within YPS and therefore not a separate legal entity. (ECF No. 26 ("Ds' Mem.") at 1 n.1.)

2    At the pre-motion conference, Plaintiff's counsel had no explanation for why he had served Defendants with an unsigned, unsealed "summons" that had not been issued by the Court, but in the interest of resolving the claims on the merits, I extended Plaintiff's time to serve to 21 days after the filing of the AC.

3 Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

4 Plaintiff's counsel acknowledges that *Twombly* and *Iqbal* are more recent than 🚩 *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), yet seems to rely on *Conley*'s statement that dismissal is not warranted unless it is apparent that Plaintiff can prove no set of facts that would entitle it to relief. (ECF No. 27 ("P's Opp.") at 9.)

 *Conley*'s "no set of facts" standard, however, was "retire[d]" by the Supreme Court in 🏷 *Twombly*, 550 U.S. at 562-63, and the applicable standard is now one of plausibility, *see* 🏷 *Iqbal*, 556 U.S. at 678; 🏷 *Twombly*, 550 U.S. at 570. No attorney should be citing to or relying on the "no set of facts" standard over a decade after it has been overruled.

5 The fifth claim in the AC is captioned "Title VII of the Civil Rights Act of 1964, 🏷 42 U.S.C. § 2000d et seq." (AC at 15.) This caption is puzzling, because 🏷 § 2000d is Title VI of the Civil Rights Act, whereas Title VII is § 2000e. It is even more puzzling because I specifically told Plaintiff's counsel at the pre-motion conference to make clear under which Title Plaintiff was bringing her claim. "Title VI prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin." 🏷 *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 664 (2d Cir. 2012). Because Plaintiff in her fifth claim alleges that Defendants receive federal funds, (AC ¶ 76), and because at the pre-motion conference Defendants represented that no administrative complaint had been filed, as would be required for a Title VII claim, I conclude that Plaintiff means to assert a Title VI claim.

6 To the extent Plaintiff wishes to bring discrimination claims based on gender, those claims also fail. Gender is not a protected class under 🏷 § 1981. 🏷 *Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) ("🏷 Section 1981 does not prohibit discrimination on the basis of gender or religion, national origin, or age.") More fundamentally, the AC is devoid of any facts even faintly suggesting that Defendants discriminated on the basis of her gender. The same is true as to Plaintiff's religion (which she does not describe) and veteran status.

7 In addition, as Defendants point out, (ECF No. 28 "Ds' Reply") at 4-5), Plaintiff does not address this argument in her opposition, and thus has abandoned her Title VI claim.

8 "There is a 'personal interest' or 'personal stake' exception to the intracorporate conspiracy doctrine, however, which permits a 🏷 § 1985 claim where there are individuals who are 'motivated by an independent personal stake in achieving the corporation's objective.' " *Salgado v. City of N.Y.*, No. 00-CV-3667, 2001 WL 290051, at *8 (S.D.N.Y. Mar. 26, 2001) (quoting 🏷 *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71-72 (2d Cir. 1976)). Plaintiff does not allege that any such exception applies, and courts in this district have held that personal bias, by itself, is insufficient to defeat the intracorporate conspiracy doctrine. *See Salgado*, 2001 WL 290051, at *9 (officer defendants' derogatory remarks about plaintiff's sexual orientation were insufficient to properly allege "personal interest" exception to intracorporate conspiracy doctrine); 🏷 *Johnson v. Nyack Hosp.*, 954 F. Supp. 717, 723 (S.D.N.Y. 1997) ("[P]ersonal bias is not the sort of individual interest that takes a defendant out of the intraenterprise conspiracy doctrine," or else the exception would swallow the rule.).

9 The AC states that the directive to remain in her classroom (if indeed that is what Plaintiff was told, as opposed to being required to stay in her room except for her free periods) followed "[s]oon after" the report, (AC ¶¶ 67-69), and that the verbal abuse "intensified" after the report, (*id.* ¶¶ 67, 72). But it also says that Delany "increased" her abuse "[s]tarting in 2009 and running through 2019," (*id.* ¶ 71), and that Delany blackballed Plaintiff "[s]tarting in 2014 and running through 2019," (*id.* ¶ 73). It is hard to see how mistreatment after

August 31, 2018 – which by Plaintiff's account was the continuation of years of increasing abuse – could be attributable to the protected activity. *See Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013) ("It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff engaged in protected activity."), *aff'd*, 641 F. App'x 60 (2d Cir. 2016) (summary order).

10  To the extent Plaintiff meant to advance a claim of retaliation under ⚑ New York Social Services Law § 413(c) and ⚑ New York Labor Law § 740 – and she makes no such suggestion in her opposition – it would be even further outside the statute of limitations, *see Lomonoco v. Anne*, No. 15-CV-1163, 2016 WL 4402029, at *6 (N.D.N.Y. Aug. 18, 2016) (no private right of action under N.Y. Social Services Law so Plaintiff must bring action under ⚑ N.Y. Labor Law § 740) (collecting cases); *Geldzahler v. N.Y. Med. Coll.*, 746 F. Supp. 2d 618, 630 (S.D.N.Y. 2010) ("The statute of limitations for bringing an action under ⚑ Section 740 is one year after the alleged retaliatory action was taken"), and would fail for the same reasons as her other state-law claims, as discussed below. Plaintiff plainly did not intend to advance a claim of First Amendment retaliation, as her IC contained such claims, (IC at 8, 11-12), and they were removed in the AC.

11  To the extent this allegation could be interpreted as advancing a claim that the hostile work environment was retaliation for this protest, it would fail for two reasons. First, as set forth in note 11 above, Plaintiff withdrew her First Amendment claims. Second, when teachers complain internally about their work conditions, they are speaking as employees, not citizens, and their speech does not constitute protected activity that can support a retaliation claim. *See, e.g.*, *Brooke v. County of Rockland*, No. 21-598-CV, 2022 WL 6585350, at *3-4 (2d Cir. Oct. 11, 2022); ⚑ *Weintraub v. Bd. of Educ.*, 593 F.3d 196, 203 (2d Cir. 2010); *Geer v. Gates Chili Cent. Sch. Dist.*, 577 F. Supp. 3d 147, 177 (W.D.N.Y. 2021).

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 132 of 142

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,
v.
SYRACUSE POLICE
DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

*1 This is a civil rights action brought by *pro se* plaintiff Jeramie White, a New York State prison inmate, pursuant to 42 U.S.C. § 1983, against the Syracuse Police Department ("SPD") and five of its officers. In his complaint, plaintiff alleges that defendants violated his constitutional rights during the course of his arrest on February 13, 2017. Plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP") have been referred to me for review. Based upon my consideration of those materials, I will (1) grant plaintiff's amended IFP application, (2) recommend dismissal of his claim against the SPD with leave to replead, and (3) recommend that his complaint otherwise be accepted for filing.

I. BACKGROUND
Plaintiff commenced this action on or about December 20, 2018. Dkt. No. 1. According to plaintiff, he and two friends were on their way to play indoor basketball when their vehicle was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at 4. Plaintiff alleges that after the stop, defendant William Kittle forcibly removed White from the vehicle and that Kittle, in addition to defendants Abraham Mamoun and Shawn Hauck, proceeded to use excessive force against him during the course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No. 1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda

and Fiorini were present and had an obligation to intervene and prevent the unlawful use of force, but failed to do so. *Id.* at 5, 7.

Plaintiff was ultimately arrested and charged with resisting arrest, in violation of N.Y. Penal Law § 205.30, and second-degree obstruction of governmental administration, in violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As relief, plaintiff seeks compensatory and punitive damages in the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]
When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). A court is authorized, however, to permit a litigant to proceed IFP if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). [2] Because I conclude that plaintiff meets the requirements for IFP status, his amended application for leave to proceed without prepayment of fees is granted. [3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

*2 Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 133 of 142

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' "

*Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

## 2. Analysis of Plaintiff's Claims

**\*3** Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and

Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also* Edrei v. Maguire, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure. [4]

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." Branham v. Clark, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also* Mathon v. Marine Midland Bank, N.A., 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000); *see also* Cortec Indus. Inc. v. Sum Holding L.P., 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." Ruffolo v. Oppenheimer & Co., 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters,* No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts

that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See* Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

**\*4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 135 of 142

to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 🚩 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 🚩 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; 🚩 *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

---

## Footnotes

1    Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2    The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 🚩 28 U.S.C. § 1915(b)(3).

3    Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4    The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5    If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through
Barbara McGREGOR, as Administratrix of
the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel,
Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq.,
Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel,
Utica, NY, for the Defendants.

***MEMORANDUM–DECISION AND ORDER***

GARY L. SHARPE, Chief Judge.

**I. *Introduction***

**\*1** Plaintiff Kylie Ann Turczyn, deceased, by and through
Barbara McGregor, as administratrix of the estate of Kylie
Ann Turczyn, commenced this action against defendants
City of Utica, City of Utica Police Dept., and Elizabeth
Shanley alleging substantive due process claims pursuant to
42 U.S.C. § 1983 and separate state law causes of action.
(Am.Compl., Dkt. No. 12.) Pending is defendants' motion
to dismiss for failure to state a claim. (Dkt. No. 19.) For the
reasons that follow, the motion is granted in part and denied
in part.

**II. *Background***

**A. *Facts*** [1]
Shanley, an Oneida County domestic violence investigator,
was at all relevant times assigned by the Police Department to

accomplish the goals of reducing "occurrence[s] of domestic
violence by increasing reporting and by identifying and
tracking repeat victims and/or offenders," and "increas[ing]
victims' access to supportive services by encouraging [them]
to report their abuse, thereby increasing arrest rates for
domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012,
Thomas Anderson, Turczyn's former boyfriend and the father
of her daughter, broke into Turczyn's home armed with a 9
mm rifle. (*Id.* ¶ 11) Anderson repeatedly shot Turczyn, taking
her life in view of their four-year-old daughter, G.T. (*Id.*)
Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn
made between five and ten complaints to Utica police
officers, "including informing them of a specific threat by
Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told
Shanley "that Anderson was armed and had threatened to
kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic
violence between Turczyn and Anderson, neither Shanley,
New York State Police, nor Utica Police took any steps to
arrest Anderson, investigate Turczyn's complaints, or follow-
up with Anderson "as is the policy and protocol of the
domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of
protection, which she attempted to do, but was told by an
unknown person at the Oneida County Family Court to return
the following day because the court was " 'too busy.' " (*Id.*
¶¶ 15–16.) The following day, Turczyn left a voice message
for Shanley, explaining that she was unable to obtain an order
of protection and that Anderson had a gun and planned to
kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge,
"Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly
believed that Turczyn's issues with Anderson were outside of
the purview of Utica Police and should, instead, be dealt with
by New York State Police; however, "she did not inform any
other police agency or take any action herself." (*Id.* ¶¶ 18, 19,
20.)

**B. *Procedural History***
Turczyn commenced this action by filing a complaint on
October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved
to dismiss, (Dkt. No. 10.) In response, Turczyn filed an
amended complaint as of right, which is now the operative
pleading. (*See generally* Am. Compl.) In her amended
complaint, Turczyn alleges the following causes of action:
(1) a denial of substantive due process rights under the Fifth
and Fourteenth Amendments due to deliberate indifference;

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 137 of 142

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

(2) a *Monell* [2] claim against the City; (3) negligence; (4) a "derivative abandon" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

**\*2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in 🚩 *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

#### A. *Preliminary Matters*

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendant causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendant state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at \*6 (N.D.N.Y. May 22, 2014) (internal quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

**\*3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at \*3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting 🚩 *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19,

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 138 of 142

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

**B.** *Rule 8*

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason, 160 F.3d 858, 872 (2d Cir.1998)* ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

**C.** *Rule 12(b)(6)*

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

**\*4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to

protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989),* potentially applies in this case. That exception imposes liability for failure to protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't, 577 F.3d 415, 428 (2d Cir.2009)* (internal quotation marks and citation omitted); *see Pena v. DePrisco, 432 F.3d 98, 110 (2d Cir.2005).* "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin, 577 F.3d at 428* (quoting *Dwares v. City of N.Y., 985 F.2d 94, 99 (2d Cir.1993)*). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id. at 428–29* (quoting *Pena, 432 F.3d at 111*)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id. at 429.*

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id. at 431* (quoting *Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).* A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis, 523 U.S. at 850*). Accordingly, the inquiry is highly fact specific.

Case 3:22-cv-00977-BKS-ML    Document 35    Filed 09/15/23    Page 139 of 142

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under *§ 1983* attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

**\*5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not

the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for *§ 1983* liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

**\*6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See* ⚠️ *Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at \*10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y.,* No. 12–CV–6151, 2014 WL 1224257, at \*13 (E.D.N.Y. Mar. 24, 2014).

## V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby **DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

## Footnotes

1    The facts are presented in the light most favorable to plaintiff.

2    *See* 🚩 *Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3    In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." 🚩 *Okin,* 577 F.3d at 428.

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE DEPARTMENT; Abraham
Mamoun, Syracuse Police Dept.; William Kittle,
Syracuse Police Dept.; Shawn Hauck, Syracuse
Police Dept.; Altimonda, Syracuse Police Dept.;
and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga
Correctional Facility, P.O. Box 1186, Moravia, New York
13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Jeramie White ("Plaintiff") against the
Syracuse Police Department and five of its employees
("Defendants"), is United States Magistrate Judge David
E. Peebles' Report-Recommendation recommending that (1)
Plaintiff's Complaint be accepted for filing by the Court
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini, and (2) Plaintiff's remaining cause of action against
the Syracuse Police Department be dismissed with leave to
replead within thirty days of the issuance of an Order adopting
the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not
submit an objection to the Report-Recommendation, and the
deadline by which to do so has expired. (*See generally* Docket
Sheet.)[1]

Based upon a review of this matter, the Court can find
no clear error in the Report-Recommendation:[2] Magistrate
Judge Peebles employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. As a result, the Court accepts and adopts the Report-
Recommendation for the reasons stated therein; Plaintiff's
Complaint is accepted for filing with respect to his Fourth
Amendment cause of action against Defendants Mamoun,
Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's
remaining cause of action against the Syracuse Police
Department is dismissed with leave to replead within thirty
days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-
Recommendation (Dkt. No. 9) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini; and it is further

**\*2 ORDERED** that Plaintiff's remaining cause of action
against the Syracuse Police Department is **DISMISSED with
leave to replead within THIRTY (30) DAYS** of the issuance
of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended
Complaint within the above-referenced thirty-day period, it
shall be referred to Magistrate Judge Peebles for review; and
it is further

**ORDERED** that, in the event Plaintiff does not file an
Amended Complaint within the above-referenced thirty-
day period, this action shall move forward with respect to
his Fourth Amendment cause of action against Defendants
Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk
of the Court is directed to issue summonses and USM-285
forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

## Footnotes

1    The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review
     Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter,
     the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a
     written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing
     regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of
     Objection to the Report-Recommendation.

2    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to
     only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing
     such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record
     in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at
     *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's]
     report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal
     quotation marks omitted).

**End of Document**                                       © 2023 Thomson Reuters. No claim to original U.S. Government Works.